# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

| | |
|---|---|
| JAMI CLAIRE and KATHRYN LANE,<br><br>      Plaintiffs,<br><br>    v.<br><br>FLORIDA DEPARTMENT OF MANAGEMENT SERVICES; JONATHAN SATTER, in his official capacity as Secretary of the Florida Department of Management Services; UNIVERSITY OF FLORIDA BOARD OF TRUSTEES; MORTEZA HOSSEINI, in his official capacity as Chair of the University of Florida Board of Trustees;  THOMAS KUNTZ, DAVID BRANDON, JAMES HEAVENER, LEONARD JOHNSON, MICHAEL MURPHY, DANIEL O'KEEFE, RAHUL PATEL, MARSHA POWERS, JASON ROSENBERG, ROBERT STERN, RAY THOMAS, and ANITA ZUCKER, in their official capacities as Members of the University of Florida Board of Trustees; and ANDY THOMAS, in his official capacity as Public Defender of the Second Judicial Circuit of Florida,<br><br>      Defendants. | Case No.:   4:20-cv-20 |

# COMPLAINT FOR DECLARATORY
# AND INJUNCTIVE RELIEF AND DAMAGES

## PRELIMINARY STATEMENT

1.      Plaintiffs Jami Claire ("Ms. Claire") and Kathryn Lane ("Ms. Lane") are employees of the State of Florida ("State"). As part of their compensation for employment, they receive employer-sponsored health insurance benefits that are solicited, chosen, and implemented by the State ("State Plans"). All of the State Plans, including those provided to Plaintiffs, explicitly exclude coverage of "gender reassignment or modification services or supplies" ("State Plan Exclusion"). Plaintiffs are transgender individuals who were, and who continue to be, denied coverage for medically necessary gender-affirming care (also referred to as "transition-related care") for gender dysphoria due to this categorical exclusion.

2.      Gender-affirming care is medically necessary treatment for gender dysphoria, a medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") and the International Classification of Diseases ("ICD-10"). The State Plan Exclusion contravenes the well-established medical consensus that such treatment can be medically necessary and life-saving.

3.      As a result of the State Plan Exclusion, Plaintiffs have been forced to forego medically necessary care for gender dysphoria. The

2

State Plans single out transgender employees, like Plaintiffs, for unequal treatment by categorically depriving them of coverage for gender-affirming care through the State Plan Exclusion. Other State employees who are not transgender do not face categorical exclusions barring coverage for medically necessary health care.

4.      The State's categorical exclusion of medically necessary gender-affirming care in all State Plans constitutes unlawful sex discrimination in violation of Title VII and the Equal Protection Clause. Plaintiffs bring this action for declaratory and injunctive relief and damages pursuant to 42 U.S.C. § 2000e and 42 U.S.C. § 1983, for past and ongoing injury to their rights.

## JURISDICTION

5.      This action arises under 42 U.S.C. § 1983 and Title VII, 42 U.S.C. § 2000e.

6.      This Court has jurisdiction over Plaintiffs' claims pursuant to 42 U.S.C. § 2000e-5(f)(3) (Title VII); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1343(a)(3), & (4) (civil rights); and 28 U.S.C. §§ 2201 & 2202 (declaratory judgment).

## **VENUE**

7.     Venue is proper in the Northern District of Florida under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b). Plaintiffs reside, Defendants reside, and all of the acts or omissions complained of herein occurred and will continue to occur in the Northern District of Florida. Venue is proper in the Tallahassee Division of the Northern District of Florida under N.D. Fla. Loc. R. 3.3 because it is where at least three of the Defendants and one of the Plaintiffs reside and where a substantial portion of the acts or omissions complained of herein occurred.

## **PLAINTIFFS**

8.     Ms. Claire resides in Trenton, Florida. She is a 62-year-old transgender woman. For 32 years, Ms. Claire has been a dedicated employee of the University of Florida, a component of the State's government. She works as a Senior Biological Scientist in the College of Veterinary Medicine. At all relevant times, Ms. Claire has been an employee of the University of Florida. The University of Florida's employees are State employees. As a State employee, Ms. Claire receives an employer-sponsored health plan through the State as part of the "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1).

9.     Ms. Lane resides in Tallahassee, Florida. She is a 39-year-old transgender woman. Ms. Lane is a licensed attorney, working within the appellate division of the Office of the Public Defender in the Second Judicial Circuit of Florida in Tallahassee, a component of the State's government. At all relevant times, Ms. Lane was an employee of the Office of the Public Defender. The Office of the Public Defender's employees are State employees. As a State employee, Ms. Lane receives an employer-sponsored health plan through the State as part of the "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1).

## DEFENDANTS

10.     Ms. Claire and Ms. Lane sue defendant Florida Department of Management Services ("Department"), an agency of the State's government. The Division of State Group Insurance is within the Department of Management Services. The Department creates the requirements for the State Plans offered to State employees and is an employer within the meaning of Title VII.  The Department determines components of State employees' specific "compensation, terms, conditions, or privileges of employment[,]" 42 U.S.C. § 2000e-2(a)(1),

when it establishes the scope of health insurance coverage for State employees.

11.   Ms. Claire and Ms. Lane sue defendant Jonathan Satter in his official capacity as Secretary of the Florida Department of Management Services, an agency of the State's government. As Secretary, Satter is the head of the Department. § 20.22, Fla. Stat. (2019).

12.   Ms. Claire sues defendant University of Florida Board of Trustees ("Board of Trustees"). The Board of Trustees governs and oversees the operations of the University of Florida and is an employer within the meaning of Title VII. The University of Florida is a public university in the State university system. The Board of Trustees is a corporate body with the ability to sue and be sued. § 1001.72, Fla. Stat. (2019). The Board of Trustees' established powers and duties include controlling certain terms and conditions of employment for the University's employees. For example, it sets compensation and employee benefits, which include providing healthcare coverage to University of Florida employees – including Ms. Claire – through State Plans solicited, chosen, and implemented by the Department.

13.   Ms. Claire sues defendant Moretza Hosseini, in his official capacity as Chair of the Board of Trustees, and defendants Thomas

Kuntz, David Brandon, James Heavener, Leonard Johnson, Michael Murphy, Daniel O'Keefe, Rahul Patel, Marsha Powers, Jason Rosenberg, Robert Stern, Ray Thomas, Anita Zucker, in their official capacities as Board of Trustees members. As Board of Trustees members, they carry out all lawful functions permitted by the Board's Bylaws, its Operating Procedures, Board of Governors regulations, or other law. These functions include setting compensation and other conditions of employment, including benefits. Board of Governors Regulation 1.001.

14.    Ms. Lane sues defendant Andy Thomas in his official capacity as Public Defender of the Second Judicial Circuit of Florida. Defendant Thomas controls certain terms and conditions of Ms. Lane's employment and is an employer within the meaning of Title VII.

15.    At all times relevant to this Complaint, defendants acted under color of state law and knew, or should have known, of the policies, practices, acts, or omissions alleged herein.

## FACTUAL ALLEGATIONS

### Transgender individuals and Gender Dysphoria

16.    "Sex assigned at birth" refers to the concept that in our society, sex is typically assigned at birth based on the appearance of external genitalia.

17.    "Gender identity" is a well-established medical concept referring to one's sense of belonging to a particular gender. Typically, people who are designated female at birth based on their external anatomy identify as girls or women, and people who are designated male at birth identify as boys or men. For transgender individuals, however, the sense of one's self—one's gender identity—differs from the sex assigned to them at birth.

18.    All human beings have a gender identity.

19.    "Gender expression" is the outward manifestation of one's gender identity.

20.    "Transgender" is an umbrella term for persons whose gender identity or gender expression does not conform to that typically associated with the sex to which they were assigned at birth.

21.    Transgender men are men who were assigned "female" at birth but have a male gender identity. Transgender women are women who were assigned "male" at birth but have a female gender identity.

22.    The medical diagnosis for the feeling of incongruence between one's gender identity and one's sex assigned at birth, and the resulting distress caused by that incongruence, is called "gender dysphoria." Gender dysphoria is a medical condition codified in the DSM-5 (§ 302.85) and the ICD-10.

23.    Gender dysphoria is a serious, but treatable, medical condition. Left untreated, it can lead to debilitating distress, depression, anxiety, impairment of function, substance use, self-surgery to alter one's genitals or secondary sex characteristics, self-injurious behavior, and even suicide.

24.    The American Medical Association, the American Psychiatric Association, the American Psychological Association, the American Counseling Association, the American Psychoanalytic Association, the American Academy of Child and Adolescent Psychiatry, the American Academy of Nursing, the American Academy of Pediatrics, the World Professional Association of Transgender Health, and many other leading medical organizations recognize the medical necessity of gender-affirming care for transgender people with gender dysphoria.

25.    The World Professional Association for Transgender Health ("WPATH") publishes the widely accepted standards of care for treating gender dysphoria. The WPATH Standards of Care have been recognized as authoritative standards of care by the leading medical organizations, the U.S. Department of Health and Human Services, and several federal courts.

26.    Under the WPATH standards, medically necessary treatment for gender dysphoria can include numerous steps to affirm one's gender identity and help an individual alleviate dysphoria by establishing physical, phenotypic, social, and expressive congruence with the transgender individual's gender identity. This treatment, often referred to as gender-affirming care, may include social transition (living and presenting oneself to the world in accordance with one's gender identity), counseling, hormone replacement therapy, and surgery (sometimes called gender-affirming surgery, gender-confirming surgery, sex-reassignment surgery, or gender corrective surgery).

27.    Gender-affirming surgery includes any surgical procedure to alter or adjust an individual's primary or secondary sex characteristics to align with their gender identity.

28.    Not all transgender individuals will need these medical interventions. Some transgender people may not experience gender dysphoria. But for other individuals, these are medically necessary procedures.

29.    When individuals diagnosed with gender dysphoria do not obtain competent and necessary treatment, serious and debilitating

psychological distress can occur, including depression, anxiety, self-harm, and suicidal ideation.

30.    Under the WPATH standards, treatment is based on the individualized needs of the person. Under each patient's treatment plan, the goal is to enable the individual to live all aspects of one's life consistent with their gender identity, thereby eliminating the distress associated with the incongruence.

31.    According to every major medical organization and the overwhelming consensus among medical experts, treatments for gender dysphoria, including surgical procedures, are effective, safe, and medically necessary for many transgender persons to alleviate their gender dysphoria.

32.    WPATH standards recognize that treatment for gender dysphoria is multimodal. Some transgender persons diagnosed with gender dysphoria require hormones, some may need to accord their expression and presentation with their gender, some may need surgical intervention, and some may need a combination of treatments.

33.    In the past, public and private insurance companies excluded coverage for gender-affirming care based on the misunderstanding that such treatments were cosmetic or experimental. Today, gender-affirming

care, including surgical care, is routinely covered by private insurance programs and the majority of Fortune 500 companies. More than 20 states explicitly cover gender-affirming care in their Medicaid plans, and 19 states and the District of Columbia prohibit the exclusion of gender-affirming care in private insurance policies.

34.    The American Medical Association, American Psychological Association, American Psychiatric Association, American College of Obstetricians and Gynecologists, and other leading medical organizations have issued policy statements and guidelines supporting healthcare coverage for gender-affirming care as medically necessary under contemporary standards of care.

35.    No major medical organization has taken the position that gender-affirming care cannot be medically necessary, nor has any such group supported bans on insurance coverage for gender-affirming care.

**The State Plans**

36.    The State of Florida offers health-insurance benefits to State employees and their dependents through the State Plans ("State Plans").

37.    By statute, the Department is responsible for purchasing health care for State employees under the State Plans, including developing requests for proposals or invitations to negotiate for State employee

health services, determining the provided healthcare benefits, and negotiating contracts for healthcare and healthcare administrative services. § 110.123(3)(c), Fla. Stat. (2019).

38.    Through the Department, the State contracts with private health maintenance organizations to provide employees with health care under the State Plans through the Department's procurement process.

39.    Aetna, AvMed, Capital Health Plan, and UnitedHealthCare solicited and were awarded contracts by the Department.  These insurers administer the State Plans.

40.    The Department awarded contracts to AvMed for Gilchrist County, which is where Ms. Claire resides, and to Capital Health Plan for Leon County, which is where Ms. Lane resides.

41.    As part of compensation for employment, the University of Florida Board of Trustees provides Ms. Claire with health care coverage through the State Plans selected by the Department and administered by AvMed.

42.    Although the Board of Trustees offers certain categories of employees at the University of Florida additional health care plan options, the Board of Trustees only offers the State Plans to some employees, including Ms. Claire.

43.    The Office of the Public Defender only offers its employees, including Ms. Lane, health care coverage through the State Plans.

**The State Plans' Exclusion of Gender-Affirming Care**

44.    On October 11, 2016, the Department issued an Invitation to Negotiate, soliciting private health maintenance organizations to offer 3-year contracts to administer State Plans ("Invitation to Negotiate").

45.    The Invitation to Negotiate established the defined scope of benefits to be offered under the State Plans and provided a categorical exclusion for "gender reassignment or modification services and supplies" ("State Plan Exclusion").

46.    Private health maintenance organizations were required to agree to administer the State Plans as outlined by the Department in the Invitation to Negotiate, including agreeing to the State Plan Exclusion.

47.    The Department retains the authority to modify the scope of benefits at any time.

48.    On April 18, 2017, the Department published a Notice of Intent to Award contracts with health maintenance organizations to administer the State Plans. Contracts were awarded to Aetna, AvMed, Capital Health Plan, and United Health Care.

49.    The Department intentionally solicited State Plans with categorical exclusions for medically necessary gender-affirming care.

50.    All of the State Plans solicited, chosen, and implemented by the Department for all State employees, including Plaintiffs, explicitly exclude coverage of "gender reassignment or modification services or supplies."

51.    State employees covered by State Plans receive health insurance coverage for other medically necessary care.

52.    Transgender individuals covered by State Plans do not receive health insurance coverage for gender-affirming care, although it is medically necessary, due to the State Plan Exclusion.

53.    The State establishes the terms, conditions, and criteria used in the determination of whether services are medically necessary.

54.    The State's definition of "medical necessity" for administration of State Plans, as provided in AvMed and CapitalHelath coverage booklets, is:

> The use of any appropriate medical treatment, service, equipment and/or supply as provided by a Hospital, skilled nursing facility, physician or other provider which is necessary for the diagnosis, care and/or treatment of a Health Plan Member's illness or injury, and which is:
> 1) Consistent with the symptom, diagnosis, and treatment of the Health Plan Member's condition;
> 2) The most appropriate level of supply and/or service for the diagnosis and treatment of the Health Plan Member's condition;

3) In accordance with standards of acceptable community practice;
4) Not primarily intended for the personal comfort or convenience of the Health Plan Member, the Health Plan Member's family, the physician or other health care providers;
5) Approved by the appropriate medical body or health care specialty involved as effective, appropriate and essential for the care and treatment of the Health Plan Member's condition; and
6) Not Experimental or Investigational.

55.   In the State Plans procured by the Department, an exclusion exists for any services considered to be "Experimental/Investigational or Not Medically Necessary Treatment."

56.   Given there is already an exclusion for any services considered to be "Experimental/Investigational or Not Medically Necessary Treatment," the only function of the categorical State Plan Exclusion for gender-affirming care is to exclude medical care that would otherwise qualify as medically necessary under the State Plans' generally applicable standards.

57.   The State Plan Exclusion is a categorical exclusion that precludes transgender state employees from having their gender-affirming medical needs subjected to the same medical necessity analysis to which all other state plan members' medical needs are subjected.

58.   The State Plan Exclusion was specifically included in the State Employees' HMO Plan Group Health Insurance Plan Booklet & Benefits Document provided to each Plaintiff by their employer.

59.   The medical procedures Plaintiffs seek, which the State continues to deny, are medically necessary for them. Despite meeting the medical-necessity criteria for gender-affirming treatment for gender dysphoria, the State Plan Exclusion wrongfully denied, and continues to deny, coverage to each Plaintiff.

## The State's Denial of Medically Necessary Care to Plaintiffs

### Plaintiff Jami Claire

60.   Ms. Claire is a Senior Biological Scientist in the College of Veterinary Medicine at the University of Florida, where she has been employed for thirty-two years.

61.   Ms. Claire served in the United States Navy from 1974-1980. She served for six and one-half years, first as a cook, and then as an aircraft electrician.

62.   Ms. Claire received her B.S. in Animal Science Production from Brigham Young University in 1984 and her M.S. in Animal Science Management from Utah State University in 1989.

63.    Ms. Claire is a woman. She is also transgender. She was assigned a male birth sex, but her gender identity is female and she identifies as a woman.

64.    Ms. Claire has a well-established social and professional identity as a woman. She has experienced gender dysphoria since the age of seven.

65.    It was not until 1975, when Ms. Claire was seventeen years old, that she finally discovered a name for what she had felt all her life. She was enlisted in the United States Navy and was eating a meal with her fellow sailors when she first heard celebrity Renée Richards discussing her experience affirming her female gender identity despite being assigned the male sex at birth. In that moment, Ms. Claire realized she was transgender.

### Gender-Affirmation History

66.    Ms. Claire began her gender-affirmation in 1997, during which time she was diagnosed with gender dysphoria, and began going to counseling for her dysphoria, taking hormones, and undergoing electrolysis (hair removal).

67.    At that time, Ms. Claire inquired into whether her State Plan would cover her gender-affirming care and was told it would not. Ms.

Claire then paid out of pocket for her treatment, including hormones. Her counseling was covered by the Veterans Affairs Medical Center. She continued her gender-affirmation, through counseling, hormones, and electrolysis, for five years.

68.   Despite her strong desire to continue to bring her body into alignment with her female gender identity, Ms. Claire was forced to cease her gender-affirmation around 2002. Ms. Claire's wife and children wanted nothing to do with her because of Ms. Claire's gender identity. Her family disowned her, and she knew the Mormon Church would ex-communicate her if she continued gender-affirmation. Additionally, she could not afford the gender-affirming care she had been paying for out of pocket due to the financial toll of her divorce.

69.   Fourteen years later, in 2016, Ms. Claire resumed her gender-affirmation to live authentically as a woman. Resuming Ms. Claire's gender-affirming care remained medically necessary for her due to the constant stress, anxiety, pain, and anguish she experienced struggling to live her life as a man.

70.   Ms. Claire meets the DSM-5 criteria for the diagnosis of Gender Dysphoria, 302.85, as well as the ICD-10 criteria for the diagnosis of Gender Identity Disorder, F64.0.

71.    Ms. Claire always had a strong desire to outwardly express her female gender identity and to align her body with her female gender identity. However, Ms. Claire feared the consequences of doing so in her personal and professional life, due to the stigma and political violence transgender people in our society often face.

72.    In the summer of 2016, Ms. Claire again began counseling with the transgender care coordinator at the Department of Veterans Affairs Medical Center ("VA") in Gainesville, where she received primary care for over twelve years. She consistently has been in counseling since that time for her gender dysphoria.

73.    In December 2016, Ms. Claire began outwardly expressing her female gender identity in all public spaces, both in her personal life and her professional life as an employee of the University of Florida College of Veterinary Medicine. She has done so consistently ever since.

74.    Ms. Claire sought to resume hormone replacement therapy, intending to induce physical changes in the body caused by female hormones during puberty, to feminize her body, and to have her hormone levels match her gender identity.

75.    A mental health professional evaluated Ms. Claire to determine her readiness for hormones, and she was referred to an endocrinologist for hormone replacement therapy.

76.    In May 2017, Ms. Claire began hormone replacement therapy at the recommendation of her therapist and her treating endocrinologist, as recommended by the WPATH Standards of Care. Ms. Claire inquired about coverage by her State Plan but was told her State Plan refused to cover hormone replacement therapy due to the State Plan Exclusion.

77.    In 2017, Ms. Claire also began electrolysis, to help treat the dysphoria she experienced as a result of having body hair not typical of a female. As indicated by the WPATH Standards of Care, electrolysis can be a medically necessary treatment to alleviate gender dysphoria. Again, Ms. Claire inquired about coverage by her State Plan, but was told that her State Plan refused to cover this treatment due to the State Plan Exclusion.

78.    Ms. Claire paid out of pocket for the electrolysis treatments until August 2018.

79.    To ensure her legal identity matched her female gender identity and expression, Ms. Claire obtained a court order from Florida's Eighth

Judicial Circuit Court on September 1, 2017, officially changing her legal name to Jami Lynn Claire.

80.    Ms. Claire subsequently amended the legal name and gender marker on her government-issued identification documents to reflect her female gender identity, including her Social Security record, Florida driver's license, U.S. Passport, and DD-214 (Certificate of Release or Discharge from Active Duty).

81.    In November 2018, Ms. Claire underwent an augmentation mammoplasty to continue feminizing her body. The WPATH Standards of Care recognize augmentation mammoplasty is medically necessary for some transgender individuals. Again, Ms. Claire inquired about coverage by her State Plan, but was told that her State Plan refused to cover this treatment due to the State Plan Exclusion. Therefore, she paid out of pocket for the surgery.

### Medical Necessity of Denied Procedure

82.    Ms. Claire has received hormone replacement therapy for over two years. She is on the anti-androgen (testosterone blocker) spironolactone and estrogen.

83.    The goal of hormone replacement therapy for transgender women is to induce physical changes in the body caused by female

hormones during puberty (secondary sex characteristics) to promote the matching of an individual's gender identity and body (gender congruence). This requires a suppression of endogenous androgens (testosterone) and the addition of estrogen.

84.    Long term use of estrogen comes with risks, including liver disease, cardiovascular disease, metabolic syndrome, and breast cancer. One of the most common and concerning risks is that estrogen increases the risk of blood clots. Blood clots can cause death, permanent lung damage, permanent brain damage (stroke), heart attack, or chronic problems with the veins in the legs.

85.    Transdermal estrogen (absorbed by skin through patches) has been shown to decrease the risk of blood clots. For this reason, transdermal estrogen is usually recommended to anyone over the age of forty.

86.    Ms. Claire, however, must ingest the estrogen orally through pills because her body cannot absorb the estrogen through transdermal patches; and, due to her age, she is ineligible for estrogen injections.

87.    Ms. Claire is sixty-two years old, and is at a heightened risk of developing deep vein thrombosis. Deep vein thrombosis is a blood clot that forms in a vein deep in the body, most often in the lower leg or thigh.

A deep vein thrombosis can break loose and cause a pulmonary embolism in the lung. This is a constant source of concern for Ms. Claire.

88.     The testicles are the main source of testosterone production. When hormone replacement therapy fails to block the production of testosterone and change hormonal levels in the body, surgical removal of the testicles functions to remove the main source of testosterone production and its effects. This allows patients to cease or significantly reduce their dosage of androgen-blockers (spironolactone) and to reduce their dosage of estrogen.

89.     Due to the potential health risks and long-term effects of continuing such high dosages of hormones at her age, Ms. Claire sought an orchiectomy (surgical removal of the testicles), a procedure that the WPATH Standards of Care recognize can be medically necessary and was recommended by her treating physician in accordance with those standards.

90.     Ms. Claire's treating physician deemed this procedure medically necessary to treat her gender dysphoria.

91.     Peer-reviewed medical literature has demonstrated gender-affirmation surgeries, such as orchiectomies, can ameliorate the

psychological symptoms of gender dysphoria, including depression, anxiety, and suicidal ideation.

**Procedure Denied by Defendants**

92.     On December 27, 2018, Ms. Claire sought authorization through her State Plan for an orchiectomy.

93.     On January 8, 2019, AvMed denied insurance coverage for the medically necessary procedure, citing to the State Plan Exclusion of "gender reassignment or modification services or supplies" as the basis for denial.

94.     On January 25, 2019, Ms. Claire appealed this denial to AvMed.

95.     On February 22, 2019, AvMed denied the appeal, again citing to the State Plan Exclusion of "gender reassignment or modification services or supplies" as the basis for the denial.

96.     On March 18, 2019, Ms. Claire filed a second-level appeal to the Division of State Group Insurance.

97.     On May 17, 2019, the Division of State Group Insurance denied the appeal, citing to the State Plan Exclusion of "gender reassignment or modification services or supplies" as the basis for the denial.

98.     Had the requested surgery been recommended by a medical provider for a medically necessary purpose other than treatment for

gender dysphoria – for instance, an orchiectomy for an individual suffering from testicular cancer or trauma to the testes – the State Plan would have covered it.

99.     Ms. Claire has suffered, and will continue to suffer, because of the State Plan Exclusion.

100. Ms. Claire meets all the criteria set forth in the WPATH Standards of Care concerning the medical necessity for the orchiectomy.

101.  Ms. Claire has followed all the recommended WPATH Standards of Care for gender-affirmation, including mental health counseling, hormone replacement therapy, and social transition in all spheres of functioning, and her physician has deemed her ready to undergo the medically necessary next step of an orchiectomy. Medical research supports an orchiectomy as a medically necessary intervention for some transgender women.   Medical research additionally documents substantial quality-of-life benefits in emotional, physical, and social domains for those who have undergone this procedure.

102. The State Plan Exclusion prevents Ms. Claire from obtaining medically necessary treatment in accordance with her physicians' recommendations and the WPATH Standards of Care, putting her at a heightened risk for serious health complications such as blood clots and

deep vein thrombosis. The State Plan Exclusion also precludes her from taking the next essential step in her treatment for gender dysphoria.

103.   Ms. Claire has suffered as a result of the actions of the Board of Trustees as well.

104.   The Board of Trustees must allow university employees to participate in State Plans through the State insurance group programs, but are not limited to providing only those State Plans to employees.

105.   By statutory authority, the Board of Trustees creates university-sponsored insurance programs. For example, the Board of Trustees established GatorCare Health Management Corporation ("GatorCare") in 2012, through which it offers health benefits to certain classifications of employees, but not all employees.

106.   GatorCare covers gender-affirming surgery and services related to gender dysphoria or gender-affirmation.

107.   Ms. Claire has been offered only the State Plan with the corresponding State Plan Exclusion for gender-affirming care.

108.   The duties of the Board of Trustees include ensuring that the University complies with federal and State laws and regulations.

### Exhaustion of Administrative Remedies

109.  On June 4, 2019, Ms. Claire timely filed a charge with the Equal Employment Opportunity Commission ("EEOC") against AvMed, the Florida Department of Management Services, and the University of Florida for sex discrimination in violation of Title VII.

110.  On July 22, 2019, Ms. Claire requested the Notice of Right to Sue on all charges.

111.  On July 27, 2019, the EEOC issued the Notice of Right to Sue for all charges.

112.  On August 6, 2019, Ms. Claire requested that the Notice of Right to Sue for the charges against the Florida Department of Management Services and the University of Florida be issued by the U.S. Department of Justice, pursuant to 42 USC § 2000e-5(f)(1) and 29 CFR § 1601.28(d)(2).

113.  On October 21, 2019, Ms. Claire received the Notice of Right to Sue letter from the U.S. Department of Justice for the charges against the Florida Department of Management Services and the University of Florida.

**Plaintiff Kathryn Lane**

114.   Ms. Lane is an attorney, currently working within the appellate division of the Office of the Public Defender in the Second Judicial Circuit of Florida.

115.   Ms. Lane received her B.A. in Political Science from St. Leo University in 2003 and her J.D. from the University of Florida in 2006.

116.   Ms. Lane worked as a prosecutor for the Office of the State Attorney for the Fifth Judicial Circuit of Florida in Ocala from 2006 to 2011.

117.   Ms. Lane worked in the criminal appeals division of the Florida Attorney General's office from 2011 to 2017.

118.   Ms. Lane is a woman. She is also transgender. She was assigned a male birth sex, but her gender identity is female and she identifies as a woman.

119.   Ms. Lane has a well-established social and professional identity as a woman. She has experienced gender dysphoria since approximately the age of five, but suppressed her female gender identity for as long as possible until she could no longer do so. This has caused her severe depression and anxiety.

***Gender-Affirmation History***

120.   Ms. Lane embraced the female gender with which she has always identified in 2012, at which time she began her gender-affirmation.

121.   Ms. Lane began counseling in March 2012.

122.   Ms. Lane meets the DSM-5 criteria for the diagnosis of Gender Dysphoria, 302.85, as well as the ICD-10 criteria for the diagnosis of Gender Identity Disorder, F64.0. She was diagnosed with gender dysphoria in March 2012. Her symptoms are characterized as severe.

123.   In Spring 2012, Ms. Lane began the process of facial hair removal. She inquired about coverage by her State Plan but was told that her State Plan refused to cover the treatment due to the State Plan Exclusion. She paid out of pocket for this treatment.

124.   In August 2012, Ms. Lane began hormone replacement therapy. She has been on estrogen and spironolactone for over seven years.

125.   In Fall 2012, Ms. Lane began growing out her hair so she would be identified more easily as a female, which would alleviate some of her dysphoria.

126.   In March 2015, Ms. Lane began outwardly expressing her female gender identity in all areas of her life.

127. In June 2015, Ms. Lane underwent an augmentation mammoplasty to continue the feminization of her body. The WPATH Standards of Care recognize augmentation mammoplasty is medically necessary for some transgender individuals.  Again, Ms. Lane inquired about coverage by her State Plan, but she was told that her State Plan refused to cover this treatment due to the State Plan Exclusion. Therefore, she paid out of pocket for the surgery.

128.  Since 2015, Ms. Lane has presented consistently as female in all areas of her personal and professional life, including updating her name with The Florida Bar as part of her professional transition.

129.  To ensure that her legal identity matched her female gender identity and expression, Ms. Lane obtained a court order from Florida's Second Judicial Circuit Court on August 27, 2015, officially changing her legal name to Kathryn Lane to match her female gender identity.

130.  Ms. Lane subsequently amended the legal name and gender marker on her government-issued identification documents to reflect her female gender identity, including her Social Security record, Florida driver's license, and U.S. Passport.

***Procedure Denied by Defendants***

131.  Ms. Lane has undergone gender-affirming hormone replacement therapy for seven years, and treating physicians believe she has received the maximum benefit from this therapy. They expect no further physical change. Despite hormone therapy, her facial structure remains phenotypically male. To more fully alleviate her gender dysphoria, she requires medically necessary surgery.

132.  The WPATH Standards of Care recognize that for those who do not experience relief due to other measures, "surgery is essential and medically necessary to alleviate their gender dysphoria…relief from gender dysphoria cannot be achieved without modification of their primary and/or secondary sex characteristics to establish greater congruence."

133.  Gender-affirming surgeries for the face, known as facial feminization surgery, can be a critical part of gender-affirmation for a transgender woman. Facial features play an important part in being recognized as a particular gender. The public's ability to recognize an individual as transgender based on their facial features places that individual at risk of violence, harassment, and discrimination.

134.  Facial feminization surgery facilitates the ability of a transgender woman in "passing" (i.e., blending or assimilating), which refers to a

transgender person's ability to go through daily life without being recognized as being transgender.

135.  After a consultation, Ms. Lane's physician recommended facial feminization surgery as a medically necessary treatment for her gender dysphoria. Consistent with the WPATH Standards, Dr. Keojampa recommended via letter on January 11, 2019, that Ms. Lane obtain the gender-affirming surgery.

136.  On February 19, 2019, Ms. Lane received a denial letter from Capital Health denying authorization for coverage of the medically necessary procedure, citing the State Plan Exclusion of "gender reassignment or modification services or supplies" as the basis for denial.

137.  Ms. Lane appealed this denial to Capital Health on April 16, 2019.

138.  On April 25, 2019, Capital Health denied the appeal, again citing the State Plan Exclusion of "gender reassignment or modification services or supplies" as the basis for denial. Capital Health added as a basis for denial the exclusion for "Cosmetic Surgeries/Services."

***Procedure Denied by Defendants is Medically Necessary***

139.  The surgery for which Ms. Lane sought authorization is medically necessary treatment recommended by professionals specializing in

gender-affirming care to alleviate the significant depression, anxiety, and psychological distress that she faces on a daily basis.  This procedure is a medically necessary treatment for Ms. Lane's gender dysphoria.

140.  Despite her intentionally feminine presentation, Ms. Lane's facial features can still be identified as masculine, which causes her significant anxiety, depression, and psychological distress, in addition to putting her at risk for violence, harassment, and discrimination.

141.  Transgender women face violence, harassment, and discrimination at disproportionately high rates, and there are transgender women murdered in Florida every year because they are transgender.

142.  Ms. Lane lives in fear of such interactions as a result of having facial features that can be identified as masculine and that "out" her (i.e., disclose that she is transgender) to strangers without her consent or volition.

143.  Despite Ms. Lane's consistent participation in psychotherapy since 2012, various psychotropic regimens and Transcranial Magnetic Stimulation (a noninvasive procedure that uses magnetic fields to stimulate nerve cells in the brain to improve symptoms of depression), she persistently experiences depressed mood, self-esteem deficits,

disgust and dissatisfaction with her appearance, suicidal ideation, fatigue, anxiety, fear, and a pervasive sense of hopelessness.

144.  Ms. Lane meets all of the criteria set forth in the WPATH Standards of Care concerning the medical necessity of gender-affirming surgery.

145.  Ms. Lane has followed all the recommended WPATH Standards of Care for gender-affirmation, including mental health counseling, hormone replacement therapy, and social transition in all spheres of functioning, and multiple physicians have deemed her ready to undergo the medically necessary next step of facial feminization surgery.

146.  Medical research supports facial feminization surgery as a medically necessary intervention for transgender females. This research documents the substantial quality-of-life benefits in emotional, physical, and social domains for those who have undergone this procedure.

***Procedure Denied by Defendants is Not Cosmetic***

147.  The WPATH Standards of Care, the U.S. Department of Health and Human Services, and several federal courts, make it clear gender-affirming procedures that are medically necessary are not cosmetic.

148.  Ms. Lane's requested procedure was deemed medically necessary by multiple medical professionals who are qualified to make

such determinations. Thus, the procedure should not be denied under the State Plan's exclusion for "Cosmetic Surgeries/Services."

149.  The purpose of changing sex characteristics is to treat gender dysphoria. This purpose underscores the medical necessity as opposed to cosmetic nature of these treatments. Facial feminization surgery is not designed to "improve the appearance" of a person's face, but rather to affirm a transgender woman's gender identity in that the face functions as a face that is consistent with the person's gender identity. Accordingly, facial feminization is a form of sex reassignment surgery.

150. Peer-reviewed medical literature, medical opinions of professional societies, evidence-based professional standards of care, and the opinions of health care professionals involved in the specialty of treating gender dysphoria concur that facial feminization surgery is safe, effective, and medically necessary for treating gender dysphoria.

*Exhaustion of Administrative Remedies*

151.  On June 4, 2019, Ms. Lane timely filed a charge with the Equal Employment Opportunity Commission ("EEOC") against Capital Health Plan and the Florida Department of Management Services for sex discrimination in violation of Title VII.

152.  On July 18, 2019, the EEOC issued a Dismissal and Notice of Right to Sue for the charge against Capital Health.

153.  On July 22, 2019, Ms. Lane requested the Notice of Right to Sue for the charge against the Florida Department of Management Services.

154.  On August 1, 2019, the EEOC notified Ms. Lane that the request for the Notice of Right to Sue for the charge against the Florida Department of Management Services had been forwarded to the U.S. Department of Justice for action.

155.  On November 4, 2019, Ms. Lane received the Notice of Right to Sue letter from the U.S. Department of Justice for the charge against the Florida Department of Management Services.

156.  On October 18, 2019, Ms. Lane timely filed a charge with the EEOC against Andy Thomas in his official capacity as Public Defender of the Second Judicial Circuit for sex discrimination in violation of Title VII.

157.  On November 5, 2019, Ms. Lane requested the Notice of Right to Sue for the charge against Andy Thomas in his official capacity as Public Defender of the Second Judicial Circuit.

## COMMON ALLEGATIONS FOR CLAIMS I, II AND III, <u>TITLE VII OF THE CIVIL RIGHTS ACT OF 1964</u>

158.  Plaintiffs incorporate by reference paragraphs 1 through 157 of the Complaint as if fully set forth below.

159.  Title VII of the Civil Rights Act of 1964 provides that employers may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1).

160.  An employer-sponsored health plan constitutes "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1).

161.  Title VII's prohibition on "sex" discrimination encompasses discrimination based on failure to conform to gender stereotypes – i.e., failing to act and appear according to gender-expressive expectations ordinarily assigned to men and women.

162.  A person is defined as transgender precisely because of the perception that they contradict the gender stereotypes associated with the sex they were assigned at birth. The very expression that associates some transgender people with being transgender itself contradicts stereotypes of expected appearance and behavior for the sex they were assigned at birth.

163.  Discrimination against a transgender individual because of their gender non-conformity is sex-based discrimination under Title VII, whether described as being on the basis of sex or gender.

164. When a transgender person affirms their authentic gender, it inherently contradicts standard gender stereotypes expected of the individual based on their sex assigned at birth. An individual who was assigned male at birth contradicts gender stereotypes and engages in gender non-conforming behavior when seeking to feminize their body.

165. Discrimination against transgender individuals seeking to align their bodies to match their gender identities is sex-based discrimination.

166. Denying medically necessary coverage to an individual for "gender reassignment or modification" surgery constitutes impermissible discrimination based on gender non-conformity.

167. Discrimination against a transgender individual because of their gender non-conformity or their gender transition is discrimination on the basis of "sex" under Title VII.

168. Not all transgender state employees seek to conform their bodies to match their gender identities. What helps one transgender employee alleviate gender dysphoria might be very different from what helps another, and what is medically necessary to address the employee's gender dysphoria is a decision made on an individualized basis. For some transgender employees, however, medical treatment, including surgical intervention, remains essential and medically necessary to

alleviate gender dysphoria. Further, some transgender state employees have already undergone treatment for gender-affirmation, and still others choose not to proceed for individual reasons. However, the exclusion need not injure *all* members of a protected class for it to constitute sex discrimination.

169.  All individuals, whether transgender or cisgender, have their own understanding of their genders. A transgender person's understanding of their gender impacts the dysphoria they may experience when certain physical characteristics do not align with their gender identity.

170.  However, the only individuals who require medically necessary care to treat gender dysphoria, and thus the only individuals to whom the State Plan Exclusion is being applied, are transgender individuals. As a result of the State Plan Exclusion, non-transgender employees receive coverage for all medically necessary healthcare, but transgender employees do not.

171.  The State Plan Exclusion implicates sex stereotyping by limiting the ability of a transgender person to transition, if not rendering it economically infeasible, thus requiring transgender individuals to maintain the physical characteristics of their birth-assigned sex. The State Plan Exclusion illegally discriminates against transgender persons by

mandating that transgender individuals preserve the physical attributes of their birth-assigned sex over specific medical recommendations to the contrary.

172. The State Plan Exclusion on its face treats transgender individuals differently on the basis of sex, thus triggering the protections of Title VII.

## CLAIM I
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

### *All Plaintiffs against Florida Department of Management Services*

173.  Plaintiffs incorporate by reference paragraphs 1 through 172 of the Complaint as if fully set forth below.

174.  Defendant Department has more than fifteen employees and is an "employer" as that term is defined in Title VII, 42 U.S.C. § 2000e(b).

175.  Plaintiffs are "employees" of the State of Florida, as that term is defined in Title VII, 42 U.S.C. § 2000e(f).

176. Defendant Department substantially controls the terms and conditions of employment for employees in the State of Florida, including by establishing the scope of insurance coverage and administering that coverage for all state employees.

177.  The State Plans, solicited and implemented by the Department, provided to Plaintiffs by the State agencies employing them, and administered by AvMed and Capital Health, facially discriminate based on Plaintiffs' gender non-conformity and gender-affirmation by categorically excluding coverage for all medically necessary "gender reassignment or modification services or supplies."

178.  By providing facially discriminatory State Plans that categorically exclude all healthcare related to "gender reassignment or modification" from the only available health plan it provides to employees, Defendant Department has unlawfully discriminated against Plaintiffs—and continues to unlawfully discriminate against them—"with respect to compensation, terms, conditions, or privileges of employment, because of…sex." 42 U.S.C. 2000e-2(a)(1).

### CLAIM II
### <u>VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964</u>

#### *Plaintiff Claire against Defendant University of Florida Board of Trustees*

179.  Plaintiff incorporates by reference paragraphs 1 through 113 and 158 through 172 of the Complaint as if fully set forth below.

180.  Defendant Board of Trustees has more than fifteen employees and is an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b).

181.  Ms. Claire is an employee of the University of Florida Board of Trustees as that term is defined in Title VII, 42 U.S.C. § 2000e(f).

182.  The State Plan provided to Ms. Claire through her employment facially discriminates based on Plaintiff's gender non-conformity and gender transition by categorically excluding coverage for all medically necessary "gender reassignment or modification services or supplies."

183.  Defendant Board of Trustees offers additional health care plan options to other university employees through Gator Care, a private Direct Service Organization.

184.  By law, Defendant Board of Trustees must provide employee compensation and benefits, including health-insurance coverage, in a non-discriminatory manner. It has chosen to provide gender-affirming care to some, but not all, of its employees. This is a deliberate policy decision by the Board of Trustees that discriminates against those employees who are transgender, like Ms. Claire, and who are only offered the State Plans with the State Plan Exclusion.

185.  By providing facially discriminatory State Plans that exclude all healthcare related to "gender reassignment or modification" from the only available health plans it provides to employees such as Plaintiff Claire, Defendant Board of Trustees has unlawfully discriminated against Ms.

Claire—and continues to unlawfully discriminate against her—"with respect to compensation, terms, conditions, or privileges of employment, because of…sex." 42 U.S.C. 2000e-2(a)(1).

## CLAIM III
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

### *Plaintiff Lane against Defendant Thomas*

186.  Plaintiff incorporates by reference paragraphs 1 through 59 and 114 through 172 of the Complaint as if fully set forth below.

187.  Defendant Thomas in his official capacity as Public Defender of the Second Judicial Circuit of Florida has more than fifteen employees and is an employer as that term is defined in Title VII, 42 U.S.C. § 2000e-(b).

188.  Ms. Lane is an employee of the Public Defenders Office of the Second Judicial Circuit as that term is defined in Title VII, 42 U.S.C. § 2000e(f).

189.  The State Plan provided to Ms. Lane through her employment facially discriminates based on Plaintiff's gender non-conformity and gender transition by categorically excluding coverage for all medically necessary "gender reassignment or modification services or supplies."

190.  By providing facially discriminatory State Plans that exclude all healthcare related to "gender reassignment or modification" from the only available health plans provided to employees such as Plaintiff Lane, Defendant Thomas has unlawfully discriminated against Ms. Lane—and continues to unlawfully discriminate against her—"with respect to compensation, terms, conditions, or privileges of employment, because of…sex." 42 U.S.C. 2000e-2(a)(1).

## COMMON ALLEGATIONS FOR CLAIMS IV, V, AND VI, EQUAL PROTECTION CLAUSE

191.  Plaintiffs incorporate by reference paragraphs 1 through 157 of the Complaint as if fully set forth below.

192.  The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the states and state actors from discriminating against individuals on the basis of sex.

193.  Discrimination on the basis of gender stereotype is sex-based discrimination.

194.  Discrimination against someone because of their gender non-conformity is sex-based discrimination.

195.  A person is defined as transgender precisely because of the perception that they contradict the gender stereotypes associated with the sex they were assigned at birth. The very expression that associates

some transgender people with being transgender itself contradicts stereotypes of expected appearance and behavior for the sex they were assigned at birth.

196. Discrimination against a transgender individual because of their gender non-conformity is sex discrimination under the Equal Protection Clause, whether it is described as being on the basis of sex or gender.

197. When a transgender person affirms their authentic gender, it inherently contradicts standard gender stereotypes expected of the individual based on their sex assigned at birth. An individual who was assigned male at birth contradicts gender stereotypes and engages in gender non-conforming behavior when seeking to feminize their body.

198. Discrimination against transgender individuals seeking to align their bodies to match their gender identities is sex-based discrimination.

199. Denying medically necessary coverage to an individual for "gender reassignment or modification" surgery constitutes impermissible discrimination based on gender non-conformity.

200. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the states and state actors from discriminating against transgender individuals based on their gender identity and gender non-conformity.

201.  The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the states and state actors from discriminating against individuals because they are transgender.

202.  The State Plan Exclusion, on its face and as applied to Plaintiffs, impermissibly discriminates against Plaintiffs on the basis of their sex, their gender non-conformity, and because they are transgender, and violates their rights to equal protection of the laws.

203.  Defendants' actions purposefully single out a minority group, transgender persons, that historically have been subjected to discriminatory treatment and are relegated to a position of political powerlessness solely on the basis of stereotypes and myths regarding their gender identity —a characteristic that bears no relation to their ability to contribute to society and is immutable.

204.  The Equal Protection Clause requires the government to confer to all women – cisgender and transgender – full citizen stature, which includes equal opportunity to aspire, participate in, and contribute to society based on their individual talents and capacities. When the State employs people, full citizenship stature means providing equal benefits for the contributions they make as State employees.

205.  Discrimination on the basis of sex is a quasi-suspect class and is subject to heightened scrutiny.

206.  Discrimination against individuals on the basis of their being transgender is independently subject to heightened scrutiny.

207.  The State Plan Exclusion is not narrowly tailored to serve a compelling governmental interest.

208.  The State Plan Exclusion is not substantially related to an important governmental interest.

209.  The only function of the State Plan Exclusion is to exclude medical care that would otherwise qualify as medically necessary under the State Plan's generally applicable standards.

210.  The State Plan Exclusion is grounded in sex stereotypes and discomfort with Plaintiffs' gender transition and gender non-conformity.

## CLAIM IV
## EQUAL PROTECTION CLAUSE

### *All Plaintiffs against Defendant Satter*

211.  Plaintiffs incorporate by reference paragraphs 1 through 157 and 191 through 210 of the Complaint as if fully set forth below.

212.  The State Plan Exclusion, on its face and as applied to Plaintiffs, impermissibly discriminates against Plaintiffs on the basis of sex and gender non-conformity and their being transgender and violates their right

to Equal Protection of the laws under the Fourteenth Amendment to the United States Constitution

213.  As a direct and proximate result of the discrimination described above, Plaintiffs have suffered injury and damages, including mental pain and suffering and emotional distress. Without injunctive relief from Defendants' discriminatory exclusion of coverage for gender-affirming care, Plaintiffs will continue to suffer irreparable harm in the future.

## CLAIM V
## EQUAL PROTECTION CLAUSE

***Plaintiff Claire against Defendants Hosseini, Kuntz, Brandon, Heavener, Johnson, Murphy, O'Keefe, Patel, Powers, Rosenberg, Stern, Thomas, and Zucker, in their official capacities as members of the University of Florida Board of Trustees***

214.  Plaintiff incorporates by reference paragraphs 1 through 113 and 191 through 210 of the Complaint as if fully set forth below.

215. Defendants have the duty and legal authority to provide compensation and benefits, including health-insurance coverage, in a non-discriminatory manner. They have chosen to provide gender-affirming care to some, but not all, of their employees. This is a deliberate policy decision by the Board of Trustees that discriminates against those employees who are transgender, like Ms. Claire, and who are only offered the State Plans with the State Plan Exclusion.

216. The State Plan Exclusion, on its face and as applied to Ms. Claire, impermissibly discriminates against her on the basis of sex and gender non-conformity and her being transgender and violates her right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

217. As a direct and proximate result of the discrimination described above, Ms. Claire has suffered injury and damages, including mental pain and suffering and emotional distress. Without injunctive relief from Defendants' discriminatory exclusion of coverage for gender-affirming care, Ms. Claire will continue to suffer irreparable harm in the future.

## CLAIM VI
## EQUAL PROTECTION CLAUSE

### *Plaintiff Lane against Defendant Thomas*

218. Plaintiff incorporates by reference paragraphs 1 through 59, 114 through 157, and 191 through 210 of the Complaint as if fully set forth below.

219. The State Plan Exclusion, on its face and as applied to Ms. Lane, impermissibly discriminates against her on the basis of sex and gender non-conformity and her being transgender and violates her right to Equal Protection of the laws under the Fourteenth Amendment to the United States Constitution.

50

220.  As a direct and proximate result of the discrimination described above, Ms. Lane has suffered injury and damages, including mental pain and suffering and emotional distress. Without injunctive relief from Defendants' discriminatory exclusion of coverage for gender-affirming care, Ms. Lane will continue to suffer irreparable harm in the future.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against the Defendants and award the following relief:

A. Declaratory relief, including, but not limited to, a declaration that Defendants are in violation of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, and Title VII.

B. Permanent injunctive relief with respect to all Defendants, requiring Defendants to: (1) cease enforcement of the State Plan Exclusion of coverage for "gender reassignment or modification services or supplies," and (2) provide benefits that cover Plaintiffs' medically necessary gender-affirming care.

C. Permanent injunctive relief with respect to Defendant Florida Department of Management Services to prohibit the Department from soliciting and accepting bids, and granting contracts, for health

insurance plans that contain an exclusion of coverage for gender-affirming care.

D. Award Plaintiffs with respect to all Defendants compensatory damages, including emotional distress, and other appropriate relief as permitted by law.

E. Award reasonable attorneys' fees and costs where allowed by law.

F. Award all other relief to which Plaintiffs may be entitled that the Court deems just and equitable.

Dated: January 13, 2020        Respectfully submitted,

*/s/ Simone Chriss*
SIMONE CHRISS, Fla. Bar No. 124062
simone.chriss@southernlegal.org
KIRSTEN ANDERSON, Fla. Bar No. 17179
kirsten.anderson@southernlegal.org
JODI SIEGEL, Fla. Bar No. 511617
jodi.siegel@southernlegal.org
Southern Legal Counsel, Inc.
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890

DANIEL TILLEY, Fla. Bar No. 102882
dtilley@aclufl.org
ACLU Foundation of Florida
4343 West Flagler St., Suite 400,
Miami, FL 33134
(786) 363-2714

ANTON MARINO, D.C. Bar No. 1028871
Fla. Bar pending; will submit pro hac vice

amarino@aclufl.org
ACLU Foundation of Florida
4343 West Flagler St., Suite 400
Miami, FL 33134
(786) 363-2707

JIMMY MIDYETTE, Fla. Bar No. 495859
jmidyette@aclufl.org
ACLU Foundation of Florida
118 W Adams St., Suite 510
Jacksonville, FL 32202
(904) 228-4797

ERIC LINDSTROM, Fla. Bar No. 104778
elindstrom@eganlev.com
Egan, Lev, Lindstrom & Siwica, P.A.
P.O. Box 5276
Gainesville, FL 32627
(352) 672-6901

**ATTORNEYS FOR PLAINTIFFS**