## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**JAMI CLAIRE and KATHRYN LANE,**

　　**Plaintiffs,**

**v.**                                          **CASE NO.: 4:20-cv-00020-MW-CAS**

**FLORIDA DEPARTMENT OF**
**MANAGEMENT SERVICES; JONATHAN**
**SATTER, in his official capacity as**
**Secretary of the Florida Department of**
**Management Services; UNIVERSITY OF**
**FLORIDA BOARD OF TRUSTEES;**
**MORTEZA HOSSEINI, in his official**
**Capacity as Chair of the University of**
**Florida Board of Trustees; THOMAS**
**KUNTZ, DAVID BRANDON, JAMES**
**HEAVENER, LEONARD JOHNSON,**
**MICHAEL MURPHY, DANIEL O'KEEFE,**
**RAHUL PATEL, MARSHA POWERS,**
**JASON ROSENBERG, ROBERT STERN,**
**RAY THOMAS, and ANITA ZUCKER, in**
**their official capacities as Members of the**
**University of Florida Board of Trustees;**
**and ANDY THOMAS, in his official capacity**
**as Public Defender of the Second Judicial**
**Circuit of Florida,**

　　**Defendants.**

_____/

## DEFENDANT ANDY THOMAS'
## MOTION TO DIMISS PLAINTIFFS' COMPLAINT

　　Defendant Andy Thomas, in his official capacity as Public Defender of the

Second Judicial Circuit of Florida ("Mr. Thomas" or "Public Defender Defendant")

through undersigned counsel, and pursuant to Rules 12(b)(1) and 12(b)(6), Fed. R. Civ. P., and N.D. Fla. Loc. R. 7.1, moves this Court to dismiss Counts III and VI of the Complaint, with prejudice.

### *Introduction*

The Complaint must be dismissed based on several fundamental grounds. Plaintiff Kathryn Lane ("Plaintiff" or "Ms. Lane") brings the following counts against the Public Defender Defendant: Count III asserts violations of Title VII; and Count VI, brought pursuant to 42 U.S.C. §1983, asserts violations of the Fourteenth Amendment's Equal Protection Clause.

Each of these counts must be dismissed with prejudice because Plaintiff has failed to demonstrate standing. None of the alleged injuries is fairly traceable to, or can be redressed by the Public Defender Defendant. This is because by statute, the Florida Department of Management Services ("DMS") has total control and authority over the provision of health insurance for state employees, including the Plaintiff. As such, the actions of the Public Defender Defendant are not fairly traceable to the harm suffered by the Plaintiff, which was solely caused by the actions of the State in determining the appropriate level of healthcare for state employees.

Count VI, styled as an *Ex Parte Young* claim for prospective injunctive relief from a continuing violation of law against state officers, also fails because it is barred

by sovereign immunity. The relief sought is essentially retrospective and not prospective, and Mr. Thomas lacks the authority to actually implement the complained-of policies. Both are factors that destroy the legal fiction that *Ex Parte Young* provides in very limited cases for litigants to obtain relief from states in federal courts in situations where such actions for relief would otherwise be barred.

Finally, Count III must be dismissed for failure to state a claim. Title VII does not prohibit discrimination based on gender identity, and the actions complained of do not state an actionable claim for sex-stereotyping discrimination. While the Public Defender Defendant is sympathetic to and has supported Ms. Lane in her efforts to seek coverage for her requested procedure, the Public Defender Defendant in no way discriminated against the Plaintiff, and this Court can obviously only afford Ms. Lane remedies based on the law as it is written. The law here, Title VII, simply does not afford Plaintiff a remedy on the facts alleged.

### *Facts*

The following facts are taken from the Complaint and in the light most favorable to the Plaintiff. None of the facts recited herein should be deemed an admission on the part of the moving party that they are true. That said, the facts as set forth herein and in the complaint, simply do not provide a basis for relief against the Public Defender Defendant.

Plaintiff, Ms. Lane was born male, but identifies as female. (Doc.1, p. 29 ¶ 118). Plaintiff was diagnosed with gender dysphoria at or before the alleged constitutional and statutory violations occurred. (Doc. 1, p. 30 ¶ 122). According to the Complaint, gender dysphoria is a medical diagnosis for the "feeling of incongruence between one's gender identity and one's sex assigned at birth, and the resulting distress caused by that incongruence. . .." (Doc. 1 p. 8 ¶ 22).  Plaintiff Lane alleges that her treating physician recommended she receive facial feminization surgery and deemed it medically necessary to treat her gender dysphoria. (Doc. 1 pp. 32-33 ¶¶ 134, 135).

Plaintiff Lane is employed by the Office of the Public Defender in the Second Judicial Circuit of Florida, which is headed by Mr. Thomas. (Doc. 1 p. 29 ¶ 114). As a state employee, her health insurance is provided by the state of Florida through Capital Health Plan ("CHP"). (Doc. 1 pp.12-14 ¶¶ 36, 40, 43).

The state health plan is developed, maintained, and provided by DMS. (Doc. 1 pp. 12-13 ¶¶ 37, 38, 39). Under section VI of the health insurance plan document outlining the coverage provided by CHP there is a "Limitations and Exclusion" provision, which states "[t]he following services and supplies are excluded from coverage under this Plan unless a specific exception is noted. Exceptions may be subject to certain coverage Limitations." (Doc. 19-1 p. 57). Section VI then goes on

to identify 39 different categories of limitations and exclusion in the plans, one of which is "gender reassignment or modification services supplies." (Doc. 19-1 p. 57).

While the Complaint does not include the CHP document (Doc. 19-1), it is referred to extensively therein. The Eleventh Circuit has instructed that a district court may consider extrinsic evidence in ruling on a motion to dismiss if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged. *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010); *see also Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1267-68 (11th Cir. 2002). Plaintiff's Complaint is centered around the state-provided insurance plan and the gender reassignment exclusions are also referred to repeatedly. (Doc. 1 p. 15 ¶ 50). Obviously, the plan document is central to the complaint and its authenticity should not be in question.

On January 11, 2019, Plaintiff Lane's physician sent a letter recommending that Lane obtain facial feminization surgery. (Doc. 1 p. 33 ¶ 135). CHP denied authorization for coverage citing to the exclusion in the state plan for gender reassignment or modification services or supplies. (Doc. 1 p. 33 ¶ 136). Lane appealed the denial pursuant to the plan, and CHP again denied the appeal for the same reason, as well as for the additional reason that the procedure fell under the exclusion for cosmetics surgeries or services. (Doc. 1 p. 33 ¶¶ 137, 138).

It is this denial upon which the Plaintiff premises her Complaint, but fundamentally, Plaintiff fails to alleges any fact connecting the Public Defender Defendant to this decision or to the establishment of the state plan.

## *Argument* [1]

### I.   *Plaintiff Lacks Article III Standing to Sue the Public Defender Defendant.*

Both of Plaintiff's Counts against the Public Defender Defendant must be dismissed pursuant to Rule 12(b)(1), Fed. R. Civ. P., as this Court lacks subject matter jurisdiction over the Plaintiff's claims. This is because the Plaintiff cannot establish standing to sue the Public Defender Defendant. To satisfy the constitutional restriction of federal courts' jurisdiction to "cases" and "controversies," "a plaintiff must demonstrate constitutional standing." *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1302 (2017). "Article III standing requires Plaintiff to show an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and 'that is likely to be redressed by a favorable judicial decision." *Id.* The party invoking federal jurisdiction bears the burden of proving standing. *Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1265 (11th Cir. 2000).

To be sure, litigants must establish standing to sue under Title VII, but the burden under Title VII is weightier than the Article III standard. Only a "person

---

[1] Because this Court is surely well-versed in the standard for adjudicating a motion to dismiss, it is omitted.

aggrieved" may file suit under Title VII. 42 U.S.C. § 2000e–5(b), (f)(1). Standing for those "aggrieved" under Title VII must be construed more narrowly than the outer boundaries of Article III. *Thompson v. N. Am. Stainless, LP,* 562 U.S. 170, 177-78 (2011). Instead of Article III standing, the proper test to determine standing under Title VII is the "zone of interests" test. *Id.* at 177. Under this test, review must be denied "if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (quoting *Clarke v. Secs. Indus. Assn.,* 479 U.S. 388, 399–400 (1987)). Moreover, the plain terms of Title VII only make actionable instances where an employer, as defined by the statute, takes an adverse employment action against an employee. 42 U.S.C. § 2000e—2(a).

Here, Plaintiff's alleged injuries are not fairly traceable to the challenged actions of the Public Defender Defendant. In fact, the injuries are not traceable to this Defendant at all. Moreover, a favorable decision by this Court on the Counts subject to this motion will not result in any remedy that the Public Defender Defendant can provide as a matter of law. Stated another way, this Court cannot compel the Public Defender to do anything that would redress the Plaintiff's injuries. Thus, Plaintiff cannot establish the requisite standing to proceed against the Public Defender Defendant warranting dismissal.

A.   *Plaintiff's Injuries Are Not Fairly Traceable to the Public Defender Defendant*

Article III standing requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party." *Hollywood Mobile Estates,* 641 F.3d at 1265 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Here, any injury allegedly suffered by the Plaintiff via denial of coverage for her requested procedure, is exclusively tied to the independent actions of a third party – DMS. The Public Defender Defendant has no control over any aspect of the health insurance provided to state employees via the CHP state insurance plan.

The Florida Legislature has expressly declared its intent that DMS "shall be responsible for *all aspects* of the purchase of health care for state employees under the state group health insurance plan or plans . . ." §110.123(3)(c), Fla. Stat. (2019) (emphasis supplied).  The responsibilities assigned DMS by the Legislature include the "determination of health care benefits to be provided" and the "negotiation of contracts for health care and health care administrative services." *Id*.; *see also* §110.123(5)(a), Fla. Stat. (It is the duty of the DMS to "[d]etermine the benefits to be provided and the contributions to be required for the state group insurance program"). Plaintiff Lane acknowledges DMS's statutory responsibilities as to the determination and provision of group health insurance for state employees. (Doc. 1

¶ 37-40). To be sure, the Public Defender's Office is a "State Agency" for purposes of the state insurance program. §110.123(2)(i), Fla. Stat. The Plaintiff is a full-time employee of a state agency as defined in §110.123(2)(i), Fla. Stat., and has voluntarily elected to participate in the group insurance program offered by DMS as an enrollee. §110.123(2)(b) & (c), Fla. Stat.

Nowhere in the Complaint does Plaintiff allege that the Public Defender Defendant has any role in, or authority to, implement the state health plans, establish exclusions, solicit or choose providers, or otherwise control or influence any aspect of the state health plans. Further, there is no allegation in the Complaint that the Public Defender Defendant was in any way involved in the decision to deny the Plaintiff her requested procedures. The hands of state agencies such as the Public Defender Defendant are tied because those agencies *must* offer the health plans selected by DMS, exclusions and all.

It was solely DMS's responsibility, both by statute and in practice, to select and define the contours of the benefits offered under the state health plan. Because the Public Defender Defendant had no involvement in that process, no conduct of the Public Defender Defendant is fairly traceable to the injury alleged in the Complaint.

Indeed, ultimately, the "fairly traceable" element of Article III standing is essentially a threshold showing that there is some causal connection between the

injury and the actions of the defendants. *See Allen v. Wright,* 468 U.S. 737, 757 (1984) (holding that causation is a distinct requirement of standing apart from whether requested relief might substantially remedy a threatened constitutional injury). This case is similar to numerous cases in which the Eleventh Circuit has found want of facts to establish the "fairly traceable" element of Article III standing and a lack of causal connection between the conduct alleged on the part of a defendant and the injury suffered.

For example, in *Doe v. Pryor,* several plaintiffs sued the Attorney General of Alabama to enjoin enforcement of a statute making "deviate sexual intercourse" a criminal offense. 344 F.3d 1282, 1285–86 (11th Cir. 2003). While one plaintiff lost a custody dispute based on the challenged statute, the Eleventh Circuit held that this injury was not "fairly traceable" to the Attorney General because the Attorney General played no role in that custody determination. *Id.* at 1285. What was lacking in *Doe* is the same as what is lacking here: any connection between the defendant and the injury. *Id*.; *see also Hollywood Mobile Estates,* 641 F.3d at 1265–67 (holding that injury was not fairly traceable to Secretary of the Interior, where there was no allegation that Secretary caused any injury, in that case, a forcible eviction of a leased property committed by the Seminole Tribe of Florida)*; Daogaru v. U.S. Attorney Gen.,* 683 Fed. App'x 824, 825-26 (11th Cir. 2017) (dismissing federal government defendant and finding that defendant's conduct was not fairly traceable

to injury in complaint challenging federal firearms law prohibiting the plaintiff from possessing a firearm and ammunition in his home, where state law independently prohibited plaintiff from possessing a firearm)*; Allen*, 468 U.S. at 753 n.19, *abrogated in part on other grounds by Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) (holding that parents lacked standing to sue the IRS for their children's diminished ability to receive an education in a racially integrated school because, even though this was a cognizable injury, "whatever deficiencies exist in the opportunities for desegregated education for [plaintiffs'] children might not be traceable to IRS violations of law").

If the bar for the "fairly traceable" element of Article III standing is as low as the facts of the Complaint suggest, then any denial of a benefit under the state plan by insurance providers such as CHP, could lead to state agencies being hauled into court to defend an action it had nothing to do with. Just as in those situations, the decision to deny a particular claim for benefits, perhaps for cosmetic dentistry or laser eye surgery, could lead to liability for a state agency even though it was in no way involved in that determination.

This simply is not the bar for standing in this Circuit. As the Eleventh Circuit has noted, a plaintiff lacks standing to challenge a rule if an independent source would have caused her to suffer the same injury. *Swann v. Sec'y, Georgia*, 668 F.3d 1285, 1288–89 (11th Cir. 2012); Charles Alan Wright, Arthur R. Miller & Edward

H. Cooper, *Federal Practice and Procedure* § 3531.5 (3d ed. 2008) ("Rather than a break in one causal chain, standing may be defeated by finding a different cause."). Here, you can substitute the Public Defender Defendant for any state agency, and the result would be the same because that result is *compelled by* DMS and not Mr. Thomas. Nothing is more probative of the lack of standing.

B.  *Plaintiff's Injuries Are Not Redressable by the Public Defender Defendant*

For an injury to be redressable "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561. "Redressability is established . . . when a favorable decision 'would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redressed the injury suffered.'" *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1290 (11th Cir. 2010) (quoting *Harrell v. Fla. Bar*, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010)). Courts must be able "to ascertain from the record whether the relief requested is likely to redress the alleged injury," *Steele v. Nat'l Firearms Act Branch*, 755 F.2d 1410, 1415 (11th Cir. 1985), and if they cannot, then there is no jurisdiction to entertain the action. *See DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1303 (11th Cir. 2008) (dismissing complaint for lack of standing because it did not "suggest in any way how [the] 'injury' could be redressed by a favorable judgment").

Plaintiff, along with her co-Plaintiff, Jami Claire, seeks, *inter alia*, equitable relief in the form of permanent injunctive relief against all of the defendants to: (1) cease enforcement of the State Plan Exclusion of coverage for "gender reassignment or modification services and supplies"; and (2) provide benefits that cover Plaintiffs' medically necessary gender affirming care. (Doc. 1 p. 51).  Again, as DMS is the singular controlling entity as to the determination and administration of the state health plans as provided pursuant to Chapter 110 Fla. Stat., a favorable decision against the Public Defender Defendant will do absolutely nothing to redress the Plaintiff's alleged injuries.  The Public Defender Defendant has no power or authority to require DMS to alter the group health insurance plans already in effect. Moreover, the Public Defender Defendant could not compel or require DMS, notwithstanding the current plans in effect, to provide funds that cover the benefits the Plaintiff seeks, nor does the Public Defender Defendant have any inherent statutory authority to commit state funds for such use.

In fact, Mr. Thomas is statutorily prohibited from doing so as the state of Florida has exclusively made it the province and authority of DMS to control such terms. *See* section I(a), *supra.* Accordingly, even if the Plaintiff is successful in Counts III or VI, the harm suffered by Plaintiff cannot be redressed by the Public Defender Defendant. As such Plaintiff lacks Article III standing to sue the Public Defender Defendant. *See Doe*, 344 F.3d at 1285–86 (holding that injuries suffered

by plaintiff in custody proceeding by virtue of criminal statute would not be redressed through lawsuit against the Alabama Attorney General where injunctive relief against the Attorney General would have done nothing to change the result the plaintiff suffered in the state court custody proceeding and nothing that the court could order the Attorney General refrain from doing would address the harm suffered); *Hollywood Mobile Estates*, 641 F.3d at 1265–67 (holding plaintiff could not establish standing against Secretary of the Interior because plaintiff failed to show how a judgment against the Secretary would redress the harm caused by a third party).

## II.    *Count VI, Asserting Equal Protection Clause Violations, is Barred by the Doctrine of Sovereign Immunity*

Count VI, brought pursuant to Section 1983, is lodged against Mr. Thomas in his official capacity, and alleges a deprivation of rights under the Equal Protection Clause of the Fourteenth Amendment. This claim however is barred by the Eleventh Amendment, and, while technically styled as an *Ex Parte Young* claim, that legal fiction should not apply here.

"Dual sovereignty is a defining feature of our Nation's constitutional blueprint." *Sossamon v. Texas*, 563 U.S. 277, 283 (2011) (citation omitted). "Upon ratification of the Constitution, the States entered the Union 'with their sovereignty intact.'" *Id*. (citation omitted). It is a fundamental concept of Federalism that states yield their sovereignty only with respect to matters exclusively assigned to the

federal government. *See Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779 (1991). This concept underlies the Eleventh Amendment of the Constitution which limits the power of federal courts to hear certain lawsuits brought against states. *See* U.S. Const. amend. XI; *P.R. Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 143-46 (1993). The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state . . .." U.S. Const. Amend. XI.

The Amendment has been interpreted by the Supreme Court to forbid lawsuits brought by citizens of a state against their own state in federal courts under most circumstances. Congress may abrogate state sovereign immunity if it has unequivocally expressed its intent to abrogate the immunity and if it has acted pursuant to a valid exercise of power. *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 55 (1996). The doctrine of sovereign immunity has been interpreted to bar suits against an unconsenting state brought by private parties regardless of the nature of the relief sought. *See id*.; *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).

Sovereign immunity, as embodied in the Eleventh Amendment, precludes actions brought pursuant to Section 1983 against state entities for money damages and for injunctive relief. Indeed, state entities and state officials sued in their official

capacities are not "persons" subject to suit under Section 1983. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 70–71 (1989). The state of Florida has not waived its immunity to suits under Section 1983. *See Gamble v. Fla. Dep't of Health & Rehab. Servs.*, 779 F.2d 1509, 1513-20 (11th Cir. 1986).

Nevertheless, the Eleventh Amendment and the doctrine of sovereign immunity does not preclude suits against state officers in their official capacity for prospective injunctive relief when the state officers' alleged actions are in violation of federal law. *Ex Parte Young*, 209 U.S. 123 (1908); *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). This is because such suits, including suits under Section 1983, are not treated as suits against the state itself. *Will*, 491 U.S. at 71 n. 10.

The *Ex Parte Young* doctrine creates a legal fiction allowing a claim against a state officer to redress continuing violations of federal law. *Verizon Md. Inc. v. Public. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). However, only prospective injunctive or declaratory relief may be sought against a state official under *Ex Parte Young. See Green v. Mansour*, 474 U.S. 64, 68 (1985); *Fla. Ass'n of Rehab. Facilities, Inc.*, 225 F.3d 1208, 1219 (11th Cir. 2000). The exception does not allow a plaintiff "to adjudicate the legality of past conduct." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1337-38 (11th Cir. 1999) ("*Ex parte Young* requires the allegation of an ongoing and continuous violation of federal law.")

Moreover, *Ex parte Young* cannot "operate as an exception to ... sovereign immunity where no defendant has any connection to the enforcement of the challenged law at issue." *Id.* at 1341. Thus, before the exception applies, the "state officer [named as a defendant in his official capacity must have] the authority to enforce an unconstitutional act in the name of the state." *Id.*

The Equal Protection Clause claims brought pursuant to Section 1983 against Mr. Thomas in his official capacity must be dismissed because, while the count is pled in a manner suggesting Plaintiff seeks only prospective declaratory and injunctive relief to redress ongoing violations of the law, the Complaint reflects an attempt to dress-up claims for the monetary redress of a past harm as a request for prospective injunctive relief. Further, as state law makes clear, Mr. Thomas simply has no influence, effect, or authority to dictate the terms of the state health plans challenged by the Plaintiff.

A.    *The Count Against Mr. Thomas in his Official Capacity is, in Essence, Brought Against the State and for Retrospective Monetary Relief*

The *Ex Parte Young* fiction does not apply if the prospective relief sought by a plaintiff is the functional equivalent of money damages. In those situations, where the damages are "measured in terms of a monetary loss resulting from a past breach of a legal duty," sovereign immunity would bar a claim even brought against state officials in their official capacities. *Edelman v. Jordan*, 415 U.S. 651, 668 (1974). "[W]hen the action is in essence one for the recovery of money from the state, the

state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945) (overruled on other grounds).

Here, while Plaintiff alleges she is seeking only prospective declaratory and injunctive relief to redress an ongoing violation of the law on the part of Mr. Thomas, the Complaint cannot avoid the application of the doctrine of sovereign immunity merely through creative pleading. Contrary to the tenor of the Complaint, it is clear the Plaintiff actually seeks a declaration that the denial of her requested procedure and the application of the gender-identity exclusion was unlawful. This is not a case where the Complaint pleads an ongoing violation of a federal law, or the entitlement to prospective injunctive relief against state officials in anything but a nominal sense.

Indeed, "cases in which that relief is intended indirectly to encourage compliance with federal law through deterrence or simply to compensate the victim" are not appropriate for *Ex Parte Young* actions. *See Fla. Ass'n of Rehab. Facilities, Inc.*, 225 F.3d at 1219. *Ex Parte Young* actions are for those situations in which the remedies end a continuing violation of federal law and are necessary to vindicate federal interest in securing the supremacy of the law, but not where the interest is compensatory or deterrence. *Id*. at 1291-21. The instant matter is essentially an

appeal of a past denial of claims for benefits under the plan, dressed up as a claim for prospective injunctive relief.

*Seminole Tribe of Fla. v. Fla. Dep't of Revenue*, 750 F.3d 1238 (11th Cir. 2014), is instructive. There, the Eleventh Circuit considered whether *Ex Parte Young* applied where a tribe sought a declaratory judgment that it was exempt from Florida's fuel tax. The Eleventh Circuit found the State was the "real, substantial party in interest" because the suit was in essence "a suit for monetary relief to be financed by the Florida fisc." *Id*. at 1244. The Court reasoned that the "relief that the Tribe seeks is equitable in name only[,]" because, due to the structure of Florida's tax laws, a "declaratory ruling that the Tribe is exempt from the tax would amount to a judgment that the Tribe is entitled to a refund under Florida law" money that necessarily would have to come from state coffers. *Id.* The Court noted the refund would amount to a money judgment against Florida. *Id.* The Court also noted that, even if the relief sought "could conceivably be described as prospective in nature[,]" the relief is nothing "other than an award of damages." *Id.*

Just as in *Seminole Tribe*, the Plaintiff here seeks relief that is prospective and equitable in name only. The effect of finding that the terms of the state health plan or its application to Plaintiff is unconstitutional, is to redress a past harm suffered by Plaintiff and require the state to expend monies to fund the procedures Plaintiff contends were unlawfully denied. This is hardly akin to the proper cases for

prospective injunctive relief appropriately brought against state officials in their official capacities to cease ongoing violations federal law, for example, to require state officials to remove a display of the Ten Commandments from a state capitol building; *Van Orden v. Perry,* 545 U.S. 677 (2005); or to challenge state officials on the constitutionality of a statute concerning school prayer, *Wallace v. Jaffree,* 472 U.S. 38 (1985). The distinction makes a difference, and warrants dismissal of the Count VI as to Mr. Thomas in his official capacity. *See Fla. Ass'n of Rehab. Facilities, Inc.*, 225 F.3d at 1221 ("[T]he Eleventh Amendment's immunity is triggered when a declaration or injunction effectively calls for the payment of state funds as a form of compensation for *past* breaches of legal duties by state officials")

> B.   *Mr. Thomas Lacks any Authority to Enforce the State Health Plan Exclusion*

Just as the Public Defender Defendant cannot redress any harm suffered by Plaintiff, he is not authorized to establish or enforce the terms of the exclusion in the state health plans, rendering an *Ex Parte Young* claim inappropriately pled against Mr. Thomas in his official capacity. Under *Ex Parte Young*, a litigant must bring her case "against the state official or agency responsible for enforcing the allegedly unconstitutional scheme." *Osterback v. Scott*, 782 Fed. App'x 856, 858–59 (11th Cir. 2019) (quoting *ACLU v. The Florida Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993).

Indeed, unless the state officer sued in his official capacity has some responsibility to enforce the statute or provision at issue, the "fiction" of *Ex parte*

*Young* cannot operate. Only if a state officer has the authority to enforce an unconstitutional act in the name of the state can the Supremacy Clause be invoked to strip the officer of his official or representative character and subject him to the individual consequences of his conduct. *Summit Med. Assocs., P.C*, 180 F.3d at 1341 (citing Ex *Parte Young*). Where the named defendant lacks any responsibility to enforce the statute or scheme at issue the real party in interest is the state and the suit remains barred by the Eleventh Amendment. *Summit Med. Assocs.*, 180 F.3d at 1341.

The fact of the matter is that Mr. Thomas, as the Public Defender of the Second Judicial Circuit, employs state employees. DMS is tasked by statute with establishing the health care plans for all state employees, exclusions and all.  Mr. Thomas is not authorized in any way to solicit bids for health insurance plans, establish exclusions, or otherwise dictate to any state employees the contours of healthcare coverage. That is DMS's responsibility. Indeed, Mr. Thomas was not involved in the decision to even deny the Plaintiff's claims for benefits.

Because Mr. Thomas lacks the authority to establish the state health plan or enforce any exclusion that Plaintiff alleges caused her harm, the fiction of *Ex Parte Young* simply does not hold water. *See Osterback*, 782 Fed. App'x at 858–59 (holding that suit against the Governor of Florida in his official capacity was barred by sovereign immunity and not subject to *Ex Parte Young* exception because, while

the Governor had constitutional and statutory authority to enforce the law and oversee the executive branch, the responsibility for the enforcement of a challenged provision rested with the Division of Administrative Hearings). The non-fiction is that the Complaint is a suit against the state, and the challenge lodged against Mr. Thomas in his official capacity is barred by the doctrine of sovereign immunity.

III.   *Plaintiff's Title VII Claim Against Mr. Thomas in Count III Must be Dismissed because Title VII's Prohibition Against Sex Discrimination Does Not Encompass Discrimination Based on Gender Identity*

Plaintiff's claims under Title VII against the Public Defender Defendant must be dismissed because transgender status or gender identity is not a protected class under the statute. While Plaintiff may advance the argument that discrimination against someone based on her gender identity is *ipso facto* discrimination based on sex, that argument is not supported by the plain language of Title VII's text and is inconsistent with the ordinary and common meaning of the term "sex" when the statute was enacted. The argument that gender identity is encompassed within discrimination based on sex, is also foreclosed by binding precedent in the Eleventh Circuit.

Since 1964, Title VII has prohibited employers from "discriminat[ing]" against any individual with respect to employment "because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). Title VII does not define the term "sex." "It is a fundamental canon of statutory construction that, unless otherwise defined, words

will be interpreted as taking their ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014). More specifically, courts look at the ordinary meaning of the term at the time Congress enacted the statute." *Perrin v. U.S.*, 444 U.S. 37, 42 (1979); *New Prime, Inc. v. Oliveira*, 586 U.S. __, 139 S. Ct. 532, 539 (2019).

It cannot be gainsaid that at the time that Congress enacted Title VII in 1964, that the term "sex" was not meant to encompass gender identity. Indeed, ordinary common usage of the term sex in 1964 meant biologically male or female, based on reproductive organs. Sex, Webster's New World Dictionary of the American Language (College ed. 1962) ("either of the two divisions of organisms distinguished as male or female"); Sex, The American Heritage Dictionary of the English Language (1st ed. 1969) ("[t]he property or quality by which organisms are classified according to their reproductive functions"). Gender identity did not appear in federal law until 1990 when Congress enacted the Americans with Disabilities Act and excluded protection for "gender identity disorders." 42 U.S.C. 12211(b)(1).

Furthermore, while one can make the argument that a hyper-literal reading of the prohibition, "because of sex" in Title VII would extend to situations in which employees are treated differently because of their gender identity, this Court has already rejected that argument. *Winstead v. Lafayette Cnty. Bd. of Cnty. Com'rs*, 197 F. Supp. 3d 1334, 1343-1344 (N.D. Fla. 2016). Conceivably the Plaintiff might

argue that had her gender identity been consistent with her sex assigned at birth, her requested procedures would not have been denied. But such an argument ignores the fact that Title VII requires a showing that one sex is being treated differently than the other. As pled, a transgender male is treated no differently, worse or better, than a transgender female, rendering this construction out of step with what Title VII was meant to prohibit—actions within the terms and conditions of employment that disadvantage one sex as to the other. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).

Finally, discrimination based on gender identity is not akin to sex-stereotyping discrimination, and this is not a case where the Plaintiff has even pled facts to support that she has been treated differently from the other sex based on a stereotypical view of the sexes. Discrimination based on gender identity is not just another way to claim gender-nonconformity discrimination. To hold otherwise, misreads Supreme Court and Eleventh Circuit precedent.

The genesis of such claims is the Supreme Court decision in *Price Waterhouse v. Hopkins*. 490 U.S. 228 (1989). Crucially, *Price Waterhouse* did not hold that sex stereotyping is per se unlawful, regardless of whether the reliance on stereotypes is used to favor one sex over another. If that were the holding, then discrimination against a transgender person is per se unlawful as well because transgender men and women do not conform with sex stereotypes as to how they should identify

themselves. But *Price Waterhouse* only makes sex-stereotyping actionable to the extent it provides evidence of favoritism of one sex over the other. *Id.* at 251 (holding that sex-stereotyping is not sex discrimination per se, but is only actionable when disparate treatment of men and women results from sex stereotypes). *See also id.* ("An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind.") (citations and quotations omitted).

Indeed, the Eleventh Circuit expressly held as much in *Evans v. Georgia Regional Hospital*, where it held that a gender non-conformity claim is not "just another way to claim discrimination based on sexual orientation," and clarified that its holding in *Glenn v. Brumby,* was not meant to transform claims of discrimination based on transgender status into sex stereotyping claims. 850 F.3d 1248, 1254–55 (11th Cir. 2017) (citing *Glenn v. Brumby*, 663 F.3d 1312, 1318–19 (11th Cir. 2011)). As Judge Pryor clarified in his concurrence in *Evans*, sex stereotyping claims are ultimately about behavior and not status. *Evans*, 850 F.3d at 1259 (J. Pryor, concurring). To be sure, if the law of the Circuit was otherwise, the Eleventh Circuit could not have reached the result it did in *Bostock v. Clayton Cty. Bd. of Commissioners*, where it held that Title VII does not prohibit discrimination based on sexual orientation. 723 Fed. App'x 964 (11th Cir. 2018), *cert. granted sub nom.*

*Bostock v. Clayton Cty., Ga.*, 139 S. Ct. 1599 (2019). The same rationale applies in equal force to claims centered on the inherent gender non-conforming aspects of transgender individuals.

While it is true that Title VII has been interpreted to apply to situations that Congress might not have contemplated when it enacted the statute, a reading of Title VII's prohibition of sex discrimination to include discrimination based on gender identity, as a form of sex-stereotyping or otherwise, goes beyond the limits of the text. Indeed, the Supreme Court in *Oncale*, interpreted Title VII to apply to male-on-male sexual harassment, something not contemplated by Congress when enacting Title VII in 1964. As the Supreme Court explained:

> [S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed. Title VII prohibits "discriminat [ion] ... because of ... sex" in the "terms" or "conditions" of employment. Our holding that this includes sexual harassment must extend to sexual harassment of any kind that meets the statutory requirements.

*Oncale*, 523 U.S. at 80. Fundamentally though, interpreting Title VII to prohibit claims of discrimination based on gender identity or sex-stereotyping claims centered on status rather than behavior and a showing that a stereotype resulted in the disadvantageous treatment of someone based on sex, is not a result that inures from the text of Title VII.

Indeed, a proper comparator in the instant matter is a transgender male that is seeking a procedure otherwise covered by the exclusion. If a transgender male, someone similarly situated to the Plaintiff in all material respects, but outside of her protected class, was afforded better treatment than the Plaintiff, a sex discrimination claim would be stated. To read the statute otherwise goes beyond the outer limits of Title VII's text even if it is ambiguous on this point. Even ambiguous statutes should not be interpreted in a way that would have major policy implications, as Congress "does not alter the fundamental details of a regulatory scheme in vague or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'n,* 531 U.S. 457, 468 (2001). *See also, e.g., Gonzales v. Oregon,* 546 U.S. 243, 267 (2006) (same).

Of course, the Supreme Court is set to resolve these issues this term. *See R.G. & G.R. Harris Funeral Homes, Inc. v. E.E.O.C.*, 139 S. Ct. 1599 (2019). The Public Defender Defendant welcomes that decision from the Supreme Court. To be sure, Mr. Thomas and his office actively assisted Ms. Lane in her attempts to obtain her requested procedure. The Public Defender is sensitive to the needs of all of their employees, including, of course, the Plaintiff.

Nevertheless, under the Constitution, judges have the power to say what the law is, not what it should be. The people who ratified the Constitution authorized courts to exercise "neither force nor will but merely judgment." The Federalist No.

78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton) (capitalization altered). This Court, like all federal courts, is bound by Article III of the Constitution to interpret the law as Congress enacted and to effectuate that law as the will of the people. Notwithstanding the support of Mr. Thomas' office as to his employee's quest for state plan benefits, which he is permitted to do in his best judgment and in response to the people he serves, this Court is bound by the language of the text of Title VII and precedent interpreting that text. Title VII simply does not support a cognizable claim as pled in the Complaint, warranting dismissal.

### *Conclusion*

For the foregoing reasons, the Public Defender Defendant requests that this Court dismiss Count's III and VI of the Complaint, with prejudice.

Respectfully submitted this 27th day of February, 2020.

*/s/ Jeffrey D. Slanker*
**JEFFREY D. SLANKER**
Florida Bar No. 100391
E-mail: jslanker@sniffenlaw.com
**MICHAEL P. SPELLMAN**
Florida Bar No. 937975
E-mail: mspellman@sniffenlaw.com
**MARK K. LOGAN**
Florida Bar No. 0494208
E-mail: mlogan@sniffenlaw.com

**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004

*Attorneys for the Public Defender Defendant*

## WORD COUNT CERTIFICATION

This document complies with word limits set forth in N.D. Fla. Local Rule 7.1(F), and contains 6,642 words, which includes the headings, footnotes, and quotations, but does not include the case style, signature block or Certificates of Word Count and Service.

*/s/ Jeffrey D. Slanker*
**JEFFREY D. SLANKER**

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 27th day of February, 2020, a true and correct copy of the foregoing was electronically filed in the U.S. District Court, Northern District of Florida, using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ Jeffrey D. Slanker*
**JEFFREY D. SLANKER**