## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**JAMI CLAIRE, KATHRYN LANE,**
**and AHMIR MURPHY,**

     **Plaintiffs,**

**v.**                    **CASE NO.: 4:20-cv-00020-MW-MAF**

**FLORIDA DEPARTMENT OF**
**MANAGEMENT SERVICES, et al.,**

     **Defendants.**

_____/

## <u>DEFENDANT, FLORIDA DEPARTMENT OF CORRECTIONS',</u>
## <u>SECRETARY MARK INCH'S, AND ANDY THOMAS' MOTION TO</u>
## <u>DISMISS PLAINTIFFS' AMENDED COMPLAINT</u>

Defendants, Florida Department of Corrections ("FDC"), Mark Inch, in his

official capacity as Secretary of the Florida Department of Corrections ("Secretary

Inch"), (collectively "FDC Defendants") and Andy Thomas, in his official capacity

as Public Defender of the Second Judicial Circuit of Florida ("Mr. Thomas" or the

"Public Defender") through undersigned counsel, and pursuant to Rules 12(b)(1) and

12(b)(6), Fed. R. Civ. P., and N.D. Fla. Loc. R. 7.1, move this Court to dismiss

Counts III, IV, VII, and VIII of the Amended Complaint, with prejudice.

### *Introduction*

The Amended Complaint must be dismissed based on several fundamental

grounds. Plaintiff Ahmir Murphy brings the following counts against the FDC

Defendants: Count IV asserts violations of Title VII by the FDC; and Count VIII, brought against Secretary Inch in his official capacity as Secretary of the FDC pursuant to 42 U.S.C. §1983, asserts violations of the Fourteenth Amendment's Equal Protection Clause.

Similarly, Plaintiff Kathryn Lane brings the following counts against the Public Defender: Count III asserts violations of Title VII by the Public Defender; and Count VII, brought against the Public Defender in his official capacity pursuant to 42 U.S.C. §1983, asserts violations of the Fourteenth Amendment's Equal Protection Clause.

Each of these counts must be dismissed with prejudice because Mr. Murphy and Ms. Lane (for the purposes of this motion collectively referred to as "Plaintiffs") have failed to demonstrate Article III standing. None of the alleged injuries are fairly traceable to, or can be redressed by the FDC or the Secretary of FDC or Mr. Thomas. This is because by statute, the Florida Department of Management Services ("DMS") has total control and authority over the provision of health insurance for state employees, including the Plaintiffs. As such, the actions of the FDC, Secretary Inch and Mr. Thomas are not fairly traceable to the harm suffered by the Plaintiffs, which was solely caused by the actions of the DMS in determining the appropriate level of healthcare for state employees.

Count VIII, styled as an *Ex Parte Young* claim for prospective injunctive relief from a continuing violation of law against Secretary Inch, also fails because it is barred by sovereign immunity. Secretary Inch lacks the authority to actually implement or enforce the complained-of policies. This destroys the legal fiction that *Ex Parte Young* provides in very limited cases for litigants to obtain relief from states in federal courts in situations where such actions for relief would otherwise be barred. This same reason also requires the dismissal of Count VII against Mr. Thomas.

Counts III and IV of the Complaint, brought pursuant to Title VII alleging sex discrimination must also be dismissed for failure to state a cause of action. Plaintiffs simply fail to plead any facts establishing that they were treated adversely due to their sex.

### *Facts*

The following facts are taken from the Amended Complaint and in the light most favorable to the Plaintiffs. None of the facts recited herein should be deemed an admission on the part of the moving parties that they are true.

Mr. Murphy was born female, but identifies as male. (Doc. 34 p. 38 ¶ 165). Ms. Lane was born male, but identifies as female. (Doc. 34 p. 29 ¶ 122). Mr. Murphy and Ms. Lane were diagnosed with gender dysphoria at or before the alleged constitutional and statutory violations occurred. (Doc. 34 pp. 30, 39 ¶¶ 126, 171).

According to the Amended Complaint, gender dysphoria is a medical diagnosis for the "feeling of incongruence between one's gender identity and one's sex assigned at birth, and the resulting distress caused by that incongruence. . .." (Doc. 34 p. 9 ¶ 25).

Mr. Murphy alleges that his treating physician recommended he receive a double mastectomy and chest reconstruction and deemed both procedures medically necessary to treat his gender dysphoria. (Doc. 34 p. 42 ¶¶ 185, 186). Ms. Lane alleges that her treating physician recommended she receive facial feminization surgery and deemed it medically necessary to treat her gender dysphoria. (Doc. 34 pp. 32-33 ¶¶ 138, 139).

Mr. Murphy is employed as a correctional sergeant at Homestead Correctional Institution in Florida City for the FDC. (Doc. 34 p. 37-38 ¶163). As a state employee, his health insurance is provided by the state of Florida through AvMed. (Doc. 34 pp. 13-14 ¶¶ 39, 43, 47). Ms. Lane is employed by the Office of the Public Defender in the Second Judicial Circuit of Florida, which is headed by Mr. Thomas. (Doc. 34 p. 29 ¶ 118). As a state employee, her health insurance is provided by the state of Florida through Capital Health Plan ("CHP"). (Doc. 34 pp.13-14 ¶¶ 39, 43, 46).

The state health plan is developed, maintained, and provided to state employees by DMS. (Doc. 34 p. 13 ¶¶ 40, 41, 42). Under section VI of the health insurance plan documents outlining the coverage provided by AvMed there is a

"Limitations and Exclusions" provision, which states "[t]the following services and supplies are excluded from coverage under this Plan unless a specific exception is noted. Exceptions may be subject to certain coverage Limitations." (Doc. 20-1 p. 57). Section VI then goes on to identify 39 different categories of limitation and exclusions in the plans, one of which is "gender reassignment or modification services and supplies." (Doc. 20-1 p. 58).

Likewise, under section VI of the health insurance plan document outlining the coverage provided by CHP there is a "Limitations and Exclusion" provision, which states "[t]he following services and supplies are excluded from coverage under this Plan unless a specific exception is noted. Exceptions may be subject to certain coverage Limitations." (Doc. 19-1 p. 57). Section VI then goes on to identify 39 different categories of limitations and exclusion in the plans, one of which is "gender reassignment or modification services supplies." (Doc. 19-1 p. 58).

While the Amended Complaint does not include or attach the AvMed or CHP plan documents, they are both referred to extensively therein. The Eleventh Circuit has instructed that a district court may consider extrinsic evidence in ruling on a motion to dismiss if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged. *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010); *see also Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1267-68 (11th Cir. 2002). Plaintiffs' Amended Complaint is centered around the state-

provided insurance plans and the gender reassignment exclusion. (Doc. 34 p. 15 ¶ 54). Obviously, the plan documents are central to the Amended Complaint and their authenticity should not be in question.

Mr. Murphy alleges that on May 13, 2019, his physician sought authorization for Murphy to obtain a double mastectomy. (Doc. 34 p. 44 ¶ 193). On May 23, 2019, AvMed denied authorization for coverage citing to the exclusion in the state plan for gender reassignment or modification services and supplies. (Doc. 34 p. 44 ¶ 194). On May 29, 2019, a different physician sought authorization for Mr. Murphy to obtain the procedure. (Doc. 34 p. 44 ¶ 195). On June 5, 2019, AvMed denied the second authorization request for coverage citing to the exclusion in the state plan for gender reassignment or modification services and supplies. (Doc. 34 p. 45 ¶ 196).

On January 11, 2019, Plaintiff Lane's physician sent a letter recommending that Lane obtain facial feminization surgery. (Doc. 34 p. 33 ¶ 139). CHP denied authorization for coverage citing to the exclusion in the state plan for gender reassignment or modification services and supplies. (Doc. 34 p. 33 ¶ 140). Ms. Lane appealed the denial pursuant to the plan, and CHP again denied the appeal for the same reason, as well as for the additional reason that the procedure fell under the exclusion for cosmetics surgeries or services. (Doc. 34 p. 33 ¶¶ 141, 142).

### *Argument* [1]

---

[1] Because this Court is surely well-versed in the standard for adjudicating a motion to dismiss, it is omitted.

I.   *Plaintiffs Lack Article III Standing to Sue the FDC Defendants and Mr. Thomas*

All of Plaintiffs' counts against the FDC Defendants and Mr. Thomas must be dismissed pursuant to Rule 12(b)(1), Fed. R. Civ. P., as this Court lacks subject matter jurisdiction over these claims. This is because the Plaintiffs cannot establish standing to sue the FDC Defendants or Mr. Thomas. To satisfy the constitutional restriction of federal courts' jurisdiction to "cases" and "controversies," "a plaintiff must demonstrate constitutional standing." *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1302 (2017). "Article III standing requires Plaintiff to show an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and 'that is likely to be redressed by a favorable judicial decision." *Id.* The party invoking federal jurisdiction bears the burden of proving standing. *Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1265 (11th Cir. 2000).

Here, Plaintiffs' alleged injuries are not fairly traceable to the challenged actions of the FDC Defendants or Mr. Thomas. Moreover, a favorable decision by this Court on the counts subject to this motion will not result in any remedy that the FDC Defendants or Mr. Thomas can provide as a matter of law. Stated another way, this Court cannot compel the FDC Defendants or Mr. Thomas to do anything that would redress the Plaintiffs' injuries. Thus, the Plaintiffs cannot establish the requisite standing to proceed against the FDC Defendants or the Public Defender warranting dismissal.

a.   *Plaintiffs' Injuries Are Not Fairly Traceable to the FDC Defendants or the Public Defender.*

Article III standing requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party." *Hollywood Mobile Estates,* 641 F.3d at 1265 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Here, any injury allegedly suffered by the Plaintiffs via denial of coverage for their respective requested procedures, is exclusively tied to the independent actions of a third party – DMS. The FDC Defendants and Mr. Thomas have no control over any aspect of the health insurance provided to state employees via the AvMed or CHP state insurance plans.

The Florida Legislature has expressly declared its intent that DMS "shall be responsible for *all aspects* of the purchase of health care for state employees under the state group health insurance plan or plans . . ." §110.123(3)(c), Fla. Stat. (2019) (emphasis supplied). The responsibilities assigned and limited to DMS by the Legislature include the "determination of health care benefits to be provided" and the "negotiation of contracts for health care and health care administrative services." *Id*.; *see also* §110.123(5)(a), Fla. Stat. (It is the duty of the DMS to "[d]etermine the benefits to be provided and the contributions to be required for the state group insurance program"). Plaintiffs acknowledge DMS's statutory responsibilities as to the determination and provision of group health insurance for state employees. (Doc.

34 ¶¶ 40-43). To be sure, the FDC and the Public Defender are both included in the definition of "State Agency" for purposes of the state insurance program. §110.123(2)(i), Fla. Stat. The Plaintiffs are full-time employees of state agencies as defined in §110.123(2)(c) and §110.123(2)(i), Fla. Stat., and have voluntarily elected to participate in the group insurance program offered by DMS as an enrollee. §110.123(2)(b) & (c), Fla. Stat.

Nowhere in the Amended Complaint do the Plaintiffs allege that the FDC Defendants or the Public Defender have any role in, or authority to, implement the state health plans, establish exclusions, solicit or choose providers, enter into contracts to establish the state health plans, or otherwise control or influence any aspect of the state health plans. Further, there is no allegation in the Amended Complaint that the FDC Defendants or the Public Defender were in any way involved in the decision to deny the Plaintiffs their requested procedures.

It was solely DMS's responsibility to select and define the contours of the benefits offered under the state health plan that covered Plaintiffs. Because the FDC Defendants and the Public Defender have no involvement in that process, no conduct of the FDC Defendants or the Public Defender is fairly traceable to the injury alleged in the Amended Complaint.

Ultimately, the "fairly traceable" element of Article III standing is essentially a threshold showing that there is some causal connection between the injury and the

actions of the defendants. *See Allen v. Wright,* 468 U.S. 737, 757 (1984), *abrogated in part on other grounds by Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) (holding that causation is a distinct requirement of standing apart from whether requested relief might substantially remedy a threatened constitutional injury). This case is similar to numerous cases in which the Eleventh Circuit has found want of facts to establish the "fairly traceable" element of Article III standing and a lack of causal connection between the conduct alleged on the part of a defendant and the injury suffered.

For example, in *Doe v. Pryor,* several plaintiffs sued the Attorney General of Alabama to enjoin enforcement of a statute making "deviate sexual intercourse" a criminal offense. 344 F.3d 1282, 1285–86 (11th Cir. 2003). While one plaintiff lost a custody dispute based on the challenged statute, the Eleventh Circuit held that this injury was not "fairly traceable" to the Attorney General because the Attorney General played no role in the custody dispute. *Id.* at 1285. What was lacking in *Doe* is the same as what is lacking here: any connection between the defendant and the injury. *Id.*; *see also Hollywood Mobile Estates,* 641 F.3d at 1265–67 (holding that injury was not fairly traceable to Secretary of the Interior, where there was no allegation that Secretary caused any injury, in that case, a forcible eviction of a leased property committed by the Seminole Tribe of Florida)*; Daogaru v. U.S. Attorney Gen.,* 683 F. App'x 824, 825-26 (11th Cir. 2017) (dismissing federal

government defendant and finding that defendant's conduct was not fairly traceable to injury in complaint challenging federal firearms law prohibiting the plaintiff from possessing a firearm and ammunition in his home, where state law independently prohibited plaintiff from possessing a firearm); *Allen*, 468 U.S. at 753 n.19 (holding that parents lacked standing to sue the IRS for their children's diminished ability to receive an education in a racially integrated school because, even though this was a cognizable injury, "whatever deficiencies exist in the opportunities for desegregated education for [plaintiffs'] children might not be traceable to IRS violations of law").

The instant matter is unlike the case in *Arizona Governing Comm. for Tax Deferred Annuity and Deferred Comp. Plans v. Norris,* 463 U.S. 1073 (1983) which found the state of Arizona responsible for a discriminatory fringe benefit plan it adopted. In *Norris*, the plaintiff brought suit against the state of Arizona, the Governing Committee responsible for adopting the plan, and several members of the Committee. *Id*. at 1078 (Marshall, J., concurring). Notably, the plaintiff's employer, the Arizona Department of Economic Security, was not itself a defendant. *Id.* While the Supreme Court did note that "an employer that adopts a fringe-benefit scheme that discriminates among its employees on the basis of race, religion, sex, or national origin violates Title VII regardless of whether third parties are also involved in the discrimination" it emphasized the extent of the involvement of the defendants in establishing and administering the discriminatory fringe benefit plan in reaching that

conclusion. *Id.* at 1088–89 (Marshall, J., concurring). Indeed, the Supreme Court noted the extensive involvement of Arizona's Governing committee in establishing the fringe benefit plan including the fact that it invited insurance companies to submit bids outlining the terms on which they would supply benefits, selected the companies that were to participate in the plan, and entered into contracts with them governing the terms on which benefits were to be provide to employees. *Id.* It was only "under these circumstances" that the Supreme Court held "there can be no serious question" that the state was responsible for the discriminatory terms of the fringe benefit plan. 463 U.S. at 1089 (Marshall, J., concurring).

Indeed, courts that have based employer liability on participation in third party programs that are discriminatory, emphasize the fact that the employer in those situations had some control over the terms of the program and therefore can be said to have perpetuated that discrimination. *See Morgan v. Safeway Stores, Inc.*, 884 F.2d 1211, 1214-15 (9th Cir. 1989) (collecting authorities holding the same). The Ninth Circuit's decision in *Morgan* is directly on point. There, the Ninth Circuit held that Safeway was not responsible for alleged discriminatory features of the Safeway Credit Union benefit offered to employees because the grocery store did not participate in the discriminatory program. *Id*. at 1215–16. The Ninth Circuit held as much because there was no evidence of the participation of Safeway in establishing or maintaining the credit union's alleged discriminatory policy. *Id*. Safeway did not

specify the terms of the program by contract, as in the *Norris* case, it did not require its employees to participate in the alleged discriminatory program, it did not establish conditions for receiving the benefits, and it did not develop the terms of the program. *Id*.

Just as in *Morgan*, the FDC Defendants and the Public Defender have no involvement in the development of the state health care plans challenged in this action. The FDC and the Public Defender are defined as state agencies under Section 110.123, which reserves the administration and authority for the state health care plans, including engaging in all of the key indicia of participation outlined by the *Norris* and *Morgan* courts, to DMS. The Amended Complaint does not plead any facts demonstrating that the Public Defender or the FDC Defendants solicited any plan terms, established any plan terms, entered into any contracts with service providers or were part of the process for establishing or administering the state health plans. Simply put, "participation" and control over the state health plan on the part of these defendants has not been alleged or pled.

Any invitation that the Article III standing requirement, an important prudential requirement that speaks to the heart of this Court's jurisdiction over the subject matter of a dispute, can be premised on the *Norris* case must be rejected as inapposite as applied here. Indeed, the plaintiff in the *Morgan* case argued that "participation" in the allegedly discriminatory third party program does not require

an active role on the part of the employer relying on the Ninth Circuit's own precedent in *Norris v. Arizona Governing Comm. for Tax Deferred Annuity and Deferred Comp. Plans,* 671 F.2d 330 (9th Cir.1982), which would go on to the Supreme Court, as cited *supra.* The Ninth Circuit plainly rejected this argument, noting that the State of Arizona could be held liable because it took an active role in administering and developing the program, adopted the plan, and entered into a contract governing the terms of the plan, thus specifically agreeing to them. *Morgan*, 884 F.2d at 1214-15, n. 1. That active participation was lacking in the *Morgan*, and it is lacking here.

To be sure, the injury need not be "the very last step in the chain of causation" to be fairly traceable to the defendant, but the conduct of the defendant must have at least been a step in that chain. *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). In *Bennett*, the plaintiff was found to have standing to sue a federal agency that issued an advisory opinion, because the advisory opinion amounted to a "determinative or coercive effect upon the action of someone else" leading to injury. *Id.* at 169. Indeed, while another agency took ultimate action in the *Bennett* case, the exceptional circumstances of the advisory opinion led to a finding that the injury was fairly traceable to the agency issuing that advisory opinion. *Id.* at 168-171. In *Bennett*, the government admitted that the specific advisory opinion at issue had a powerful and coercive effect on the action of agencies playing a central role in the agency's

decision-making process. *Id.* at 169. Agencies bore the burden of articulating in its administrative record why it decided to go against the advisory opinion and they carried a substantial risk in disregarding the advisory opinion because it opened itself up to criminal and civil penalties in those circumstances. *Id.* at 169-170. In fact, the advisory opinion at issue in *Bennett* contained an "incidental take statement" that provided that an action was not approved unless it was "in compliance with this incidental take statement," and warning that "[t]he measures described below are nondiscretionary, and must be taken." *Id*. at 170-71.

This is hardly a situation in which the FDC Defendants or the Public Defender caused Plaintiffs an injury by taking an action that had a "determinative or coercive effect upon the action of someone else." Rather, DMS solely controls the State Group Health Insurance Plan and its terms.

The allegations in the Amended Complaint simply do not meet the bar for standing in this Circuit as recently articulated by the Eleventh Circuit. *Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193 (11th Cir. 2020) (holding that plaintiffs lacked Article III standing to sue Secretary of State for dispute over election ballot ordering where "Florida law expressly gives a different, independent official control over the order in which candidates appear on the ballot"). Indeed, a plaintiff lacks standing to challenge a rule if an independent source would have caused her to suffer the same injury. *Swann v. Sec'y, Georgia*, 668 F.3d 1285, 1288–89 (11th Cir. 2012); Charles

Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3531.5 (3d ed. 2008) ("Rather than a break in one causal chain, standing may be defeated by finding a different cause."). Here, the Plaintiffs' injury is attributable to DMS, and not fairly traceable to the FDC or Secretary Inch or the Public Defender, meriting dismissal of all counts pled against these defendants.

> b.   *Plaintiffs' Injuries Are Not Redressable by the FDC Defendants or the Public Defender*

For an injury to be redressable "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561. "Redressability is established . . . when a favorable decision 'would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redressed the injury suffered.'" *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1290 (11th Cir. 2010) (quoting *Harrell v. Fla. Bar*, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010)). Courts must be able "to ascertain from the record whether the relief requested is likely to redress the alleged injury," *Steele v. Nat'l Firearms Act Branch*, 755 F.2d 1410, 1415 (11th Cir. 1985), and if they cannot, then there is no jurisdiction to entertain the action. *See DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1303 (11th Cir. 2008) (dismissing complaint for lack of standing because it did not "suggest in any way how [the] 'injury' could be redressed by a favorable judgment").

Plaintiffs seek, *inter alia*, equitable relief in the form of permanent injunctive relief against all of the defendants to: (1) cease enforcement of the State Plan Exclusion of coverage for "gender reassignment or modification services and supplies"; and (2) provide benefits that cover Plaintiffs' asserted medically necessary gender affirming care. (Doc. 34 pp. 62-63).  Again, as DMS is the singular controlling entity as to the determination and administration of the state health plans as provided pursuant to Chapter 110 Fla. Stat., a favorable decision against the FDC Defendants or the Public Defender will do nothing to redress the Plaintiffs' alleged injuries. The FDC Defendants and the Public Defender have no power or authority to require DMS to alter the group health insurance plans already in effect. Moreover, the FDC Defendants and the Public Defender could not compel or require DMS, notwithstanding the current plans in effect, to provide funds that cover the benefits the Plaintiffs seek, nor do the FDC Defendants have any authority to commit state funds for such use.

In fact, the FDC, Secretary Inch, and the Public defender are statutorily prohibited from doing so as the state of Florida has exclusively made it the province and authority of DMS to control such terms. *See* section I(a), *supra.* The Eleventh Circuit's opinion in *Jacobson* is on point. There, the Eleventh Circuit found that relief ordered against Florida's Secretary of State could not redress the injury caused by the decision to order candidate names on a ballot in a certain way because

nonparty supervisors of election, over whom the Secretary did not have any pertinent control, were responsible for ballot ordering. 957 F.3d 1193. No factual allegations have been pled to suggest such control exists in the instant matter.

Ultimately, even if the Plaintiffs are successful in the counts against the FDC Defendants or the Public Defender, the harm suffered by the Plaintiffs cannot be redressed by these defendants. As such Plaintiffs lack Article III standing to sue the FDC Defendants and the Public Defender. *See Doe*, 344 F.3d at 1285–86 (holding that injuries suffered by plaintiff in custody proceeding by virtue of criminal statute would not be redressed through lawsuit against the Alabama Attorney General where injunctive relief against the Attorney General would have done nothing to change the result the plaintiff suffered in the state court custody proceeding and nothing that the court could order the Attorney General refrain from doing would address the harm suffered); *Hollywood Mobile Estates*, 641 F.3d at 1265–67 (holding plaintiff could not establish standing against Secretary of the Interior because plaintiff failed to show how a judgment against the Secretary would redress the harm caused by a third party).

II.   *Counts VII and VIII, Asserting Equal Protection Clause Violations, are Barred by the Doctrine of Sovereign Immunity*

Counts VII and VIII, brought pursuant to Section 1983, are lodged against Secretary Inch in his official capacity and Mr. Thomas in his official capacity, respectively, and allege a deprivation of rights under the Equal Protection Clause of

the Fourteenth Amendment. This claim however is barred by the Eleventh Amendment, and, while technically styled as an *Ex Parte Young* claim, that legal fiction should not apply here.

"Dual sovereignty is a defining feature of our Nation's constitutional blueprint." *Sossamon v. Texas*, 563 U.S. 277, 283 (2011) (citation omitted). "Upon ratification of the Constitution, the States entered the Union 'with their sovereignty intact.'" *Id*. (citation omitted). It is a fundamental concept of Federalism that states yield their sovereignty only with respect to matters exclusively assigned to the federal government. *See Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779 (1991). This concept underlies the Eleventh Amendment of the Constitution which limits the power of federal courts to hear certain lawsuits brought against states. *See* U.S. Const. amend. XI; *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144-46 (1993). The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state . . .." U.S. Const. Amend. XI.

The Amendment has been interpreted by the Supreme Court to forbid lawsuits brought by citizens of a state against their own state in federal courts under most circumstances. Congress may abrogate state sovereign immunity if it has unequivocally expressed its intent to abrogate the immunity and if it has acted

pursuant to a valid exercise of power. *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 55 (1996). The doctrine of sovereign immunity has been interpreted to bar suits against an unconsenting state brought by private parties regardless of the nature of the relief sought. *See id.*; *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).

Sovereign immunity, as embodied in the Eleventh Amendment, precludes actions brought pursuant to Section 1983 against state entities for money damages and for injunctive relief. Indeed, state entities and state officials sued in their official capacities are not "persons" subject to suit under Section 1983. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 70–71 (1989). The state of Florida has not waived its immunity to suits under Section 1983. *See Gamble v. Fla. Dep't of Health & Rehab. Servs.*, 779 F.2d 1509, 1513-20 (11th Cir. 1986).

Nevertheless, the Eleventh Amendment and the doctrine of sovereign immunity does not preclude suits against state officers in their official capacity for prospective injunctive relief when the state officers' alleged actions are in violation of federal law. *Ex Parte Young*, 209 U.S. 123 (1908); *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). This is because such suits, including suits under Section 1983, are not treated as suits against the state itself. *Will*, 491 U.S. at 71 n. 10.

The *Ex Parte Young* doctrine creates a legal fiction allowing a claim against a state officer to redress continuing violations of federal law. *Verizon Md. Inc. v.*

*Public. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). However, *Ex parte Young* cannot "operate as an exception to ... sovereign immunity where no defendant has any connection to the enforcement of the challenged law at issue." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1341 (11th Cir. 1999). Thus, before the exception applies, the "state officer [named as a defendant in his official capacity must have] the authority to enforce an unconstitutional act in the name of the state." *Id.*

The Equal Protection Clause claims brought pursuant to Section 1983 against Secretary Inch and Mr. Thomas in their official capacities must be dismissed because, as state law makes clear, Secretary Inch and Mr. Thomas simply have no influence, effect, or authority to dictate the terms of the state health plans challenged by the Plaintiffs. Indeed, only if a state officer has the authority to enforce an unconstitutional act in the name of the state can the Supremacy Clause be invoked to strip the officer of his official or representative character and subject him to the individual consequences of his conduct. *Summit Med. Assocs., P.C.*, 180 F.3d at 1341 (citing Ex *Parte Young*). Where the named defendant lacks any responsibility to enforce the statute or scheme at issue the real party in interest is the state and the suit remains barred by the Eleventh Amendment. *Summit Med. Assocs. P.C.*, 180 F.3d at 1341.

The fact of the matter is that Secretary Inch, as the Secretary of the FDC, and Mr. Thomas, as the Second Judicial Circuit's Public Defender, have no control over or authority over the provision of healthcare insurance coverage to state employees under Section 110.123. DMS is tasked by statute with establishing the health care plans for all state employees. Secretary Inch and Mr. Thomas are not authorized in any way to solicit bids for health insurance plans, establish exclusions, enter into contracts for the provision of healthcare coverage, or otherwise dictate to any state employee the contours of healthcare coverage. That is DMS's responsibility.

This case is unlike those that have found a connection sufficient to support an *Ex Parte Young* claim. For example, the Eleventh Circuit in *Luckey v. Harris*, 860 F.2d 1012, 1016 (11th Cir. 1988) held that personal action by the defendants causing injury is not a necessary condition of injunctive relief against a state official in their official capacity, but that the official must still have been responsible for the action leading to the injury. While the defendants in that case contended that personal action on the part of the official sued was required to defeat Eleventh Amendment immunity, the court held all that was required was that the official was "responsible for the challenged action." *Id*. at 1015. According to the Eleventh Circuit, the state officer sued must "by virtue of his office, ha[ve] some connection" with the unconstitutional act or conduct complained of whether that connection arises out of general law or is specifically created by the act itself. *Id.* at 1016.

In relying on these holdings, the Eleventh Circuit found that the governor of Georgia and Georgia judges were proper official defendants in an *Ex Parte Young* action challenging systemic deficiencies in the Georgia indigent criminal defense system resulting in constitutional deprivation. *Id*. at 1015-1016. This was because the governor was responsible for law enforcement in the state, charged with executing the laws faithfully, and had residual power to commence criminal prosecutions by state statute. Similarly, Judges were responsible for administering the system of representation for indigent criminally accused defendants by state statute. This made them appropriate defendants against whom prospective relief could be ordered. *Id.* at 1016.

But this is not a case where alleged deficiencies in a system are being challenged against those that are responsible for the system. By statute, neither Secretary Inch nor Mr. Thomas has any responsibility for the establishment of the state health plans. Far from "some connection," they have no connection to the harm alleged by the Plaintiffs.

Because Secretary Inch and Mr. Thomas lack the authority to establish the state health plan or enforce any exclusion that Plaintiffs allege caused them harm, the fiction of *Ex Parte Young* simply does not hold water. *See Osterback v. Scott*, 782 F. App'x 856, 858–59 (2019) (holding that suit against the Governor of Florida in his official capacity was barred by sovereign immunity and not subject to *Ex Parte*

*Young* exception because, while the Governor had constitutional and statutory authority to enforce the law and oversee the executive branch, the responsibility for the enforcement of a challenged provision rested with the Division of Administrative Hearings). The non-fiction is that the Amended Complaint is a suit against the state, and the challenges lodged against Secretary Inch and Mr. Thomas in their official capacities are barred by the doctrine of sovereign immunity.

III.   *Plaintiffs' Title VII Claims Against the FDC Defendants and the Public Defender in Counts III and IV Must be Dismissed because Plaintiffs Fail to Plead Facts Stating a Cause of Action Under Title VII for Sex Discrimination*

Plaintiffs' claims under Title VII against the FDC and the Public Defender must be dismissed because they fail to plead facts to support a claim of sex discrimination. While Plaintiffs may advance the argument that discrimination against someone based on their gender identity is *ipso facto* discrimination based on sex, that argument is not supported by the plain language of Title VII's text. Further, the Amended Complaint fails to state a cause of action for sex discrimination based on a sex-stereotyping theory.

Since 1964, Title VII has prohibited employers from "discriminat[ing]" against any individual with respect to employment "because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). Title VII was meant to prohibit—actions within the terms and conditions of employment that disadvantage one sex as to the other. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). That one sex is

treated disadvantageously because of their sex is a threshold showing that, while it does not always require a showing that a similarly situated comparator was treated less favorably, still must be supported by evidence of disparate treatment of the sexes. *Id*. (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)) ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."). Indeed, Title VII's sex-discrimination ban requires plaintiffs to show "disparate treatment of men and women." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (plurality) (quoting *Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978)).

Plaintiffs' allegations of discrimination in violation of Title VII in the Amended Complaint appear to allege that the gender reassignment or modification services exclusion in the state group health insurance plan is inherently discriminatory on the basis of sex because it discriminates against transgender individuals for failing to conform to stereotypes about the sexes. Ultimately though, the Amended Complaint fails to plead any facts establishing that the Plaintiffs were treated disparately because of their sex by application of the terms of the state health plan. Any invitation to extend sex stereotyping jurisprudence to essentially create a stand-alone stereotyping claim, and not just as evidence to support a disparate

treatment claim on the basis of an enumerated protected class in Title VII, must be rejected.

The genesis of sex stereotyping claims is the Supreme Court's decision in *Price Waterhouse.* Crucially, *Price Waterhouse* did not hold that sex stereotyping is *per se* unlawful, regardless of whether the reliance on stereotypes is used to favor one sex over another. If that were the holding, then discrimination against a transgender person is *per se* unlawful as well because transgender men and women do not conform with sex stereotypes as to how they should identify themselves, which appears to be the claim asserted by the Plaintiffs in the Amended Complaint. But *Price Waterhouse* only makes sex-stereotyping actionable to the extent it provides evidence of favoritism of one sex over the other. *Id.* at 251 (holding that sex-stereotyping is not sex discrimination *per se*, but is only actionable when disparate treatment of men and women results from sex stereotypes), *see also id.* ("An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind.") (citations and quotations omitted).

Indeed, the Eleventh Circuit expressly held as much in *Evans v. Georgia Reg'l Hosp.*, where it held that a gender non-conformity claim is not "just another way to claim discrimination based on sexual orientation," and clarified that its holding in

*Glenn v. Brumby,* was not meant to transform claims of discrimination based on transgender status into sex stereotyping claims. 850 F.3d 1248, 1254–55 (11th Cir. 2017) (citing *Glenn v. Brumby*, 663 F.3d 1312, 1318–19 (11th Cir. 2011)). The plaintiff in *Evans* argued, citing *Glenn*, that discrimination because of sexual orientation was *per se* discrimination based on gender non-conformity, because sexual attraction to a member of the same sex was contrary to a stereotypes about to whom members of a certain sex should be attracted. *Id*. at 1254-55. The Eleventh Circuit held that because there was no evidence of gender non-conformity beyond Ms. Evans' status as a lesbian, she could not prevail on her sex discrimination claim. *Id.* Gender non-conformity discrimination is not just another way to claim discrimination based on sexual orientation, but rather is a distinct avenue of relief in a sex discrimination claim. *Id*. at 1255.  As Judge Pryor clarified in his concurrence in *Evans*, sex stereotyping claims are ultimately about behavior and not status. *Evans*, 850 F.3d at 1259 (J. Pryor, concurring).

*Glenn* does not stand for the proposition that discrimination against a transgender person for being transgender is discrimination on the basis of gender non-conformity and therefore sex discrimination. At best, statements suggesting this to be the case in *Glenn*, relying solely on law review articles, are dicta as it was not essential to the holding. *See Glenn*, 663 F.3d at 1316. Indeed, and to the contrary, *Glenn*'s holding is that "discrimination against a transgender individual because of

her gender non-conformity is sex discrimination, whether it's described as being on the basis of sex or gender." *Id.* at 1317. That does not mean that discrimination against a transgender individual is inherently sex discrimination or discrimination against someone on the basis of a stereotype about the sexes is actionable, without any evidence that one sex was treated disadvantageously as compared to the other.

To be sure, if the law of the Circuit were otherwise, the Eleventh Circuit could not have reached the result it did in *Bostock v. Clayton Cty. Bd. of Comm'rs.*, where it held that Title VII does not prohibit discrimination based on sexual orientation. 723 F. App'x 964 (11th Cir. 2018), *cert. granted sub nom. Bostock v. Clayton Cty., Ga.*, 139 S. Ct. 1599 (2019). The same rationale applies in equal force to claims centered on the inherent gender non-conforming aspects of transgender individuals.

While it is true that Title VII has been interpreted to apply to situations that Congress might not have contemplated when it enacted the statute, a reading of Title VII's prohibition of sex discrimination to include discrimination as alleged here, as a form of sex-stereotyping or otherwise, goes beyond the limits of the text. Indeed, the Supreme Court in *Oncale*, interpreted Title VII to apply to male-on-male sexual harassment, something not contemplated by Congress when enacting Title VII in 1964. As the Supreme Court explained:

> [S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed. Title VII prohibits "discriminat [ion] ... because of ...

> sex" in the "terms" or "conditions" of employment. Our holding that
> this includes sexual harassment must extend to sexual harassment of
> any kind that meets the statutory requirements.

*Oncale*, 523 U.S. at 80. Fundamentally though, interpreting Title VII to prohibit claims of discrimination based on sex-stereotyping claims centered on status rather than behavior and a showing that a stereotype resulted in the disadvantageous treatment of someone based on sex, is not a result that inures from the text of Title VII.

Plaintiffs have not pled that they have been treated disadvantageously from the opposite sex. Plaintiffs essentially allege that the State Group Health Insurance Plan's exclusion causes them harm because they do not conform to gender stereotypes as transgender individuals. But this does not suffice to establish a claim under Title VII which focuses, again, on the disadvantages of one sex as to the other. Indeed, the terms of the State Group Health Insurance Plan apply the same way to males and females. For these reasons, the Plaintiffs fail to allege facts to establish that the exclusion operates to disadvantage one sex as to the other or is facially discriminatory on the basis of sex in any way.

To read the statute otherwise goes beyond the outer limits of Title VII's text even if it is ambiguous on this point. Even ambiguous statutes should not be interpreted in a way that would have major policy implications, as Congress "does not alter the fundamental details of a regulatory scheme in vague or ancillary

provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'n,* 531 U.S. 457, 468 (2001), s*ee also, e.g., Gonzales v. Oregon,* 546 U.S. 243, 267 (2006) (same). The allegations in the Amended Complaint as pled by the Plaintiffs simply fail to state cognizable claim under Title VII, warranting dismissal of those claims as to the FDC and the Public Defender.

### *Conclusion*

For the foregoing reasons, the FDC Defendants and the Public Defender request that this Court dismiss Count's III, IV, VII, and VIII of the Amended Complaint, with prejudice.

Respectfully submitted this 29th day of May, 2020.

*/s/ Jeffrey D. Slanker*
**JEFFREY D. SLANKER**
Florida Bar No. 100391
E-mail: jslanker@sniffenlaw.com
**MICHAEL P. SPELLMAN**
Florida Bar No. 937975
E-mail: mspellman@sniffenlaw.com
**MARK K. LOGAN**
Florida Bar No. 0494208
E-mail: mlogan@sniffenlaw.com

**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004

*Attorneys for the FDC Defendants and the Public Defender*

## **WORD COUNT CERTIFICATION**

This document complies with the word limits set forth in N.D. Fla. Local Rule 7.1(F), and contains 7,437 words, which includes all portions of this motion, even those permitted to be excluded from this word count by Local Rule.

*/s/ Jeffrey D. Slanker*
**JEFFREY D. SLANKER**

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on this 29th day of May, 2020, a true and correct copy of the foregoing was electronically filed in the U.S. District Court, Northern District of Florida, using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ Jeffrey D. Slanker*
**JEFFREY D. SLANKER**