**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

JAMI CLAIRE, KATHRYN LANE,
and AHMIR MURPHY

      Plaintiffs,

v.                              CASE NO. 4:20-cv-0020-MW-CAS

FLORIDA DEPARTMENT OF
MANAGEMENT SERVICES; et al.,

      Defendants.

_____/

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AND MEMORANDUM OF LAW**
**AND REQUEST FOR ORAL ARGUMENT**

Plaintiffs Jami Claire, Kathryn Lane, and Ahmir Murphy move for partial summary judgment against Defendant Department of Management Services (DMS) on their Title VII claim and against Defendant Jonathan Satter, in his official capacity as Secretary of DMS, on their equal protection claim, and state:

1.     Plaintiffs are transgender employees of the State of Florida who were prescribed gender-affirming procedures to treat their gender dysphoria.

2.     Plaintiffs were denied coverage for these procedures because of Defendants' policy of categorically excluding coverage for medically

necessary gender-affirming care in the state employee health insurance plans (State Plans).

3.     Defendant Satter violated their rights to Equal Protection, and Defendant DMS violated their rights to equal terms and conditions of employment under Title VII, by adopting, administering, and enforcing the State Plans, which facially discriminate against transgender state employees on the basis of sex by denying coverage for gender-affirming care.

4.     The State Plans contain exclusions that work together to categorically exclude coverage for medically necessary gender-affirming care, including exclusions for "gender reassignment and modification services and supplies," "cosmetic surgery/services," "sexual reassignment, or modification services or supplies," and prescriptions for "psychosexual disorders" (Exclusions).

5.     The Exclusions injure Plaintiffs by preventing them from obtaining medically necessary care on equal terms with non-transgender state employees.

6.     The procedures sought by Plaintiffs are routinely covered by the State Plans when they are for medically necessary purposes other than the treatment of gender dysphoria.

7.      Defendants adopted the Exclusions, which have been in the State Plans in some form since at least 1978.

8.      Defendants' adoption, administration, and enforcement of the discriminatory policy constitutes unlawful sex discrimination under Title VII. As Plaintiffs have been denied coverage pursuant to a facially discriminatory policy, Plaintiffs need not prove additional discriminatory intent.

9.      Under the Equal Protection Clause, classifications discriminating against transgender persons are reviewed under heightened scrutiny, which Defendants cannot satisfy. Indeed, because Defendants disclaim any justification for the policy apart from longevity, the Exclusions cannot even survive rational-basis review.

10.     Because there are no relevant factual disputes, Plaintiffs are entitled to summary judgment as a matter of law.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter: (1) a declaration that Defendants' policy of categorically excluding medically necessary gender-affirming care in the State Plans violates Title VII of the Civil Rights Act of 1964 and the Equal Protection Clause of the U.S. Constitution; (2) a permanent injunction prohibiting Defendants from enforcing the Exclusions to deny medically necessary gender-affirming care

for the treatment of gender dysphoria; and (3) an order setting trial on damages on their Title VII claim against DMS.

## REQUEST FOR ORAL ARGUMENT

Plaintiffs request oral argument and estimate a total of two hours.

## STATEMENT OF UNDISPUTED FACTS

### <u>Medical Care for Transgender Individuals</u>

Ahmir Murphy is a man who is transgender. Jami Claire and Kathryn Lane are women who are transgender. They each have a diagnosis of gender dysphoria. (ECF 118-23, Murphy, 17:6-8; 67:6-8; ECF 118-5, Claire, 22:15-19; ECF 118-19, Lane, 16:16-23.)

The American Psychiatric Association publishes the DSM-5, which defines gender dysphoria as a "marked incongruence between one's experienced/expressed gender and assigned gender, of at least six months' duration, as manifested by at least two" of six listed criteria. (ECF 122-1.) The World Health Organization publishes a medical classification list called the ICD-10. The ICD-10 billable codes for gender dysphoria are F64: Gender Identity Disorders. (ECF 122-2; ECF 118-12, Ettner, 137:12-18.)

Not all transgender individuals have gender dysphoria. (ECF 118-16, Gorton, 40:21-24.) However, clinically significant distress from gender dysphoria is serious and requires treatment. (ECF 118-20, Levine, 129:1-4.)

Left untreated, gender dysphoria can result in serious mental distress, depression, anxiety, self-harm, and suicidality. (ECF 118-16, Gorton, 40:25-42:22.) Gender-affirming care is medical care provided to transgender people to treat gender dysphoria, and can include psychotherapy, social transition, hormone therapy, and various surgeries. (ECF118-20, Levine, 11:16-22, 99:16-19, 134:10-14, 158:1-16; ECF 118-16, Gorton, 111:17-112:11.)

Gender-affirming surgeries can treat a transgender person's gender dysphoria. (ECF 118-20, Levine, 100:2-3; ECF 118-16, Gorton, 42:23-44:3.) Such surgeries can be "psychologically beneficial" to transgender people with gender dysphoria, and they are authorized based on a belief the person is "likely to benefit" from the treatment. (ECF 118-20, Levine, 35:16-20, 51:17-20, 57:25-58:9; ECF 118-12, Ettner, 64:23-66:9.) For example, a mastectomy for a transgender male is a non-experimental treatment (ECF 118-20, Levine, 130:16-19; *see* ECF 118-12, Ettner, 149:19-23) that can significantly decrease his clinically significant distress from being perceived as female. (ECF 118-20, Levine, 40:10-18; ECF 118-12, Ettner, 65:20-66:9.) Facial-feminization surgery for a transgender woman can be appropriate treatment in certain circumstances (ECF 118-20, Levine, 45:24-46:11; ECF 118-16, Gorton, 94:21-96:4) and can significantly decrease the clinically

5

significant distress from being perceived as male. (ECF 118-20, Levine, 40:19-41:8 ECF 118-16, Gorton, 94:21-95:18.) An orchiectomy (removal of testicles) for a transgender woman would alleviate her "genital" dysphoria. (ECF 118-20, Levine, 130:20-131:3.) Gender-affirming surgery and hormones can diminish pain and anxiety. (*Id.*, 93:7-16.) In some individuals with gender dysphoria, surgery can significantly improve their mental health. (*Id.*, 95:2-18; ECF 118-16, Gorton, 41:3-42:22, 43:17-44:3.) Even Defendants' expert, Dr. Stephen Levine, has provided authorization letters for different gender-affirming surgeries, including penectomy, vaginoplasty, mastectomy, orchiectomy, and phalloplasty. (ECF 118-20, Levine 31:2-32:3, 35:21-36:8.) He only provides authorization letters if he thinks the care is appropriate for the person. (*Id.*, 60:21-61:17.)

Psychotherapy alone is insufficient to treat all individuals with gender dysphoria. (*Id.*, 137:12-19; ECF 118-12, Ettner, 89:8-21.) Medical care for transgender individuals should be based on individual needs and not on blanket exclusions. (ECF 118-20, Levine, 120:4-20,152:10-20; *see* ECF 118-12, Ettner, 62:5-10.)

The World Professional Association for Transgender Health (WPATH) is "an international, multidisciplinary, professional association whose mission is to promote evidence-based care, education, research, advocacy, public

6

policy, and respect for transgender health." (ECF 122-3, at 7.) WPATH Standards of Care are clinical guidelines to treat gender dysphoria (*id.* at 2), accepted by major medical and mental health associations (ECF 118-20, Levine, 145:16-19; ECF 118-16, Gorton, 45:2-47:19, 83:3-11; ECF 118-12, Ettner, 59:10-60:21; ECF 122-4, at 6), and have been accepted as authoritative by this Court in *Keohane v. Jones,* 328 F. Supp. 3d 1288, 1316 (N.D. Fla. 2018), *vacated on other grounds*, 952 F.3d 1257 (11th Cir. 2020).

### Plaintiffs' Denials of Coverage Under the State Plan

Plaintiffs are state employees: Mr. Murphy works as a correctional officer for the Department of Corrections (ECF 118-23, Murphy, 9: 21-22); Ms. Claire works for the University of Florida's College of Veterinary Medicine (ECF 118-5, Claire, 14:13-22); Ms. Lane is a lawyer with the Office of the Public Defender for Florida's Second Judicial Circuit (ECF 118-19, Lane, 13:5-11).

The Department of Corrections, University of Florida, and Public Defender offer its employees the State Plan as part of compensation. (ECF 118-1, Arthmann, 48:18-25; ECF 118-15, Gentry, 50:11-23, 121:17-21; ECF 118-5, Claire, 15:21-24, 16:17-23,; ECF 118-19, Lane, 14:7-10.) The only health insurance options available to Plaintiffs contain the Exclusions

prohibiting coverage of gender-affirming care. (ECF 118-13, Fillyaw, 66:6-8; ECF 118-17, Horwich, , 61:2-13; ECF 118-21, Loven, 42:10-15; ECF 118-1, Arthmann, 81:24-82:2; ECF 118-11, Edwards, 128:22-129:3.) The State Plans also exclude hormones if the purpose is to treat gender dysphoria. (ECF 122-5, at 6; ECF 118-10, DMS-Thomas-Brown, at 101:20-24.) And under the cosmetic exclusion's guidelines, certain types of "gender reassignment" surgery, such as facial feminization, are categorically denied without allowing for an individualized determination of whether the surgery is medically necessary to treat gender dysphoria. (ECF 118-3, CHP-Frost, 25:25-26:24, 40:14-41:4; 72:15-73:2.)

AvMed administers Mr. Murphy's and Ms. Claire's HMO plans. (ECF 118-23, Murphy 16:1-2; ECF 118-5, Claire, 16:17-20.) Capital Health administers Ms. Lane's HMO plan. (ECF 118-19, Lane, 14:16-21.)

In May 2019, Mr. Murphy's doctor submitted a prior authorization request to AvMed for a double mastectomy, with a letter from Mr. Murphy's therapist stating the surgery is consistent with WPATH. (ECF 122-6.) Mr. Murphy meets WPATH eligibility criteria for a double mastectomy and chest reconstruction. (*See* ECF 122-3, at 65.) AvMed denied coverage on June 5, 2019, citing the gender reassignment exclusion. (ECF 122-7; ECF 118-2, AvMed, 31:7-10.) Coverage was denied because Murphy's gender is male,

his diagnosis is gender dysphoria, and the request was for bilateral mastectomy. (ECF 118-2, AvMed, 30:13-31:6.)

Ms. Claire's doctor submitted a prior authorization request to AvMed for an orchiectomy in December 2018. (ECF 118-5, Claire, 43:10-14; 85 4-10; ECF122-8.) Ms. Claire meets WPATH eligibility criteria for an orchiectomy (*See* ECF 122-3, at 66.) AvMed denied coverage on January 8, 2019, stating "orchiectomy related to gender reassignment is not a covered benefit" (ECF, 118-5, Claire, 45:14-18; ECF 122-9; ECF 118-2, AvMed, 34:8-11), and because Claire's gender is female, her diagnosis is gender dysphoria, and she requested bilateral orchiectomy. (ECF 118-2, AvMed, 33:22-34:7.) Ms. Claire appealed her denial to AvMed (ECF118-5, Claire, 45:19-21; ECF 122-10) and submitted letters from two doctors. (ECF 118-5, Claire 46:9-47:5; ECF 122-10.) AvMed denied the appeal, citing the gender reassignment exclusion. (ECF 118-5, Claire, 47:9-13, ECF 122-11; ECF 118-2, AvMed, 36:23-37:4.) Ms. Claire filed a Level II appeal to DMS. (ECF 118-5, Claire, 47:14-16; ECF 122-12.) DMS denied Ms. Claire's Level II appeal, based on the State Plan's gender reassignment exclusion. (ECF 118-10, DMS-Thomas-Brown, 90:1-92:3; ECF 122-13.)

Ms. Lane's doctor requested prior authorization for facial feminization surgery (ECF 122-14), which Capital Health denied on February 19, 2019,

based on the gender reassignment exclusion. (ECF 122-15; ECF 118-5, Lane, 42:7-20; ECF 118-3, CHP-Frost, 54:9-21.) WPATH has no specific criteria for facial feminization surgeries, though it provides that such surgeries "in an individual with severe gender dysphoria can be considered medically necessary, depending on the unique clinical situation of a given patient's condition and life situation." (ECF 122-3, at 70.) In 2016, WPATH clarified facial feminization surgery is not "cosmetic" or "elective." (ECF 122-16, at 3.) Ms. Lane appealed her denial to Capital Health. (ECF 118-19, Lane, 42:21-23; ECF 122-17.) Capital Health denied her appeal, citing the gender reassignment exclusion, and adding the exclusion for cosmetic surgery. (ECF 118-19, Lane, 43:2-43:18; ECF 118-3, CHP-Frost, 56:7-57:12, 63:14-25; ECF 122-18.) Capital Health denied coverage because the requested service was "specific to gender dysphoria" and not part of the allowable cosmetic benefits. (ECF 118-3, CHP-Frost, 64:10-65:1.) The denial of facial feminization surgery was categorical, based on the Exclusions, and not on whether the procedure was medically necessary to treat her gender dysphoria. (ECF 118-3, CHP-Frost, 57:4-12, 64:20-65:1, 65:13-24.)

Plaintiffs timely filed charges against DMS with the Equal Employment Opportunity Commission (ECF 122-19) and were issued Right to Sue Notices. (ECF 122-20.)

A medically necessary service is a service that is needed due to an underlying medical condition. (ECF 118-3, CHP-Frost, 67:23-68:3.) DMS requires that Third Party Administrators contractually agree to create, maintain, and annually update medical guidelines, which shall be thoroughly researched using published medical literature. (ECF 122-21, at 58; ECF 118-13, Fillyaw, 146:14-147:8.) DMS relies on these medical guidelines in determining what services and supplies are excluded from coverage under the Exclusions. (ECF 118-10, DMS-Thomas-Brown, 12:9-25, 15:8-21, 30:2-31:5, 34:23-35:3, 46:6-14, 47:3-48:15, 48:22-49:9, 49:18-50:15, 51:1-8.) Medical guidelines are only utilized for covered benefits; if a service is excluded, then medical coverage guidelines are not used. (ECF 118-25, Thomas-Brown, 40:17-41:15, 57:4-16.) Since gender reassignment services are excluded in the State Plan, the State Plan has no medical coverage guidelines for gender dysphoria, though DMS relies on Third Party Administrators' gender dysphoria guidelines. (ECF 118-13, Fillyaw, 145:8-146:13; *see infra* p.19.)

Plaintiffs' denials were automatic, with no individualized inquiry into the medical necessity of the requested procedures; coverage was denied solely based on the Exclusions with no medical necessity analysis or criteria applied. (ECF 118-3, CHP-Frost, 12:18-13:13, 28:11-29:10, 30:8-21, 57:4-12, 64:20-65:1, 65:13-24; ECF 118-10, DMS-Thomas-Brown, 33:19-34:3, 60:14-18; ECF 118-25, Thomas-Brown, 40:22-41:15, 57:24-58:7; ECF 118-17, Horwich, 66:8-67:5; ECF 118-13, Fillyaw, 66:9-25, 76:14-77:8, 82:10-83:6, 111:1-5, 145:25-146:13; ECF 118-2, AvMed, 32:10-13, 34:15-20; ECF 122-7, at 3, ECF 122-9, at 3.)

To obtain gender-affirming surgeries outside their current insurance, Plaintiffs would need to either pay thousands in out-of-pocket costs or buy private insurance. (ECF 118-23, Murphy, 76:20-25; ECF 118-5, Claire, 36:11-25; ECF 118-19, Lane, 40:5-8.) Following the trend among healthcare plans in eliminating exclusions for gender-affirming care, over 90% of the Silver Affordable Care Act plans do not contain exclusions like those in the State Plans. (ECF 118-18, Kirkland, 82:25-84:23.) However, these marketplace plans are not financially feasible alternatives, as Plaintiffs would lose employer premium contributions, would be ineligible for tax credits, and may be assessed a tax penalty. (ECF 118-11, Edwards, 105:7-106:11; ECF 122-22.)

Plaintiffs seek to have the requested surgeries and potentially other care in the future. (ECF 118-5, Claire, 36:8-25; ECF 118-23, Murphy, 45:12-16; ECF 118-19, Lane, 58:15-59:12.) Without access to gender-affirming care, Plaintiffs suffer emotional distress. (ECF 118-23, Murphy, 59:11-61:2; ECF 118-5. 55:21-58:3; ECF 118-19, 75:23-76:11.)

### State Plan Exclusions

Through a procurement process, *see* Fla. Stat. §110.123(5)(c), DMS mandates to private insurers (Third Party Administrators) the scope of covered benefits and exclusions under the State Plan. (ECF 118-9, DMS-Stokes, 63:18-64:8; ECF 122-21, at 5, 36, 39.) Third Party Administrators must administer exactly what is listed on the contract's covered benefits and services and its limitations and exclusions. (ECF 118-9, DMS-Stokes, 64:1-11; ECF 118-13, Fillyaw, 144:11-145:7, 155:20-25.)

The current HMO State Plans contain separate exclusions for "gender reassignment or modification services and supplies," and "sexual deviations, disorders or psychosexual dysfunctions services and supplies." (ECF 122-23, at 60, 61.) The current PPO State Plan contains one exclusion for "sexual reassignment, or modification services and supplies, including, but not limited to, any healthcare service related to such treatment, such as services necessary to treat sexual deviations and disorders, psychosexual

dysfunction or services or supplies provided in connection with intersex surgery" (ECF 122-24, at 36.) There is no meaningful difference between the HMO exclusion for "gender reassignment and modification services and supplies" and the PPO exclusion for "sexual reassignment and modification services and supplies." (ECF 118-9, DMS-Stokes, 36:11-37:1; ECF 118-10, DMS-Thomas-Brown, 37:23-38:14.)

The gender reassignment exclusions have been in State Plan documents with varying language since at least 1978, which then excluded "Sexual Deviation" and "Intersex surgery, charges for surgical procedures for gender reassignment." (*See* ECF 122-5, at 1.) Over the years, the Legislature modified the language, expanded exclusions, and separated exclusions in two. (*Id. passim*) The current PPO language has been consistent since 2007 and HMO since 2013. (*Id.* at 3, 5.)

DMS does not know the original or current rationale for the exclusions; there is no known financial or medical justification. (ECF 118-9, DMS-Stokes, 19:14-20, 20:10-13; ECF 118-10, DMS-Thomas-Brown, 26:2-5; ECF 118-13, Fillyaw, 98:4-6). The only known justification is that the exclusions have existed for a long time. (ECF 118-9, DMS-Stokes, 19:21-21:12; ECF 118-13, Fillyaw, 58:15-25, 97:22-98:3.) Gender reassignment or modification services and supplies are not currently considered experimental or

investigational. (ECF 118-13, Fillyaw, 152:25-153:10; ECF 118-20, Levine, 129:25-130:19; ECF 122-16, at 4.)

The State Plans' categorical exclusion of medically necessary gender-affirming care includes cosmetic surgery to improve a transgender "member's appearance or self-perception." (ECF 122-23, at 59; ECF 122-24, at 33.) The Legislature has changed the language, but a cosmetic exclusion has been in the State Plans since 1974. (ECF 122-25, at 7.) Cosmetic procedures for purposes of gender reassignment are excluded with no medical necessity analysis. (ECF 118-4, CHP-Glennon, 41:10-42:12.) Facial feminization surgery to treat gender dysphoria is categorically excluded. (ECF 118-10, DMS-Thomas-Brown, 61:19-63:7, 96:4-8.) Because of the gender reassignment exclusion, facial feminization, the purpose of which is to treat gender dysphoria, also falls under cosmetic exclusion which likewise excludes all surgeries to treat gender dysphoria. (ECF 118-3, CHP-Frost, 25:16-26:24; 72:15-73:2.)

The State Plans do not contain a definition for the gender reassignment exclusion. DMS also lacks a definition. (ECF 118-25, DMS-Thomas-Brown, 14:14-23; ECF 118-13, Fillyaw, 153:12-154:8.) DMS does not have a list of services or supplies falling under the exclusion, nor does it have a list of

billable medical procedure codes (CPT) or medical diagnosis codes (ICD-10) triggering the exclusion. (ECF 118-10, DMS-Thomas-Brown, 75:2-11.)

DMS interprets the exclusion to prohibit coverage for all services and supplies for the purpose of "gender reassignment." (ECF 118-10, DMS-Thomas-Brown, 55:3-12, 58:10-21, 101:13-102:17; ECF 118-13, Fillyaw, 52:10-53:2, 59:5-16.) All surgeries to treat gender dysphoria are prohibited, including mastectomies, orchiectomies, and facial feminization. (ECF 122-4, at 9-11, 14.) These same surgeries could be covered if they were medically necessary for purposes other than gender reassignment or transition. (*Id.* at 9-10; ECF 118-25, Thomas-Brown, 65:5-66:6, 68:19-69:1, 116:25-118:2, 158:25-159:9; ECF 118-10, DMS-Thomas-Brown, 54:12-18, 98:6-22, 101:8-102:17; ECF 118-14, Florida Blue, 49:4-13, 61:2-12; ECF 118-13, Fillyaw, 199:2-7; ECF 118-3, CHP-Frost, 22:19-23:17, 28:20-29:20; ECF 118-2, AvMed, 18:24-20:10.) Mastectomies are routinely covered for cisgender women to treat breast cancer or even prophylactically if BRCA tests show high risk for breast cancer. (ECF 118-2, AvMed, 32:21-33:4.) Orchiectomies are authorized if the purpose is for testicular cancer. (*Id.*, 40:5-9; ECF 118-25, Thomas-Brown, 158:25-159:9.) Facial feminization surgeries may include various surgeries, including rhinoplasty (nose), blepharoplasty (eyelid) and bone reconstruction; if the purpose of surgery is for gender

reassignment they are not covered, but if for medical reasons such as sinus issues, congenital deformity or the result of an accident, they would be covered. (ECF 118-3, CHP-Frost, 22:19-25, 41:15-43:1; ECF 118-14, Florida Blue, 59:24-61:12; ECF 118-25, Thomas-Brown, 116:25-118:12; ECF 118-13, Fillyaw, 102:13-103:11.) The Exclusions also preclude coverage of hormone therapy and puberty blockers as treatment for gender dysphoria. (ECF 122-4, at 9, 14-15.)

According to DMS, mental health services, including psychological counseling and testing, are covered. (ECF 118-10, DMS-Thomas-Brown, 17:25-18:10, 21:17-25.) However, if a state employee seeks counseling for the specific purpose of gender reassignment surgery or hormones, those visits may be denied under the gender reassignment exclusion. (ECF 118-13, Fillyaw, 191:5-192:12.)

Capital Health interprets the gender reassignment exclusion to exclude services specific to gender dysphoria, regardless of whether a medical provider deems such service medically necessary. (ECF 118-3, CHP- Frost, 30:8-21, 64:10-65:1, 66:6-19.) Capital Health, as a wholly owned affiliate of Florida Blue, relies on Florida Blue's guidance to interpret what services and supplies fall under the exclusion. (ECF 118-4, CHP-Glennon, 24:3-7, 37:24-38:15.)

Florida Blue interprets the gender reassignment exclusion to exclude services and supplies with CPT codes associated with "sexual reassignment," which could include surgeries, psychotherapy, office visits, labs, X-rays, and other types of claims. (ECF 118-14, Florida Blue, 19:2-20:24, 41:6-42:4, 50:10-15.) Florida Blue's interpretation is that all F64 diagnosis codes (ICD-10 diagnoses for "gender identity disorders") are excluded. (*Id.*, 31:12-16; *see* ECF 122-2.)

AvMed defines gender reassignment as female-to-male or male-to-female transitional services. (ECF 118-2, AvMed, 9:9-10:5.) The F64 diagnosis codes trigger the gender reassignment exclusion. (*Id.*, 15:17-17:18.)

DMS does not ensure consistent interpretation or application of the Exclusions across the six Third Party Administrators. (ECF 118-10, DMS-Thomas-Brown, 44:11-45:13, 50:22-51:8, 60:3-12, 66:11-19.)

DMS has full and final decision-making authority concerning eligibility, coverage, benefits, claims, and interpretation of the State Plans. (ECF 122-21, at 58; ECF 118-13, Fillyaw, 90:2-7, 143:11-145:7, 147:17-148:12.) DMS does not provide guidance to Third Party Administrators on interpretation or application of the exclusions (ECF 118-13, Fillyaw, 81:6-12, 105:18-106:1, 107:19-108:18; ECF 118-10, DMS-Thomas-Brown, 39:5-40:4, 43:8-44:2,

45:3-13, 60:3-6, 64:5-19; ECF 118-14, Florida Blue, 22:13-16; ECF 118-4, CHP-Glennon, 36:23-37:5, 38:3-7), although DMS clarified to AvMed all male-to-female and female-to-male transitional services were excluded. (ECF 118-2, AvMed, 11:2-16.)

Third Party Administrators each have their own internal medical guidelines to determine coverage for medically necessary gender reassignment services and supplies that they use for administering insurance plans outside of the State Plan in which they do not exclude these services and supplies. (ECF 122-26; ECF 118-4, CHP-Glennon, 58:7-59:1, 61:1-3.) DMS relies on these medical guidelines to determine what to exclude under the gender reassignment exclusion by prohibiting coverage under the State Plan for all services and supplies allowed in the Third Party Administrators' gender reassignment medical coverage guidelines. (ECF 118-10, DMS-Thomas-Brown, 12:9-25, 15:8-21, 30:2-31:5, 34:23-35:3, 46:6-14, 47:13-48:15, 48:22-49:9, 49:18-50:15, 51:1-8; ECF 118-13, Fillyaw, 146:14-147:8.)

### DMS' Management of State Group Insurance Program

The State Group Insurance Program was created in 1979. Laws of Fla. ch. 79-190, §20 (1979). DMS is the executive branch agency responsible for administering the program. §§20.22, 110.123(5), Fla. Stat. (2020). The

Division of State Group Insurance (DSGI) exists within DMS. *Id.* §110.123(3)(a). The purpose of the insurance program is "to offer a comprehensive package of health insurance and retirement benefits…." *Id.* §110.123(3)(b). Participation is available to all state officers, state employees (including university personnel for purposes of the insurance program), and retirees who elect to continue coverage under the program. *Id.* §110.123(2)(b),(c),(f),(h)&(n). State agencies for purposes of the state group insurance program [and for this motion] are any branch, department, or agency of state government, and any state university. *Id.* §110.123(2)(i). State agencies are required to participate. *Id.* §1001.705(2)(k). (ECF 118-9, DMS-Stokes, 23:23-24:15; ECF 118-13, Fillyaw, at 38:18-39:9.)

To implement the insurance program, DMS shall, *inter alia*, with prior approval by the Legislature, determine the benefits to be provided and the contributions to be required for the state group insurance program. §110.123(5)(a). DMS does not interpret its role to include determining benefits, but rather solely to implement the benefits the Florida Legislature determines. (ECF 118-9, DMS-Stokes, 11:11-18.) DMS has authority to recommend benefits changes to the Legislature, but has not done so. (*Id.,* 12:4-13:5, 14:8-15:3, 15:15-16:1; ECF 118-13, Fillyaw, 18:9-13, 32:5-16.)

The Legislature approves the state group insurance benefits in the General Appropriations Act (GAA). (ECF 118-9, DMS-Stokes, 13:19-24, 17:19-18:4, 77:17-24; ECF 122-27, at 1.) DMS, in conjunction with contracted insurance companies, drafts the state plan booklet for approval by the Legislature. (ECF 118-9, DMS-Stokes, 18:10-19:1.)

Through the Invitation to Negotiate (ITN) process, DMS selects and contracts with Third Party Administrators to administer the State Plan. (*Id.,* 59:14-16.) DSGI personnel within DMS manage these contracts. (*Id.*, 60:11-21.) Neither the ITN document nor the contract is approved by the Legislature. (*Id.*, 59:7-19.) The last ITN was issued in 2016, effective in 2018. Since then, DMS renewed the contracts. (*Id.,* 64:15-24, 66:11-25.) DMS' contract managers work with Third Party Administrators to ensure compliance with DMS' contract terms, performance guarantees, and minimum service requirements. (*Id.*, 60:11-21.) State agencies play no role in the ITN process or managing the contracts. (*Id.*, 60:22-61:4.)

The Third Party Administrator administering Florida's statewide PPO plan is Florida Blue. (*Id.,* 49:8-11.) HMOs are administered, based on geographic locations across the state, by AvMed, Aetna, Capital Health, and United HealthCare. (*Id.,* 58:4-8.) CVS Caremark administers the statewide prescription plan. *See* §110.123(15). (ECF 118-10, DMS-Thomas-Brown,

53:6-7.) The HMO and PPO plans and CVS prescription plan are the only health insurance options for state employees or retirees, and all cover the same benefits and include the same exclusions. (ECF 118-9, DMS-Stokes, 26:13-27:5, 37:2-8.)

Claims for state group insurance are paid by DMS. (ECF 118-9, DMS-Stokes, 59:20-60:7.) Revenue sources primarily include premiums collected from state agencies and state employees, but also from DMS' appropriations and other sources. (*Id.,* 78:18-79:4, 80:18-82:6.)

DMS provides quarterly updates of claims paid and relevant trends to the Legislature's Revenue Estimating Conference, which develops annual premium amounts. (*Id.*, 6:14-24, 70:18-71:22, 72:4-74:7; ECF 118-13, Fillyaw, 30:8-31:4.) State agency and state employee premium contributions for the different employee classifications are annually set forth in the GAA. (ECF 118-9, DMS-Stokes, 74:8-16; ECF 122-27, at 2-3.) In recent years, state agency contributions have risen while state employee contributions have remained constant. (ECF 118-9, DMS-Stokes, 75:12-76:14.) State agencies have no say in premium amounts; they all pay the same. (*Id.*, 24:24-25:5.)

State employees are classified for purposes of state group insurance. Mr. Murphy and Ms. Claire are classified as Career Service, and Ms. Lane

is SMS (Senior Management). (ECF 118-1, Arthmann, 83:18-21; ECF 118-11, Edwards, 49:18-21; ECF 118-24, Rodgers, 24:14-25:8.) The state agencies' monthly premium contribution for 2019-20 for Mr. Murphy and Ms. Claire was $713.80, and for Ms. Lane was $726.80. (ECF 118-1, Arthmann, 83:22-84:7; ECF 118-11, Edwards, 50:5-7; ECF 118-24, Rodgers, 89:15-90:5) Mr. Murphy and Ms. Claire's monthly premium contribution was $50.00, and Ms. Lane's was $8.34. (ECF 118-23, Murphy, 16:6-8; ECF 118-5, Claire, 16:24-17:1; ECF 118-19, Lane, 15:6-10; *see also* ECF 122-28.) The total amount paid in fiscal year 2019-20 from state agency contributions was $2.08 billion, and from state employee contributions was $174 million. (ECF 118-9, DMS-Stokes, 86:1-8.)

DMS compiles the premium amounts from the GAA into an annual chart and notifies state agencies and state employees of their premium contributions. (ECF 118-13, Fillyaw, 35:19-25; *see* ECF 122-28.)

As of November 2020, there were 141,000 state employees enrolled in state group health insurance with 363,000 members (employees, spouses and dependents). (ECF 118-9, DMS-Stokes, 25:25-26:12.) DMS does not know how many enrollees are transgender. (*Id.*, 85:21-25.)

DMS is responsible for day-to-day management of state group insurance on behalf of Florida's six personnel systems: State Personnel

System (SPS); State Courts System; Justice Administrative Commission (JAC); Florida Legislature; Florida Lottery; and State Universities. §110.123(c). (ECF 118-8, DMS-Larson, 13:4-18.) SPS consists of 30 state agencies including the Department of Corrections. (*Id.*, 11:2-13; 16:23-25.) Public Defender offices are part of JAC. (ECF 118-6, Colvin, 21:13-22:2.) The University of Florida is part of the State University System. Art. IX, §7, Fla. Const. (ECF 118-15, Gentry, 33:14-16.) DMS is the Department of Corrections' employer in collective bargaining. (ECF 118-13, Fillyaw, 92:8-13.) State agencies have no authority to bargain with unions over the scope of State Plan benefits and exclusions. (*See* ECF 118-11, Edwards, 138:2-10.)

Benefits, including health insurance, are a significant part of a state employee's compensation. (ECF 118-7, DMS-Cox, 61:18-62:19). On top of salary, Plaintiffs receive insurance benefits through employer contributions ranging from $8,566 to $8,722 annually. (*See supra* p.23.) State agencies use state group health insurance to recruit the state's prospective employees. (ECF 118-1, Arthmann, 56:20-57:22, 58:10-59:5; ECF 118-15, Gentry, 50:11-13; ECF 118-24, Rodgers, 111:1-24; ECF 118-11, Edwards, 70:2-20, 72:18-73:22.)

DMS contracts with a private vendor to maintain People First, a workforce program, and to operate its call center. (ECF 118-7, DMS-Cox, 8:12-18, 9:15-25.) State employees, retirees, and state agency human resource professionals access People First through a website. (*Id.*, 9:1-14, 23:15-21.) When a state agency hires a new employee, it completes a Personnel Action Request form to create an employee account within People First. (*Id.*, 18:11-19:7.) DMS sends new state employees information about People First and health insurance options and premium costs. (*Id.*, 21:19-22:6; ECF 122-29.)

DMS determines new state employees' eligibility for health insurance benefits based upon information entered by state agencies, including employee classification and expected hours; then DMS provides state employees with an online enrollment opportunity to select health insurance. (*Id.*, 22:19-23:11; 33:16-34:2.) New state employees use DMS' People First to select a PPO or HMO plan and add eligible dependents. (*Id.*, 35:1-37:9.) If new state employees seek health insurance coverage for dependents, DMS verifies eligibility and requires employees to submit documentation through People First. (*Id.*, 44:5-45:19; 46:7-47:4.) To complete the enrollment process, DMS sends state employee enrollment information directly to Third Party Administrators. (*Id.*, 34:23-25, 43:4-11.)

DMS is responsible for notifying the Department of Financial Services to deduct employees' premium portion from their paychecks and collect the agency's portion of the premium. (*Id.*, 34:8-11, 42:4-16, 51:21-52:12.) For State University employees, DMS interfaces with state universities' separate payroll system. (*Id.*, 34:12-16.) The interface occurs daily to pick up changes by either system. (ECF 118-11, Edwards, 79:17-23, 81:1-19.) DMS sends enrollment information to Third Party Administrators and pays them the full premiums. (ECF 118-7, DMS-Cox, 34:23-25, 43:4-11.)

State employees may only make changes to health insurance coverage during open enrollment or if there is a qualifying event such as a marriage, divorce, or having a child. (*Id.*, 47:5-15). Employees provide DMS with documentation of qualifying events in People First. (*Id.,* 47:16-48:13.) During open enrollment, DMS mails benefits statements to state employees indicating current enrollment and eligible plans. (*Id.*, 38:7-39:14.) DMS holds annual Benefits Fairs and webinars to inform state employees about benefits. (ECF 118-11, Edwards, 156:12-157:6, 175:14-21). Once open enrollment is complete, DMS sends employees' enrollment elections to Third Party Administrators. (ECF 118-7, DMS-Cox, 50:23-51:3.)

State agencies have no ability to change coverage and exclusions in the State Plan. (ECF 118-9, DMS-Stokes, 63:23-64:11; ECF 118-13, Fillyaw,

131:25-132:4; ECF 118-11, Edwards, 69:20-22.) State agencies do not directly communicate with Third Party Administrators. (ECF 118-1, Arthmann, 81:19-23; ECF 118-11, Edwards, 111:22-112:4.)

When an employee's medical service is denied, they may appeal to Third Party Administrators. (ECF 118-10, DMS-Thomas-Brown, 66:23-67:6.) If the matter is not resolved, employees can proceed to a Level II appeal handled by DMS for all Third Party Administrators, except for Capital Health, which conducts its own. (*Id.*, 66:11-22.) If the requested service falls under an exclusion, no individualized assessment of medical necessity is conducted at the appeal level. *See supra* p.12.

### DMS Has No Intention to Recommend Elimination of Exclusions

DMS relies on the expertise of Third Party Administrators as experts in healthcare coverage and medical care provided to state employees. (ECF 118-10, DMS-Thomas-Brown, 28:13-24, 64:5-19; ECF 118-13, Fillyaw, 95:12-18, 105:5-105:15, 153:19-154:8.) DMS requires Third Party Administrators to communicate relevant changes in law to DMS. (ECF122-21, at 94).

Several Third Party Administrators communicated to DMS they recommended changes to the State Plans regarding coverage of care for transgender individuals. (ECF 118-9, DMS-Stokes, 46:19-23; ECF 118-13,

Fillyaw, 204:14-205:12, 210:13-211:11, 212:25-213:22.) Florida Blue changed its policies and guidelines in 2017 to include coverage for gender-affirming healthcare and recommended to DMS that the PPO State Plan provide coverage for gender reassignment surgery based on the Affordable Care Act's nondiscrimination provision (Section 1557). (ECF 118-13, FIllyaw, 202:14-203:21; ECF 118-9, DMS-Stokes, 46:19-23.) CVS also contacted DMS regarding the Exclusions as a result of Section 1557 and asked DMS to notify it if Florida wanted to provide coverage. (ECF 118-13, Fillyaw, 207:17-208:20:11.) DMS reviewed whether to change the exclusions, but decided not to. (ECF 118-13, Fillyaw, 208:21-209:5; ECF 122-30.)

DMS contracted with Mercer Health and Benefits to conduct a high-level review of the State Plans to determine compliance with the Mental Health Parity Act. (ECF 118-22, Mercer, 61:25-62:6, 67:13-25; ECF 118-13, Fillyaw, 233:23-234:7; ECF 118-9, DMS-Stokes, 44:5-8.) Mercer's analysis, provided to DMS in 2018, indicated a "Red Flag" in the State Plan's "Blanket Exclusion" for "Coverage for treatment of transgender/gender dysphoria conditions is excluded." (ECF 122-31, at 14, 19, 22; ECF 118-22, Mercer, 65:19-66:25.) DMS and Mercer discussed the findings and potentially contracting regarding amending the language flagged in the State Plans. (ECF 118-22, Mercer, 62:19-64:6, 68:1-70:5, 84:24-86:3; ECF 118-13,

Fillyaw, 238:14-240:19.) However, DMS decided not to make changes to the gender reassignment exclusions and not to contract with Mercer to amend the language. (ECF 118-9, DMS-Stokes, 44:19-22; ECF 118-13, Fillyaw, 116:20-117:7, 239:4-240:19; ECF 118-22, Mercer, 86:9-87:6.)

Although DMS has authority to recommend changes to the State Plan, *see* §110.123(5)(a), Fla. Stat., it has not recommended the Exclusions' elimination or alteration. (ECF 118-9, DMS-Stokes, 53:17-23; ECF 118-13, Fillyaw, 18:9-13, 138:8-10, 223:22-224:6, 232:8-233:7.) DMS has no intention of recommending changes to the Legislature regarding the Exclusions. (ECF 118-13, FIllyaw, 119:2-12.)

## MEMORANDUM OF LAW

### I. This Court should grant summary judgment in favor of Plaintiffs.

Summary Judgment is proper if the evidence shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The undisputed facts show Defendants administer and enforce the Exclusions that resulted in the denial of the employee health insurance coverage Plaintiffs need. (Facts, *supra* pp.19-27) The Third Party Administrators denied Plaintiffs' requests for coverage solely because of the discriminatory Exclusions. (Facts, *supra* pp.8-12.) The treatments denied to Plaintiffs are covered when used to treat

other medical conditions. (Facts, *supra* pp.16-17.) Plaintiffs are provided with less compensation for employment than cisgender employees who are not subjected to categorical exclusions and receive the care they need. (Facts, *supra* pp.8-12.) The undisputed facts demonstrate as a matter of law that Defendants' insurance benefits unlawfully discriminate against Plaintiffs in violation of Title VII and equal protection because they are transgender and need transition-related care to treat their gender dysphoria.

### a. Title VII prohibits sex discrimination against transgender employees in the provision of healthcare benefits.

Title VII prohibits an employer from discriminating against an individual "with respect to [their] compensation, terms, conditions, or privileges of employment, because of such individual's…sex[.]" 42 U.S.C. §2000e-2(a)(1); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989) (individual employee's sex is "not relevant to the selection, evaluation, or compensation of employees"); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (Title VII demonstrates "congressional intent to strike at the entire spectrum of disparate treatment" predicated on sex). Discrimination for purposes of Title VII "refers to 'distinctions or differences in treatment that injure protected individuals.'" *Bostock v. Clayton Cty.*, 140 S.Ct. 1731, 1753 (2020) (quoting *Burlington N. & S.F.R. Co. v. White*, 548 U.S. 53, 59 (2006)). Title VII's prohibition of sex discrimination

encompasses discrimination "on the basis of transgender and transitioning status[,]" which "is necessarily discrimination on the basis of sex[.]" *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 571 (6th Cir. 2018*), aff'd sub nom. Bostock*, 140 S.Ct. 1731.

Employer-provided health insurance and other fringe benefits are compensation, terms, conditions, or privileges of employment. *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983) (employer violated Title VII by singling out pregnancy-related hospitalizations for exclusion from medical coverage). An employer violates Title VII when it provides health insurance or other fringe benefits that rely on sex-based classifications to treat employees differently on the basis of sex. *See Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1080-86 (1983) (Marshall, J., concurring) (rejecting state's deferred compensation plan requiring women to pay more based on statistical findings about women's life expectancy); *City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 712-13 (1978) (invalidating policy requiring female employees to make larger retirement contributions than male employees).

Under Title VII, policies that facially discriminate based on a protected class are direct evidence of discrimination. *Trans World Airlines, Inc. v.*

*Thurston*, 469 U.S. 111, 121 (1985); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) ("Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination.") Employment policies, including fringe benefit plans, are facially discriminatory when they treat employees unfavorably due to sex-correlated medical conditions, such as pregnancy. *Newport News*, 462 U.S. at 682-84 (invalidating employer's healthcare exclusion for pregnancy-related hospital benefits for spouses of male employers because it violates Title VII's simple test "in a manner which but for that person's sex would be different") (quoting *Manhart*, 435 U.S. at 711); *Maddox v. Grandview Care Ctr., Inc.*, 780 F.2d 987, 989-91 (11th Cir. 1986) (rejecting employer's argument that leave policy treating pregnancy differently from other medical conditions did not constitute sex discrimination on its face).

Relying on this precedent, other courts have concluded states which offer employer-based health insurance policies that similarly exclude "gender reassignment or modification services or supplies" facially discriminate against transgender employees on the basis of sex. *See, e.g., See Fletcher v. Alaska*, 443 F.Supp.3d 1024, 1029-31 (D. Alaska 2020) (Alaska's

discriminatory health insurance policy maintained a "blanket exclusion…for gender transition-related surgery"); *Boyden v. Conlin*, 341 F.Supp.3d 979, 982 (W.D. Wis. 2018) (Wisconsin's discriminatory health insurance policy excluded "[p]rocedures, services, and supplies related to surgery and sex hormones associated with gender reassignment").

### b. Defendant DMS discriminated against Plaintiffs on the basis of sex in violation of Title VII.

The Exclusions rely on sex-based classifications that discriminate against Plaintiffs in violation of Title VII because they are transgender and seek transition-related care to treat their gender dysphoria. *See Bostock*, 140 S.Ct. at 1742 ("There is simply no escaping the role intent plays here: Just as sex is necessarily a but-for *cause* when an employer discriminates against homosexual or transgender employees, an employer who discriminates on these grounds inescapably *intends* to rely on sex in its decisionmaking."). In *Newport News,* the Supreme Court declared unconstitutional an employer's health insurance plan that had a categorical exclusion for pregnancy-related hospitalizations for employees' wives while allowing more extensive coverage for employees' spouses for all other medical conditions requiring hospitalization. 462 U.S. at 683. Exclusion of medical care for pregnancy-related conditions in employee benefits, which only women require, is gender-based discrimination on its face. *Id.* at 684. Such exclusions on the

basis of medical conditions unique to the employee's sex do not meet the simple test of showing the "treatment of a person in a manner which but for that person's sex would be different." *Johnson Controls*, 499 U.S. at 200, (quoting *Manhart*, 435 U.S. at 711). Similarly, if a policy facially discriminates on the basis of sex because the excluded medical condition is unique to the employee's sex, it follows that the Exclusions also facially discriminate on the basis of sex because gender-affirming care is unique to a transgender person's treatment of their gender dysphoria.

The Exclusions "single[] out transgender individuals for different treatment" because "transgender individuals are the only people who would ever seek gender reassignment surgery." *Toomey v. Arizona*, No. CV-19-00035-TUC-RM (LAB), 2019 WL 7172144, at *6 (D. Ariz. Dec. 23, 2019) ("No cisgender person would seek, or medically require, gender reassignment."). Singling out care related to "gender reassignment" for unequal treatment is inherently a sex-based classification that discriminates based on sex stereotypes and Plaintiffs' gender nonconformity. *See Bostock*, 140 S.Ct. at 1742; *see also Price Waterhouse*, 490 U.S. at 251. By denying Plaintiffs access to gender-affirming care, Defendant discriminates on the basis of Plaintiffs' "transitioning status" which "constitutes an inherently gender non-conforming trait." *Harris Funeral Homes*, 884 F.3d at 577; *see also Schroer*

*v. Billington*, 577 F.Supp.2d 293, 306-07 (D.D.C. 2008) (discrimination against transgender employee because of a "change" in sex is sex discrimination just as "[d]iscrimination 'because of religion' easily encompasses discrimination because of a *change* of religion").

Plaintiff Murphy was denied coverage for a mastectomy – a procedure necessary to treat his gender dysphoria under WPATH's standards. (Facts, *supra* p.8.) A mastectomy is routinely covered for cisgender women when medically necessary to treat breast cancer (Facts, *supra* p.16), but because Murphy is a transgender man, his request was never subjected to a medical necessity analysis and was instead categorically excluded. (Facts, *supra* pp.8-9,12.) The plan's "disparate treatment" of Murphy's medical needs through the gender reassignment exclusion discriminates against Murphy on the basis of sex as the exclusion negatively impacts only transgender individuals "who do not conform to the gender identity typically associated with the sex they were assigned at birth." *See Toomey*, 2019 WL 7172144, at *6.

Plaintiff Claire was denied coverage for an orchiectomy – a procedure necessary to treat her gender dysphoria under WPATH's standards. (Facts, *supra* p.9.) An orchiectomy is routinely covered for cisgender men when it is medically necessary, for example to treat testicular cancer (Facts, *supra*

p.16), but because Claire is a transgender woman, her request was never subjected to a medical necessity analysis and was instead categorically excluded. (Facts, *supra* pp.9,12.) Thus, the State Plan discriminates against Claire on the basis of sex. *See Fletcher*, 443 F.Supp.3d at 1030 (insurance policy with exclusion for gender transition-related surgery treats transgender employees differently by denying coverage for certain medically necessary surgeries because of their sex assigned at birth while allowing those same surgeries for cisgender employees).

Plaintiff Lane was denied coverage for facial feminization surgery – a procedure necessary to treat her gender dysphoria under WPATH's standards. (Facts, *supra* pp.9-10.) Two of the surgical procedures she sought coverage for were a rhinoplasty and bone reconstruction, which are routinely covered for individuals, regardless of sex, if the surgery is for medical reasons such as sinus issues, congenital deformity, or the result of an accident. (Facts, *supra* pp.16-17.) The sole reason provided for Lane's initial denial was the gender reassignment exclusion. (Facts, *supra* p.10.) On a second level appeal, Capital Health added a justification that the procedure was "cosmetic." (Facts, *supra* p.10.) Because of the Exclusions, Lane's request to treat her gender dysphoria was never subjected to a medical necessity analysis but instead was categorically excluded under "gender

reassignment" guidelines that exclude cosmetic surgeries. (Facts, *supra* pp.9-10,12.) Capital Health's secondary basis for denial, the cosmetic exclusion, as the reason for denial under either exclusion was that "facial feminization surgery" is for the purpose of "gender reassignment." (Facts, *supra* p.10.) Lane was therefore subjected to discriminatory treatment in the provision of healthcare benefits, which Title VII prohibits. *See Boyden*, 341 F.Supp.3d at 995 (rejecting argument that gender-confirmation surgeries, such as a rhinoplasty sought by a transgender woman to treat her gender dysphoria, is justifiably denied under rationale that an exclusion for cosmetic coverage applies to "all psychological conditions").

The State Plans treat Plaintiffs differently because of their sex assigned at birth, and deprive them coverage for certain medically necessary surgeries needed to address the "marked incongruence between [their] experienced/expressed gender and assigned sex at birth." (Facts, *supra* p.4.) The exclusion is "[d]iscrimination based on the incongruence between natal sex [sex assigned at birth] and gender identity—which transgender individuals, by definition, experience and display" and it therefore "implicates the gender stereotyping prohibited by Title VII." *Toomey*, 2019 WL 7172144, at *6. And it penalizes Plaintiffs "by limiting the availability of medical transitioning, if not rendering it economically infeasible," and requiring them

"to maintain the physical characteristics of their natal sex" over "medical and psychological recommendations to the contrary." *Boyden*, 341 F.Supp.3d at 997. (Facts, *supra* p.12.)

DMS has not raised the defense that the discrimination is justified by a bona fide occupational qualification. *See Johnson Controls*, 499 U.S. at 200. Indeed, DMS has raised no justification at all. Therefore, this defense does not apply. Indeed, no bona fide occupational qualification exists for administering a health insurance plan categorically excluding gender-affirming care. *Fletcher*, 443 F.Supp.3d at 1031. For these reasons, Defendant's policies are facially discriminatory on the basis of sex and injured Plaintiffs by denying them employee health insurance coverage that they need in violation of Title VII.

### c. Defendant DMS is liable under Title VII for unlawful sex discrimination against Plaintiffs.

DMS is Plaintiffs' employer for purposes of health insurance coverage provided to state employees. *See* 42 U.S.C. §2000e(b) (defining "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person"). The statute defines a "person" as "one or more…governments, governmental agencies, [or] political subdivisions[.]" *Id.* §2000e(a). The

definition of employer is construed liberally. *Williams v. City of Montgomery*, 742 F.2d 586, 588 (11th Cir. 1984), *cert. denied* 470 U.S. 1053 (1985).

DMS is liable under Title VII, because state law requires the state agencies that Plaintiffs work for to delegate control over Plaintiffs' employer-based health insurance coverage to DMS and because DMS exercises that control. (Facts, *supra* pp.19-27; *see also* ECF 95, at 3, 6); *Williams*, 742 F.2d at 589 ("Where the employer has delegated control of some of the employer's traditional rights, such as hiring or firing, to a third party, the third party has been found to be an 'employer' by virtue of the agency relationship."), quoting Schlei & Grossman, *Employment Discrimination Law,* at 1002 (2d ed. 1983). Florida law expressly delegates responsibilities traditionally held by Plaintiffs' employing agencies (UF, DOC, OPD) to DMS to set the terms of fringe benefits offered as compensation for employment through the establishment of the state health group insurance program. Fla. Stat. §110.123(3)(b); *see also* §20.22 (statute creating DMS). As these are functions "traditionally exercised by an employer" but DMS "utilizes these powers," DMS is an agent of Plaintiffs' employing state agencies.[1] *See Williams*, 742 F.2d at 589.

---

[1] The EEOC has held similarly regarding the U.S. Office of Personnel Management's (OPM) role as the Federal Employees Health Benefits

Similarly, in *Boyden*, transgender Wisconsin state employees sued the state employee trust fund and state government insurance board for providing discriminatory health plans that excluded gender-affirming care. 341 F.Supp.3d at 982. Both agencies contested their liability under Title VII, arguing neither directly employed plaintiffs. *Id.* at 997. Rejecting both defendants' arguments, the district court held, "having been actually empowered by the State to administer the policies…forms a sufficient basis to hold [defendant] as an agent of the State and the ultimate employer, liable for sex discrimination under Title VII. *Id.* at 998. Also, just as in *Boyden*, where the court dismissed plaintiff's direct employers because a separate agency was statutorily delegated control over the provision of benefits, this Court employed similar reasoning in dismissing Plaintiffs' state agency employers. (ECF 95). *See Boyden v. Conlin*, Case No. 17-cv-264-wmc, 2018 WL 2191733, at *4-5 (W.D. Wis. May 11, 2018).

Alternatively, DMS is liable under Title VII because it forms a single employer with the state agencies (DOC, UF and OPD). 42 U.S.C. §2000e(a). The factors considered to determine whether multiple entities form a single

_____

(FEHB) administrator for all federal sector employees. *See, e.g., Darin B. v. McGettigan*, EEOC Appeal No. 0120161068, 2017 WL 1103712, at *3-4 (EEOC Mar. 6, 2017) ("[a]gency administering the FEHB program (OPM) is responsible for an insurance carrier's denial of [gender-affirming] benefits" to a transgender employee).

employer under Title VII "share a common focus: all of them seek to determine who (or which entity) is in control of the fundamental aspects of the employment relationship that gave rise to the claim." *Lyes v. City of Riviera Bch.*, 166 F.3d 1332, 1345 (11th Cir. 1999). The Eleventh Circuit's non-exclusive factors guide the determination, but "consideration must be given to the totality of the circumstances." *Id.*

A court starts by analyzing how the state legislature chooses to structure its own government.[2] *Id.* at 1344; *see EEOC v. McIntosh Cty. Bd. of Health*, No. CV 208-120, 2010 WL 11617982, at *3 (S.D. Ga. May 13, 2010) ("The natural starting point for determining whether distinct governmental entities should be treated as a single employer is the statutes creating and regulating them."). Courts treat multiple public entities as a single employer when the legislature does not declare its intention that each entity is separate and distinct. There is a presumption that a public entity is separate and distinct when a legislature creates a public entity and declares

---

[2] In *Lyes*, the Eleventh Circuit rejected applying the four-part test that is typically used to determine whether entities constitute a "single employer" when considering cases involving government entities. 166 F.3d at 1342-43. The test typically looks at: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Id.* at 1341. The court found the third and fourth factors "not readily applicable" to government entities, and while the first two factors could still be relevant, courts must give deference to the way the government has chosen to structure itself. *Id.* at 1343-44.

it as such. *Lyes*, 166 F.3d at 1344. However, that presumption is rebutted "where other factors so plainly indicate integration that they clearly outweigh the presumption that the entities are distinct." *Id.*

Here, the statutory intent and structure are clear, and the general presumption does not apply. The legislative intent in creating the Division of State Group Insurance within DMS is to require centralized control and interrelation of operations for health insurance and all other fringe benefits offered to state employees. (Facts, *supra* p.20.) Under the totality of the circumstances, the state agencies form a single employer with DMS, which has control over the fundamental aspect of employment giving rise to Plaintiffs' claim – state group health insurance. *See McIntosh Cty.*, 2010 WL 11617982, at *4 (state and county boards of health could be considered single employer where the state had control over a fundamental aspect of employment giving rise to the claim).

This Court already held Plaintiffs' direct state agency employers are not responsible for the portion of the employment relationship that gave rise to this claim, because Fla. Stat. §110.123(3)(c) delegates responsibility for all aspects of the plans to DMS. (ECF 95, at 3-4.) The Legislature expressly delegated control for the administration of the state group health insurance program to DMS for all "state agencies." (Facts, *supra* p.20.) As this is the

"fundamental aspect[] of the employment relationship that gave rise to the claim," *Lyes*, 166 F.3d at 1345, this statutory structure demonstrates the state agencies' interrelationship of operations and centralized control for the purpose of providing fringe benefits to state employees as compensation for employment. (Facts, *supra* p.20.)

This is consistent with *Norris*, where an Arizona state agency that administered Plaintiffs' discriminatory fringe benefits was held legally responsible under Title VII for plans it contracted for and administered. *Norris*, 463 U.S. at 1086; (ECF 95, at 4, analogizing governing committee in *Norris* to Defendant DMS). DMS is therefore liable under Title VII as the employer for the provision of fringe benefits under the state group health insurance program to state employees.

### d. Defendant Satter violated Plaintiffs' right to Equal Protection.

Defendant Satter violates Plaintiffs' rights to equal protection by creating, offering, and administering the Exclusions that discriminate against Plaintiffs on the basis of sex, for the same reasons the Exclusions violate Title VII. "[D]iscrimination against a transgender individual because of [their] gender-nonconformity is sex discrimination" and is "subject to heightened scrutiny under the Equal Protection Clause." *Glenn v. Brumby*, 663 F.3d 1312, 1317-19 (11th Cir. 2011). Plaintiffs need not prove discriminatory

intent, because they challenge a facially discriminatory policy that discriminates against a protected class. *E&T Realty v. Strickland*, 830 F.2d 1107, 1112 n.5 (11th Cir. 1987). Facial classifications based on protected status such as sex generally have "no sensible ground for differential treatment." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 440 (1985). Such classifications will fail unless they meet heightened scrutiny. *Id.* at 441.

Other courts have held similar healthcare exclusions violate equal protection. *Kadel v. Folwell*, 446 F.Supp.3d 1, 18 (M.D.N.C. 2020), *appeal docketed*, No. 20-1409 (4th Cir. Apr. 9, 2020) (finding on motion to dismiss that exclusion for gender-affirming care facially discriminates on basis of gender by excluding care needed for treatment of gender dysphoria, which "only results from a discrepancy between assigned *sex* and *gender* identity"); *Boyden,* 341 F.Supp.3d at 1000-03 (state-sponsored employer healthcare exclusion of gender reassignment fails heightened scrutiny accorded to sex-based discrimination claims under Equal Protection Clause); *Toomey,* 2019 WL 7172144, at *6 (denying motion to dismiss where state-sponsored employer healthcare exclusion for gender reassignment surgery does not appear to meet either heightened scrutiny or rational basis because government's asserted interest in limiting healthcare costs "cannot be

furthered by arbitrary classifications or by harming a politically unpopular or vulnerable group"); *Flack v. Wis. Dep't of Health Servs.*, 395 F.Supp.3d 1001, 1020-22 (W.D. Wis. 2019) (state Medicaid exclusion of gender-confirming care, including surgery, subjects transgender people to disparate and inferior healthcare on the basis of sex in violation of equal protection).

Satter has the "demanding" burden of demonstrating that his proffered justification for the differential treatment is "exceedingly persuasive." *U.S. v. Virginia*, 518 U.S. 515, 533 (1996). The "burden of justification" requires him to show the differential treatment "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* (internal quotations omitted). Satter fails to meet his burden as he has proffered *no* justification for the discriminatory policy (Facts, *supra* p.14), much less one that is genuine and not hypothetical or invented. *See Virginia*, 518 U.S. at 533 ("The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation.").

"Moreover, the classification must substantially serve an important governmental interest *today*, for in interpreting the equal protection guarantee, [the Supreme Court has] recognized that new insights and societal understandings can reveal unjustified inequality that once passed

unnoticed and unchallenged." *Adams v. Sch. Bd. of St. Johns Cty.*, 318 F.Supp.3d 1293, 1313 (M.D. Fla. 2018), *aff'd*, 968 F.3d 1286 (11th Cir. 2020) (alteration in original) (quoting *Sessions v. Morales-Santana*, 137 S.Ct. 1678, 1690 (2017)). Satter admits he knows of no current financial or medical justifications for the exclusion, and also admits that gender reassignment services are not currently considered experimental or investigational. (Facts, *supra* p.14-15.) *See Flack*, 395 F.Supp.3d at 1021 ("medical consensus is that gender-confirming treatment, including surgery, is accepted, safe, and effective in the treatment of gender dysphoria"). Therefore, this Court should find Satter's policy fails to meet the heightened scrutiny accorded to sex-based classifications under the Equal Protection Clause. *See Glenn*, 663 F.3d at 1321.

## II. Declaratory Judgment

Plaintiffs are entitled to a declaration of their rights pursuant to 28 U.S.C. §2201. *Medimmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 129 (2007). Plaintiffs request that this Court enter a declaration that Defendants' policy of categorically excluding all medically necessary gender-affirming care in the State Plans violates Title VII of the Civil Rights Act and the Equal Protection Clause of the U.S. Constitution.

### III.    Permanent Injunction

A plaintiff seeking a permanent injunction must satisfy a four-factor test demonstrating: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

For constitutional violations, the injunction must be no broader than necessary to address the violation. *Newman v. Alabama*, 683 F.2d 1312, 1319 (11th Cir. 1982). However, Title VII authorizes the court to fashion broad injunctive relief to prevent future unlawful employment practices as required by the specific circumstance of the case. 42 U.S.C. § 2000e-5(g)(1); *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763-64 (1976); *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1136 (11th Cir. 1984) (in Title VII case, noting that "injunctive relief may benefit individuals not party to the action, and that classwide injunctive relief may be appropriate in an individual action"); *Hutchings v. U.S. Indus., Inc.*, 428 F.2d 303, 311 (5th Cir. 1970) ("The trial judge in a Title VII case bears a special responsibility in the public

interest to resolve the employment dispute, for once the judicial machinery has been set in train, the proceeding takes on a public character in which remedies are devised to vindicate the policies of the Act, not merely to afford private relief to the employee."). When the case involves ongoing discrimination, the court's discretion *not* to order relief is severely limited because "injunctive relief is *mandatory* absent clear and convincing proof that there is no reasonable probability of further noncompliance with the law." *In re: Nat'l Airlines, Inc.* 700 F.2d 695, 697 (11th Cir. 1983) (quotations omitted).

Plaintiffs succeed on the merits of their claims that the State Plans' Exclusions are facially discriminatory in violation of Title VII and equal protection. Plaintiffs suffer ongoing irreparable injury as the State Plans continue to contain exclusions categorically denying gender-affirming care on the basis of sex. While damages may compensate Plaintiffs for past discriminatory acts, permanent injunctive relief is necessary to ensure they do not continue to receive discriminatory health insurance from the State. The threat of ongoing future harm is real and immediate because DMS has no intention of requesting the removal of the Exclusions and Plaintiffs need gender-affirming care in the future. (Facts, *supra* p.13.) *See Thomas v. Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010) (irreparable injury requirement

met when there is "a real or immediate threat that the plaintiff will be wronged again").

The balance of hardships weighs in Plaintiffs' favor, especially when Defendants offer no justification for the Exclusions apart from longevity and when Plaintiffs face ongoing harm. Finally, "[t]he vindication of constitutional rights and the enforcement of a federal statute serve the public interest almost by definition." *League of Women Voters of Fla. v. Browning*, 863 F.Supp.2d 1155, 1167 (N.D. Fla. 2012). Since injunctions for Title VII violations take on a public benefit to prevent future discriminatory acts, *Rau v. Apple-Rio Mgmt. Co.,* 85 F.Supp.2d 1344, 1352 (N.D. Ga. 1999), it further benefits the public to ensure that no other state employee receives health insurance that discriminates based on sex.

Because Plaintiffs meet this four-part test and seek to prevent ongoing discrimination, Plaintiffs are entitled to a permanent injunction prohibiting Defendants or their agents from enforcing the Exclusions to deny medically necessary gender-affirming care for the treatment of gender dysphoria.

## IV.   Conclusion

For the foregoing reasons, Plaintiffs respectfully request that this Court GRANT their Motion for Partial Summary Judgment and allow their case to

proceed to trial on the amount of damages on their Title VII claim against DMS.

## CERTIFICATE OF WORD COUNT

Pursuant to N.D. Loc. R. 56.1(B) and this Court's Order allowing 9,000 words (ECF 120), the above Statement of Undisputed Facts and Memorandum of Law contain 8,995 words.


Dated: February 8, 2021     Respectfully submitted,

*/s/ Jodi Siegel*

SIMONE CHRISS, Fla. Bar No. 124062
simone.chriss@southernlegal.org
KIRSTEN ANDERSON, Fla. Bar No. 17179
kirsten.anderson@southernlegal.org
JODI SIEGEL, Fla. Bar No. 511617
jodi.siegel@southernlegal.org
Southern Legal Counsel, Inc.
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890

DANIEL TILLEY, Fla. Bar No. 102882
dtilley@aclufl.org
ACLU Foundation of Florida
4343 West Flagler St., Suite 400,
Miami, FL 33134
(786) 363-2714

ANTON MARINO, Fla. Bar. No. 1021406
amarino@aclufl.org
ACLU Foundation of Florida
4343 West Flagler St., Suite 400

Miami, FL 33134
(786) 363-2707

ERIC LINDSTROM, Fla. Bar No. 104778
elindstrom@eganlev.com
Egan, Lev, Lindstrom & Siwica, P.A.
P.O. Box 5276
Gainesville, FL 32627
(352) 672-6901

NICHOLAS WARREN, Fla. Bar No. 1019018
ACLU Foundation of Florida, Inc.
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-1769
nwarren@aclufl.org

**ATTORNEYS FOR ALL PLAINTIFFS**

JEFFREY HEARNE, Fla. Bar No. 512060
jhearne@legalservicesmiami.org
JOCELYN ARMAND, Fla. Bar No.44264
jarmand@legalservicesmiami.org
PAMELA FLORES, Fla. Bar No. 0124363
pflores@legalservicesmiami.org
Legal Services of Greater Miami, Inc.
4343 W Flagler Street, Suite 100
Miami, FL 33134
(305) 438-2403

**ATTORNEYS FOR PLAINTIFF MURPHY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this <u>8th</u> day of February, 2021, a true copy of

the foregoing has been filed with the Court utilizing its CM/ECF system,

which will transmit a notice of electronic filing to all Plaintiffs' and Defendants' counsel of record registered with the Court for that purpose.

*/s/ Jodi Siegel*

**ATTORNEY FOR PLAINTIFFS**