**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

JAMI CLAIRE, KATHRYN LANE,
and AHMIR MURPHY,

    Plaintiffs,

v.                                          CASE NO. 4:20-cv-0020-MW-CAS

FLORIDA DEPARTMENT OF
MANAGEMENT SERVICES; et al.,

    Defendants.
_____/

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE
IN OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT**

**I. Plaintiffs' Title VII Claims Succeed.**

DMS does not dispute that Plaintiffs are state employees who receive state health insurance as benefits, and that DMS is Plaintiffs' employer under Title VII. (*See generally* ECF 135.) DMS does not dispute Title VII prohibits sex discrimination against transgender employees, including Plaintiffs. (*Id.* at 4, 9.) The disputed issue is whether the state plans, which exclude gender and sex reassignment services (Exclusions), violate Title VII.

Plaintiffs' Title VII claims succeed because undisputed evidence demonstrates the Exclusions are a facially discriminatory policy for which

1

no *bone fide* occupational qualification exists. (*See generally* ECF 123.) *See Int'l Union, United Auto Aerospace & Agric. Works of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 197-200 (1991). Plaintiffs belong to a protected class, they suffered adverse employment actions for which inferences of discrimination exist, and no legitimate, non-discriminatory reason supports the actions. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-56 (1981).

DMS argues no sex discrimination occurred and no liability attaches because: (A) the Exclusions are facially neutral and unrelated to pregnancy; (B) *Bostock* does not protect "transitioning" status; (C) no sex stereotyping occurred; and (D) there is no discriminatory intent. As detailed below, these arguments fail.[1]

### A. DMS Ignores Section 2000e(k)'s Text.

DMS mistakenly argues the Pregnancy Discrimination Act only expands Title VII's "because of sex" to include pregnancy-related medical conditions. (ECF 135, at 14.) Statutory analysis begins with whether the text has a plain, unambiguous meaning. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). Fundamentally, any word or phrase's meaning

---

[1] For DMS' argument that Plaintiffs have not identified similarly situated comparators (*id.* at 23-25), Plaintiffs refer to their Response. (ECF 136, at 20-25.)

cannot be construed in isolation, "but must be drawn from the context in which it is used." *Yates v. U.S.*, 574 U.S. 528, 537 (2015); *see, e.g.*, *Bostock v. Clayton Cnty.*, 140 S.Ct. 1731, 1739 (2020) ("The question isn't just what 'sex' meant, but what Title VII says about it.").

In pertinent part, 42 U.S.C. § 2000e(k) provides:

> The terms "because of sex" or "on the basis of sex" *include, but are not limited to,* because of or on the basis of pregnancy, childbirth, or related medical conditions[.]

(emphasis added). The word "include" plainly signals the statute only offers illustrative examples, not an exhaustive list. *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 99-100 (1941); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts,* 132-33 (2012). Moreover, "include, but are not limited to," expands the definition of "because of sex" beyond the listed examples to other sex- or gender-specific medical conditions. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678 n.14 (1983) ("The meaning of the first clause is not limited by the specific language in the second clause, which explains the application of the general principle to women employees."). Consistent with Title VII's text and *Newport News*, the Exclusions—which categorically exclude coverage that only transgender employees need—facially discriminate on the basis of sex.

3

DMS argues the Exclusions are facially neutral because not all transgender state employees are harmed, reasoning that not all transgender employees have gender dysphoria or require medical care for gender reassignment. (ECF 135, at 11-12.) That only a subset of transgender employees suffer directly is irrelevant, and it does not erase the fact the Exclusions only target transgender employees. *Bostock*, 140 S.Ct. at 1740-41 (Title VII prohibits discrimination against individuals, regardless of how groups are treated as a whole). *Bostock* unequivocally rejected the argument DMS presents. *Id.* at 1744-45 (rejecting argument that intentional discrimination on transgender status supplies no basis for liability).

### B.  DMS Misinterprets *Bostock*.

DMS contends *Bostock* does not apply, claiming it only reaffirmed "a traditional understanding of sex discrimination" that makes Title VII inapplicable if an employee is not treated differently because of "biological sex." (ECF 135, at 16.) To DMS, treating transgender employees disparately remains legal if the exclusion of benefits is not expressly predicated on employees' biological sex characteristics. (*Id.* at 15-19.) DMS also argues its Exclusions cannot discriminate based on sex because it did

4

not know Plaintiffs' sex or gender identity when it applied the Exclusions. (*Id.* at 20.) These arguments fail.

*Bostock*'s rule is simple: "An individual's…transgender status is not relevant to employment decisions. That's because it is impossible to discriminate against a person for being…transgender without discriminating against that individual based on sex." 140 S.Ct. at 1741. The Court clarified being transgender is not "related to sex in some vague sense or because discrimination on th[is] bas[is] has some disparate impact on one sex or another, but because to discriminate on th[is] ground[] requires an employer to intentionally treat individual employees differently because of their sex." *Id.* at 1742. Thus, an employer treating a transgender employee differently "inescapably *intends* to rely on sex in its decisionmaking." *Id.*

Similarly, DMS inescapably intends to rely on sex in its decisionmaking by excluding transgender healthcare from the state plans. Applying the "simple test" in *Bostock,* DMS "necessarily and intentionally discriminates against [transgender employees] in part because of sex." *Id.* at 1744 (discussing *Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707-08 (1978)). Relying on purported "biological fact[s]" regarding transgender people's reproductive characteristics (ECF 135, at

18) is sufficient to demonstrate DMS intended to treat transgender state employees differently because of sex. *See* 140 S.Ct. at 1744-45.

*Bostock* rejects requiring the employer to know the employee's identified sex for liability to attach. *Id.* at 1746 ("[T]he individual applicant's sex still weighs as a factor in the employer's decision."). The Exclusions' discriminatory policy makes DMS liable. *Id.* ("By intentionally setting out a rule that makes [providing benefits] turn on [a protected class], the employer violates the law, whatever he might know or not know about individual applicants."). Moreover, DMS' argument it lacked knowledge of Plaintiffs' sex when it denied benefits contradicts undisputed facts. (*See* ECF 123, at 8-10.)

DMS argues protecting Plaintiffs from being offered discriminatory fringe benefits as compensation for employment is a "novel judicial interpretation" of Title VII. (ECF 135, at 37.) This ignores that Title VII's text encompasses all modalities of sex discrimination. 140 S.Ct. at 1745 ("[N]one of these contentions about what the employers think the law was meant to do, or should do, allow us to ignore the law as it is.").

### C. No Supreme Court Title VII Decision Supports DMS' Interpretation.

Contrary to DMS' argument, fifty years of precedent confirms DMS is subjecting Plaintiffs to unlawful sex stereotyping.

6

The Court confirmed Title VII "precludes [disparate] treatment of individuals as simply components of a...sexual...class," and rejects an employer's decision predicated on "[m]yths and purely habitual assumptions" or generalizations about a class's characteristics. *Manhart*, 435 U.S. at 707-08. Early on, Justice Marshall highlighted Title VII's aim to prevent treatment of "an individual based on stereotyped characterizations of the sexes." *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 545 (1971) (Marshall, J., concurring).

The *Manhart* Court adopted Justice Marshall's framing and invalidated a policy requiring women employees to contribute more to a pension fund. 435 U.S. at 707-10. Title VII rejects "[p]ractices that classify employees in terms of...sex" because they ordinarily preserve generalized, "traditional assumptions" about sex "rather than thoughtful scrutiny of individuals." *Id.* at 709. The Court concluded Title VII precludes treating individuals as "simply components" of their protected class, emphasizing this proposition of "critical importance":

> If height is required for a job, a tall woman may not be refused employment merely because, on the average, women are too short. *Even a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply.*

*Id.* at 708 (emphasis added). Title VII rejects assumptions regarding *any* generalization about sex, whether it involves a physical characteristic, behavior, or statistical fact. *Id.* at 707-13; *Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1085 n.15 (1983) (Marshall, J., concurring in part). *Price Waterhouse v. Hopkins* reaffirmed *Manhart*'s stereotyping framework and emphasized Title VII "intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." 490 U.S. 228, 251 (1989).

Precedent confirms sex discrimination covers discrimination because of sex in *any* manner. When an employer discriminates against an employee because it perceives them to be a woman (or man), because they fail to conform to stereotypes, or because their gender identity does not match their birth-assigned sex, sex is a but-for cause. *See Bostock*, 140 S.Ct. at 1747-48. Title VII prohibits all forms of sex discrimination against a transgender person, however it manifests or whatever other labels may attach. *Id*. DMS' categorical exclusion of transgender healthcare relies explicitly on sex stereotypes by excluding healthcare that would otherwise be covered except for the purpose of gender reassignment. That DMS deprives Plaintiffs of medical care because their medical needs depart from "even a true generalization" or "biological fact" about "natal"

women and men cannot nullify DMS' liability. It proves it. *Manhart*, 435 U.S. at 708.

### D. Plaintiffs Have Demonstrated Discriminatory Intent.

Contrary to DMS' contentions, (ECF 135, at 25-28), Plaintiffs have shown the Exclusions facially discriminate against them. (*See* ECF 123, at 33-38.) When an employer maintains a facially discriminatory policy, liability turns on the explicit terms of the policy. *Johnson Controls*, 499 U.S. at 199. Here, the facially discriminatory policy is sufficient evidence of discrimination. *Bostock*, 140 S.Ct. at 1745 (employer who discriminates against transgender employees necessarily and intentionally applies sex-based rules). (*See also* ECF 123, at 31-33; ECF 136, at 6-16.)

Still, DMS argues it need not cover all medically necessary procedures, and "the fact that the exclusion precludes a medical necessity determination for gender reassignment services" does not evidence its intent to discriminate. (ECF 135, at 26.) DMS may not have to cover *all* procedures, but it *cannot* exclude procedures based on a discriminatory classification, like denying medically necessary care only transgender employees need. No case DMS cites controls and none involved discrimination targeting transgender individuals. (*Id.*) No matter how DMS characterizes it, the Exclusions ban transgender healthcare. (*See, e.g.,*

ECF 136, at 17, repeated references to transgender employees as the targets of the Exclusions.)

## II. Plaintiffs' Equal Protection Claims Succeed.

Plaintiffs' equal protection claims based on sex discrimination succeed because they have shown Satter's state action is based on a sex or gender classification, and is not substantially related to a legitimate and important governmental interest. *See Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 723 (1982); *Glenn v. Brumby*, 663 F.3d 1312, 1315 (11th Cir. 2011). There is no question the Exclusions result from state action. And contrary to Satter's insistence, undisputed evidence demonstrates the Exclusions are based on sex or gender, and that they are not substantially related to a legitimate and important governmental interest.

### A. The Exclusions Classify on Sex and Gender.

To support Satter's argument the Exclusions are not based on sex and that heightened scrutiny is inapplicable, he asserts the Exclusions solely classify "based on treatment for a particular medical condition, not based on sex or transgender status." (ECF 135, at 31.)

Sex-based classifications appear on the face of the policy. *See E & T Realty v. Strickland,* 830 F.2d 1107, 1112 & n.2 (11th Cir. 1987) (under

equal protection, courts first determine whether classification is created on face of policy as those require a closer connection between classification and purpose served). The Exclusions expressly classify based on "gender" and "sex" reassignment—medical care only applicable to transgender individuals. The classification limits the medical care transgender individuals can receive, and in no way limits cisgender people's care. Classifying allowable medical care by whether the purpose is for gender reassignment is sex discrimination against transgender individuals because of their gender non-conformity. *See Glenn*, 663 F.3d at 1319-20; *cf. Bostock,* 140 S.Ct. at 1746-47 (discrimination based on transgender status necessarily entails discrimination based on sex; the first cannot happen without the second).

By the Exclusions' plain language, and how that language is interpreted by Satter and the third-party administrators, the Exclusions apply only to transgender individuals and require "gender reassignment" to treat a diagnosis of gender dysphoria. Satter misses the point when he argues that the fact that "Plaintiffs include members of both sexes proves that the exclusion does not discriminate against any one Plaintiff because of sex." (ECF 135, at 30.) The discriminatory sex-based classification in the Exclusions treats transgender individuals less favorably than cisgender

11

individuals, who have their medical needs considered on an individual basis instead of being subjected to a categorical exclusion.

Relying on *Frontiero v. Richardson*, 411 U.S. 677 (1973), Satter erroneously argues sex discrimination does not apply to transgender individuals who seek to change their "reproductive characteristics[,]" because "sex is an immutable characteristic." (ECF 135, at 31.) Satter wrongly conflates reproductive anatomy with immutability of sex, and argues that altering one's anatomy upends the equal protection analysis. It does not. A person's sex remains constant even if that person undergoes genital reconstruction, because gender is a component of sex. *Cf. Schroer v. Billington*, 577 F. Supp. 2d 293, 306 & n.7 (D.D.C. 2008); (*see also* ECF 118-12, Ettner, 58:21-23). Moreover, defining the contours of sex is unnecessary, because discriminating against a transgender person involves sex discrimination.

Satter relies on the dissent in *Adams v. Sch. Bd. of St. Johns Cnty.*, even though the majority specifically concluded discrimination against transgender persons is sex discrimination. 968 F.3d 1286, 1296 (11th Cir. 2020) (holding a school bathroom policy "singl[ing] out transgender students for differential treatment because they are transgender" violates equal protection). This Court must follow the majority, not the dissent.

Satter's healthcare policy singles out transgender employees for different health insurance coverage because they are transgender. Like a bathroom "policy plac[ing] a special burden on transgender students because their gender identity does not match their sex assigned at birth," *id.,* Satter's healthcare policy places a special burden on transgender employees because their gender identity does not match their sex assigned at birth. This violates equal protection.

Satter attempts to distinguish *Glenn* by erroneously arguing Georgia only terminated the plaintiff "because of his[2] biological sex," and Plaintiffs in this case "were not denied coverage because of their biological sex." (ECF 135, at 32.) But the Eleventh Circuit concluded Glenn's gender non-conformity predicated her termination. 663 F.3d at 1321. *Glenn* relied on Supreme Court reasoning that sex discrimination precludes gender stereotyping. *Id.* at 1316 (citing *Price Waterhouse*, 490 U.S. at 250-51). *Glenn's* conclusion that discrimination against transgender individuals because of their gender non-conformity applies here to the Exclusions, which likewise discriminate because of sex.[3]

---

[2] Defendants continue a pattern of misgendering transgender individuals – using "his" to refer to Ms. Glenn, and "him" for Ms. Claire. (ECF 135, at 21, 32).

[3] Satter cites to the district court in *Glenn*, which analyzed a second claim on the basis of gender identity disorder under rational basis. (ECF

13

## B. The Exclusions Do Not Substantially Relate to Legitimate and Important Governmental Interests.

The Exclusions fail intermediate scrutiny because the governmental interests are illegitimate, post hoc justifications invented by counsel. (*See* ECF 137, at 3-7.) Prior to summary judgment, Satter expressly denied knowledge of any financial or medical justifications for the Exclusions. (*See id.* at 3-4, 6.) Yet he now fabricates interests to argue the Exclusions satisfy heightened scrutiny. (ECF 135, at 35-36.) He asserts excluding treatment for children, discouraging cosmetic or scientifically unproven treatments, and not financing procedures that could potentially harm its members satisfy heightened scrutiny. (*Id.*) Outside their briefing to this Court, neither DMS nor Satter identified these interests as current justifications for continuing the Exclusions in the State Plans. During discovery, the only explanation Defendants offered is that the Exclusions have existed for a long time. (ECF 123, at 14-15.) Putting forward these new, post hoc interests at summary judgment demonstrates their illegitimacy. *See Virginia*, 518 U.S. at 533 ("justification must be genuine, not hypothesized or invented *post hoc* in response to litigation").

---

135, at 32.) This is inapposite. Satter ignores the claim the Eleventh Circuit affirmed which was based on sex discrimination. *Glenn v. Brumby*, 724 F. Supp. 2d 1284, 1293 (N.D. Ga. 2010), *aff'd*, 663 F.3d 1312 (11th Cir. 2011).

Satter asserts protecting the public health justifies the Exclusions. (ECF 135, at 34-36.) But the assertion of potential harm is unsupported by the evidence because DMS and Satter concede gender-affirming care is no longer experimental (*see id.* at 34) and is not considered harmful by WPATH and major medical and mental health associations. (*See* ECF 123, at 6-7, 14-15.) Such care is regularly covered outside the State Plan by insurance companies, including DMS' third-party administrators (*see id.* at 19, 27-28), which cover gender-affirming care and have medical guidelines in non-state plans. (ECF 122-26.) Indeed, Satter's expert authorizes the procedures Plaintiffs seek. (ECF 123, at 6.) 90% of marketplace plans cover this care. (*Id.* at 12.) And the same procedures are covered for other conditions. (*Id.* at 16-17; ECF 135, at 23; ECF 121-11.) Therefore, the procedures themselves are safe and widely utilized. The only time this care is prohibited is when used to treat transgender individuals—a discriminatory classification. Thus, Satter's exclusion of coverage is unrelated to any valid medical rationale.

In the event this Court finds the interests are legitimate and important, no substantial relationship between the Exclusions' objective and means exists. The validity of the discriminatory classification must be determined through reasoned analysis and not on simplistic, outdated assumptions

15

about gender used as a proxy for other bases of classification. *Mississippi Univ.,* 458 U.S. at 725-26.

The purported objective of protecting children[4] is not achieved by a categorical ban that furthers no medical interests. Eliminating the Exclusions will not mean all procedures must be provided regardless of medical necessity. Just as third-party administrators developed medical guidelines for gender-affirming care, if the Exclusions are eliminated, all care would still have to meet medical necessity guidelines in accordance with scientifically-based standards of care. Any purported protection from harm would be achieved by medical guidelines rather than an overbroad generalization in a categorical ban. *See Virginia,* 518 U.S. at 541-42 (state actors may not rely on overly broad gender classifications). Accordingly, no substantial relationship between the objective of protecting state employees and the means of a categorical exclusion exists.

---

[4] Satter's fear-based rhetoric regarding gender-affirming care for children is contradicted by practice. Gender-affirming standards of care for children do not include surgery. (ECF 122-3, at 27.) Puberty blockers, which are reversible, may be provided for adolescents if certain criteria are met (*id.* at 24-26; ECF 118-12 Ettner, 153:10-17), while treatment for younger children focus on social transition. (ECF 122-3, at 23.)

## C. The Exclusions Lack A Rational Relationship to Any Legitimate Interest.

Even if this Court finds the Exclusions are not sex- or gender-specific classifications, Satter still cannot satisfy rational basis. There is no legitimate governmental interest in denying state employees who are transgender equal protection under the law. (*See* ECF 137, at 32-34.)

## III. Conclusion

Plaintiffs request this Court grant summary judgment against DMS under Title VII and against Satter under equal protection based on the undisputed evidence and applicable law.

## CERTIFICATE OF WORD COUNT

Pursuant to N.D. Loc. R. 56.1(D), the above Reply to Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment contains 3,200 words.

Dated: March 8, 2021    Respectfully submitted,

*/s/ Jodi Siegel*
SIMONE CHRISS, Fla. Bar No. 124062
simone.chriss@southernlegal.org
KIRSTEN ANDERSON, Fla. Bar No. 17179
kirsten.anderson@southernlegal.org
JODI SIEGEL, Fla. Bar No. 511617
jodi.siegel@southernlegal.org
Southern Legal Counsel, Inc.
1229 NW 12th Avenue

Gainesville, FL 32601
(352) 271-8890

DANIEL TILLEY, Fla. Bar No. 102882
dtilley@aclufl.org
ACLU Foundation of Florida
4343 West Flagler St., Suite 400,
Miami, FL 33134
(786) 363-2714

ANYA MARINO, Fla. Bar. No. 1021406
amarino@aclufl.org
ACLU Foundation of Florida
4343 West Flagler St., Suite 400
Miami, FL 33134
(786) 363-2707

ERIC LINDSTROM, Fla. Bar No. 104778
elindstrom@eganlev.com
Egan, Lev, Lindstrom & Siwica, P.A.
P.O. Box 5276
Gainesville, FL 32627
(352) 672-6901

NICHOLAS WARREN, Fla. Bar No. 1019018
ACLU Foundation of Florida, Inc.
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-1769
nwarren@aclufl.org

**ATTORNEYS FOR ALL PLAINTIFFS**

JEFFREY HEARNE, Fla. Bar No. 512060
jhearne@legalservicesmiami.org
JOCELYN ARMAND, Fla. Bar No.44264
jarmand@legalservicesmiami.org
PAMELA FLORES, Fla. Bar No. 0124363
pflores@legalservicesmiami.org
Legal Services of Greater Miami, Inc.

18

4343 W Flagler Street, Suite 100
Miami, FL 33134
(305) 438-2403

**ATTORNEYS FOR PLAINTIFF MURPHY**

## **CERTIFICATE OF SERVICE**

I hereby certify that on this <u>8th</u> day of March, 2021, a true copy of the foregoing has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to all Plaintiffs' and Defendants' counsel of record registered with the Court for that purpose.

<u>/s/ Jodi Siegel</u>
**ATTORNEYS FOR PLAINTIFFS**