UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**JAMI CLAIRE, KATHRYN LANE,
and AHMIR MURPHY**

**Plaintiffs,**

v.                                          CASE NO. 4:20-cv-0020-MW-CAS

**FLORIDA DEPARTMENT OF
MANAGEMENT SERVICES and
PEDRO ALLENDE, in his official
Capacity as Secretary of the Florida
Department of Management Services.**

**Defendants.**

_____

### DEFENDANTS' SUPPLEMENTAL BRIEF

Pursuant to the Court's Order for Supplemental Briefing (Doc. 158) requiring the parties to address how the *en banc* decision in *Adams* affects the merits of Plaintiffs' claims and whether the parties wish to file amended summary judgment papers, Defendants, Florida Department of Management Services and Pedro Allende[1] (hereinafter collectively "DMS"), respond as follows:

The Eleventh Circuit's holding in *Adams* solidifies the outcome already compelled by federal law: under the Equal Protection Clause and Title VII, "sex" is

---

[1] Pedro Allende is the current Secretary of DMS and is automatically substituted as the proper party, pursuant to Rule 25(d), Fed. R. Civ. Pro.

1

defined as an immutable, biological characteristic, and the facially neutral State Health Plan exclusion for gender/sexual reassignment services, as a treatment for gender dysphoria, does not discriminate based on sex or sex-based stereotypes.

### I.     Procedural History of *Adams* and Plaintiffs' Reliance on Original *Adams* Opinion.

The original *Adams* opinion was issued on August 7, 2020. This opinion held that heightened scrutiny applied to a school's sex-based bathroom policy and that, because there was no substantial relationship between the school's interest in student privacy and excluding a transgender male student from the boys' restroom, the bathroom policy violated the Equal Protection Clause. *Adams v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, 1303 (11th Cir. 2020). Plaintiffs cited the original *Adams* opinion for the proposition that a policy impacting transgender individuals is necessarily a sex-based classification warranting the application of heightened scrutiny. (See Doc. 137 p. 17; Doc. 139 p. 12.)

The original *Adams* opinion was vacated and superseded by *Adams v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299 (11th Cir. 2021), on July 14, 2021. This second opinion attempted to narrow its holding by defining the issue as an as-applied challenge in the context of a transgender student's ability to use the bathroom based on gender identity, rather than ruling on the constitutionality of sex-based bathrooms.

Then, on August 23, 2021, the Eleventh Circuit vacated the second *Adams* opinion and granted rehearing *en banc*. *Adams v. Sch. Bd. of St. Johns Cnty.*, 9 F.4th

2

1369, 1372 (11th Cir. 2021). The *en banc Adams* opinion was issued on December 30, 2022. *Adams v. Sch. Bd. of St. Johns Cnty.*, 18-13592, 2022 WL 18003879 (11th Cir. Dec. 30, 2022).

In its *en banc* opinion, the Eleventh Circuit held that a public-school policy to separate bathrooms based on biological sex[2] was a lawful, sex-based classification because it satisfied heightened scrutiny. *Adams,* 2022 WL 18003879 at 11. The Court also held that, for the purpose of constitutional analysis, "sex" referred to the immutable characteristic of biological sex determined solely by the accident of birth; therefore, the plaintiff's gender identity was not dispositive for the adjudication of the equal protection claim because gender identity is not akin to biological sex. *Id*. at 10. The Court also held that the bathroom policy at issue did not impermissibly discriminate against transgender students because the policy did not adopt sex-based stereotypes. *Id*. at 10-12.

## II.     *Adams*' Impact on Plaintiffs' Claims.

Plaintiffs' primary argument is that the State Health Plan exclusion for gender/sexual reassignment services facially discriminates against transgender individuals and that classifications affecting transgender persons necessarily discriminate based on sex requiring heightened scrutiny review, which they claim

---

[2] Biological sex is akin to the concept of "natal sex" or "sex assigned at birth." Biological sex is the status of being male or female based on reproductive biology.

Defendants cannot satisfy. (Doc. 123 p. 3, 31.) Plaintiffs also argue that because they purportedly receive less benefits under the State Health Plan than cisgender state employees,[3] the Plan facially discriminates based on sex in violation of Title VII. (Doc. 29-33.) Plaintiffs' arguments require this Court to find that, on its face, a class of treatments for a medical condition constitutes a proxy for biological sex, which neither the Equal Protection Clause nor Title VII supports. *Adams* further dispels this assertion.

    A.    ***Adams*' definition of "sex" and reliance on *Geduldig* defeats Plaintiffs' Equal Protection claim.**

In *Adams,* the Eleventh Circuit makes clear that the Supreme Court's sex-discrimination jurisprudence is based solely on biological sex. *Adams*, 2022 WL 18003879 at 7 n.6, 10, 12, 14. As *Adams* clarifies, the Supreme Court's opinion in *Bostock v. Clayton County* does not render transgender status a proxy for biological sex. *Id*. at 10.[4]

---

[3] All Plan members are entitled to the same coverage under the Plan. No Plan member can receive coverage for gender/sexual reassignment services or other surgical interventions to treat a psychiatric condition, regardless of their biological sex or transgender status. Moreover, regardless of biological sex or gender identity, any Plan member is entitled to receive a covered treatment if it is medically necessary to treat a covered medical condition. (Doc. 125 p. 8; Doc. 135 p. 3-4.)

[4] *See* 207 L. Ed. 218 (2020). The Eleventh Circuit also noted in *Adams* that it had "grave doubt" that transgender persons constitute a quasi-suspect class. 2022 WL 18003879 at 7 n.5.

Moreover, *Adams* confirms that a policy impacting transgender students does not facially discriminate based on sex or transgender status when there is a "lack of identity" between the policy and a protected class. *Id.* at 12 (citing *Geduldig v. Aiello*, 417 U.S. 484, 496-97 (1974)). In *Adams*, the Eleventh Circuit adopted the rationale of *Geduldig*, establishing that *Geduldig* is binding precedent applicable to the present action.[5]

Applying the rationale of *Adams* and *Geduldig*, the Plan exclusion is facially neutral because it equally impacts both biological sexes. Given *Adams'* definition of sex, this ends the constitutional analysis.

But the State Health Plan exclusion lacks identity with transgender status as well. Just like the medical condition of pregnancy at issue in *Geduldig*, which the Supreme Court found lacked identity with the biological female sex because not all women experience pregnancy, so too the Plan exclusion for gender/sexual reassignment services lacks identity with transgender status because not all

---

[5] In *Geduldig*, the Supreme Court held that a disability insurance plan complied with the Equal Protection Clause even though it declined to cover pregnancy-related disabilities. *Id*. at 494. The Court found that the plan did not classify on the basis of sex because it distinguished between conditions. *Id*. at 496–97. The Court concluded the exclusion created two groups – pregnant and nonpregnant people. *Id*. at 496 n.20. Although "the first group is exclusively female," the Court explained, "the second includes members of both sexes," which revealed a "lack of identity" between pregnancy and sex. *Id.* The present case is farther removed from sex than *Geduldig* because unlike pregnancy, the condition at issue (gender dysphoria) impacts both men and women, and the exclusion only impacts one class of treatments for the condition rather than the condition itself.

transgender individuals require or seek gender/sexual reassignment services as a treatment for gender dysphoria.[6] Moreover, the Plan excludes all surgical or medical procedures prescribed to treat a purely psychological condition – whether sought by cisgender or transgender Plan members, further exemplifying the lack of identity between the Plan exclusion and biological sex or transgender status. (Doc. 125 p. 7, 20, 22-23; Doc. 135 p. 12, 24.)

Moreover, the Plan exclusion, much like the bathroom policy at issue in *Adams*, does not rely on impermissible sex-based stereotypes. *Adams*, 2022 WL 18003879 at 12. The State Health Plan exclusion does not depend on how an employee acts or identifies; rather, it delineates coverage based only on medical conditions or medical services or supplies. In fact, the Plan would equally exclude sexual/gender reassignment services for persons attempting to detransition (a not uncommon phenomenon where previously transgender individuals revert their gender identity back to their natal sex), indicating that the exclusion does not promote or punish gender non-conformity. (Doc. 118-20 p. 14-16, 138-139; Doc. 118-12 p. 69-70, 111-113; Doc. 87 p. 25-26.)

---

[6] The record evidence establishes that there are many individuals who are gender nonconforming, some of whom self-identify as transgender. Among those individuals, only some experience gender dysphoria, and even fewer individuals diagnosed with gender dysphoria seek gender reassignment services. (Doc. 135 p. 2.)

At most, Plaintiffs' challenge amounts to a claim that the Plan exclusions have a disparate impact on transgender persons; however, "a disparate impact alone does not violate the Constitution." *Id*. at 12. Rather, for a disparate impact analysis, Plaintiffs must prove that "an otherwise neutral policy is motivated by purposeful discrimination," which Plaintiffs have not and cannot show. *Id*. citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) ("[D]iscriminatory purpose implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.")

Just like the bathroom policy enacted by the school board in *Adams*, which the Eleventh Court held was not created because of its adverse effect upon transgender students, *id*. at 13, there is no evidence that the State Health Plan exclusion was created or enforced by DMS because of any discriminatory purpose. Rather, the challenged Plan exclusion has been in place since at least the 1970s, when gender/sexual reassignment was universally considered experimental, and predating the more recent surge in requests for such treatments; the exclusion for gender/sexual reassignment services is one of many exclusions[7] affecting all Plan

---

[7] The State Health Plan excludes coverage for medical procedures to treat a purely psychological condition, such as penile implant to treat psychologically induced erectile dysfunction. As of January 1, 2018, the State Health Plans also excluded coverage for elective abortions, custodial care such as home health or skilled nursing facilities, cosmetic surgery, dental care, eye care, hearing aids, fertility testing and

7

members regardless of sex or transgender status; and it is undisputed that DMS cannot add coverage to the State Health Plan without Legislative direction. (Doc. 125 p. 4, 9.)

### B. *Adams*' definition of "sex" confirms that rational basis review applies to the State Health Plan exclusion.

Distinguishable from the present case, the bathroom policy in *Adams* was undisputedly based on biological sex, thereby triggering heightened scrutiny review. *Adams,* 2022 WL 18003879 at 5-6. On the other hand, the State Health Plan exclusion of one class of treatments for a medical condition is facially neutral and not based on sex; therefore, rational basis scrutiny applies. *See Dobbs v. Jackson's Health Org.*, 213 L. Ed. 2d 545, 142 S. Ct. 2228, 2245-46 (2022) (holding that "the regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny" without a showing of intent to discriminate based on sex); *Glenn v. Brumby*, 724 F. Supp. 2d 1284, 1306-07 (N.D. Ga. 2010), *aff'd,* 663 F.3d 1312 (11th Cir. 2011) (holding that discrimination based on gender identity disorder, a medical condition, is analyzed under rational basis review).[8]

---

treatment, penile and testicular prosthesis, recreational therapy, speech therapy, sleep therapy, weight reduction services, tobacco cessation, and cardiac rehabilitation, among other exclusions. (Doc. 125 p. 5.)

[8] The Eleventh Circuit's decision in *Glenn* did not address the District Court's ruling on the plaintiff's claim for Medical Condition Discrimination. *See Glenn*, 663 F.3d at 1321 (holding that plaintiff's cross-appeal on the district court's grant of summary judgment on plaintiff's medical discrimination claim was moot).

*Adams*' definition of sex in the Equal Protection context requires such a result. *Adams* holds, just like *Bostock*, that sex is the status as either male or female as determined by reproductive biology. *Adams,* 2022 WL 18003879 at 7 n.6, 10, 12, 14; *Bostock v. Clayton County*, 140 S.Ct. at 1739. Thus, sex is an immutable characteristic, i.e. "an accident of birth," thereby justifying heightened scrutiny review. *Adams,* 2022 WL 18003879 at 10.

Here, however, Plaintiffs essentially argue that the Court should compare transgender persons to cisgender persons without regard to biological sex, (See Doc. 123 p. 30, 35; Doc. 136 p. 15, 23-24. See also, Doc. 141 p. 7-10), thereby asking the Court to construe sex as something less than immutable, and assert that they are being discriminated against by the Plan's exclusion, which does not provide state-funding for medical treatments that surgically change one's reproductive characteristics based on a psychological condition. Plaintiffs' efforts to recharacterize the definition of sex is not recognized by the Eleventh Circuit; based on Plaintiffs' own theory, the immutable characteristic of biological sex is not implicated, and heightened scrutiny does not apply.

Here, the Plan exclusion, which serves a legitimate government purpose of containing costs and ensuring public health and safety, easily satisfies rational basis

9

review. (Doc.125 p. 30-32; Doc.135 p.33-35; Doc. 141 p.14-15.) But the Plan would also satisfy a heightened scrutiny analysis as well. (Doc. 135 p. 35-36.)

To satisfy heightened scrutiny, a policy must (1) advance an important governmental objective and (2) be substantially related to that objective. *Adams*, 2022 WL 18003879 at *7.

Just like the important interest public schools have in ensuring the privacy and safety of its students, which were served by the bathroom policy, *id*. at 8-9, the State has an important interest in enacting health policies that protect the health and well-being of its employees and their family members. Here, the State Health Plan exclusion was put in place in the late 1970s when gender reassignment was universally considered experimental. (Doc. 125 p. 9, 28.) While advocacy efforts have led to gender reassignment's growing acceptance in recent years, the efficacy of these treatments is still not scientifically established; and in the case of children and minors, is highly controversial and disputed. (Doc. 125 p. 11, 32; Doc. 118-20 p. 54, 66-69; Doc. 87 p. 18-25.) After all, these treatments modify healthy anatomy, often permanently. The State has an important interest in excluding such medical treatment and procedures, particularly given the serious risks and complications of many gender/sexual reassignment services, unless and until they can be established as universally safe and effective and approved by the people's representatives as ethically and fiscally acceptable.

### C. *Adams*' definition of sex defeats Plaintiffs' Title VII claim.

The *Adams* opinion has a similar impact on Plaintiffs' Title VII claims as well.[9] Plaintiffs rely on *Bostock* for the proposition that excluding gender reassignment surgery "unavoidably discriminates against persons with one sex identified at birth and another today." (Doc. 136 p. 12.) However, one's "transitioning status" is not within the definition of sex.

As *Adams* makes clear, "because of sex" means because of biological/natal sex. 2022 WL 18003879 at 14-15 (holding that "sex" under Title IX unambiguously means "biological sex, i.e. discrimination between males and females"). Sex under Title VII does not include "gender identity." *Id*. at 15. Rather, previous Supreme Court and Eleventh Circuit cases addressing transgender discrimination, like *Bostock* and *Glenn*, were premised on discrimination based on biological sex – "neither case reads 'gender identity' into the definition of 'sex.'" *Adams*, 2022 WL 18003879 at 15 ("There simply is no alternative definition of 'sex' for transgender persons as compared to nontransgender persons under Title IX.")

---

[9] Because Title IX and Title VII both prohibit sex discrimination, they are often interpreted similarly. *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 896 (1st Cir. 1988), *aff'd,* 759 F. Supp. 40 (D.P.R. 1991); *Does v. Covington Cnty. Sch. Bd. of Educ.*, 930 F. Supp. 554, 574 fn. 15 (M.D. Ala. 1996).

Here, Plaintiffs cannot show that they were discriminated against based on their biological sex. No Plan members are entitled to gender/sexual reassignment services, regardless of whether they are males or females.

Moreover, Plaintiffs' efforts to demonstrate that a policy affecting some transgender individuals necessarily invokes sex-stereotypes are unpersuasive. There is no evidence that any biological sex-based stereotypes played a role in the coverage decisions at issue. DMS does not know how Plaintiffs, or any of the other hundreds of thousands of Plan participants, identify or present when Plan exclusions are applied. DMS does not know if they identify as transgender or cisgender. The Plan is only concerned with making coverage decisions based on the Plan documents, which exclude a multitude of medical treatments and services, some of which may fall more heavily on one sex than another. (Doc. 136 p. 18-20.) None of these decisions are based on stereotypes about how Plaintiffs should act or behave. Because Plaintiffs have failed to show that the Plan exclusion discriminates based on biological sex, Plaintiffs' Title VII claim fails.

**D.   Amended Summary Judgment Memoranda.**

Defendants do not believe that the submission of amended memoranda (Docs. 125, 126, 135, 140 and 141) is necessary, in light of the opportunity provided by this Court to submit the present supplemental brief addressing *Adams*. However, Defendants will gladly submit amended papers updating citations and incorporating

12

argument based on the *en banc Adams* opinion if the Court determines that it would aid in the resolution of the Parties' motions or if Plaintiffs seek leave to amend.

Respectfully submitted this 17th day of January 2023.

        HENRY BUCHANAN, P.A.

        */s/ Miriam R. Coles*
        MIRIAM R. COLES
        Florida Bar No. 58402
        mcoles@henryblaw.com
        J. STEVEN CARTER
        Florida Bar No. 896152
        scarter@henryblaw.com
        Post Office Drawer 14079
        Tallahassee, Florida 32317-4079
        (850) 222-2920: Telephone
        (850) 224-0034: Facsimile
        *Counsel for Defendants*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rules 5.1 and 7.1, undersigned counsel certifies that this motion consists of 2957 words and is typed in Times New Roman, font size 14.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed via the CM/ECF system which will send electronic notification to all counsel of record on this 17th day of January 2023.

        */s/ Miriam R. Coles*
        ATTORNEY