# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

JAMI L. CLAIRE, et al.,

    *Plaintiffs*,

v.

FLORIDA DEPARTMENT OF
MANAGEMENT SERVICES, et al.,

    *Defendants*.

Case No.:  4:20-cv-20-MW-MAF

## PLAINTIFFS' RESPONSE TO
## SECOND ORDER FOR SUPPLEMENTAL BRIEFING

Plaintiffs respond to this Court's January 3, 2023, Order for Supplemental Briefing (ECF 158), which asks the parties to "address[ ] how the en banc decision in *Adams*[1] affects the merits of Plaintiffs' claims and whether they wish to file amended summary-judgment papers given this development." (*Id.* at 2.)

In their October 8, 2021, Supplemental Brief asking this Court to rule on the parties' pending motions for summary judgment without awaiting the en banc decision, Plaintiffs explained why the Eleventh Circuit's resolution

---

[1] *Adams v. Sch. Bd. of St. Johns Cnty.*, No. 18-13592, __ F.4th __, 2022 WL 18003879 (11th Cir. Dec. 30, 2022) (en banc).

1

of the two narrow and specific questions *Adams* concerns would not dictate resolution of Plaintiffs' claims. (ECF 154.)[2] The ultimate decision supports Plaintiffs' previous explanation for two reasons.

First, the en banc decision in *Adams* does not apply to Plaintiffs' claims under Title VII of the Civil Rights Act of 1964 ("Title VII"). The Eleventh Circuit's discussion highlights Title VII and Title IX of the Education Amendments of 1972's ("Title IX's") textual differences in application and enforcement. *See, e.g.*, *Adams*, 2022 WL 18003879, at *14. That Title VII lacks the express carveouts Title IX maintains—and contains an expansive definition of the terms "because of sex" and "on the basis of sex," *see* 42 U.S.C. § 2000e-2(a)(1); *id.* § 2000e(k)—underscores why Defendant Department of Management Service's ("DMS's") Exclusions discriminate against transgender employees because of their sex and violate Title VII.

Second, the en banc Court's discussion of Adams's Equal Protection claim highlights the difference between the broadly applicable school bathroom policy and the narrow, facially discriminatory Exclusions at issue here. *Adams* reaffirms that the Exclusions must survive heightened scrutiny because the Exclusions facially discriminate on the basis of sex, and the

---

[2] As this Court aptly noted in its Order for Supplemental Briefing, the Eleventh Circuit's en banc opinion holds "that 'separating school bathrooms based on biological sex passes constitutional muster . . . .'." (ECF 158, at 1-2.)

undisputed facts in the record of this matter prove that DMS lacked sufficient justifications to satisfy heightened scrutiny.

### I.   The *Adams* Decision's Reliance on Statutory Text Demonstrates Why Plaintiffs' Title VII Claims Succeed.

Plaintiffs brought Title VII claims against Defendant DMS for discriminating against them with respect to the "terms, conditions, [and] privileges of employment, because of . . . [their] sex." *See* 42 U.S.C. § 2000e-2(a)(1). Plaintiffs did not bring claims under Title IX, which—subject to expressly delineated exceptions[3]—prohibits persons from being "excluded from the participation in, being denied the benefits of, or being subject to discrimination under any education program or activity receiving Federal financial assistance" on the basis of sex. *See* 20 U.S.C. § 1681(a). This matters.

Although Title IX was "patterned after" the Civil Rights Act of 1964,[4] courts must orient themselves in each respective statute's text when charged with evaluating a claimant's cause of action. *See, e.g.*, *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020) (observing, "[O]nly the words on the page constitute the law adopted by Congress and approved by the

---

[3] *See, e.g.*, 20 U.S.C. § 1681(a)(1)-(9); *id.* § 1686 (expressly carving out an exception "with respect to living facilities").

[4] *Cannon v. University of Chicago*, 441 U.S. 677, 695 (1979) (observing Congress envisioned Title IX to use the same enforcement procedures as Title VII and concluding Title IX contemplates a private right of action).

President," and cautioning against extratextual interpretation, revision, or application). The Eleventh Circuit's en banc decision in *Adams* stresses this throughout its evaluation of Adams's Title IX claim against the St. Johns County School Board. *See* 2022 WL 18003879, at *13-15. Indeed, the en banc Court's holding hinges on the clear textual differences between Title VII and Title IX, and relies on Title IX's "express statutory and regulatory carve-outs for differentiating between the sexes when it comes to separate living and bathroom facilities." *Id.* at *14.

Unlike Title IX, Title VII lacks express statutory and regulatory carve outs. *Adams* firmly recognizes this textual distinction when explaining why *Bostock*'s application to Title IX differs from its application to Title VII. *Id.* The en banc decision cabins *Bostock* because Adams brought a Title IX claim, whereas *Bostock*—and Plaintiffs' claims against DMS—involve Title VII, not Title IX. *Adams* is therefore immaterial to Plaintiffs' Title VII claims, aside from the decision's emphasis on the differences between the two statutes.[5]

In contrast, Title VII's text and *Bostock* control Plaintiffs' claims against DMS. Title VII makes it unlawful—without exception—"to discriminate

---

[5] The Title IX analysis in *Adams* also relies on limitations specific to federal legislation enacted pursuant to the Spending Clause. 2022 WL 18003879, at *17. That analysis does not apply to Title VII, which does not rely on the Spending Clause.

against any individual with respect to [their] compensation, terms, conditions, or privileges of employment, because of such individual's" sex. 42 U.S.C. § 2000e-2(a)(1).

That is exactly what the Exclusions do. The Exclusions discriminate on their face by expressly excluding Plaintiffs from equivalent benefits and opportunities because of their sex, or sex-correlated medical conditions. *See, e.g.*, *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of America, UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 197 (1991); *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678-79, 682-84 (1983).

Applying *Bostock*'s "simple test" demonstrates the Exclusions "necessarily and intentionally discriminate against [transgender employees] in part because of sex." *Bostock*, 140 S. Ct. at 1744. "That is because it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* at 1741.

II.   **The Equal Protection Analysis Applicable to Plaintiffs'
Claims Remains Unchanged After the *Adams* Decision.**

a.  **The Exclusions facially discriminate against Plaintiffs
"because of sex."**

*Adams* reiterates the clear constitutional rule that discrimination on the

basis of sex is subject to heightened scrutiny. 2022 WL 18003879, at *11,

*13. This is consistent with the Eleventh Circuit's existing binding precedent

in *Glenn v. Brumby,* 663 F.3d 1312, 1319 (11th Cir. 2011). *Adams* cites

*Glenn* favorably, 2022 WL 18003879, at *15, and the two cases must be read

in accord with each other as binding precedents.

The Exclusions facially discriminate on the basis of sex. By their plain

terms, they bar "gender reassignment or modification services" (ECF 122-

23, at 60, 61) (State HMO Plan Exclusion) and "sexual reassignment, or

modification services" (ECF 12-24, at 36) (State PPO Plan Exclusion). These

Exclusions "necessarily rest[] on a sex classification, because [they] cannot

be stated or effectuated without referencing sex." *See Kadel v. Folwell*, 2022

WL 3226731, at *19 (M.D. N. Car. Aug. 10, 2022) (citation and internal

quotation marks omitted). As the Supreme Court explained in *Bostock*: "[T]ry

writing out instructions for" which treatments are excluded "without using the

words man, woman, or sex (or some synonym). It can't be done." 140 S. Ct.

at 1746.

Accordingly, courts considering similar categorical coverage exclusions have had no trouble arriving at the conclusion that such policies constitute sex discrimination. *See, e.g.*, *Kadel,* 2022 WL 3226731, at *19 (holding that North Carolina's state employee healthcare exclusion for treatments "leading to or in connection with sex changes or modifications" facially discriminates on the basis of sex); *Fain v. Crouch*, 2022 WL 3051015, at *8 (S.D.W. Va. Aug. 2, 2022) (reaching the same conclusion regarding West Virginia Medicaid's ban on "transsexual surgery"); *Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1030-31 (D. Alaska 2020); *Flack v. Wisconsin Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1019-22 (W.D. Wis. 2019); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 1002-03 (W.D. Wis. 2018); *cf. Brandt by & through Brandt v. Rutledge*, 2022 WL 3652745, at *2 (8th Cir. Aug. 25, 2022) ("Because the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law, [Arkansas law prohibiting medical professionals from providing care for gender transition to minors] discriminates on the basis of sex."), *denial of reh'g en banc*, 2022 WL 16957734 (Nov. 18, 2022).

### b. The Exclusions discriminate on the basis of sex stereotypes.

*Adams* affirms *Glenn*'s holding that "[a]ll persons, whether transgender or not, are protected from discrimination on the basis of [a sex stereotype]."

*Adams,* 2022 WL 18003879, at *15 (quoting *Glenn*, 663 F.3d at 1318-19). Cognizant that "[d]iscrimination on this basis is a form of sex-based discrimination that is subject to heightened scrutiny under the Equal Protection Clause," *Glenn*, 663 F.3d at 1319, *Adams* concludes the bathroom policy does not "rel[y] on impermissible stereotypes" because it "separates bathrooms based on biological sex, which is not a stereotype." 2022 WL 18003879, at *12; *id.* at *1 (defining "biological sex" as "sex based on chromosomal structure and anatomy at birth").

By contrast, as Plaintiffs explain in their summary judgment papers, the Exclusions are based on stereotypical assumptions and expectations about men and women's appearance and secondary sex characteristics. (ECF 123, at 34-37; ECF 136, at 14; ECF 137, at 14-18.) When a policy excludes coverage for gender-affirming care as the Exclusions in this case do, it "entrenches" the sex-stereotyped "belief that transgender individuals must preserve the genitalia and other physical attributes of their [sex assigned at birth] sex over not just personal preference, but specific medical and psychological recommendations to the contrary." *Boyden,* 341 F. Supp. 3d at 997; *Kadel v. Folwell*, 446 F. Supp. 3d 1, 14 (M.D.N.C. 2020) (exclusion "tethers Plaintiffs to sex stereotypes which, as a matter of medical necessity, they seek to reject").

Binding precedent in this Circuit has made clear that "[e]ver since the Supreme Court began to apply heightened scrutiny to sex-based classifications, its consistent purpose has been to eliminate discrimination on the basis of gender stereotypes." *Glenn*, 663 F.3d at 1319. When a transgender person seeks to alter their primary or secondary sex characteristics to bring their body into alignment with their gender identity, this is quintessential gender nonconforming conduct. *Id.* at 1316 ("[T]he very acts that define transgender people as transgender are those that contradict stereotypes of gender-appropriate appearance and behavior."); *Evans v. Georgia Reg'l Hosp.,* 850 F.3d 1248, 1263-64 (11th Cir. 2017) (Rosenbaum, J., concurring in part, dissenting in part) ("We in the Eleventh Circuit heard the Supreme Court's message loud and clear….the employer fired Glenn, a transgender woman, because the employer learned that Glenn intended to proceed with gender transition," thus constituting sex discrimination under Title VII); *Winstead v. Lafayette Cnty. Bd. of Cnty. Comm'rs*, 197 F. Supp. 3d 1334, 1345 (N.D. Fla. 2016) (quoting *Glenn*, 663 F.3d at 1316).

Because the Exclusions are a "governmental act[] based upon gender stereotypes—which presume that men and women's appearance and behavior will be determined by their sex—[they] must be subjected to heightened scrutiny because they embody 'the very stereotype the law

condemns.'" *Glenn,* at 1320 (quoting *J.E.B. v. Alabama*, 511 U.S. 127, 138 (1994)).

### c. *Adams'* application of *Geduldig* is inapplicable here.

Everybody uses bathrooms. Only transgender people seek and receive "gender reassignment or modification services" (State HMO Plan Exclusion) or "sexual reassignment, or modification services" (State PPO Plan Exclusion). Neither the Plaintiff in *Adams* nor the Plaintiffs in this case dispute the lawfulness of sex-separated bathrooms, nor do either suggest that a policy that creates men's bathrooms and women's bathrooms facially discriminates against transgender people. A policy that categorically excludes medical treatments for "gender" or "sexual" "reassignment or modification," on the other hand, unavoidably discriminates against transgender people—as the only people for whom such treatments would *ever* be sought or required are transgender.

As *Adams* reiterates, it is binding Supreme Court precedent that "discrimination based on . . . transgender status necessarily entails discrimination based on sex." 2022 WL 18003879, at *11 (quoting *Bostock*, 140 S. Ct. at 1747). There is no dispute that the terms "sexual reassignment or modification" or "gender reassignment or modification" mean, in practical application, bringing one's primary and/or secondary *sex* characteristics into

alignment with their *gender* identity— i.e. transitioning. This is conduct that defines transgender individuals as a class. In *Christian Legal Society v. Martinez*, the Supreme Court rejected the argument that a distinction could be made between a policy that excluded individuals because of sexual orientation and one that excluded them on the basis that they were engaging in homosexual conduct. 561 U.S. 661, 689 (2010).

Likewise, no distinction can be made between a policy that excludes transition-related health care—care that only transgender people seek and need—and a policy that discriminates on the basis of transgender status. *See id.* (quoting *Lawrence v. Texas*, 539 U.S. 558, 575 (2003) ("When homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination."); *id.* at 583, (O'Connor, J., concurring in judgment) ("While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, [the] law is targeted at more than conduct. It is instead directed toward gay persons as a class."); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews.")).

The en banc Court's application of *Geduldig v. Aiello*, 417 U.S. 484 (1974), to explain why the bathroom policy does not discriminate on the basis of transgender status has no purchase here. In *Geduldig*, the Supreme Court held that a state insurance program that excluded coverage for certain pregnancy-related disabilities did not classify on the basis of sex. *Id.* at 496-97. Because the Exclusions here facially discriminate on the basis of sex, *Geduldig* does not apply.

Here, unlike in *Geduldig*, the conduct that is being targeted is the conduct that defines transgender people as a class. *See Christian Legal Society*, 561 U.S. at 689; *Lawrence*, 539 U.S. at 575. While pregnancy is not the defining characteristic of a woman, bringing one's body into alignment with their gender identity is the defining characteristic of a transgender person. *See*, *e.g.*, *Glenn*, 663 F.3d at 1316; *Kadel*, 2022 WL 3226731, at *20; *Toomey v. Arizona,* No. CV-19-00035-TUC-RM (LAB), 2019 WL 7172144, at *6 (D. Ariz. Dec. 23, 2019) (exclusively transgender people seek, or medically require, gender reassignment.); *see also Eknes-Tucker v. Marshall,* Case No. 2:22-CV-184, 2022 WL 1521889, at *10 (M.D. Ala. May 13, 2022), *appeal docketed,* No. 22-11707 (11th Cir., May 18, 2022) ("The fundamental flaw in [the State's *Geduldig*] argument is that the first category consists entirely of transgender minors[;]" and by categorically prohibiting

transgender minors from taking transitioning medications, "the Act places a special burden on transgender minors because their gender identity does not match their birth sex [and] therefore amounts to a sex-based classification.").

To put it plainly: the Exclusions limit the medical care that transgender individuals can receive, and the Exclusions never limit the medical care that cisgender people receive. Under the Exclusions, a state employee is able to access a bilateral mastectomy for *any* medically necessary reason *except* for treatment of gender dysphoria (ECF 123, at 16, 35); a state employee is able to access an orchiectomy for any medically necessary reason *except* for treatment of gender dysphoria (*id.* at 16, 35-36); and a state employee is able to access hormones for *any* medically necessary reason *except* for treatment of gender dysphoria (*id.* at 8, 17). Similarly, a state employee is able to access a rhinoplasty for any medically necessary reason without having the procedure labeled "cosmetic" *except* when the medically necessary reason is the treatment of gender dysphoria. (*Id.* at 15, 36.)

Because the only people who experience gender dysphoria are transgender people, in each instance above the relevant characteristic is not whether someone is classified as male or female, but whether they are cisgender or transgender. *See, e.g., Toomey,* 2019 WL 7172144, at *6. *Bray*

*v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), is inapposite and inapplicable for the same reasons *Geduldig* is.

It is therefore unsurprising that in addition to the many cases cited in Plaintiffs' memorandum in support of summary judgment (ECF 123, at 44-45), courts across the country have continued to recognize that insurance exclusions targeting the treatment of gender dysphoria facially discriminate against transgender beneficiaries. *See, e.g.*, *Kadel,* 2022 WL 3226731, at *19 (holding that North Carolina's state employee healthcare exclusion for treatments "leading to or in connection with sex changes or modifications" facially discriminates on the basis of sex and transgender status); *Fain*, 2022 WL 3051015, at *8; *see also Eknes-Tucker,* 2022 WL 1521889, at *9 ("the Act prohibits transgender minors—and only transgender minors—from taking transitioning medications due to their gender nonconformity…. [and] therefore constitutes a sex-based classification for purposes of the Fourteenth Amendment.").

The Exclusions, on their face, plainly constitute discrimination on the basis of sex.

14

### d. Defendant Allende's[6] justification for the Exclusions fails heightened scrutiny and would fail under any level of review.

*Adams* expressly holds that the bathroom policy at issue survives heightened scrutiny. "To satisfy intermediate scrutiny, the bathroom policy must (1) advance an important governmental objective and (2) be substantially related to that objective." 2022 WL 18003879, at *7. "The bathroom policy clears both hurdles because the policy advances the important governmental objective of protecting students' privacy in school bathrooms and does so in a manner substantially related to that objective." *Id.* That same test—heightened scrutiny—applies here, and Defendant Allende does not satisfy it. The governmental interest in protecting student privacy in school bathrooms has no bearing on, or relation to, state employee health insurance rules.

It is hornbook law that under heightened scrutiny, a defendant must provide an "exceedingly persuasive justification" for discriminating on the basis of sex against transgender state employees. *Glenn*, 663 F.3d at 1321. An "exceedingly persuasive justification" means a "sufficiently important governmental interest" for the Exclusions—a burden that "is demanding and it rests entirely on the State" and that cannot be "hypothesized or invented

---

[6] **Error! Main Document Only.**Pedro Allende is the current Secretary of DMS and is automatically substituted as
the proper party pursuant to Fed. R. Civ. P. 25(d).

post hoc in response to litigation. *Id.* (quoting *U.S. v. Virginia*, 518 U.S. 515, 533 (1996)). Defendant Allende here made no effort to meet this burden, as argued in our summary judgment briefs. (ECF 123, at 45-46; ECF 137, at 29-34.)

Defendant Allende fails to meet his burden as no current justification was raised or asserted by him or Defendant DMS prior to the filing of their motions for summary judgment. The record is devoid of any evidentiary or factual basis supporting their proffered justifications related to cost and efficacy, and they expressly disavowed knowledge of the justifications upon which they now seek to rely. (*See* ECF 137, at 13.) The only rationale offered by Defendant Allende to support the Exclusions that is supported by the undisputed facts in the record is that the Exclusions have been in place since the 1970s (ECF 122-5, at 1; ECF 123, at 14-15; ECF 137, at 29-32; ECF 139, at 14-15)—as if to say that discrimination survives constitutional scrutiny for all time so long as it was put in place many years ago. That is not the law: "the classification must substantially serve an important governmental interest *today*, for in interpreting the equal protection guarantee, we have recognized that new insights and societal understandings can reveal unjustified inequality that once passed unnoticed and unchallenged." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690

(2017) (quoting *Obergefell v. Hodges*, 576 U.S. 644, 673 (2015) (emphasis in original, internal punctuation omitted)).

Defendant Allende's lack of procedures for considering evolving medical standards also contrasts sharply with *Adams*. There, the en banc Court placed special weight on the fact that the School Board engaged in a detailed evaluation of the needs of its LGBTQ+ students prior to promulgating its bathroom policy in 2015. 2022 WL 18003879, at *6. Even if it was customary in the 1970s for health insurance plans to exclude treatments for what we now call gender dysphoria, that is no longer true: over 90% of the Silver Affordable Care Act plans have no exclusions like those in the DMS plans. (ECF 118-18, Kirkland, 82:25–84:23.)[7] Even with the replacement of "gender identity disorder" (referenced in *Glenn*, decided in 2011, 663 F.3d at 1314), with "gender dysphoria" a decade later, shows the large shift from viewing transgender individuals as mentally "disordered" to being recognized as a medical condition that warrants medically necessary care such as hormones and surgeries. This rationale utterly fails to meet

---

[7] In fact, Defendants' own expert witness testified that gender reassignment services and supplies are no longer considered experimental or investigational (ECF 118-20, Levine, 129:25-130:19), as did Defendant Allende's Chief of Staff (ECF 118-13, Fillyaw, 152:25-153:4).

Defendant's burden under heightened scrutiny. Indeed, it would fail under any level of scrutiny.

### III.   Plaintiffs do not seek to submit new summary judgment papers.

For the reasons argued above, *Adams* does not change the analysis presented in Plaintiffs' summary-judgment papers, and the Court should grant summary judgment in favor of Plaintiffs against Defendant DMS on their Title VII claim and against Defendant Allende on their Equal Protection claim. Given the arguments above, Plaintiffs see no need to supplement their summary judgment briefs further beyond the arguments presented here. As a final consideration, filing amended summary judgment papers will adversely impact Plaintiffs who cannot, now and in the future, access medically necessary care under the state employee health insurance plans due to the discriminatory Exclusions.

### CERTIFICATE OF WORD COUNT

Pursuant to N.D. Loc. R. 7.1(F), this Response to the Court's Second Order for Supplemental Briefing contains 3,584 words, which includes the headings, footnotes, and quotations, but does not include the case style, signature block or Certificates of Word Count and Service.

Dated: January 17, 2023          Respectfully submitted,

*/s/ Simone Chriss*
**SIMONE CHRISS**, Fla. Bar No. 124062
simone.chriss@southernlegal.org
**JODI SIEGEL**, Fla. Bar No. 511617
jodi.siegel@southernlegal.org
Southern Legal Counsel, Inc.
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890

**DANIEL TILLEY**, Fla. Bar No. 102882
dtilley@aclufl.org
**CAROLINE MCNAMARA**, Fla. Bar No. 1038312
cmcnamara@aclufl.org
ACLU Foundation of Florida
4343 West Flagler St., Suite 400,
Miami, FL 33134
(786) 363-2714

**ANYA A. MARINO**, Fla. Bar No. 1021406
amarino@law.harvard.edu
Harvard Law School LGBTQ+ Advocacy Clinic
122 Boylston St.
Jamaica Plain, MA 02130
(617) 522-3003

**ATTORNEYS FOR ALL PLAINTIFFS**

**JEFFREY HEARNE**, Fla. Bar No. 512060
jhearne@legalservicesmiami.org
**JOCELYN ARMAND**, Fla. Bar No. 44264
jarmand@legalservicesmiami.org
**PAMELA FLORES**, Fla. Bar No. 0124363
pflores@legalservicesmiami.org
Legal Services of Greater Miami, Inc.
4343 W Flagler Street, Suite 100

Miami, FL 33134
(305) 438-2403

**ATTORNEYS FOR PLAINTIFF MURPHY**