# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

JAMI CLAIRE et al.,

     Plaintiffs,

vs.                       Case No. 4:20-cv-00020-MW/MAF

FLORIDA DEPARTMENT OF
MANAGEMENT SERVICES et al.,

     Defendants.

_____/

## PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs moved for summary judgment on the liability of Defendant Florida Department of Management Services (DMS) under Title VII and of Defendant Pedro Allende[1] under the Equal Protection Clause. (ECF 123.) Defendants DMS (ECF 126) and Allende (ECF 125) also moved for summary judgment. Plaintiffs update the Court on their employment status, new caselaw under each claim, and changes in state law since the previous supplemental briefing (ECF 160, 161) on the parties' motions for summary judgment.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Mr. Allende is automatically substituted as the current Secretary of the Florida Department of Management Services.

## I. Plaintiffs' Standing

Plaintiffs Kathryn Lane, Ahmir Murphy, and Jami Claire are transgender individuals who are current or former employees of the state of Florida. Each Plaintiff suffered injury in fact during their employment because their employer-sponsored health insurance benefits provided by DMS and Secretary Allende contain discriminatory Exclusions[2] that prevent coverage for gender-affirming care through those employment benefits.

Plaintiff Kathryn Lane continues to be employed by the Office of the Public Defender in the Second Judicial Circuit of Florida in Tallahassee, a component of state government. The Exclusions deny her medical coverage for necessary medical care (ECF 123, at 7-13, 29-30, 36-38), this injury is fairly traceable to Defendants, which will be redressed by declaring the Exclusions unlawful and enjoining Defendants from applying the Exclusions to Ms. Lane (*id.* at 46-50). *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). In addition, as Plaintiff Lane will prove at trial, she is entitled to compensatory damages, including emotional distress and out-of-pocket

---

[2] The State Plans contain exclusions that work together to categorically exclude coverage for medically necessary gender-affirming care, including exclusions for "gender reassignment and modification services and supplies," "cosmetic surgery/services," "sexual reassignment, or modification services or supplies," and prescriptions for "psychosexual disorders" (Exclusions).

costs for care that would have been covered but for the Exclusions, from Defendant DMS pursuant to Title VII.

Plaintiffs Jami Claire and Ahmir Murphy are no longer state employees, but during their years of employment they suffered harm by being unable to receive necessary medical care because of the Exclusions. (ECF 123, at 7-13, 29-30, 35-38.) Further, as Plaintiffs Claire and Murphy will prove at trial, they are also entitled to damages, including emotional distress and out-of-pocket costs for care that would have been covered but for the Exclusions. Mr. Murphy and Ms. Claire have been injured by the Exclusions, and those injuries are fairly traceable to Defendant DMS and can be redressed through compensatory damages pursuant to Title VII. (*Id.* at 46-50.); *see also Lujan,* 504 U.S. at 560-61.

## II. Title VII Claim Against Defendant DMS

Since Plaintiffs' motion in 2021, the Eleventh Circuit has unequivocally held that under Title VII "discrimination against transgender individuals ... is discrimination 'because of sex.'" *Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766, 775 (11th Cir. 2024) (quoting *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1743 (2020)). The Circuit applied *Bostock* to a claim under Title VII and found that the harassment, humiliation, and intimidation of a transgender sergeant at a Georgia state prison constituted a hostile work environment. *Id.* at 780.

More directly on point to the instant case, the Eleventh Circuit recently held that an employer's health insurance plan with "a blanket denial of coverage for gender-affirming surgery" violated Title VII by discriminating against the plaintiff, a transgender woman, "and other transgender persons." *Lange v. Houston Cnty., Ga.*, 101 F.4th 793, 798-99 (11th Cir. 2024), *mandate withheld,* App. Doc., ECF 82 (May 14, 2024). The Circuit concluded that the blanket denial of coverage discriminated based on transgender status and therefore "no further proof of disparate intent is needed." *Id*. at 798.

The Circuit rejected arguments similar to the ones made by Defendant DMS in opposition to Plaintiffs' motion. *First*, DMS' argument that Plaintiffs need to proffer evidence of discriminatory intent (*See* ECF 126, at 9, 14-15; ECF 135, at 25-28), is directly contradicted by *Lange*. 101 F.4th at 798. *Second*, Defendant argued that its health insurance plan does not discriminate on the basis of sex because the plan provides the same benefits and exclusions to all employees and therefore does not treat transgender members any differently than cisgender members. (ECF 126, at 5-9; ECF 135, at 9-10.) The Eleventh Circuit, however, concluded that because transgender participants are the only participants who would seek and qualify for gender-affirming surgery, the "plan denied health care coverage

based on transgender status." *Lange,* 101 F.4th at 799. *Third*, Defendant's argument that transgender or cisgender status is irrelevant to the plan's coverage decisions is without merit as transgender status is the basis for denial. (ECF 126, at 12-14; ECF 135, at 23-25.)

Furthermore, Defendant DMS' attempt to distinguish *Bostock* by contending that Florida's health plan's "exclusion applies equally to all employees regardless of their natal sex or how they identify" (ECF 126, at 8) is clearly wrong under *Lange's* holding. The *Lange* court put to rest Defendant's position that "[c]onstruing 'because of sex' to mean 'because of transitioning status' is not endorsed by the Supreme Court in *Bostock*." (ECF 135, at 16.)  According to the Eleventh Circuit, that is exactly how *Bostock* (and the Eleventh Circuit) interprets Title VII. *Lange,* 101 F.4th at 798; *Copeland*, 97 F.4th at 775.

*Lange* also made clear that the defendant Houston County was liable as an employer under Title VII even though the plaintiff worked directly for the Sheriff and not Houston County; this is because the Sheriff had delegated to Houston County the administration and provision of health insurance. *Lange,* 101 F.4th at 800. "In accepting such a delegation, Houston County qualified themselves as an agent and employer under Title VII." *Id*. Similarly, the state agencies here who directly employ plaintiffs have delegated to

Defendant DMS to administer and provide the state health plan. Accordingly, Defendant DMS is liable under Title VII for its discriminatory blanket exclusion of gender-affirming care.

The Eleventh Circuit's recent cases in *Lange* and *Copeland* support Plaintiffs' claim that Defendant DMS is an employer liable under Title VII for providing a health plan that excludes coverage for transgender employees. The Plan is facially discriminatory on the basis of sex because gender-affirming care is unique to a transgender person's treatment of gender dysphoria. (*See* ECF 123, at 30-43.)

### III. Equal Protection Claim Against Defendant Allende

The same conclusion under Title VII should also apply under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution: state laws or regulations that discriminate against transgender persons are discrimination on the basis of sex. Courts have divided, however, on whether to follow the clear logic of *Bostock* or not, with differences depending on the specific type of state law at issue and the asserted state interests in that law. Defendant Allende's position in this litigation has been that "the coverage exclusion for gender reassignment surgery and related procedures is not based on a member's sex or even on their transgender identity; rather, is an across-the-board exclusion of a class of medical treatments applicable to all

members, regardless of sex." (ECF 125, at 20.) This, he deems, makes the Exclusions a facially neutral classification, subject only to rational basis review, and requiring evidence of intentional discrimination. (ECF 125, at 19-21.) But this "no discrimination" argument is not the correct reading of the Exclusions and not the most persuasive reading of the caselaw.

Plaintiffs explained in their previous supplemental brief (ECF 161, at 6-14) why these arguments were unpersuasive as of January 2023, and why this court should reject the "no discrimination" argument as applied to the Exclusions at issue here. Below, Plaintiffs explain why subsequent Equal Protection caselaw in the Eleventh Circuit (*Eknes-Tucker*) does not foreclose their equal protection claims. Then, Plaintiffs examine a Fourth Circuit *en banc* opinion directly supporting their position (*Kadel*), and a similar case from this court that is in accord (*Dekker*). Finally, Plaintiffs argue that, even if this court is persuaded that *Eknes-Tucker* requires rational basis review of discrimination in state-sponsored health insurance plans, the Exclusions lack any rational basis and should be declared unconstitutional and enjoined.

### A.   *Eknes-Tucker*

The Eleventh Circuit addressed an Equal Protection argument in *Eknes-Tucker v. Gov'r of Ala.*, 80 F.4th 1205 (11th Cir. 2023) *mandate withheld*, App. Doc. 22-11707 ECF 132 (Sept. 25, 2023). A state of Alabama

law made it a crime to provide medical care to minors that involved prescribing puberty blockers or cross-sex hormones for treating a discordance between the minor's biological sex and sense of gender identity. *Id.* at 1210. On May 13, 2022, the district court granted Plaintiffs' motion for preliminary injunction as to their equal protection claim, enjoining the criminal ban on the provision of care to minors because the Act classified "on the basis of gender nonconformity and therefore on the basis of sex." *Id.* at 1227 (*citing Bostock v. Clayton County,* 140 S. Ct. 1731 (2020) and *Glenn v. Brumby,* 663 F.3d 1312 (11th Cir. 2011)). However, on August 21, 2023, the Circuit concluded that the statute did not discriminate on the basis of sex and applied the rational basis standard. There are several reasons why *Eknes-Tucker* does not control the outcome of the instant case.

*First*, it is important to note that the Eleventh Circuit specifically distinguished equal protection analysis from Title VII. 80 F.4th at 1228-29. The Circuit did not undermine the holding nor reasoning of *Bostock* nor *Glenn,* rather the Court observed that "[b]ecause Bostock … concerned a different law (with materially different language) and a different factual context, it [bore] minimal relevance to [that] case", *id.* at 1229, and found that *Brumby* "discussed [equal protection] as applied to a particular factual scenario, i.e. one where an employer fired an employee for failing to adhere

to certain expectations and stereotypes associated with the employees' sex[;]" which was "not the scenario presented [t]here", *id.*[3] Thus, the discussion above stands regarding the liability of Defendant DMS under Title VII.

*Second*, *Eknes-Tucker* concluded that the Alabama law limits specific medical treatments for minors, and therefore was a distinction based on age, which is not a suspect classification under the Equal Protection Clause. *Id.* at 1230. That stands in stark contrast to the instant case: the Exclusions challenged by Plaintiffs apply to every person covered by the State Plans regardless of age and treat them differently only because of sex.

*Third*, Alabama's law made it a crime to provide the medical care at issue in that case. Florida's Exclusions, however, do not make it illegal to obtain gender-affirming care. Instead, the state of Florida has determined that it will not *pay for* transgender state employees to have insurance for lawful healthcare based upon that person's sex.

For these reasons, *Eknes-Tucker* does not require this court to apply rational basis review to Plaintiffs' Equal Protection claims. Plaintiffs suggest that the Fourth Circuit's recent equal protection analysis in *Kadel* regarding

---

[3] The Circuit acknowledged that the Alabama law at issue "restricts a specific course of medical treatment that, by the nature of things, only gender nonconforming individuals may receive."

a state's health insurance plan, discussed in the following section, provides more direct guidance and, because of the factual distinctions, can be applied consistently with *Eknes-Tucker.*

### B.   *Kadel v. Folwell*

The United States Court of Appeals for the Fourth Circuit sitting *en banc* in *Kadel v. Folwell*, No. 22-1721, and *Anderson v. Crouch*, No. 22-1927, issued an order on April 29, 2024, regarding the constitutionality of categorical exclusions of coverage for gender-affirming medical care in the North Carolina State Health Plan and West Virginia Medicaid Program, respectively. *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (en banc). Like Plaintiffs argue in the instant case, the Fourth Circuit held that the Exclusions discriminated based on gender identity and sex, were therefore subject to intermediate scrutiny, and that they could not meet that heightened standard. *Compare Id.* at 141-42 *with* ECF 123, at 43-46 *and* ECF 137, at 14-18, 27-32.

*Kadel* is more directly on point for Plaintiffs' claims against Defendant Allende than *Eknes-Tucker* because *Kadel* considers equal protection claims raised by transgender state employees. Like the Exclusions in the State Plans created and administered by Defendants in the instant case, *see supra* note 2, the North Carolina State Health Plan contained a coverage exclusion

for "[t]reatment or studies leading to or in connection with *sex changes or modifications* and related care." *Kadel*, 100 F.4th at 133 (emphasis added).

The Fourth Circuit confirmed these exclusions involve medical care that is unique to, and would only be sought by, transgender individuals. *Id.* at 148-49 (the surgeries that are excluded are "surgeries that *only transgender people would get*;" as "cisgender people would not seek any treatment for gender dysphoria" and thus the exclusion "is only relevant to transgender individuals"). The Eleventh Circuit in *Lange* agrees, as discussed above, that "[b]ecause transgender persons are the only plan participants who qualify for gender-affirming surgery, the plan denies health care coverage based on transgender status." *Lange,* 101 F.4th at 799.[4]

Like the State Plans challenged in the instant case, the North Carolina State Health Plan is administered by third-party administrators (*see Kadel,* 100 F.4th at 134-35; ECF 123, at 13); the administrators do not get to decide what benefits to cover as the state health plans alone determine benefits and exclusions in the Plan Benefit Booklets (100 F.4th at 135*;* ECF 123, at 18, 21); coverage is provided for some behavioral health services, including

---

[4] The Court further noted that this finding is supported by the 11th Circuit's decision in *Glenn v. Brumby*, "where we held that an individual may not 'be punished because of his or her perceived gender-nonconformity.' 663 F.3d 1312, 1319 (11th Cir. 2011)." *Id.*

psychotherapy (100 F.4th at 135 n.3; ECF 123, at 17); and the "important government interests" put forth by the North Carolina State Health Plan - which the District Court and Fourth Circuit readily dismissed - were "cost & efficacy" (100 F.4th at 137-38; ECF 125, at 31-32). Meanwhile, the West Virginia defendants, like the Defendants in the instant case, "admit they do not know why [the exclusion] was adopted, nor are they are aware of what information, if any, the Program relied on in adopting the exclusion." (100 F.4th at 140; ECF 137, at 30 ("Defendants DMS and [Allende] … confirmed there are no known justifications for the Exclusions" and Defendants' "witnesses expressly disavowed the justifications upon which Defendant [Allende] now seeks to rely."); *see also* ECF 123, at 14-15; ECF 137, at 3-5).

In an attempt to avoid the conclusion that the Exclusions discriminate based on gender identity and sex and fail intermediate scrutiny, the *Kadel* defendants, like Defendant Allende (ECF 125, at 20-21), argued the exclusions distinguished on the basis of diagnosis and thus only had to withstand rational basis review. 100 F.4th at 141. The *Kadel* defendants claimed the exclusions were facially neutral because: (a) treatments for gender dysphoria "are excluded from coverage for *everyone*, regardless of their gender identity," *id.* at 142; (b) the exclusions "do not explicitly mention transgender *people,"* rather only types

of treatments, i.e. treatments for gender dysphoria, *id.* at 143; and (c) gender dysphoria is not a proxy for transgender identity, as "not all transgender people have gender dysphoria" and "the policies apply to everyone" *id.* at 143-44. (*See* ECF 125, at 19-23; ECF 135, at 10-12; ECF 141, at 7-10.) The Fourth Circuit found these arguments unavailing. Rightly so.

The Exclusions challenged by Plaintiffs facially discriminate on the basis of sex. As *Kadel* held regarding similar exclusions, this is "textbook sex discrimination"[5] as one cannot determine whether the State Plan will cover a certain patient's surgery without referencing their sex (or some synonym). 100 F.4th at 153-54 (*citing Bostock*, 140 S. Ct. at 1742-49 (2020)). "It can't be done." *Bostock*, 140 S. Ct. at 1746. It is impossible to determine whether a particular treatment would lead to "*sexual* reassignment or modification" or

---

[5] *Kadel* reasoned that: "Certain gender-affirming surgeries that could be provided to people assigned male at birth and people assigned female at birth are provided to only one group under the policy. Those surgeries include vaginoplasty (for congenital absence of a vagina), breast reconstruction (post-mastectomy), and breast reduction (for gynecomastia). Anderson, J.A. 304, 332, 2385–87, 2418–27. Those assigned female at birth can receive vaginoplasty and breast reconstruction for gender-affirming purposes, but those assigned male at birth cannot. And those assigned male at birth can receive a mastectomy for gender-affirming purposes, but those assigned female at birth cannot. In other words, when the purpose of the surgery is to align a patient's gender presentation with their sex assigned at birth, the surgery is covered. When the purpose is to align a patient's gender presentation with a gender identity that does not match their sex assigned at birth, the surgery is not covered." 100 F.4th at 153.

"*gender* reassignment or modification" – and thus, whether the State Plan Exclusions apply – without comparing the member's sex assigned at birth *before* the treatment to how it might be impacted *by* the treatment (i.e. whether their "sex" or "gender" has been "reassigned" or "modified"). The Eleventh Circuit in *Eknes-Tucker* refused to extend *Bostock*'s Title VII reasoning to equal protection challenges to criminal bans on specific medical procedures, because *Bostock* did not "deal[] with the Equal Protection Clause as applied to laws regulating medical treatments." *Eknes-Tucker*, 80 F.4th at 1228. But that is not the situation at issue in the case at bar, where the Exclusions do not in any way regulate medical treatments. Instead, the Exclusions refuse to pay for *legal* medical treatments that Plaintiffs have been forced to pay for out of their own pockets. The logic of *Bostock* applies more clearly to equal protection challenges involving discrimination in employment benefits. *Kadel* demonstrates why that is so, and *Eknes-Tucker* does not require a different result.

Plaintiffs' equal protection claims against Defendant Allende should be evaluated under heightened scrutiny, and this court should grant summary judgment on that basis as argued by Plaintiffs in support of their motion for summary judgment.

**C.**   ***Dekker v. Weida***

This Court recently had the opportunity to weigh in on some of the issues presented in the instant case in *Doe v. Ladapo,* No. 4:23-cv-114 (N.D. Fla., Hinkle J.) and, more directly on point, *Dekker v. Weida,* No. 4:22-cv-00325 (N.D. Fla., Hinkle, J.). *Dekker* involved a challenge to the state of Florida's coverage exclusion of treatments for gender dysphoria in all plans provided to Florida Medicaid beneficiaries regardless of age.

Judge Hinkle held that the exclusion of coverage for treatments for gender dysphoria for all adult and minor Florida Medicaid beneficiaries constituted discrimination on the basis of sex and gender nonconformity. *Dekker v. Weida*, 679 F. Supp. 3d 1271, 1289-91 (N.D. Fla. 2023) (appeal pending). Like Defendant Allende, the state of Florida defendants in *Dekker* argued that the exclusion did not discriminate based on sex because "the reason for the treatment—the diagnosis—is different for the natal male and natal female." *Id.* at 1290. This Court reasoned that "this does not change the fact that this is differential treatment based on sex. The *reason* for sex-based differential treatment is the purported *justification* for treating the natal male and natal female differently—the justification that must survive intermediate scrutiny. One can survive—but cannot avoid—intermediate scrutiny by saying there is a good reason for treating a male and female

differently." *Id.* (emphasis in original).

Defendants DMS and Allende expressly disavowed any purported justifications for the Exclusions in the instant case, but even if their alleged interest in "efficacy" were not a post hoc rationalization, they still could not satisfy their burden. (ECF 125, at 32; ECF 135, at 34-35; ECF 141, at 3).[6] In *Dekker,* the state of Florida's argument "that gender-affirming medical care—puberty blockers, cross-sex hormones, and surgery—were not supported by generally accepted medical standards and were instead experimental" was held by the Court to be "not supported by the evidence" and "contrary to generally accepted medical standards." 679 F. Supp. 3d at 1281; *see also id.* at 1296 ("[t]he great weight of medical authority supports these treatments[;]" and "[n]o country in Europe—or so far as shown by this record, anywhere in the world—entirely bans these treatments or refuses to pay for them.")

For these reasons, *Dekker* is in accord with *Kadel* and supports Plaintiffs' arguments in favor of summary judgment on their equal protection claims against Defendant Allende.

---

[6] Defendant's other post hoc justification, based on "cost," is plainly a non-starter. (*See* ECF 125, at 31-32.) *See also Kadel,* 100 F. 4th at 156-57; *see also, Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974) ("[A] state may not protect the public fisc by drawing an invidious distinction between classes of its citizens.").

### D.   In the Alternative, the Exclusions Cannot Survive Rational Basis Review

Plaintiffs maintain that the Exclusions are sex-based classifications and should be analyzed under heightened scrutiny. However, as Plaintiffs have explained in their motions, even if this Court were to subject them to rational basis review, the Exclusions fail.

*First*, Defendants disclaimed knowledge of the original or current rationale for the Exclusions. Defendants' witnesses proffered that the *only* known justification was that the exclusions have "existed for a long time." (ECF 123, at 14-15; ECF 137, at 3-5; ECF 139, at 14-15.) Secretary Allende's predecessor "admits he knows of no current financial or medical justifications for the exclusion, and also admits that gender reassignment services are not currently considered experimental or investigational." (ECF 123, at 45-46.)

*Second*, the only purported justification finding any support in the record is that the Exclusions have "always existed" and were added to the plan "over 40 years ago." (ECF 137, at 2-5, 32-34 (*citing* ECF 125, at 28)) As Plaintiffs argued in their opposition to Defendant Allende's motion for summary judgment, "[c]ost savings do not justify the differential treatment of transgender employees with a medical need for gender-affirming medical care from other state employees who receive insurance coverage for

treatment of other medical conditions." (ECF 137, at 33.)

There is no legitimate governmental interest in denying state employees who are transgender equal protection under the law. (*See id.* at 32-34; ECF 139, at 14-17.) This Court recently held, in analyzing a similar categorical coverage exclusion adopted by the state of Florida, that "[t]here is no rational basis for a state to categorically ban these treatments or to exclude them from the state's Medicaid coverage." *Dekker*, 679 F.Supp.3d at 1286. There is similarly no rational basis for the Exclusions at issue here.

Through expert witness reports, depositions, and summary judgment briefing, which concluded in March 2021, Plaintiffs showed that the Exclusions were inconsistent with current scientific and medical consensus regarding these treatments and contrary to the widely accepted, evidence-based, authoritative standards of care for the treatments at issue. (*See, e.g.,* ECF 123 at 4-7; ECF 139, at 15-16). In addition to the evidence produced by Plaintiffs in this case, Defendants' own Third Party Administrators recommended changes to the State Plans regarding coverage of care for transgender individuals. (ECF 123, at 27-29).[7] Despite all of this information,

---

[7] For example, Florida Blue changed its policies and guidelines in 2017 to include coverage for gender-affirming healthcare and recommended to DMS that the PPO State Plan provide coverage for gender reassignment surgery based on the Affordable Care Act's nondiscrimination provision (Section 1557); Mercer Health and Benefits' compliance analysis of the State Plans

Defendants have chosen not to remove or revise the Exclusions.

In *Dekker*, Judge Hinkle reasoned – in explaining an alternative additional basis that triggers intermediate scrutiny – that adverse treatment of transgender individuals constitutes discrimination against a discrete and insular minority. 679 F. Supp. 3d*, at 1290-91 (*citing City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432 (1985) in support of the point that meaningful rational basis scrutiny requires *meaningful* analysis, and finding neither the Defendants in *City of Cleburne* nor the state Defendants in *Dekker* could withstand meaningful analysis.) The Defendants have put forth no rational basis to support the Exclusions at issue in the instant case.

## IV.   Changes in State Law

Since the parties filed their motions for summary judgment, Florida enacted Fla. Stat. § 286.311, a law which prohibits the use of state funds, including by a state group health insurance program, for "sex-reassignment prescriptions or procedures." *See* Fla. Stat. § 286.311(2). "Sex-reassignment prescriptions or procedures," as defined in Florida Statute § 456.001(9), includes all procedures covered under the Exclusions that Plaintiffs seek to cover through this case.

---

in 2018 resulted in a "red flag" regarding the Exclusions for "transgender/gender dysphoria conditions."

This change in state law does not impact the underlying federal legal bases of Plaintiffs' claims or the relief sought by Plaintiffs. Plaintiffs' Amended Complaint (ECF 34) seeks: (1) A declaration that Defendants are in violation of the Equal Protection Clause and Title VII; (2) Permanent injunctive relief to cease enforcement of the State Plan Exclusion for coverage of "gender reassignment or modification services or supplies," and provide benefits that cover Plaintiffs' medically necessary gender-affirming care; (3) Permanent injunctive relief with respect to Defendant Florida Department of Management Services to prohibit the Department from soliciting and accepting bids, and granting contracts for health insurance plans that contain an exclusion of coverage for gender-affirming care.

If the Court rules that Defendants violated Title VII and the Equal Protection Clause, it can provide the full relief sought in Plaintiffs' amended complaint without regard to Florida Statute § 286.311 "because federal laws are 'the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding,' U.S. Const. Art. VI, Cl. 2, 'state law that conflicts with federal law is 'without effect.'" *Gallardo by & through Vassallo v. Dudek*, 963 F.3d 1167, 1174 (11th Cir. 2020), *aff'd sub nom. Gallardo by & through Vassallo v. Marstiller*, 596 U.S. 420 (2022). Title VII contains an anti-preemption provision which allows states to have

employment laws different than federal law, however the statute expressly states that the state law cannot "purport to require or permit the doing of any act which would be an unlawful employment practice under this subchapter." 42 U.S.C. §2000e-7; *see also Bradshaw v. Sch. Bd. of Broward Cnty., Fla.*, 486 F.3d 1205, 1211 (11th Cir. 2007) (States cannot "interfere with Title VII by requiring or permitting acts that Title VII would forbid").

Additionally, this Court in *Dekker* declared Fla. Stat. § 286.311(2)[8] invalid to the extent it "categorically ban[s] Medicaid payment for puberty blockers and cross-sex hormones for the treatment of gender dysphoria." 679 F. Supp. 3d at 1299. For these reasons, Florida cannot rely on a state law to shirk its obligations under federal law or to avoid compliance with an injunction from this Court.

## V.    Conclusion

For the reasons stated above, Plaintiffs continue to be entitled to summary judgment as requested in their motion (ECF 123), and the Court

---

[8] SB 254, the bill that created Fla. Stat. § 286.311, contained a clerical typo and referred to the new statute as Fla. Stat. § 286.31. See https://www.flsenate.gov/Session/Bill/2023/254. The *Dekker* opinion continues this clerical typo by invalidating Fla. Stat. § 286.31(2), which prohibits state expenditures on travel to another state to receive services that are intended to support an abortion. 679 F. Supp. 3d at 1299. It is clear from the text of the opinion that the court meant to invalidate Fla. Stat. § 286.311, which prohibits state expenditures on sex-reassignment prescriptions or procedures.

should deny the motions for summary judgment sought by Defendants Allende (ECF 125) and DMS (ECF 126).

Respectfully submitted on this 5th day of June, 2024.

> /s/ Simone Chriss
> Counsel for Plaintiffs

## **CERTIFICATE OF WORD COUNT**

Pursuant to N.D. Loc. R. 7.1(F), I certify this Response to the Court's Order for Supplemental Briefing (ECF 164) contains 4,113 words, which includes headings, footnotes, and quotations, but does not include case style, signature block or Certificates of Word Count and Service.

> /s/ Simone Chriss
>
> **SIMONE CHRISS**
> Fla. Bar No. 124062
> simone.chriss@southernlegal.org
> **JODI SIEGEL**
> Fla. Bar No. 511617
> jodi.siegel@southernlegal.org
> Southern Legal Counsel, Inc.
> 1229 NW 12th Avenue
> Gainesville, FL 32601
> (352) 271-8890
>
> **DANIEL TILLEY**
> Fla. Bar No. 102882
> dtilley@aclufl.org
> **CAROLINE MCNAMARA**
> Fla. Bar No. 1038312
> cmcnamara@aclufl.org

ACLU Foundation of Florida
4343 West Flagler St., Suite 400,
Miami, FL 33134
(786) 363-2714

*ATTORNEYS FOR ALL PLAINTIFFS*

**JEFFREY HEARNE**
Fla. Bar No. 512060
jhearne@legalservicesmiami.org
**JOCELYN ARMAND**
Fla. Bar No.44264
jarmand@legalservicesmiami.org
Legal Services of Greater Miami, Inc.
4343 W Flagler Street, Suite 100
Miami, FL 33134
(305) 438-2403

*ATTORNEYS FOR PLAINTIFF MURPHY*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of June, 2024, a true and correct copy of the foregoing has been filed with the Court electronically utilizing its CM/ECF system, which will transmit a notice of electronic filing to all Plaintiffs' and Defendants' counsel of record registered with the Court for that purpose.

*/s/ Simone Chriss*
**Simone Chriss**
Counsel for Plaintiffs