**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

**JAMI CLAIRE, KATHRYN LANE,**
**and AHMIR MURPHY**

     **Plaintiffs,**

**v.**                             **CASE NO. 4:20-cv-0020-MW-CAS**

**FLORIDA DEPARTMENT OF**
**MANAGEMENT SERVICES and**
**PEDRO ALLENDE, in his official**
**Capacity as Secretary of the Florida**
**Department of Management Services.**

     **Defendants.**
_____

**DEFENDANTS' SUPPLEMENTAL BRIEF**

Pursuant to the Court's Orders on Supplemental Briefing (Docs 164, 166 and 167) and the Parties' Joint Response to Order for Supplemental Briefing (Doc. 165) Defendants, FLORIDA DEPARTMENT OF MANAGEMENT SERVICES and PEDRO ALLENDE,[1] respond as follows:

**Procedural History**

Plaintiffs are transgender individuals employed by the State of Florida who were denied coverage under the State Health Plan for gender-affirming surgical interventions because of the Plan's exclusion for gender/sexual modification or

_____
[1] Pedro Allende is the current Secretary of DMS. *See* Rule 25(d), Fed. R. Civ. Pro.

reassignment services and supplies. Plaintiff Claire, a transgender female, seeks an orchiectomy; Plaintiff Murphy, a transgender male, seeks a mastectomy; and Plaintiff Lane, a transgender female, seeks facial feminization surgery. (Doc. 125 p. 12-15.)

Plaintiffs filed suit on January 30, 2020, alleging that the Plan exclusion for gender/sexual reassignment is facially discriminatory in violation of Title VII of the Civil Rights Act of 1964 and the Equal Protection Clause. (Doc.34 p. 49, 57-58).

On February 8, 2021, Defendants DMS and Allende moved for summary judgment. (Docs. 125 and 126.) Defendants argued that the Plan exclusion was not a sex-based classification; that it was facially neutral; and that there was no evidence of discriminatory intent. (Docs. 125, 126, 140, 141.) Plaintiffs also moved for partial summary judgment. (Doc. 123.)

On January 17, 2023, the parties provided supplemental briefing regarding the impact of the Eleventh Circuit's *en banc* decision in *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 813 (11th Cir. 2022), which defined sex as an immutable, biological characteristic and confirmed the viability of *Geduldig's* rationale to find that a policy impacting transgender individuals does not facially discriminate based on sex where, as here, there is a lack of identity between the policy and protected class. (Doc. 160.)

On April 24, 2024, this Court afforded the parties an opportunity to provide supplemental briefing (Doc. 164), and subsequently asked the parties to address the Eleventh Circuit's recent opinion in *Lange v. Houston Cnty.,* 101 F.4th 793 (11th Cir. 2024). (Doc. 167.)

## **Factual Summary**

A full account of the undisputed evidence is set forth in Defendant Allende's Motion for Summary Judgment (Doc. 125 p. 3-12) and Defendants' Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment. (Doc. 135 p. 1-8.) A synopsis of the relevant evidence is as follows:

 The State Employees Health Plan has existed since at least 1979. The Plan is subject to annual approval by the Florida Legislature, and the addition of any covered benefit requires Legislative approval and funding. Fla. Stat. § 110.123(5); (Doc 125 p. 3-4.) DMS has no authority to amend the State Health Plan without prior legislative approval. Moreover, since at least 2016, DMS has only suggested administrative changes for the purposes of cost savings; it has not advocated for the addition of any category of benefits. (Doc. 125 p. 9.)

The Plan documents define the applicable coverage terms, and not all services deemed medically necessary by a member's clinician are covered. (Doc.125 p. 4.) For example, the Plan excludes coverage for elective abortions, custodial care such as home health or skilled nursing facilities, cosmetic surgery, dental care, eye care,

hearing aids, fertility treatment, penile and testicular prosthesis, recreational therapy, speech therapy, sleep therapy, weight reduction services, tobacco cessation, and cardiac rehabilitation, among other exclusions. (Doc. 125 p. 4-5.)

At issue in this lawsuit is the Plan exclusion for "gender reassignment or modification services and supplies." (Doc. 121-4 p. 60; Doc.121-5 p. 53.) This exclusion includes surgical interventions and hormone replacement therapy if the associated diagnosis is gender dysphoria or something similar and the only purpose is gender reassignment. (Doc. 125 p. 7.)[2] However, if the member is prescribed a surgical procedure or hormone replacement therapy for a covered medical diagnosis (for example, an endocrine disorder) in addition to gender dysphoria, the service would be covered if all coverage criteria are met. In addition, psychotherapy and psychological testing and evaluation are covered services under the Plan even when the only underlying diagnosis necessitating treatment is gender dysphoria. (Doc. 125 p. 7-8.)

Gender/sexual reassignment services have never been covered by the State Health Plan. The express written exclusion first appeared in plan documents in the

---

[2] The only treatments denied to Plaintiffs, and therefore at issue in this lawsuit, are double mastectomy, orchiectomy, and facial feminization surgery.

late 1970s, at which time gender/sexual reassignment surgery was considered experimental and investigational. (Doc. 125 p. 8-9.)[3]

Transgender individuals are entitled to the same coverage as all other State Health Plan members. No Plan members are denied covered services because they identify as transgender. In addition, gender markers (whether the member is male or female) are not used to rule out the provision of services for a specific member. (Doc. 125 p. 8; Doc. 141 p. 5.)

Although some gender/sexual reassignment services are accepted in the medical community, some experts still question whether there is sufficient research to establish the efficacy of these treatments for gender dysphoria. Moreover, there are risks, complications, and limitations associated with these procedures, along with concerns about informed consent, particularly with respect to the use of puberty blockers and cross-sex hormones in minors. (Doc. 125 p. 10-12.)

## Argument

Plaintiffs contend that the Plan exclusion for gender/sexual reassignment services facially discriminates against transgender individuals, and that classifications affecting transgender persons necessarily discriminate based on sex.

---

[3] It is undisputed that in the 2000s almost all health insurance plans in the United States contained similar exclusions. In 2016, the majority of large employer health insurance plans excluded coverage for reassignment surgery. (Doc. 125 p. 9.)

Because the Plan at issue simply excludes a category of medical treatments, Plaintiffs' argument would require this Court to find that gender/sexual reassignment services constitute a proxy for biological sex, which neither the Equal Protection Clause nor Title VII supports. The Eleventh Circuit's holdings in *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023) and *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022), along with the Supreme Court holdings in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) and *Geduldig v. Aiello*, 417 U.S. 484 (1974), compel a finding that the Plan exclusion classifies based on medical treatment, not biological sex, for purposes of the Equal Protection Clause claim. Accordingly, this Court should enter summary judgment in favor of Defendant Allende.

The Eleventh Circuit's recent holding in *Lange v. Houston Cnty.,* 101 F.4th 793 (11th Cir. 2024) that a health plan exclusion for gender-affirming care necessarily discriminated on the basis of sex for purposes of a Title VII claim, while presently controlling, misapplied existing Title VII precedent and disregarded United States Supreme Court precedent regarding whether medical treatments can be considered a proxy for sex. It also set forth a concerning precedent that threatens myriads of other conditions that have been excluded from the State Health Plan for decades simply based on the fact that they may relate to reproductive characteristics,

affect a particular sex, or affect one sex more than another; the precise issue *Geduldig* sought to avoid fifty years ago.

Furthermore, the mandate in *Lange* has been withheld, and a request for *en banc* rehearing has been filed. *See Order*, *Lange*, No. 22-13626 (11th Cir. May 14, 2024); *Petition for Rehearing En Banc, Lange*, No. 22-13626 (11th Cir. June 3, 2024). As such, Defendants ask this Court to withhold ruling on the Title VII claim until after the mandate in *Lange* is issued.

## I.   The State Health Plan Exclusion for Gender/Sexual Reassignment Services Does Not Violate the Equal Protection Clause

*Lange* does not address the Equal Protection Clause issue. 101 F.4th at 797 n.2. Instead, binding Eleventh Circuit precedent compels a finding that the State Health Plan exclusion is facially neutral, and that Plaintiffs' claims fail as a matter of law because the record contains no evidence of discriminatory intent.

### A. Classifications based on medical treatments impacting transgender persons are not "because of sex" as held by the Eleventh Circuit in *Eknes-Tucker*.

This Court is bound by the Eleventh Circuit's holding in *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205 (11th Cir. 2023). In *Eknes-Tucker,* parents and healthcare providers challenged an Alabama law prohibiting the use of puberty blockers and cross-sex hormones for the purpose of altering sex or affirming gender identity inconsistent with sex assigned at birth. 80 F.4th at 1210-1213. The plaintiffs

argued that the law amounted to sex-based classification subject to heightened scrutiny under the Equal Protection Clause because the language of the statute used sex-based terms and stereotyped "on the basis of gender nonconformity." *Id.* at 1227.

 In rejecting this argument, the Eleventh Circuit held that the challenged statute targeted specific medical interventions; it did not classify on the basis of sex. *Id*. at 1227. The Court reasoned that "the statute does not discriminate based on sex" because (1) it did not establish an unequal regime for males and females, but rather treated all minors the same; and (2) its reference to sex-specific medical treatments simply acknowledged medical realities and did not amount to an improper sex-based classification as contemplated by the Equal Protection Clause. *Id*. at 1228.

The *Eknes-Tucker* Court acknowledged that classifying based on sex-specific medical treatments did not indirectly amount to classification on the basis of gender-nonconformity. *Id.* at 1228-29. Citing the Supreme Court's holding in *Dobbs v. Jackson Womens Health Org.*, 597 U.S. 215 (2022), the Eleventh Circuit noted that even if gender nonconformity itself was a suspect class, "the regulation of a course of treatment that only gender nonconforming individuals can undergo would not trigger heightened scrutiny unless the regulation were a pretext for invidious discrimination against such individuals." *Id*. at 1229-1230. Therefore, prohibiting treatment for gender dysphoria does not discriminate "based on sex," even when the prohibited medical interventions are necessarily "sex-based" due to the biological

realities regarding those procedures. *Id.* at 1228; *see also, Nguyen v. I.N.S., 533 U.S.* 53, 68 (2001) (finding that statutory recognition of inherent biological differences does not necessarily constitute a gender-stereotyping in violation of the equal protection clause.)

The Court rejected the argument that *Bostock v. Clayton Cnty.,* 590 U.S. 644, 654 (2020) and *Glenn v. Brumby,* 663 F.3d 1312 (11th Cir. 2011) compelled a finding that the Alabama statute amounted to sex-stereotyping. First, the Court distinguished *Bostock* on two grounds. The Court noted that the text of the Equal Protection Clause was different than the text of Title VII, the law at issue in *Bostock.* *Id.* at 1228-29. But more importantly, the Court emphasized the "different factual context" involved in *Eknes-Tucker* and *Bostock. Eknes-Tucker* involved a law regulating specific medical treatments, not an employment decision which intentionally penalized a transgender individual for not conforming with the employer's stereotypes about biological sex. *Id.* at 1229.

Similarly, in distinguishing *Brumby,*[4] the Court found that the statute at issue "targets certain medical interventions for minors meant to treat the condition of gender dysphoria; it does not further any particular gender stereotype. Insofar as [the

---

[4] *Brumby* held that the Equal Protection Clause prohibited an employer from firing a transgender employee for failing to adhere to certain expectations and stereotypes associated with the employee's biological/natal sex.

Act] involves sex, it simply reflects biological differences between males and females, not stereotypes associated with either sex." *Id*.

Finally, the Court rejected the argument that the statute was subject to heightened scrutiny because it classified based on transgender status, apart from sex. *Id*. at 1230. First, the Court noted that transgender status is probably not a quasi-suspect class in and of itself. Notwithstanding, the Court also found that even if transgender status is a suspect class, "the regulation of a course of treatment that, by the nature of things, only transgender individuals would want to undergo, would not trigger heightened scrutiny unless the regulation is a pretext for invidious discrimination against such individuals." *Id*. at 1230.

The holding in *Eknes-Tucker* compels a finding that the State Health Plan exclusion for gender/sexual reassignment services does not classify based on sex. Just like the statute in *Eknes-Tucker*, the Plan exclusion at issue simply excludes a class of treatments for a specific medical condition – it does not treat males or females differently. Moreover, there is no evidence that the exclusion is a pretext for invidious discrimination based on sex.

### B.  The Plan exclusion is facially neutral because it does not treat men and women differently.

The mere fact that a policy references sex or gender, does not mean that it is facially discriminatory. *Eknes-Tucker*, 80 F.4th at 1228 (holding that while the

statute discussed sex and identified the applicable cross-sex hormones for each sex, it did not treat the sexes differently); s*ee also, Kadel v. Folwell*, 100 F.4th 122, 167 (4th Cir. 2024) (Richardson dissenting) ("[D]etermining whether a law facially classifies based on sex thus involves more than a mere word search for particular terms. Rather, we must examine whether the policy uses those terms to draw distinctions between the sexes.")

The Plan exclusion for gender/sexual reassignment surgery, while it references gender, does not classify based on biological sex; rather, it is an exclusion for medical treatment applicable to all Plan members, regardless of biological sex. *See also, Eknes-Tucker, 80 F.4th at 1228-30; L. W. v. Skrmetti*, 83 F.4th 460, 480 (6th Cir. 2023); *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974); *Saks v. Franklin Covey Co.*, 316 F.3d 337, 347 (2d Cir. 2003); *In re Union Pacific Railroad Employment Practices Litigation*, 479 F.3d 936, 943–45 (8th Cir. 2007). As such, the Plan exclusion is facially neutral.

### *C.* **There is no evidence that Defendants acted with discriminatory intent.**

Even if the facially neutral Plan exclusion has a disparate impact on transgender individuals, it does not violate the Equal Protection Clause, or warrant heightened scrutiny review, because Plaintiffs have not come forward with any evidence to suggest that that the exclusion is a pretext for invidious discrimination because of sex. *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 276 (1979).

11

As the Supreme Court held in *Dobbs,* "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" 597 U.S. at 236; s*ee also*, *Eknes-Tucker,* 80 F.4th at 1229–30 ("the regulation of a course of treatment that only gender nonconforming individuals can undergo would not trigger heightened scrutiny unless the regulation were a pretext for invidious discrimination against such individuals.")

To prevail on their equal protection claims, Plaintiffs must show intent to discriminate because of sex. *Eknes-Tucker,* 80 F.4th at 1229-30; s*ee also, Bannum, Inc. v. City of Fort Lauderdale,* 157 F.3d 819, 822 (11th Cir. 1998); *Strickland v. Alderman*, 74 F.3d 260, 264 (11th Cir. 1996); *Feeney*, 442 U.S. at 274. While the impact of the policy "is an 'important starting point' . . . purposeful discrimination is 'the condition that offends the Constitution.'") *Feeney*, 442 U.S. at 274. Moreover, to establish discriminatory purpose there must be evidence showing that the decision-maker selected a particular course of action because of, not merely in spite of, its adverse effects upon the protected group. *Id*. at 279.

Here, just as in *Eknes-Tucker*, there is no evidence that the reasons articulated for the exclusion are a pretext for invidious discrimination based on sex. On the contrary, the evidence establishes that the exclusion has always existed and was

added to the Plan documents over 40 years ago, when gender-affirming procedures were considered experimental and investigational industry-wide. The evidence also affirmatively establishes that the Florida Legislature is the only entity that can add benefits to the State Health Plan and that in light of its cost-containment directives, DMS has never advocated for the addition of any category of benefits to the Plan. There is simply no evidence that DMS intentionally selected a course of action because of its adverse impact on a particular group of people because of sex. *Feeney*, 442 U.S. at 279.

### D.    The Plan exclusion survives rational basis scrutiny.

Because the facially neutral Plan exclusion classifies on the basis of medical treatment, not because of sex, and there is no evidence of invidious discrimination, the Plan exclusion is only subject to rational basis scrutiny, which it easily satisfies. *See Dobbs*, 597 U.S. at 222; *Ecknes-Tucker*, 80 F.4th at 1230. Rational basis scrutiny is highly deferential; it considers whether there is any conceivably rational basis for the policy, not whether that basis was actually considered. *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993); *Joel v. City of Orlando,* 232 F.3d 1353, 1358 (11th Cir.2000); *Ecnes-Tucker*, 80 F.4th at 1225; *Strickland*, 830 F.2d at 1114.

Here, the exclusion was undisputedly put in place in the late 1970s when gender reassignment was universally considered experimental. Moreover, the State

of Florida has a legitimate interest in keeping healthcare costs low because the Plan is financed with State funds. *See Maher v. Roe*, 432 U.S. 464, 479 (1977) (holding that states are afforded wide latitude in choosing among competing demands for limited public funds); *Geduldig*, 417 U.S. at 495-96 ("There is nothing in the Constitution [] that requires the state to subordinate or compromise its legitimate interests [in cost containment] solely to create a more comprehensive social insurance program than it already has.").

DMS addresses growing healthcare costs by running the Plan as cost-effectively as possible. DMS anticipates that removal of the gender reassignment exclusion would add significant expense to the Plan, and given its directive to contain costs, DMS has never advocated for the addition of any category of benefits to the Plan.

Moreover, the Plan exclusion is rationally related to the government's interest in ensuring that the treatments covered by the Plan are effective and appropriate for all members. While some gender reassignment surgeries are accepted in the medical community, the efficacy of these procedures is not clear, and in some cases, is highly controversial and disputed. The State has an important interest in excluding such treatments, particularly given the risks, complications, and irreversible nature of many gender reassignment services unless and until they can be established as safe and effective for the treatment of gender dysphoria.

Therefore, because the Plan exclusion is facially neutral and survives rational basis scrutiny, Defendant Allende is entitled to judgment in his favor.

## II.   <u>Plaintiffs' Title VII Claim Fails as a Matter of Law</u>

Title VII makes it unlawful for an employer to discriminate against an employee "because of" sex. 42 U.S.C. § 2000e-2(a)(1); *Bostock v. Clayton* Cnty., 590 U.S. 644, 657–58 (2020).  Plaintiff can prevail by establishing that the exclusion facially discriminates because of sex, or by proffering evidence that plaintiffs were treated less favorably than similarly situated employees, because of an intent to discriminate based on sex.

"Because of sex" means because of biological/natal sex. *Bostock*, 590 U.S at 1741–42; *see also*, *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 807, 812-814 (11th Cir. 2022) (holding that "sex" under Title IX unambiguously means "biological sex, i.e. discrimination between males and females"). Sex does not include "gender identity" or transitioning status *Adams*, 57 F.4th at 813; *Eknes-Tucker*, 80 F.4th at 1230. Rather, Supreme Court and Eleventh Circuit cases prohibiting discrimination against transgender individuals, like *Bostock* and *Brumby,* found underlying discrimination based on biological sex. *Adams*, 57 F.4th at 814 ("[T]here simply is no alternative definition of 'sex' for transgender persons as compared to nontransgender persons…")

### A.     The exclusion is not facially discriminatory under Title VII.

The Plan does not facially discriminate based on biological sex. To establish facial discrimination under Title VII, Plaintiffs must show that but for their biological/natal sex, Plaintiffs would have been treated differently. *Bauer v. Lynch,* 812 F.3d 340, 347–48 (4th Cir. 2016) (citing *City of Los Angeles, Dept. of Water & Power v. Manhart*, 435 U.S. 702, 715 (1978)). Here, changing Plaintiffs' biological sex would not change the outcome; thus, Plaintiffs cannot show that but-for their sex, they would have been treated differently. *See Skrmetti*, 73 F.3d at 419. Sex is not the determining factor.

A regulation targeting specific medical interventions is not one that classifies based on a suspect characteristic. *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 135 (1976); *see also*, *Eknes-Tucker*, 80 F.4th at 1227. Excluding reassignment surgery impacts the biological sexes equally. Because the Plan exclusion addresses treatment for a psychological condition and does not "establish an unequal regime for males and females," it is not facially discriminatory. *See Eknes-Tucker,* 80 F.4th at 122; *see also, Standridge v. Union Pac. R.R. Co.,* 479 F.3d 936, 943-45 (8th Cir. 2007); *Jespersen v. Harrah's Operating Co., Inc.*, 444 F.3d 1104, 1109 (9th Cir. 2006).

### B.     *Lange* was wrongly decided.

The Eleventh Circuit's recent decision in *Lange v. Houston County,* 101 F.4th

793 (11th Cir. 2024), while presently controlling,[5] was wrongly decided and does not follow precedent. In *Lange*, an employee challenged a county health plan's exclusion for sex change surgery. *Id*. at 796-97. The Court held that the exclusion was facially discriminatory because of its impact on transgender persons.

Relying on *Bostock,* the Court held that discrimination based on transgender status violated Title VII, and "because transgender persons are the only plan participants who qualify for gender-affirming surgery, the Plan denies health care coverage based on transgender status," and therefore violates Title VII. *Id*. at 798-99.[6] However, the *Lange* opinion ignores the Supreme Court's rationale in *Bostock* and contradicts the Supreme Court's holdings in *Geduldig* and *Dobbs* that regulation of medical conditions associated with one sex does not amount to sex-based discrimination.

First, binding precedent has already rejected the argument that a policy which disparately impacts one sex is necessarily discriminatory based on sex. *See Gilbert*,

---

[5] The mandate in *Lange* has been withheld, and a request for *en banc* rehearing has been filed. Defendants ask this Court to withhold ruling on the Title VII claim until after the mandate in *Lange* is issued.

[6] This same logic was rejected with respect to pregnancy-related medical conditions. *See Gilbert*, 429 U.S. at 138–40. The rationale of *Gilbert,* adopted from *Geduldig,* is still good law. Even though pregnancy only impacts one sex, the term "because of sex" under Title VII had to be expressly amended to provide sex-based protections for pregnancy. 42 U.S.C.A. § 2000e(k). Title VII has not been amended to include protection for gender dysphoria or related treatments.

429 U.S. at 138–40 (holding that insurance plan that excluded coverage for pregnancy-related disabilities did not violate Title VII); *see also*, *Geduldig*, 417 U.S. at 496 n.20 ("While it is true that only women can become pregnant[,] it does not follow that every legislative classification concerning pregnancy is a sex-based classification"); *Bray*, 506 U.S. at 270 (holding that, though abortion is "engaged in exclusively" by women, discriminatory intent could not be presumed); *Dobbs*, 597 U.S. at 236 (holding that a state's regulation of abortion is not a sex-based classification).

Here, the Plan exclusion is farther removed from sex than the medical conditions at issue in *Gilbert, Geduldig, Dobbs,* and *Bray* because gender/sexual reassignment services are used by both biological males and females alike – not just by one sex. Because sexual/gender reassignment services are farther removed from biological sex than pregnancy or abortion, Supreme Court precedent compels a finding that such treatment is not a proxy for sex.

Contrary to the Court's reasoning in *Lange*, the Supreme Court opinion in *Bostock* does not compel a different conclusion. *Bostock* does not create a new suspect class. In *Bostock*, the Court affirmed that Title VII prohibits treating an individual worse because of biological sex than others who are similarly situated.

*Bostock v. Clayton Cty.*, 590 U.S. 644 (2020).[7] Stated differently, "if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred." *Id*. at 660.

In *Bostock,* the Court concluded that discrimination against the transgender employee was unequivocally discrimination based on biological sex. The Court made clear: "An employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision; exactly what Title VII forbids." *Id.* at 651-52.

But the State Health Plan exclusion does not treat Plaintiffs differently because of their sex, nor, as the *Bostock* Court framed the analysis, does it intentionally penalize an employee identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. *Id.* at 659-60. Rather, the exclusion applies equally to all employees regardless of their natal sex or how they identify. *See Lange*, 101 F.4th at 806 (Brasher dissenting).

For example –changing Plaintiff Murphy's natal sex (female) would not alter the coverage decision. No Plan member, regardless of natal sex, gender identity, or transgender status can obtain a mastectomy for the purpose of gender reassignment

---

[7] The Court accepted a definition of "sex" as "status as either male or female [as] determined by reproductive biology," *Id*. at 655.

under the Plan. Moreover, biological males are not treated more favorably than Murphy when it comes to obtaining a mastectomy under the Plan.

Similarly, natal females who seek gender/sexual reassignment services are no more entitled to coverage than natal males seeking the same procedures. Similarly, both natal males and natal females who seek to change their reproductive organs are not entitled to coverage under the Plan. Biological sex is not the determinative factor. *See also, Kadel,* 100 F.4th at 181 (Richardson dissenting).

Unlike the situation presented in *Bostock*, where the simple mental exercise of changing the plaintiff's sex revealed sex to be a but-for cause of the adverse action at issue, sex is not directly implicated by the exclusion. Plaintiffs challenge a health plan exclusion for a specific category of medical treatment – gender/sexual reassignment services – which is sought by some, but not all, individuals with a specific psychiatric diagnosis – gender dysphoria – which is present in some, but not all, transgender individuals, whose identities necessarily relate to reproductive characteristics of both biological sexes. But this is no different from the attenuated manner in which pregnancy or abortion relate to sex – a relationship insufficient to establish a legally meaningful connection under Title VII. *See, e.g.*, *Geduldig*, 417 U.S. 484; *Gilbert*, 429 U.S. 125. In fact, treatments for gender dysphoria are much farther removed from biological sex than pregnancy because gender dysphoria impacts both sexes.

Plaintiffs' assertion that the exclusion facially discriminates based on "gender nonconformity" is not persuasive. Even under a sex-stereotype theory, Plaintiffs must still prove that the employer's decision was motivated by sex. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-52 (1989). Title VII prevents disparate treatment. *Lewis v. City of Union City*, 918 F.3d 1213, 1223 (11th Cir. 2019). The doctrine of gender nonconformity is not an independent vehicle for relief. *Evans v. Georgia Regl Hosp.*, 850 F.3d 1248, 1260-61 (11th Cir. 2017) (Pryor, J., concurring); *Willingham v. Macon Tel. Pub. Co.*, 507 F.2d 1084, 1092 (5th Cir. 1975); *Equal Employment Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1030 (11th Cir. 2016); *Price Waterhouse,* 490 U.S. at 251.

Moreover, the exclusion of medical treatments which relate to sex-based reproductive characteristics does not implicate sex-based stereotypes. *Eknes-Tucker,* 80 F.4th at 1229 ("Insofar as section 4(a)(1)-(3) involves sex, it simply reflects biological differences between males and females, not stereotypes associated with either sex."); *see also, Skrmetti*, 73 F.4th at 421.

A sex stereotype is a generalization about the relative capabilities of, or socially acceptable behavior for, members of each sex. *See Brumby,* 663 F.3d at 1316 (defining a stereotype as "failing to act and appear according to expectations defined by gender"); *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724-725

(1982) (explaining that the Equal Protection Clause "must be applied free of fixed notions concerning the roles and abilities of males and females").

However, the Plan does not condition coverage based on whether a treatment aligns with or departs from a patient's sex. Nor does it bar certain persons from treatment if they do not identify with their sex. Instead, the Plan grants or withholds coverage based on a patient's diagnosis. *See Geduldig*, 417 U.S. at 496 n.20. The different coverage accorded to treatments for different diagnoses is therefore based on medical and biological reality, which is not a stereotype.

There is no evidence that any biological sex-based stereotypes played a role in the coverage decisions at issue. DMS does not know how Plaintiffs, or any of the other hundreds of thousands of Plan participants, identify or present when Plan exclusions are applied. DMS does not know if they identify as transgender or non-transgender. The Plan is only concerned with making coverage decisions based on the Plan documents, which exclude a multitude of medical treatments and services, some of which may fall more heavily on one sex than another. (Doc. 136 p. 18-20.) None of these decisions are based on stereotypes about how Plaintiffs should act or behave.

Plaintiffs argue that gender dysphoria / gender reassignment services is a proxy for transgender persons and therefore biological sex. However, more is needed to establish a violation of Title VII. That a law targets something closely associated

22

with a protected class cannot alone support a presumption of discriminatory intent. *See Standridge v. Union Pac. R.R. Co.,* 479 F.3d 936, 943-45 (8th Cir. 2007); *Gilbert*, 429 U.S. at 139 (applying the holding in *Geduldig* to a Title VII case).

To establish that the exclusion discriminates based on sex, plaintiffs must come forward with evidence of intent to discriminate. *Ricci v. DeStefano,* 557 U.S. 557, 577 (2009). Here, Plaintiffs have not, and cannot, rebut Defendants' articulated reasons for the exclusion or establish any evidence of discriminatory intent. It is undisputed that the exclusion was created when gender-affirming care was experimental; DMS cannot add coverage without legislative approval; and DMS, in keeping with its cost-saving mission, has never advocated for the addition of any service to the Plan.

### C.    Plaintiffs cannot identify any similarly situated comparators.

Plaintiffs fail in their attempt to identify similarly situated members of the State Health Plan outside their protected class treated more favorably. Instead, they allege that non-transgender women, for example, are treated more favorably than transgender men because non-transgender women are entitled to coverage for mastectomy following cancer, while mastectomy to treat gender dysphoria is not covered. But this argument fails to show mistreatment based on biological sex. In fact, both transgender and non-transgender individuals – regardless of natal sex – are entitled to mastectomy for a covered medical condition.

Moreover, Plan members suffering from conditions like cancer are not similarly situated to Plan members seeking gender/sexual reassignment services to treat gender dysphoria. *Lewis,* 918 F.3d at 1227. Gender dysphoria is a mental health condition identified in the Diagnostic and Statistical Manual for Mental Disorders. A more appropriate analysis would be to compare Plaintiffs to Plan members seeking surgical interventions to treat a psychiatric condition – all of whom do not have coverage under the Plan. *See e.g.*, *Standridge,* 479 F.3d at 943-45 (holding that an exclusion for all forms of contraception did not discriminate against women and that a broad comparison to the category of preventative medicines did not satisfy the similarly situated analysis).

The Plan exclusion treats members the same regardless of sex. Whether a non-transgender male seeks penile prosthesis to treat a psychosexual dysfunction, or a transgender female seeks orchiectomy to treat gender dysphoria, the Plan is non-discriminatory in its exclusion of coverage. (Doc. 125 p. 5, 25-26.) Therefore, Plaintiffs cannot establish that they were treated differently than similarly situated persons, or that Defendants unequally applied the facially neutral policy for the purpose of discriminating.

**D.   Plaintiffs have no evidence of pretext to rebut Defendants' legitimate reasons for the exclusion.**

The crux of a Title VII disparate treatment claim is intentional discrimination. *Lewis,* 918 F.3d at 1223; *Catastrophe,* 852 F.3d at 1026. Because the Plan exclusion

is not facially discriminatory based on biological sex, Plaintiffs must come forward with evidence of pretext to rebut DMS's articulated legitimate reasons for the exclusion. (Doc. 126 p. 10-11, 14-15; Doc. 140 p. 11-12.)

Plaintiffs argue that no such evidentiary showing is required because *Bostock* (and now *Lange*) mandate a finding that the exclusion is facially discriminatory because of sex. As discussed at length above, this argument is flawed and contrary to law. The exclusion is facially neutral; therefore, Plaintiffs must come forward with evidence of intent to discriminate based on sex, which they have not done. As such, Plaintiffs have not established liability under Title VII.

WHEREFORE, for the reasons set forth herein, and in Defendants' previous memoranda in support of summary judgment (Docs. 125, 126, 135, 140, 141 and 160), this Court should grant summary judgment in favor of Defendant Allende on the Equal Protection claim and withhold ruling on the Title VII claim until mandate is issued in *Lange*.

Respectfully submitted this 5th day of June 2024.

HENRY BUCHANAN, P.A.

/s/ Miriam R. Coles
MIRIAM R. COLES
Florida Bar No. 58402
mcoles@henryblaw.com
J. STEVEN CARTER
Florida Bar No. 896152
Post Office Drawer 14079

Tallahassee, Florida 32317-4079
(850) 222-2920: Telephone
(850) 224-0034: Facsimile
*Counsel for Defendants*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rules 5.1 and 7.1, undersigned counsel certifies that this motion consists of 5,659 words and is typed in Times New Roman, font size 14.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed via the CM/ECF system which will send electronic notification to all counsel of record on this 5th day of June 2024.

 */s/ Miriam R. Coles*
ATTORNEY