UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JAMI CLAIRE, KATHRYN LANE,
and AHMIR MURPHY

    Plaintiffs,

v.                              CASE NO. 4:20-cv-0020-MW-CAS

FLORIDA DEPARTMENT OF
MANAGEMENT SERVICES and
PEDRO ALLENDE, in his official
Capacity as Secretary of the Florida
Department of Management Services.

    Defendants.
_____

**DEFENDANTS' RESPONSE TO PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

    Defendants, FLORIDA DEPARTMENT OF MANAGEMENT SERVICES, and PEDRO ALLENDE in his official capacity as Secretary of the Florida Department of Management Services (collectively, "Defendants"), by and through undersigned counsel and pursuant to this Court's order (Doc. 166), hereby respond to Plaintiffs' Supplemental Brief in Support of Motion for Partial Summary Judgment (Doc. 170) as follows:

**I.    Murphy and Claire lack standing on their equal protection claims.**

    To qualify as a case fit for federal-court adjudication, an actual controversy must exist at all stages of review, not merely at the time the complaint is filed. *Preiser*

1

*v. Newkirk*, 422 U.S. 395, 401 (1975). Based on Plaintiffs' supplemental brief (Doc. 170 p. 3), which notified Defendants for the first time of Claire and Murphy's voluntary resignation from public employment, it appears that their equal protection claims have been rendered moot. "Past exposure to [alleged] illegal conduct without more, does not give a plaintiff standing to pursue prospective relief against a repeat of the illegal conduct, absent a sufficient likelihood that the plaintiff will again be a victim of the illegal conduct." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 111 (1983). Because they have lost a direct stake in the outcome of this case, Claire and Murphy do not have a present case or controversy against Defendants with respect to their claim for equitable relief under the equal protection clause. *See Arizonans for Official English v. Arizona*. 520 U.S. 43, 44 (1997). Article III standing "represents a jurisdictional requirement which remains open to review at *all* stages of the litigation." *Nat'l Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 255 (1994). (Emphasis added.)

II.  **_Lange's_ holding that classification based on medical condition is facially discriminatory ignores the plain language of Title VII and Supreme Court precedent.**

Plaintiffs, relying on *Lange,* assert that *Bostock*'s clarified definition of "because of sex" includes discrimination on the basis of a medical condition that uniquely affecting transgender persons. (Doc 170 p. 3-4.) Presumably based on their understanding that classification based on certain medical treatments constitutes

facial sex discrimination, Plaintiffs erroneously claim that transgender status was the basis for their coverage denials. (Doc. 170 p. 5.)

Contrary to what Plaintiffs or the *Lange* Court may suggest, *Bostock, Copeland* and *Brumby* do not hold that classification based on a medical condition affecting transgender individuals is facially discriminatory based on sex. The analysis in these cases is no different from the analysis in cases like *Price Waterhouse v. Hopkins*, 490 U.S. 228, 232 (1989), in which sex-stereotyping evidenced the defendant's discrimination against women because of sex. *Bostock* applied the well-established principle that discrimination on the basis of sex can encompass stereotypes about gender non-conformity in the context of discrimination against transgender individuals. *See Bostock*, 590 U.S. at 660. But the majority opinion in *Bostock* stressed that the Court was not changing or amending the meaning of "because of sex" under Title VII. *Id.* at 669. *Bostock* ensures that transgender individuals are on equal footing with women – they cannot be intentionally discriminated against in the workplace because of their biological sex or because of stereotypes about their biological sex.

But *Lange* skips a vital step in the analysis, and does not explain how, in light of *Dobbs, Geduldig, Bray, Gilbert* and *Eknes-Tucker,* exclusion of a medical condition related to transgender status constitutes facial discrimination because of sex. In this regard, Plaintiffs Claire, Lane and Murphy are no different from the

3

women in *Gilbert, Geduldig,* and *Dobbs* who challenged regulation of medical conditions only impacting women. Women are clearly within a protected class because of sex, but excluding medical conditions solely impacting women is not facial sex discrimination. The Supreme Court has repeatedly said so. *Geduldig*, 417 U.S. at 496 n.20; *Gilbert*, 429 U.S. 125; *Dobbs*, 597 U.S. at 236; *Bray*, 506 U.S. at 270. Likewise, excluding coverage for certain medical treatments impacting transgender persons is not facial sex discrimination. *Lange's* holding to the contrary is wrongly decided and ignores both Supreme Court precedent and the history of the language of Title VII itself.

Furthermore, evidence of intent to discriminate because of sex is required to find a violation of Title VII. *Lewis v. City of Union City*, 918 F.3d 1213, 1223 (11th Cir. 2019)[1]; *Equal Employment Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1030 (11th Cir. 2016). A showing of intent to discriminate is also required to find that the exclusion of treatment for medical conditions unique to transgender persons violates Title VII. Here, Plaintiff has failed to proffer any evidence of intent to discriminate. On the contrary, the record evidence actually establishes that transgender individuals are entitled to the same coverage as all other

---

[1] The Eleventh Circuit has previously found that "discrimination claims under the Equal Protection Clause and discrimination claims under Title VII "have the same requirements of proof and use the same analytical framework." *Thompson v. Sec'y of State for the State of Alabama*, 65 F.4th 1288, 1321 (11th Cir. 2023) (citing *Lewis v. City of Union City*, 918 F.3d at 1220 n.5 (11th Cir. 2019) (en banc).

State Health Plan members, and the exclusion which has always existed, is applicable to all Plan members regardless of sex or gender.

### III. *Lange's* interpretation of "because of sex" ignores the plain language and amendment history of Title VII.

As much as this Court is bound by *Bostock*, it is bound by the express language of Title VII. In *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 135 (1976), the Supreme Court interpreted "because of sex" under Title VII and, applying the rationale of *Geduldig*, held that excluding coverage for certain medical conditions uniquely affecting women did not violate Title VII. *Gilbert* constituted the final word on what "because of sex" under Title VII meant at the time. *AT & T Corp. v. Hulteen*, 556 U.S. 701, 712 n.5 (2009). The Supreme Court subsequently confirmed that *Gilbert* declared the scope and meaning of "because of sex" under Title VII as it was originally written:

> Although certain Courts of Appeals had previously concluded that treating pregnancy leave less favorably than other disability leave constituted sex discrimination under Title VII, this Court in *Gilbert* clearly rejected that conclusion. . . . **Gilbert declared the meaning and scope of sex discrimination under Title VII and held that previous views to the contrary were wrong as a matter of law**. And '[a] judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction.' It is therefore to no avail to argue that the pregnancy leave cap was unlawful before *Gilbert* and that the PDA returned the law to its prior state.

*Id*. (internal citations omitted) (emphasis added).

This means that, *before Title VII was amended*, "because of sex" was interpreted in a manner consistent with the Equal Protection Clause's meaning of

5

"because of sex" in the context of medical conditions. Under *Geduldig* and *Gilbert* "because of sex" did not include on the basis of sex-specific medical conditions without evidence of intent to discriminate because of sex. *See Geduldig*, 417 U.S. at 497 n.20; *Gilbert*, 429 U.S. at 140.[2]

Subsequent to the Supreme Court's holding in *Gilbert*, Congress amended the definition of "because of sex" under Title VII to include an express list of pregnancy-related medical conditions. 42 U.S.C § 2000e(k). Abortion – a medical treatment unique to women – is partially excluded under the amended definition (health plans are only required to cover abortion in certain contexts). Had medical conditions unique to sex been inherent in the meaning of "because of sex" under Title VII - a contention the Supreme Court unequivocally denounced in *Hulteen* - the amendment to include pregnancy-related medical conditions would not have been necessary, and arguably, partial exclusion of a particular condition like elective abortion would have been improper. Rather, certain medical conditions are included within the meaning

---

[2] Title VII derives its authority from the Fourteenth Amendment. *Fitpatrick v., Bitzer* 427 U.S. 445 (1976). Interpreting Title VII inconsistently with the Equal Protection Clause could have Eleventh Amendment implications. *See e.g*., *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356 (2001) (holding that Title I of the ADA did not validly abrogate eleventh amendment immunity); *Coleman v. Court of Appeals of Maryland*, 566 U.S. 30 (2012) (holding that congress did not validly abrogate states' sovereign immunity from suits for money damages in enacting FMLA's self-care provision.).

of "because of sex" under Title VII solely by virtue of amendment to the statutory language.

If *Lange* were correct about its expansive definition of "because of sex" under Title VII, it would render the listing of pregnancy-related medical conditions in section 2000e(k) meaningless. "The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." *See Marx,* 568 U.S. at 386 (citing *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185-186 (2011); *See also Brown v. Sec'y, U.S. Dep't of Health & Human Services*, 4 F.4th 1220 (11th Cir. 2021), *vacated on other grounds*, 20 F.4th 1385 (11th Cir. 2021). (Emphasis added). Courts should be hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Marx,* 568 U.S. at 386 (quoting *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 837, (1988). This principle is confirmed by the Supreme Court's holding in *Hulteen* that before the definition of "because of sex" under Title VII was amended, disparate treatment of pregnancy-related benefits was not prohibited by the statute. *Hulteen*, 556 U.S. at 712 n.5.

Because Title VII was amended to include specific medical conditions, medical conditions unique to one sex are only included within the definition of "because of sex" ***if the statutory language says so***. Title VII has never been amended to include gender dysphoria or related medical conditions. As such, *Lange* improperly

7

extends the holding of *Bostock* beyond the statutory language of Title VII. If gender dysphoria is to be included within the phrase "because of sex" under Title VII, Congress must amend Title VII to expressly include gender dysphoria, just as Congress amended Title VII to include pregnancy-related medical conditions.

## IV. ***Eknes-Tucker* controls the Equal Protection Clause analysis.**

*Eknes-Tucker* controls[3] and comports with binding Supreme Court precedent. Plaintiff is correct that *Eknes-Tucker* understood the statute at issue to target specific medical interventions for minors and therefore made classifications on the basis of age and not sex. 80 F.4th 1205, 1227-28 (11th Cir. 2023). Nonetheless, *Eknes-Tucker* is directly applicable because the Eleventh Circuit conducted an analysis of a statute regulating treatments for gender dysphoria and conclusively determined that "the regulation of a course of treatment that only gender nonconforming individuals can undergo would not trigger heightened scrutiny *unless* the regulation were a pretext for invidious discrimination against such individuals." *Id.* at 1229 (citing *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 235 (2022)). In so doing, the Eleventh

---

[3] Similar to *Lange*, the mandate in *Eknes-Tucker* has been withheld, and a petition for rehearing was filed on September 11, 2023. However, this Court need not delay ruling on the Equal Protection Clause issue because *Eknes-Tucker* simply follows the binding Supreme Court precedent of *Geduldig* and *Dobbs*, and because the rationale of *Eknes-Tucker* is consistent with the Eleventh Circuit's en banc holding in *Adams*, which also affirmed the viability of *Geduldig*. *See Adams*, 57 F.4th at 809.

8

Circuit once again adopted the rationale of *Geduldig* and its progeny. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 809 (11th Cir. 2022).

The Court in *Eknes-Tucker* explained that the statute at issue did not establish an *unequal regime* for males and females, reasoning that heightened scrutiny applies to government action that "denies an opportunity to women (*or* to men)." *Id.* at 1228. (Citing *United*, 518 U.S. 515, 532 (1996) (emphasis added). The Eleventh Circuit explained that the statute at issue referred to sex only because the medical procedures it regulated were themselves sex based. *Id.* The Eleventh Circuit found it difficult to even imagine how a state might regulate medical procedures it found sex based without referencing sex in some way. *Id.* at 1228. As a result, express reference to sex or gender does not necessarily constitute direct evidence of a sex-based classification scheme under the equal protection clause. *Cf. Nguyen v. I.N.S.* 553 U.S. 53 (2001). Rather, evidence of invidious discrimination is required. *Eknes-Tucker,* 80 F.4th at 1230.

Contrary to Plaintiffs' assertion, Defendants' Plan exclusion is not dissimilar to the exclusions present in the Alabama statute, which also classified based on medical diagnosis, not sex. The fact that Alabama's law imposed criminal penalties is irrelevant to the Equal Protection Clause or to the Court's analysis of the appropriate scrutiny to apply to such a statute or regulation. Finally, the differences

in language between Title VII and the Equal Protection Clause have no bearing on the application of *Eknes-Tucker* to the facts of this case.

      **a.**      ***Eknes-Tucker*, not *Kadel v. Folwell*, is binding on this Court.**

The Fourth Circuit's holding in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) is not binding on this Court and reaches a holding directly contrary to the Eleventh Circuit's holding in *Eknes-Tucker*. Specifically, the *Kadel* Court dismissed the rationale of *Geduldig* and *Dobbs* and found that "discriminating on the basis of diagnosis *is* discriminating on the basis of gender identity and sex." 100 F.4th at 141. Judge Richardson's dissent in *Kadel* points out the flaws in the majority's opinion and is more consistent with the analysis articulated by the Eleventh Circuit on a nearly identical legal issue in *Eknes-Tucker*. *See Kadel,* 100 F.4th at 164-92.

Further, the court in *Kadel*, much like the district court in *Doe*, reached the inexplicable conclusion that gender dysphoria – a medical condition experienced by men, women, and some but not all transgender persons (Doc. 125 p. 6), is somehow a closer proxy for biological sex than pregnancy. *Kadel*, 100 F. 4th at 146. In reaching this conclusion, both courts ignored the elephant in the room i.e., that only biological women can become pregnant, and that women have been fighting the persistent sex-based stereotype that pregnancy and motherhood will or should prevent them from functioning in society on equal footing with men, for centuries. *See generally, Hulteen*, 556 U.S. at 725-726 n. 6-8 (Ginsberg J. dissenting). Pregnancy is as

synonymous with sex, and as loaded with sex-based stereotypes, as any medical condition can get.[4] The privilege to overlook this reality may reflect how far women have come in recent years, but it ignores decades of civil rights advocacy and the basis for including sex within Title VII to begin with. *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 722 (2020).

In light of the Supreme Court's rulings in *Geduldig*, *Bray* and *Dobbs*, the holding in *Kadel* that classifications based on gender dysphoria are facial sex discrimination requiring intermediate scrutiny, while classifications based on medical conditions uniquely affecting women are not, effectively gives transgender persons greater rights under the Equal Protection Clause than biological women. This Court should reject such a holding.

    **b.**    ***Dekker* and *Doe* are not binding on this Court.**

Central to Plaintiff's claim under Title VII, Defendants "liability depends on whether the protected trait ... actually motivated the employer's decision." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). This Court must analyze the record evidence specific to this case for evidence of invidious discriminatory intent. Both *Dekker* and *Doe* are non-binding district court opinions involving facts and evidence

---

[4] *See Muller v. State of Oregon*, 208 U.S. 412, 419 n.1 (1908) (upholding disparate work hours restrictions for all women regardless of their actual pregnancy or motherhood status based on assumptions about women's physical characteristics, women's maternal functions, and their role in rearing and educating children.)

distinct from the present action. Specifically, the statutes at issue in these cases were either created or amended in 2022 and 2023. *See* Fla. Admin Code. 59G-1.050 (2022)*;* § 286.31 Fla. Stat. (2023); § 456.001 Fla. Stat. (2023), *amended by* ch. 2023-90, § 4 Laws of Fla; § 456.52 Fla. Stat. (2023), *amended by* ch. 2023-90, § 5 Laws of Fla.). In contrast, the Plan exclusion at issue in this case has been in place since the 1970s, when gender reassignment surgeries were universally considered experimental (Doc. 125 p. 9.)

### i. The analysis of *Geduldig* in *Doe* and *Dekker* is flawed.

Defendants have demonstrated that transgender persons regardless of their natal sex do not all experience gender dysphoria, just as not all women experience pregnancy or pregnancy-related disabilities. (Doc.125 p. 6-7.) Moreover, the record is clear that transgender individuals are entitled to the same coverage as any other Plan member, regardless of their natal sex or transgender status.

In *Doe*, the district court attempted to distinguish *Geduldig* by asserting that the exclusion in *Geduldig* treated male and female plan members the same (both did not have coverage for pregnancy-related disability) and that, while there were women on both sides of the exclusion in *Geduldig*, the same was not true for the transgender plaintiffs in *Doe*. The court explained:

> Cisgender individuals can be and routinely are treated with GnRH agonists, testosterone, or estrogen, when they and their doctors deem it appropriate. Not so for transgender individuals—the challenged statute and rules prohibit it. To know whether treatment with any of these medications is legal, one must know

12

whether the patient is transgender. And to know whether treatment with testosterone or estrogen is legal, one must know the patient's natal sex.

(*Doe v. Ladapo*, No. 4:23-cv-00114-RH-MAF at * 37-38 (N.D. Fla. June 11, 2024); *See also*, *Dekker v. Weida*, 679 F. Supp 3d. 1271, 1291-92 (N. D. Fla 2023)

These analyses do not appear to consider the fact (or perhaps the record did not contain evidence showing) that transgender persons receive hormone therapy for lawful, qualifying medical reasons. (See e.g., Doc. 125 p. 14-15.) In that regard, the court's attempt to distinguish *Geduldig* is flawed, as the application of an exclusion for both conditions – pregnancy and gender dysphoria – is similar. In fact, gender dysphoria possesses less connection to biological sex because it impacts both sexes equally. The fact that specific treatments (like testosterone and estrogen) are sex-specific speaks to biological realities, not discriminatory intent. *Eknes-Tucker,* 80 F.4th at 1234 ("recognition of biological reality is 'not a stereotype.'") (citing *Nguyen v. I.N.S.,* 533 U.S. 53, 68 (2001).

Moreover, the *Doe* rationale for distinguishing *Geduldig* fails on the facts of the present case. Under the Plan, a transgender male (natal female) can receive coverage for hormone therapy to treat an endocrine disorder or other covered condition; in fact, Plaintiffs Lane and Murphy received coverage for hormone therapy and related blood work under the Plan. (Doc. 125 p. 14-15 citing Doc.118-19. Lane 19:7-21, 20:15-25, Doc.118-23.Murphy 21:4-22:3, 23:25-24:6.) A transgender male (natal female) is also entitled to receive covered gynecological services if medically

13

necessary, notwithstanding their male gender identity. This is because the Plan does not make coverage decisions based on sex markers. (Doc. 125 p. 8-9.) Just as in *Geduldig*, there are indisputably transgender persons on both sides of the coverage decisions at issue under the Plan.

In the surgical context, if a transgender male (natal female) sought coverage for a penile prosthesis for treatment of gender dysphoria, he would be denied coverage just as a non-transgender male would be denied coverage if he sought coverage for a penile prosthesis to treat a psychiatric condition. (Doc. 125 p. 5, 25-26.; Doc. 121-4 p.56; Doc 121-18 p.2) Similarly, transgender women and all other plan members, would be denied coverage for facial feminization surgery to treat a non-covered condition. And, transgender women along with all other Plan members, would be entitled to coverage for facial plastic surgery to treat a covered condition. (Doc 121-4 p. 43, 59) Again, in both cases, there would be transgender persons on both sides of the coverage decisions. Plaintiffs have not and cannot present any evidence demonstrating that the Plan exclusion deny a transgender person coverage for a qualifying medical condition because of their gender non-conformity or transgender status.

> ii. *Doe* **acknowledges that courts evaluating classifications based on medical conditions must examine the record for evidence of invidious discrimination as set forth in** *Arlington Heights*.

Despite suggesting that the statute at issue in *Doe* was not facially neutral, the court nonetheless acknowledged that *Eknes-Tucker* presently controlled and conducted the fact-based inquiry described in *Arlington Heights. See Doe v. Ladapo*, No. 4:23-cv-00114 at 39-52 (N.D Fla. June 11, 2024). The district court's analysis of the record for evidence of sex-based animus reveals the types of evidence necessary to create an issue of fact as to the existence of invidious discrimination. By contrast, Plaintiffs have wholly failed to present similar evidence of invidious discrimination in this case.

> c. **The Plan exclusion satisfies rational basis scrutiny.**

As set forth at length in Defendants' motion and prior briefs (Doc. 125 p. 30-32; Doc. 135 p. 33-36; Doc. 141 p. 14-15; Doc. 171 p.14-14), the Plan exclusion satisfies rational basis scrutiny. Rational basis scrutiny does not require an analysis of the actual motivations of the government in creating a classification; only analysis of what rational basis they may have had. *See Lofton v. Secretary of Dept. of Children and Family Services,* 377 F.3d 1275, 1278-79 (11th Cir. 2004). Here it is undisputed that the Plan requires legislative approval to add coverage, and that DMS is required to run the plan in a cost-effective manner. There is no evidence that DMS advocated for this exclusion; much less that it did so with a discriminatory purpose. Moreover,

eliminating the exclusion would easily add over a million dollars in costs to the Plan. (Doc. 118-9 p.25:25-26:12, 83:16- 84:20.) This, along with the reasons articulated in previous briefings, are rational bases for the exclusion. *Geduldig*, 417 U.S. at 495-96; *Maher v. Roe*, 432 U.S. 464, 479 (1977).

Plaintiffs rely on *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) to assert that the Plan cannot survive a "meaningful" rational basis review. Contrary to Plaintiff's assertion, *Cleburne* does not change the meaning of rational basis review. Rather, *Cleburne* stands for the basic proposition that under the rational basis test, a state's proffered rational for its conduct cannot be found irrational. The burden remains on the Plaintiff[5] to demonstrate that "the varying treatment of different persons or groups is so unrelated to the achievement of any combination of legitimate purposes that a court can only conclude the legislature's actions were irrational." *Jones v. Governor of Florida*, 950 F.3d 795, 809 (11th Cir. 2020).

Meanwhile, governmental entities routinely survive rational basis scrutiny with regard to their statutory and regulatory policies on the basis of cost savings and the financial health of state programs and economy. *See Geduldig*, 417 U.S. at 495-96 (finding rational basis for state health plan to not cover pregnancy related

---

[5] "Those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981) (applying rational basis scrutiny).

disabilities on the basis of state health plan's self-sufficiency under equal protection); *Gilbert*, 429 U.S. at 138–40 (finding rational basis for state health plan to not cover pregnancy related disabilities on the basis of state health plan's self-sufficiency under Title VII); *Demaree v. Fulton Cnty. Sch. Dist.*, 515 Fed. Appx. 859 (11th Cir. 2013) (finding rational basis for difference in treatment of teachers and paraprofessionals on the basis of cost savings to defendant school district). The Plan clearly survives rational basis scrutiny.

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, and in Defendants' previous memoranda in support of summary judgment (Docs. 125, 126, 135, 140, 141,160, and 171), this Court should grant dismiss Plaintiffs Claire and Murphy's Equal Protection claims for lack of standing; grant summary judgment in favor of Defendant Allende on the remaining Equal Protection claim; and withhold ruling on the Title VII claim until mandate is issued in *Lange*.

Respectfully submitted this 21st day of June 2024.

HENRY BUCHANAN, P.A.

 */s/ Miriam R. Coles*
MIRIAM R. COLES
Florida Bar No. 58402
mcoles@henryblaw.com
J. STEVEN CARTER
Florida Bar No. 896152
Post Office Drawer 14079
Tallahassee, Florida 32317-4079

disabilities on the basis of state health plan's self-sufficiency under equal protection); *Gilbert*, 429 U.S. at 138–40 (finding rational basis for state health plan to not cover pregnancy related disabilities on the basis of state health plan's self-sufficiency under Title VII); *Demaree v. Fulton Cnty. Sch. Dist.*, 515 Fed. Appx. 859 (11th Cir. 2013) (finding rational basis for difference in treatment of teachers and paraprofessionals on the basis of cost savings to defendant school district). The Plan clearly survives rational basis scrutiny.

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, and in Defendants' previous memoranda in support of summary judgment (Docs. 125, 126, 135, 140, 141,160, and 171), this Court should grant dismiss Plaintiffs Claire and Murphy's Equal Protection claims for lack of standing; grant summary judgment in favor of Defendant Allende on the remaining Equal Protection claim; and withhold ruling on the Title VII claim until mandate is issued in *Lange*.

Respectfully submitted this 21st day of June 2024.

HENRY BUCHANAN, P.A.

 */s/ Miriam R. Coles*
MIRIAM R. COLES
Florida Bar No. 58402
mcoles@henryblaw.com
J. STEVEN CARTER
Florida Bar No. 896152
Post Office Drawer 14079
Tallahassee, Florida 32317-4079

(850) 222-2920: Telephone
(850) 224-0034: Facsimile
*Counsel for Defendants*

## **CERTIFICATE OF WORD COUNT**

Pursuant to Local Rules 5.1 and 7.1, undersigned counsel certifies that this motion consists of 4,203 words and is typed in Times New Roman, font size 14.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed via the CM/ECF system which will send electronic notification to all counsel of record on this 21st day of June 2024.

/s/ *Miriam R. Coles*
ATTORNEY