**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

JAMI CLAIRE et al.,

      Plaintiffs,

vs.                         Case No. 4:20-cv-00020-MW/MAF

FLORIDA DEPARTMENT OF
MANAGEMENT SERVICES et al.,

      Defendants.

_____/

## PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**I.**    **Defendants' Failure to Cite Record Evidence for Propositions Essential to Their Legal Arguments Dooms Those Arguments.**

Defendants' Supplemental Brief (ECF 171) includes a litany of unsupported allegations and bald assertions of "fact" devoid of any citation to the record upon which the summary judgment motions are based. Among the assertions upon which Defendants' arguments hinge, but which find no support in the record, are the post hoc justifications of cost and efficacy.

First, Defendants reiterate the argument that an uncited "cost-containment directive" (*id.* at 13) and "cost-saving mission" (*id.* at 23) justify the discriminatory Exclusions. (*Id.* at 14) (providing no citation for any of the alleged facts supporting this justification: "DMS addresses growing

healthcare costs by running the Plan as cost-effectively as possible. DMS anticipates that removal of the gender reassignment exclusion would add significant expense to the Plan, and given its directive to contain costs, DMS has never advocated for the addition of any category of benefits to the Plan.")

The only citation contained in Defendants Supplemental Brief for the cost justification is "Doc 125 p. 9," which offers no support for their position. (ECF 171, at 3.) In fact, the only support contained in any of Defendants' pleadings is the misrepresentation of the record in Defendant [Allende's] Motion for Summary Judgment that "it is loosely estimated that covering gender reassignment would increase costs by $0.64 per policy per month" … "or a total expense to the state of around $1,350,000 annually." (ECF 125, at 32.) As explained thoroughly in Plaintiffs' briefing, not only was cost explicitly disclaimed as a justification by DMS representatives, but record evidence makes unequivocally clear that Defendants have never analyzed the financial impact of eliminating the Exclusion nor covering gender reassignment in the Plans. (ECF 123, at 14, 45-46; ECF 137, at 3-4, 29-30.)

The "loose estimation" referenced by Defendants comes from a single statement from an agency witness who merely speculates a private third party *might* have considered the cost impacts of removing the Exclusions. The DMS corporate representative, Ryan Stokes, stated in deposition: "we

have not done an analysis on that…I think Florida Blue may have done a very informal look at their book of business, at what the cost might have been." (ECF 118-09, DMS-Stokes, 83:16-23.) However, this agency witness was unaware of what services were considered by Florida Blue in the very informal look (*id.* at 84:16-20), could not recall any details about how this information was received by the agency, including whether the Florida Blue analysis was even "in writing" (*id.* at 85:6-19), and conceded that DMS does not even know the number of transgender employees or transgender plan members in the state (*id.* at 21:25; *see also* ECF 118-13, Fillyaw, 211:20-23 (Q: "[h]as there ever been an analysis of how many transgender individuals are covered by the state plans?" A: "No.").)

Further, Defendants' statement regarding the "total expense to the state of around $1,350,000 annually" has no record cite in any of Defendants' briefing because no record support exists. Defendants' primary argument that they have "never advocated for the addition of any category of benefits to the plan" because of their interest in "cost containment" and avoiding adding "significant expense to the Plan" is undercut by the fact that they are unable to say whether the removal of the Exclusions would actually *save money* for the state, as they have never analyzed this. (ECF 118-13, at 119:25-120:9 (Q: "Do you know or does DMS know what the cost would be

to eliminate the exclusions for gender reassignment or modification services or supplies in the state plans?" A: "No."); ECF 118-9, at 83:16-84:20) (Q: "Does DMS know whether eliminating the gender reassignment exclusion would cost more, cost less, or be neutral?" A: "We have not done – to the best of my knowledge, we have not done an analysis on that.").)

Next, Defendants rehash their unsupported arguments regarding efficacy of treatment as a justification for the Exclusions -- which Plaintiffs have already addressed comprehensively in prior briefing (*see* ECF 123, at 14-15; ECF 137, at 4-6; ECF 139, 14-15) -- but offer no record cites for these unsupported "facts." (ECF 171, at 14) (containing no citations for: "Moreover, the Plan exclusion is rationally related to the government's interest in ensuring that the treatments covered by the Plan are effective and appropriate for all members. While some gender reassignment surgeries are accepted in the medical community, the efficacy of these procedures is not clear, and in some cases, is highly controversial and disputed.[1] The State

---

[1] Defendants argue that the state has "an important interest in excluding" the unspecified "gender reassignment surgeries" with purportedly unclear or controversial efficacy (ECF 171, at 14), yet they proffer no justification for the categorical denial of the non-surgical care that they readily concede the Exclusions encompass (ECF 125, at 7 ("The Plan's exclusion of gender reassignment services applies to surgical procedures (including double mastectomy, orchiectomy, and facial feminization surgery), physician office visits, hormone replacement therapy and related blood work if the associated diagnosis is gender dysphoria")).

has an important interest in excluding such treatments, particularly given the risks, complications, and irreversible nature of many gender reassignment services unless and until they can be established as safe and effective for the treatment of gender dysphoria."). In addition to the lack of evidence in the record supporting, and the clear record evidence contradicting, these statements, Defendants' attempt to justify the Exclusion by suggesting the state has an interest in ensuring any treatment covered by the Plan is "effective and appropriate for *all members*" defies common sense. One would be hard pressed to identify any medical treatment that was effective and appropriate for *all* state of Florida employees. Medical care is not one-size-fits-all, but must be provided based on the individual needs of the specific patient.

Defendant Allende conceded in his Motion for Summary Judgment that these treatments were no longer considered "experimental." (ECF 135, at 34-36.) Nevertheless, Defendants now raise alleged concerns about the treatment of gender dysphoria in minors (*id.* at 5), yet the only citation provided by Defendants is to their prior unsupported argument about the "ethics*"* surrounding minors *providing consent* to treatment, not the efficacy or safety of the treatments themselves. (*See, e.g.,* ECF 125 at 12.) The only additional support offered by Defendants are a citation to an out-of-country

declaration that was set aside by the Court of Appeal in 2021 (*see* ECF 156, Plaintiffs' Third Notice of Supplemental Authority) and a citation to a sentence from a dissenting opinion in *Adams*, a bathroom case having nothing to do with medical care. (ECF 125, at 28) ("Medical thinking when Title IX became law (1972) was firmly opposed to sex-reassignment surgery.") Neither of these offer any legitimacy to Defendants' post hoc unsupported "efficacy" justification.

Further, as explained in Plaintiffs' briefing, prior to summary judgment Defendants expressly denied knowledge of any financial *or medical justifications* for the Exclusions. (See ECF 123, at 14-15; ECF 137, at 3-7; ECF 139, at 14-15.) In fact, Defendant DMS conceded in their Reply Brief (ECF 140) that there were no known medical or financial justifications for the exclusion, but rather than disputing Plaintiffs' position and providing any record evidence to the contrary, Defendants instead argued that "Plaintiffs did not ask DMS about the 'known justifications' for the Plan's other 26 express exclusions, most of which also date back to the 70's and 80's, even though today they may exclude care deemed medically necessary by a physician." (ECF 140, at 11.) Further, Defendants explicitly stated, and their own expert agreed, that gender reassignment or modification services and supplies *are not currently considered experimental or investigational* (ECF

6

123, at 14-15; ECF 137, at 4-6) and that surgical treatment for gender dysphoria is widely accepted (ECF 137, at 4-6).

Factual assertions not supported with citations to the record are immaterial. To be relevant to the resolution of cross-motions for summary judgment, facts need to be raised to the court in summary judgment filings with record citations. "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc). It is well-established law that "summary judgment may only be defeated by *pointing to admissible evidence in the summary judgment record* that creates a genuine issue of material fact." *United States v. 5443 Suffield Terr., Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) (emphasis added); *APA Excelsior III, LP v. Windley*, 329 F. Supp. 2d 1328, 1340 n.11 (N.D. Ga. 2004) ("not the Court's duty [to] comb the record to attempt to find reasons to deny a motion for summary judgment."); *see also Chandler v. Volunteers of Am., N. Ala., Inc.,* 598 F. App'x 655, 663 (11th Cir. 2015) (noting counsel's "misimpression that it is the court's job, not counsel's, initially to comb through the record, identify the facts supporting the plaintiff's legal position, and apply them to the law—all without any guidance from counsel").  Because Defendants have never provided record

citations to support these contentions, their bald assertions do not support their arguments on any of the pending cross-motions for summary judgment.

## II.   *Lange* Is Binding Precedent That Controls Plaintiffs' Title VII Claims.

The *Lange* decision addresses a substantially identical Title VII claim by a transgender public employee in Georgia. *Lange* holds that employee benefit plans that exclude "[d]rugs for sex change surgery" and "[s]ervices and supplies for a sex change and/or the reversal of a sex change" facially discriminate against transgender employees in violation of Title VII. *Lange v. Houston County*, 101 F.4th at 793, 798-99 (11th Cir. 2024). That is what Florida's employee benefit plans do as well: the Exclusions prohibit coverage for "gender reassignment and modification services and supplies" and "sexual reassignment, or modification services or supplies" as well as prescriptions for "psychosexual disorders". (ECF 123, at 2.) Plaintiffs in the instant case are equally entitled to judgment as a matter of law for liability under Title VII as the plaintiff in *Lange*.

*Lange* reiterates the Supreme Court's longstanding position that employer-provided health insurance coverage is compensation under Title VII. 101 F.4th at 798-800; *see also Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 682 (1983). While employers are not required

to provide coverage for every possible medical treatment, they cannot exclude specific treatments on the basis of sex. "By drawing a line between gender-affirming surgery and other operations, the plan intentionally carves out an exclusion based on one's transgender status. Lange's sex is inextricably tied to the denial of coverage for gender-affirming surgery." *Lange*, 101 F.4th at 799. Defendants rely on the dissent in *Lange*, which suggests that any exclusion from a health insurance plan is fine so long as it is based on cost savings. *Id.* at 805 (Brasher, J., dissenting). Title VII prohibits discrimination based on sex. Costs can be saved, but not at the explicit and direct expense of transgender beneficiaries. 29 C.F.R. § 1604.9(e) ("It shall not be a defense under Title VII to a charge of sex discrimination in benefits that the cost of such benefits is greater with respect to one sex than the other."); *see also City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 716-17 (1978) ("[N]either Congress nor the courts have recognized [a cost justification] defense under Title VII."). For example, Title VII permits exclusions for bariatric surgery because obesity is not a protected category under the statute. *Contra Lange*, 101 F.4th at 805 (Brasher, J., dissenting). Furthermore, as discussed above, Defendants' cost defense is a post hoc justification with no support in the record.

Defendants go to great lengths to explain why the clear holding of *Lange* is wrong and might be vacated by the Eleventh Circuit sitting *en banc*. (ECF 171, at 6-7, 16-25.) But *Lange* remains binding precedent of the Eleventh Circuit, whether the mandate has issued or not. A published opinion "is the law in this circuit unless and until it is reversed, overruled, vacated, or otherwise modified by the Supreme Court of the United States or by this court sitting en banc." *Martin v. Singletary*, 965 F.2d 944, 945 n.1 (11th Cir. 1992). "Withholding mandate has no bearing, though, on this Court's obligation to apply a panel's decision as binding precedent." *Poblano v. Russell Cellular Inc.*, 543 F. Supp. 3d 1293, 1295 (M.D. Fla. 2021) (*citing Martin*). Even if the court vacates *Lange* and rehears the case *en banc*, that does not mean the rationale expressed in *Lange* becomes irrelevant. It merely ceases to be binding authority that must be followed; but the rationale of *Lange* is persuasive and follows the clear logic of *Bostock*. Further delaying a ruling on Plaintiffs' Title VII claims—which have been submitted for decision since 2021—will put this issue on hold indefinitely, potentially for years, based on Defendants' hopeful speculation.

Defendants disregard both *Lange* and *Newport News*, but this court is bound to follow both opinions. Defendants repeatedly rely on *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), to argue that Exclusions that

explicitly target treatments for gender-affirming surgery do not discriminate against transgender beneficiaries. (*See* ECF 171, at 16-18, 20, 23.) But Congress repudiated *Gilbert*, and the Supreme Court declared both the holding and the logic of *Gilbert* were no longer valid. *See Newport News*, 462 U.S. at 678 ("When Congress amended Title VII in 1978, it unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the Gilbert decision."). The Court went to lengths to explain that Congress explicitly repudiated the logic of the key footnote in *Geduldig v. Aiello*, 417 U.S. 484 (1974), upon which Defendants rely. *See Newport News*, 462 U.S. at 676-77. While the significance of that footnote from *Geduldig* continues to be contested in the Equal Protection context, after *Newport News* it has no bearing on Title VII. Plaintiffs fully briefed this issue in their Response in Opposition to Defendant DMS's Motion for Summary Judgment. (ECF 136, at 5-9.) Defendants' most recent brief adds nothing new.

The factual record in this case is consistent with the essential facts discussed by the Eleventh Circuit in *Lange*. Plaintiffs are entitled to summary judgment declaring the Exclusions violate Title VII.

### III. The Exclusions Discriminate Against Transgender Beneficiaries in Violation of the Equal Protection Clause.

#### A. *Eknes-Tucker* Does Not Change the Fate of the Exclusions

Similar to Defendants' loose approach to facts and law regarding Title VII, Defendants assert that *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205 (11th Cir. 2023), eradicates any possibility of victory on Plaintiffs' Equal Protection claims. (*See* ECF 171, at 7-11.) Defendants fail to mention that the Eleventh Circuit in *Eknes-Tucker*, just like *Lange*, has withheld the mandate while considering petitions for rehearing *en banc*. (*Compare* ECF 171, at 7, 17 n.5, 25 (noting mandate withheld in *Lange,* and asking Court to withholding ruling on Title VII claim until mandate issued), *with* ECF 171, at 7-12, 16, 21 (failing to note mandate withheld in *Eknes-Tucker,* while asking Court to rely on that opinion to resolve Equal Protection claim).)

Plaintiffs recognize that *Eknes-Tucker*, like *Lange*, "is the law in this circuit unless and until it is reversed, overruled, vacated, or otherwise modified by the Supreme Court of the United States or by this court sitting en banc." *Martin v. Singletary*, 965 F.2d 944, 945 n.1 (11th Cir. 1992). But unlike *Lange*, which is factually indistinguishable from the instant case and addresses the same issue of exclusions from employer-provided medical benefits, *Eknes-Tucker* addresses regulation of the providers prescribing the medical care itself, as opposed to health insurance coverage, and only applies to medical care for minors, unlike *Lange* and the case at bar. *Eknes-Tucker,* 80 F.4th at 1210 (the appeal centers around "Alabama's Vulnerable

Child Compassion and Protection Act" which "makes it a crime in the State of Alabama to take part in prescribing providing puberty blockers or cross-sex hormone treatment to a minor").

Plaintiffs in their most recent Supplemental Brief thoroughly explain the reasons why *Eknes-Tucker* should not dictate the outcome in the instant case. (*See* ECF 170, at 6-14). The Exclusions are facial classifications based on sex that do not withstand any level of scrutiny. Even if *Eknes-Tucker* requires rational basis review of Plaintiffs' Equal Protection claims, Defendants have failed to demonstrate any rational basis in the summary judgment record to establish any cost savings, efficacy concerns, or other purported non-discriminatory justifications for the Exclusions. (*See* ECF 170, at 17-18.) They merely rehash arguments from their original papers seeking summary judgment. Plaintiffs have already demonstrated the lack of record support for any non-discriminatory justifications for the Exclusions in their Response in Opposition to Defendant [Allende's] Motion for Summary Judgment. (*See, e.g.*, ECF 137, at 3-6.) Defendants also continue to proclaim that the Exclusions do not treat men and women differently, but Plaintiffs rebutted these contentions as well in their original briefing. (*See* ECF 137, at 14-27.)

## B. Defendants' Discriminatory Intent Argument Does Not Change the Fate of the Exclusions.

Defendants seek to avoid heightened scrutiny and survive rational basis review by alleging a lack of discriminatory intent (ECF 171, at 11-15), but as the record demonstrates, this argument is unavailing. (*See, e.g.,* ECF 123, at 27-29; ECF 137, at 29-34; ECF 139, at 9, 14-17.) While Defendants would like this Court to believe they are innocent bystanders to the discrimination, arguing "DMS has never advocated for the addition of any category of benefits to the Plan" (ECF 171, at 13, 14, 23), this is not supported by the record upon which the summary judgment motions are based. As shown below, Defendants explicitly acknowledge being made aware in at least as early as 2016 that the Exclusions constitute impermissible sex discrimination against transgender state employees under Section 1557 and the Mental Health Parity Act, yet they willfully chose to keep the Exclusions in the Plans and did not recommend any changes to the legislature.

First, Defendants misrepresent their discriminatory actions as failure to affirmatively advocate for the *coverage of additional benefits*, as opposed to failure to advocate for the *removal of an unlawful exclusion* that they knew discriminated against transgender employees. (*Id.; see also* ECF 141, at 12 ("Plaintiffs' mischaracterization of this history as an affirmative decision by

DMS not to change the exclusion… does not create an inference of discriminatory intent.").) Defendants were warned by their third-party administrators, upon whose expertise the Department readily admits reliance, and by their own contractors, who were retained to review the Plans for compliance, that maintaining the Exclusions violated federal antidiscrimination laws. (ECF 123, at 27-29; ECF 136, at 23-24.) Defendants *chose* not to make changes to the Exclusions, and *chose* not to share the warnings and recommendations with the Legislature, as confirmed by the Chief of Staff of DMS. (ECF 118-13, Fillyaw, 214:23-215:4 (in response to question "[w]ho made the decision here that no change to the benefit document was necessary?" the DMS Chief of Staff Tami Fillyaw responded "So I, as a plan administrator, in consultation with the Office of General Counsel, would have *determined that the exclusion remained in place*."); *see also* at 116:20-117:4 (confirming Mercer informed DMS that Section 1557 impacted the state plan exclusion for gender reassignment or modification services and supplies and confirming DMS "*determined not to* make any changes"); *see also* 203:16-21 (DMS did not communicate to the Legislature the Florida Blue legal team's opinion that the plan should provide coverage for [gender] reassignment surgery)). It is DMS, in fact, who *drafts* the State Plans, including the proposed benefits and exclusions, and then submits to

the legislature only for *approval.* (ECF 118-9, 18:10-12; ECF 118-13, 140:5-9.) The decision by DMS not to make changes was confirmed by other agency witnesses as well. (*See, e.g.,* ECF 118-9, DMS-Stokes, 44:19-22 (Q: "So was there was a determination not to make any changes to the gender reassignment exclusion by DMS; is that right?" A: "Correct.").

The effect of the Exclusions is the denial of medically necessary gender-affirming care for transgender state employees, which prevents or impedes transgender state employees from living in accordance with their gender identities. As this court held in *Dekker v. Weida* and *Doe v. Ladapo*, and as the state of Florida Defendants acknowledged in each of those cases (*see* § III(C) below), "preventing or impeding individuals from pursuing their transgender identities is not a legitimate, nondiscriminatory state interest." *Doe v. Ladapo*, No. 4:23-cv-114-RH-MAF, 2024 WL 2947123, at *16 (N.D. Fla. June 11, 2024); *see also id.* at *29 ("whether based on morals, religion, unmoored hatred, *or anything else*, prohibiting or impeding a person from conforming to the person's gender identity rather than to the person's natal sex is not a legitimate state interest. The defendants have acknowledged this.") (emphasis added); *see also Dekker v. Weida,* 679 F. Supp. 3d 1271, 1279 (N.D. Fla. 2023).

Despite Defendants' clear admissions in the record regarding the lack of any rational justification for the Exclusions and the knowledge that the Plans continue to exclude care that is *not* experimental nor investigational, and which their own expert has admitted is sometimes medically necessary for the treatment of gender dysphoria (*see supra* § I), in addition to the understanding that the Exclusions violate the rights of their transgender state employees (*see supra* § III(B)), Defendants have *chosen* year after year not to remove the Exclusions, nor to even recommend their removal to the Florida legislature (*see supra* § I, § III(B)). Plaintiffs have clearly demonstrated discriminatory intent.

### C. *Doe v. Ladapo* Supports Plaintiffs' Equal Protection Claims

Subsequent to the filing of Plaintiffs' Supplemental Brief, this court issued its Order on the Merits in *Doe v. Ladapo*, a case mentioned in Plaintiffs' Supplemental Brief (ECF 170, at 15), which is more directly controlled by *Eknes-Tucker* than the instant case. The court in *Doe* distinguished the facts proven at trial regarding Florida's ban on gender-affirming treatment for minors from the narrow preliminary allegations raised in the *Eknes-Tucker* case.

On June 11, 2024, this Court issued an order after a full trial on the merits *in Doe,* finding that the challenged Florida statute and administrative

rules banning access to gender-affirming care for transgender minors, and restricting access to gender-affirming care for transgender adults, violated the Equal Protection Clause regardless of the level of scrutiny applied. *Doe,* 2024 WL 2947123, at *25-38.

Acknowledging that *Eknes-Tucker* is pending rehearing *en banc* and that the case was presented to the 11th Circuit "on limited claims and an abbreviated record," Judge Hinkle's order nevertheless addresses the claims under both intermediate scrutiny and rational basis. *Id.* at *11 ("[a]ddressing the issues both ways—both as will be proper if *Eknes-Tucker* remains the law of the circuit and as will be proper if the opinion is vacated—may allow the circuit to address this case when it gets there without a remand and the attendant further delay."); *see also, id.* at *12 ("In sum, this order follows *Eknes-Tucker* as the currently binding law of the circuit. But the order includes the analysis that would apply both based on, and without regard to, Eknes-Tucker."). The Order further explains, with regard to *Eknes-Tucker,* that circuit decisions are binding on issues of law, not on issues of fact, so "to the extent the result there turned only on the facts established by that incomplete record, the decision does not control factual findings properly made on the complete record in the case at bar. Distinguishing legal from

factual issues is not always easy. Addressing all the issues here will help ensure nothing is missed." *Id.* at *11.

Like Plaintiffs argue in their Supplemental Brief (ECF 170), Judge Hinkle noted that *Eknes-Tucker* is "only one of four recent Eleventh Circuit decisions addressing transgender issues[,]" finding that, "to the extent the holdings [in *Glenn, Adams,* and *Lange*] are inconsistent, *Glenn,* as the oldest, is binding." *Id. (citing Monaghan v. Worldpay US, Inc.,* 955 F.3d 855, 862 (11th Cir. 2020) ("Our adherence to the prior-panel rule is strict, but when there are conflicting prior panel decisions, the oldest one controls").

The state of Florida Defendants have made nearly identical arguments in *Doe v. Ladapo, Dekker v. Weida,* and the instant case. Defendants attempt to distinguish decades of binding Supreme Court precedent that drawing lines based on sex triggers intermediate scrutiny, by arguing the differential treatment is based on diagnosis or medical condition, rather than sex. As Judge Hinkle aptly noted, "this does not change the fact that this is differential treatment based on sex[,]" as "the *reason* for sex-based differential treatment is the purported *justification* for treating the natal male and natal female differently" but the state "cannot avoid [] intermediate scrutiny by saying there is a good reason for treating males and females differently." *Doe,* 2024 WL 2947123, at *13. (emphasis in original). The court also rejected the *Doe*

Defendants' argument that it was differential treatment based on diagnosis, not transgender status, holding that this distinction was "just semantics." *Id.* at *14 (finding the prohibitions on gender-affirming care in *Doe* were based on transgender status, just like those in *Lange,* 101 F.4th at 799 (health plan's categorical exclusion of gender-affirming surgery denies coverage based on transgender status), and *Kadel v. Folwell,* 100 F.4th 122, 144-49 (4th Cir. 2024) (en banc) (gender dysphoria diagnosis is a proxy for transgender status).[2] Thus, the court reasoned "[h]ere, as in *Lange* and

---

[2] In so holding, the Fourth Circuit analyzed and rejected the two arguments raised by the *Kadel* defendants for why gender dysphoria is not a proxy for transgender status, arguments that were raised for the same purpose by Defendants in the instant case (ECF 125, at 20-24; ECF 135, at 11-13.) *Kadel* defendants, relying largely on *Geduldig,* argued: "(1) not all transgender people have gender dysphoria" (including that "not all transgender people seek gender-affirming surgery") and "(2) the policies apply to everyone, not just transgender people." *Kade*l, 100 F.4th at 143-44. The Fourth Circuit made quick work of distinguishing **Error! Main Document Only.***Geduldig* (*id.* at 144-47) and demonstrating that Supreme Court precedent requires a finding that "gender dysphoria is so intimately related to transgender status as to be virtually indistinguishable from it." *Id.* at 146. This is because the "excluded treatments aim at addressing incongruity between sex assigned at birth and gender identity, the very heart of transgender status. In contrast to pregnancy—which is a condition that can be described entirely separately from a person's sex—gender dysphoria is simply the medical term relied on to refer to the clinical distress that can result from transgender status." *Id.* The Fourth Circuit also rejected the rationale that gender dysphoria is not a proxy for transgender identity because "not all transgender people have gender dysphoria," noting that "a law is not immune to an equal protection challenge if it discriminates only against some members of a protected class but not others." *Id.* at 144. This

*Kadel*, the prohibition of gender-affirming care is based on transgender status." *Doe,* 2024 WL 2947123 at *14.

The Exclusions, like the challenged provisions in *Doe,* directly and explicitly target transgender people. *Id.* at *16 ("[t]here is no facially neutral decision[,]" as the provisions "explicitly apply only to transgender [people]"). This court reasoned that the *Doe* Defendants' argument that the laws regulated only medical procedures was "akin to saying that prior to *Brown v. Board of Education*, state legislatures acted not to target African Americans but only to regulate schools—and that this was not purposeful discrimination because all students, black and white equally, were required to go to school with students of their same race." *Id.* at *16; *see also, id.* ("[o]ne does not need the *Arlington Heights* factors to discern whether this statute and these rules single out transgenders. They plainly do.").

In finding that the challenged provisions in *Doe* discriminated on the basis of sex, this court applied the simple, but binding, analyses of both *Bostock* and *Adams*— i.e. if one must know the sex of a person to know whether a provision applies to the person, the provision draws a line based on sex— to conclude the challenged provisions, like the Exclusions here, did

---

finding is supported by a litany of Supreme Court precedent establishing that "discrimination *within* a certain class does not mean there is no discrimination *between* classes." *Id.* at 144-46 (collecting Supreme Court cases).

exactly that. *Id.* at \*13 ("Consider a [person] that a physician wishes to treat with testosterone. Under the challenged statute [or Exclusions], is the treatment legal or illegal [covered or excluded]? To know the answer, one must know the [person's] sex. If the [person] is a natal male, the treatment is legal [covered]. If the [person' is a. natal female, the treatment is illegal [excluded]. This is a line drawn on the basis of sex, plain and simple." (*citing Brandt ex. rel. Brandt v. Rutledge,* 47 F.4th 661, 669 (8th Cir. 2022), and *Adams v. St. Johns Cnty.,* 57 F.4th 791, 801 (11th Cir. 2022) (applying intermediate scrutiny to a policy under which entry into a designated bathroom was legal or not depending on the entrant's natal sex.)).

Similarly, in applying the rationale of this Circuit's oldest, and thus controlling, binding precedent -- *Glenn v. Brumby,* 663 F.3d 1313 (11th Cir. 2011) -- this court held that the provisions challenged in *Doe* also triggered intermediate scrutiny because the provisions drew a line based on gender nonconformity, which includes transgender status. *Id.* at \*13-14 (noting that *Eknes-Tucker's* distinguishing of *Glenn* based on it dealing with employment did not explain why that affected the applicable level of scrutiny as opposed to the separate question of whether the treatment *survived* the appropriate scrutiny). This court also found that adverse treatment of transgender individuals separately warranted heightened scrutiny under *Carolene*

*Products,* applying the factors from *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 447–50 (1985), and concluding that "transgender individuals are a discrete and insular minority." *Id.* at \*14.

Finally, like Defendants in the instant case and in *Dekker*, the *Doe* defendants invoke the same flawed logic of *Geduldig* to argue that the prohibitions on gender-affirming care do not discriminate based on sex because there are members of the disfavored class on both sides of the classification. *Id.* at \*15. Judge Hinkle makes swift work of distinguishing *Geduldig*, as, under the challenged provision in *Geduldig*, "men and women were treated the same: nobody had health coverage for pregnancy[;]" whereas here, cisgender individuals have access to the prohibited medical care, but transgender individuals do not. *Id.* (to know whether treatment with one of the prohibited medications is legal, one must know whether the patient is transgender, and to know whether treatment with testosterone or estrogen is legal, one must know the patient's natal sex). "This is differential treatment based on sex and transgender status. *Geduldig* is not to the contrary." *Id.* (*citing Kadel,* 100 F.4th at 145-47).

Like the care categorically denied under the Exclusions, the ban at issue in *Doe* also "flatly den[ied] transgender individuals safe and effective medical treatment—treatment with medications routinely provided to others

with the state's full approval so long as the purpose is not to support the patient's transgender identity." *Id.* at *5. *Doe* not only provides support for many of Plaintiffs' arguments, but also relies on similar facts as appear in the record of the instant case supporting Plaintiffs' claims, including: (a) reliance on the "well-established standards of care for the treatment of gender dysphoria," which are supported by "the overwhelming weight of medical authority" and are widely followed by well-trained clinicians, the U.S. Department of Health and Human Services, and every major medical organization (*Doe,* 2024 WL 2947123, at *5-7; *compare* ECF 123, at 4-7); (b) overwhelming clinical evidence supporting the need for the treatments banned by the Exclusions and demonstrating "the denial of this treatment will cause needless suffering for a substantial number of patients and will increase anxiety, depression, and the risk of suicide" (*Doe,* 2024 WL 2947123, at *7; *compare* ECF 123, at 4-5); (c) Dr. Levine's acknowledgment that gender-affirming care is sometimes appropriate and should not be banned (*Doe,* 2024 WL 2947123, at *4, 7; *compare* ECF 123, at 4-6) (the state of Florida Defendants rely upon Dr. Levine as an expert in *Doe*, in Dr. Levine is the sole expert relied upon by Defendants DMS and Satter). Further, like in the instant case, the "laundry list of purported justifications for the statute and rules" put forth by the *Doe* defendants were analyzed and

dismissed by this court as "largely pretextual, in any event, do not call for a different result." (*Doe*, 2024 WL 2947123, at *32-37).

## IV.    Conclusion

The undisputed facts in the record support summary judgment in favor of Plaintiffs on their Title VII claim against DMS and on their Equal Protection claim against Allende. Defendants' motion for summary judgment should be denied as their claims are not supported legally or factually. The Court need not wait for resolution of pending *en banc* petitions in the *Lange* and *Eknes-Tucker* cases.

Respectfully submitted on this 21st day of June, 2024.

/s/ Simone Chriss

**SIMONE CHRISS**
Fla. Bar No. 124062
simone.chriss@southernlegal.org
**JODI SIEGEL**
Fla. Bar No. 511617
jodi.siegel@southernlegal.org
Southern Legal Counsel, Inc.
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890

**DANIEL TILLEY**
Fla. Bar No. 102882
dtilley@aclufl.org
**CAROLINE MCNAMARA**
Fla. Bar No. 1038312
cmcnamara@aclufl.org

ACLU Foundation of Florida
4343 West Flagler St., Suite 400,
Miami, FL 33134
(786) 363-2714

*ATTORNEYS FOR ALL PLAINTIFFS*

**JEFFREY HEARNE**
Fla. Bar No. 512060
jhearne@legalservicesmiami.org
**JOCELYN ARMAND**
Fla. Bar No.44264
jarmand@legalservicesmiami.org
Legal Services of Greater Miami, Inc.
4343 W Flagler Street, Suite 100
Miami, FL 33134
(305) 438-2403

*ATTORNEYS FOR PLAINTIFF
MURPHY*

## CERTIFICATE OF WORD COUNT

Pursuant to N.D. Loc. R. 7.1(F), I certify this Response in Opposition to Defendants' Supplemental Brief (ECF 171) contains 5,540 words, which includes headings, footnotes, and quotations, but does not include case style, signature block or Certificates of Word Count and Service.

/s/ Simone Chriss
Counsel for Plaintiffs