UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JAMI CLAIRE, KATHRYN LANE,
and AHMIR MURPHY

    Plaintiffs,

v.                                    CASE NO. 4:20-cv-0020-MW-CAS

FLORIDA DEPARTMENT OF
MANAGEMENT SERVICES and
PEDRO ALLENDE, in his official
Capacity as Secretary of the Florida
Department of Management Services.

    Defendants.
_____

**DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

    Defendants, FLORIDA DEPARTMENT OF MANAGEMENT SERVICES, and PEDRO ALLENDE in his official capacity as Secretary of the Florida Department of Management Services (collectively, "Defendants"), by and through undersigned counsel and pursuant to this Court's order (Doc. 166), hereby replies to Plaintiffs' Response to Defendants' Supplemental Brief (Doc. 173) as follows:

1

I. **Plaintiffs have not satisfied their burden to show that the Plan was motivated by invidious discrimination or that the justifications for the Plan exclusions are irrational.**

Defendants have exhaustively described, cited, and discussed the record evidence prior to this round of supplemental briefs. Plaintiffs assert that throughout all of their motions, responses, replies, and supplemental briefs, Defendants have "never provided record citations to support [their] contentions." This is plainly incorrect. Specifically, in their response, Plaintiffs allege that (1) Defendants' "loose estimation" of the cost of coverage expansion is a post-hoc justification that should not be considered by the Court (Doc. 173, p. 2-4); and (2) Defendants have no record evidence to support the assertion that the efficacy of gender-reassignment surgery as a treatment for gender dysphoria remains unclear.

Defendants' justification for the coverage exclusion is simple and rational: At the time the Plan was implemented in the 1970s, gender or sexual reassignment surgery was experimental and almost universally excluded by health insurance plans. (Doc. 125 p. 9.; Doc. 118-9.Stokes p. 19:14 -22:19; Doc.122-25 pp. 5, 10, 18). Since establishing the State Health Plan, DMS has consistently declined to recommend adding costs to the Plan. (Doc. 135, p. 3; Doc. 118-9.Stokes p. 15:15-16:1). All Plan coverage expansions have occurred as a result of actions by the Florida Legislature. (Doc. 125 p. 9-10). Prompted by litigation, DMS estimated that

adding gender or sexual reassignment services to the Plan will cost over a million dollars annually. *See infra* p.3 and note 1.

Plaintiffs critique Defendants' estimation of the potential cost of expanding the Plan to include gender or sexual reassignment services. While DMS never conducted a formal analysis of the cost of including this service (because it has always been excluded and DMS has not recommended expanding the Plan to include such services), DMS's corporate representative testified that it obtained cost information from one of its contracted providers, Florida Blue. (Doc. 118-9.Stokes 83:16-84:15). Defendants' cost estimate is a simple mathematical inference regarding the potential costs of removing the exclusions based on the testimony of Randy Stokes, who provided the Florida Blue calculation of $0.63-$0.65 in additional costs per member, and the number of Plan members, all of which is clearly within the record.[1]

---

[1] In short: 0.64¢ (in costs per beneficiary based solely on the Florida Blue estimate) (Doc. 118-9.Stokes 84:10-15) multiplied by 363,000 (estimated total membership of the State Health Plan in November 2020) (Doc. 118-9.Stokes26:6-9) multiplied by 12 months (one calendar year) would amount to $2,787,840 in estimated additional cost per calendar year to the State Health Plan for surgical coverage of gender dysphoria. Alternatively, excluding retirees and their dependents from this calculation and only counting enrolled state employees totaling 141,000 in November 2020 (Doc. 118-9.Stokes 25:25-26:5), the estimated cost using the same equation would be $1,082,880 in cost to the plan per year. "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Communications*, 508 U.S. 307, 315 (1993).

Plaintiffs argue that, because Defendants didn't examine whether adding services to the Plan would save money, their proffered justification for the exclusion does not satisfy rational basis. (Doc. 173 p.14-15). This is plain burden shifting. Plaintiffs misunderstand both the nature of rational basis scrutiny and their burden under the rational basis test.

First, the rational basis standard is not rigorous, and does not hinge on evidence of what actually motivated the governmental actor. Courts simply look at what rational basis might have motivated the policy at issue. *Joel v. City of Orlando,* 232 F.3d 1353, 1358 (11th Cir.2000). On rational basis review, a classification "is accorded a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319–21 (1993); *McGowan v. State of Md.*, 366 U.S. 420, 425-26 (1961).

Second, it is *Plaintiffs'* burden to show that the justification lacks a rational basis. *FCC v. Beach Comms., Inc.*, 508 U.S. 307, 313 (1993). A governmental defendant "has no obligation to produce evidence to sustain the rationality of a statutory classification." *Heller*, 509 U.S. at 320; *see also Leib v. Hillsborough Cnty. Pub. Trans. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009) (finding in an equal protection context, "the burden is on the one attacking the [governmental activity] to negate every conceivable basis that might support it, even if that basis has no foundation in the record."). Plaintiffs have no record evidence to rebut Defendants' common-sense record evidence establishing that adding benefits to the Plan will cost

the State of Florida more money, leaving Plaintiffs no choice but to baselessly assert that the Court should not afford this evidence any weight.

A governmental defendant's justification for its conduct does not have to be based on a formal study or exhaustive cost-benefit analysis; the justification only has to have a rational basis and not contradict the proffered goals in light of the record evidence. *See City of Cleburne, Tex v. Cleburne Living Center*, 473 U.S 432, 446 (1985); *Beach Communications, Inc.*, 508 U.S. at 313-15. Plaintiff's assertion that Defendants have "failed to demonstrate any rational basis in summary judgment to establish any cost savings, efficacy concerns, or other purported non-discriminatory justifications for the exclusions" (Doc. 173 p.13) fall apart from simple comparison of Defendants' rational justifications for its plan exclusions with the deficient justification offered by the city defendant in *Cleburne.*

In *Cleburne*, the bases for the city's refusal to grant a permit was not financial, and they clearly contradicted simple inferences in light of the record evidence. *Cleburne,* 473 U.S at 449. The most straightforward example being the city defendant refused to provide plaintiffs with a land permit because the city was concerned that plaintiff's "facility was across the street from a junior high school, and feared that the students might harass the [mentally disabled] occupants of [plaintiff's] home." *Id.* The Court found this rationale contradictory because the junior high school in question had thirty (30) mentally disabled students. *Id.* In

essence, if the city was legitimately concerned about harassment, the city should have also intervened to prevent the thirty (30) mentally disabled students from being integrated with the student body at the school, but record reflected it had not. *Id*.

The Plaintiffs have not pointed to any inherent contradictions, such as those in *Cleburne*, to overcome Defendants' reason for excluding gender or sex reassignment procedures—that expanding the coverage at issue is anticipated to cost the State Health Plan additional money. (Doc. 118-9.Stokes 88:3-10). This rationale is legally sufficient to withstand rational basis review. *See Maher v. Roe*, 432 U.S. 464, 479 (1977); *Geduldig v. Aiello*, 417 U.S. 484, 495-96 (1974).

Further, contrary to Plaintiffs' assertions, Defendants have a strong evidentiary basis to question the efficacy of gender or reassignment surgery as a treatment for gender dysphoria based on the record evidence developed in this case. Defendants have repeatedly cited Dr. Levine's testimony, which demonstrates that many experts still have concerns about the lack of peer reviewed literature confirming the efficacy of gender reassignment surgery as a treatment for gender dysphoria.[2] Dr. Levine explained that there has yet to be a formal efficacy trial for

---

[2] As Dr. Levine defined it: "Efficacy is the product of scientific study, usually a controlled study, where we compare the results of a [medical] intervention with the results of a non-intervention or sham intervention. That's how we recognize that the treatment for [a] surgery or [a] medication has a 70 percent effectiveness, and a 12 percent cure rate, and the rest an improvement rate." (Doc. 118-20.Levine 172:2-173:23) In spite of Plaintiffs' assertions that the medical community has "well established standards of care for the treatment of gender dysphoria" (Doc. 173 p. 24)

hormone treatments or gender reassignment surgeries. (Doc. 118-20.Levine 172:2-173:23). Moreover, as Dr. Levine opined, patients may continue to experience ongoing psychiatric problems stemming from their psychiatric condition, because in his view, gender reassignment surgery is not curative. (Doc. 118-20.Levine 168:3-170:24).

Dr. Levine's testimony demonstrates that, while gender reassignment surgery is currently considered to be less experimental than it was when the Plan exclusion was created in the 1970s, medical practitioners like Dr. Levine are still debating the efficacy of these treatments in light of the limited number of academic trials and studies.[3] (Doc. 141 p. 3-4.). The Centers for Medicare and Medicaid reached a similar conclusion regarding the efficacy of gender or sexual reassignment services. (Doc. 135 p. 3.) Concerns regarding the efficacy of and capacity to consent to gender or sexual reassignment services in children (Doc. 118-20.Levine 105:20-107:6, 125:18-128:13, 153:4-155:25), are further rational justifications for the Plan

---

the record evidence contains little peer reviewed data that touches on statistical efficacy as Plaintiffs largely rely on WPATH publications on standards of care, not "gold standard" double blinded controlled studies or other equally reliable studies that "sufficiently circumvent ethical questions."(Doc. 118-12.Ettner 106:5-19).

[3] For Title VII purposes, a court's evidentiary inquiry for intent is set at the time of the exclusion's creation. *See AT & T Corp. v. Hulteen*, 556 U.S. 701, 712 n.5 (2009). The same can be said for an analysis under Equal Protection. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). The record evidence demonstrates that there was a rational basis for the exclusions at the time of their creation and that there still is rational basis in the present day.

exclusion, and Defendant maintains that these justifications were not contemplated when the State Health Plan was created in the 1970s.

## II.     Plaintiffs Misconstrue The Holding In *Newport News.*

With respect to their Title VII claim, Plaintiffs rely on *Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669 (1983) for the proposition that *General Electric Co. v. Gilbert,* 429 U.S. 125 (1976), has been overruled by the Supreme Court. (Doc. 173 p. 11). But Plaintiffs misconstrue the holding and rationale of *Newport News*, in which the Supreme Court simply recognized that Congress repudiated the holding in *Gilbert* with *respect to pregnancy* by passing the Pregnancy Discrimination Act (PDA).

Although the PDA was "corrective legislation" passed by Congress in response to *Gilbert*, it did not set aside the underlying reasoning or rationale of *Gilbert*, which interpreted the meaning of "because of sex" under Title VII.[4] As the Court explained in *Newport News*, members of Congress in 1978 repudiated the

---

[4] Justice Stevens, one of the dissenting judges relied on by Congress in 1978 when passing the PDA, recognized that the PDA expanded the original meaning of because of sex when he wrote his concurring opinion in *Hulteen*. *See AT & T Corp. v. Hulteen,* 556 U.S. 701, 716-17 (2009) In spite of his dissent 30 years prior in *Gilbert*, Justice Steven's acknowledged that even after passage of the PDA, *Gilbert's* holding still controlled to the extent the PDA was not retroactively applicable to benefit programs that pre-dated its passage 1978. *Id.* As a matter of *stare decisis*, *Gilbert's* rationale clearly remains good law for employee benefit matters not addressed by the broad language of the PDA.

Court's holding in *Gilbert* by expressly adding pregnancy-related disabilities as a potential basis for sex discrimination under Title VII. *Newport,* 462 U.S. at 678-679, n. 17.[5]

Needless to say, the U.S. Congress of 1978 was not the U.S. Congress of 1964. The PDA clarified that for all Title VII purposes, discrimination based on a woman's pregnancy was on its face discrimination because of her sex. *Newport,* 462 U.S at 684. But this was not the case when Title VII was passed in 1964, as the *Gilbert* Court clearly articulated. *Gilbert* constituted the final word on what "because of sex" under Title VII meant at the time *Gilbert* was decided. *AT & T Corp. v. Hulteen*, 556 U.S. 701, 712 n.5 (2009). The Supreme Court subsequently confirmed that *Gilbert* declared the scope and meaning of "because of sex" under Title VII as it was originally written. *Id*.

---

[5] "When Congress amended Title VII in 1978, it unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision…. The House Report stated, It is the Committee's view that the dissenting Justices correctly interpreted the Act. Similarly, the Senate Report quoted passages from the two dissenting opinions, stating that they correctly express both the principle and the meaning of Title VII. Proponents of the bill repeatedly emphasized that the Supreme Court had erroneously interpreted Congressional intent and that amending legislation was necessary to reestablish the principles of Title VII law as they had been understood prior to the Gilbert decision. Many of them expressly agreed with the views of the dissenting Justices."

*Gilbert'*s rationale, that classifications on the basis of a medical diagnosis unique to one sex or the other do not constitute facial sex discrimination, is superseded only to the extent that Congress enumerated specific medical diagnoses within the meaning of "because of sex."[6] The holding in *Newport News* cannot make the PDA Amendments moot,[7] or render *Gilbert* irrelevant to other medical conditions not included within the meaning of "because of sex." 42 U.S.C. 2000e(k). Because gender dysphoria and gender reassignment services are not enumerated within Title VII's definition of "because of sex," excluding their coverage or treatment under the Plan is not facially discriminatory on the basis of sex under Title VII.

---

[6] Evidencing the fact that medical conditions are only considered within the definition of "because of sex" because of the Pregnancy Discrimination Act, the amended language itself provides an express carve out for elective abortions, a medical procedure only women can receive for the medical diagnosis, pregnancy. 42 U.S.C 2000(k); *see* H.R. Rep. 95-947 at 4752-56. The Supreme Court has categorically stated multiple times that this medical procedure, unique to women, can be excluded from health plans without discriminating on the basis of sex *Compare Gilbert,* 429 U.S. at 134-36, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271-73 (1993), *and Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 236-37 (2022), *with Eknes-Tucker v. Governor of Alabama,* 80 F.4th 1205, 1227-30 (11th Cir. 2023).

[7] *C.F.Market Co. v. Hoffman*, 101 U.S. 112, 115, (1879) ("A statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (internal quotation omitted.) "It is [a court's] duty, to give effect, if possible, to ever clause and word of a statute." *United States v. Menasche*, 348 U.S. 528, 534-35 (1955)

### III. Plaintiffs mischaracterize the evidence of the Plan's evaluation of Section 1557 and the Mental Health Parity Act.

Plaintiffs mischaracterize the efforts made by DMS in 2016 to assess whether the State Health Plan complied with federal administrative rules implementing Section 1557 and The Mental Health Parity Act. (Doc. 125, p.10; Doc. 135 p. 7-8). Plaintiffs argue that, because DMS's vendors communicated with DMS about the HHS administrative rule changes under Section 1557 (Doc. 118-13.Fillyaw 116:20-117:25), such communication alone is proof that the Plan exclusion discriminates on the basis of transgender status. (Doc. 173 p.15-16).

DMS never evaluated whether the exclusion for gender or sexual reassignment services was a violation of Title VII or whether gender dysphoria is inextricably linked with sex in a manner that makes exclusion of some, but not all, treatment for gender dysphoria sex-based discrimination. Instead, the inquiry focused on a rule prohibiting categorical insurance coverage exclusions for health services related to gender transition. *See* 45 C.F.R. § 92.207(b); (Doc. 118-13.Fillyaw 114:13-115:12, 123:9-124:14). State Plan Administrator Fillyaw explained that DMS's goal was to determine whether the Plan had an impermissible categorical exclusion to gender transition, not to decide whether the coverage exclusions for surgical procedures on their own constituted sex-based discrimination. (Doc. 118-13.Fillyaw 125:25-126:21, 232:19-237:8). Fillyaw, in tandem with the DMS's General Counsel's office, correctly determined that the State

11

Health Plan did not run afoul of Section 1557 or the Mental Health Parity Act because the Plan did not have a categorical exclusion to treatments for gender dysphoria (as mental health and counseling services were covered under the Plan) and therefore that the Plan was in compliance with the rules at issue. (Doc. 118-13.Fillyaw 116:20-124:14, 212:22-216:3). Plaintiffs provide no evidence that any DMS employee was motivated by "preventing or impeding individuals from pursuing their transgender identities" or by sex-based, discriminatory animus when the state health plan was enacted; nor have they established with record evidence or binding case law that classifications on the basis of medical conditions can constitute facial sex-based discrimination under Title VII in light of the language of 42 U.S.C. 2000e(k) and the binding precedent of *Gilbert*.

Simply saying that DMS was motivated by animus towards transgender individuals, no matter how many times Plaintiffs may say it, does not turn their assertions into record evidence of discriminatory intent. Parroting the flawed holding of *Kadel v. Falwell*, 100 F.4th 122 (4th Cir. 2024), does not explain why classification on the basis of gender dysphoria constitutes facial sex discrimination on the basis of transgender status without any language in Title VII expressly stating so.[8] Plaintiffs have not proffered any evidence sufficient to create a triable issue of

---

[8] Plaintiffs' reliance on *United States v. Carolene Products*, 304 U.S. 144, 152 n.4 (1938) to apply heightened scrutiny does not bypass the holding *of Dobbs* on the issues of classifications by medical conditions and treatment.

12

fact as to discriminatory intent on either their Equal Protection or Title VII claims.[9] Therefore, all of their claims fail as a matter of law.

## Conclusion

WHEREFORE, for the reasons set forth herein, and in Defendants' previous memoranda in support of summary judgment (Docs. 125, 126, 135, 140, 141,160, and 171), this Court should dismiss Plaintiffs Claire and Murphy's Equal Protection claims for lack of standing; grant summary judgment in favor of Defendant Allende on the remaining Equal Protection claim; and withhold ruling on the Title VII claim until mandate is issued in *Lange*.[10]

Respectfully submitted this 28th day of June 2024.

---

[9] *Compare* Chapter 2024-223 p. 469, Laws of Fla. §8(3)(c) *with* Chapter 2016-66 p.418, Laws of Fla. §8(3)(c) stating in pertinent part: "the benefits provided under each of the plans shall be those benefits as provided in the current State Employees PPO Plan Group Insurance Booklet and Benefit Document, and current Health Maintenance Organization contracts and benefit documents, including any revisions to such benefits approved by the legislature."

[10] The United States Supreme Court recently granted certiorari review in a hormone therapy case which similarly held that classifications based on medical conditions affecting transgender persons were not facially discriminatory. *Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023), *cert. dismissed in part of sub nom. Doe v. Kentucky*, 144 S. Ct. 389 (2023), and *cert. granted sub nom. United States v. Skrmetti*, 23-477, 2024 WL 3089532 (U.S. June 24, 2024).

HENRY BUCHANAN, P.A.

/s/ Miriam R. Coles
MIRIAM R. COLES
Florida Bar No. 58402
mcoles@henryblaw.com
J. STEVEN CARTER
Florida Bar No. 896152
Post Office Drawer 14079
Tallahassee, Florida 32317-4079
(850) 222-2920: Telephone
(850) 224-0034: Facsimile
*Counsel for Defendants*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rules 5.1 and 7.1, undersigned counsel certifies that this motion consists of 3,188 words and is typed in Times New Roman, font size 14.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed via the CM/ECF system which will send electronic notification to all counsel of record on this 28th day of June 2024.

/s/ Miriam R. Coles
ATTORNEY
