**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

JAMI CLAIRE et al.,

    Plaintiffs,

vs.                                                                  Case No. 4:20-cv-00020-MW/MAF

FLORIDA DEPARTMENT OF
MANAGEMENT SERVICES et al.,

    Defendants.
_____/

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE**
**TO PLAINTIFFS' SUPPLEMENTAL BRIEF**

**I.     It is Black Letter Law That This Court Must Follow Eleventh Circuit**

Each Plaintiff has a Title VII claim, and these claims are controlled by *Lange v. Houston Cnty.*, 101 F.4th at 793, 798-99 (11th Cir. 2024). Defendants continue to ask this Court to simply ignore binding precedent, based on no more than the State's disagreement with the Eleventh Circuit's decision in *Lange.* (*See generally* ECF 171, at 16-18; ECF 172, at 2-8.) However, Defendants' opinion that "Lange was wrongly decided" (ECF 171, at 16) and their "concern" about the hypothetical consequences of the Eleventh Circuit's holding on other conditions (*id.* at 6) does not compel nor permit this Court to ignore *Lange* (and *Glenn v. Brumby*, 663 F.3d 1312 (11th

Cir. 2011)).[1]

By contrast, Plaintiffs' arguments regarding the equal protection claim explain that this Court should rule in Plaintiffs' favor and show how to do so while following the Eleventh Circuit's ruling in *Eknes-Tucker v. Gov'r of Ala.,* 80 F.4th 1205 (11th Cir. 2023). (*See generally* ECF 161, at 6-14; ECF 170, at 6-19; ECF 173, at 11-13, 17-25.) However, as Plaintiffs notified the Court, only one Plaintiff  - Kathryn Lane - still has standing to seek injunctive relief under equal protection. (ECF 170, at 2-3.) While Plaintiff Lane has demonstrated[2] that she can succeed on her equal protection claim under the appropriate applicable heightened scrutiny standard, and indeed under any level of review, this Court can avoid the constitutional issue by resolving this case under Title VII, as explained below (*see infra*, at 3-6).

---

[1] Despite Defendants' attempts at creative reframing to support their position that only *Eknes-Tucker*, *Geduldig,* and *Dobbs* are binding and relevant to this analysis, the Eleventh Circuit in *Eknes-Tucker* did not overrule *Glenn v. Brumby*, nor did the Supreme Court in *Dobbs* overrule *U.S. v. Virginia,* 518 U.S. 515, 555 (1996), which demands that all sex classifications be subject to heightened scrutiny. Defendants disregard that lower courts are bound to follow Supreme Court precedent "even if the lower court thinks the precedent is in tension with some other line of decisions." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (quotation omitted).

[2] (*See* ECF 170, at 6-1; ECF 173, at 11-25.)

## II. This Court Can Resolve This Case on Plaintiffs' Title VII Claims

As Plaintiffs noted in their Supplemental Brief and Response Brief (ECF 170, at 10-14; ECF 173, at 22), and as Defendants noted in their Response Brief (ECF 172, at 10), there is a difference of opinion in the Circuits with regard to the appropriate level of scrutiny to apply when analyzing equal protection claims involving gender-affirming medical care. The Fourth, Eighth, and Ninth Circuits have held that prohibitions on gender-affirming medical care violate the equal protection clause when subject to heightened scrutiny. *Brandt ex rel. Brandt v. Rutledge,* 47 F.4th 661 (8th Cir. 2022) (affirming preliminary injunction); *Poe ex rel. Poe v. Labrador*, No. 1:23-cv-269, 2024 WL 170678 (9th Cir. 2024) (refusing to stay preliminary injunction); *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (affirming permanent injunction on state ban on coverage). The Sixth and Eleventh Circuits have reversed preliminary injunctions based on application of rational basis review. *Eknes-Tucker,* 80 F.4th 1205 (reversing preliminary injunction); *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023) (same on 2–1 vote), *cert. granted*, *United States v. Skrmetti,* No. 23-477, 2024 WL 3089532 (MEM) (June 24, 2024).[3] The Supreme Court's grant of

---

[3] Plaintiffs note that the cases relied upon by Defendants in support of their position, *Eknes-Tucker* and *L.W.,* involve regulations on the *prescribing* of

3

certiorari is to consider the narrow issue of whether Tennessee's categorical ban on gender-affirming care for transgender adolescents violates the equal protection clause. *Id.*

With the uncertainty of how the Supreme Court will resolve this issue, this Court could utilize the principle of constitutional avoidance and resolve the instant case on Plaintiffs' Title VII claims without reaching the constitutional equal protection issue. *See generally Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 341, 345-46 (1936) (Brandeis, J., concurring) (setting out fundamental principles of constitutional adjudication, including that, "The Court will not 'anticipate a question of constitutional law in advance of the necessity of deciding it'") (*quoting* earlier authorities in part); *see also Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that

---

gender-affirming care applicable only to *minors*; whereas the majority of the cases relied upon by Plaintiffs, including *Kadel, Dekker,* and *Lange* involve facts that are similar or identical to the instant case, i.e. prohibitions on *health insurance coverage* for all state employees. Additionally, both cases relied upon by Defendants, *Eknes-Tucker* and *L.W.*, are based on limited preliminary injunction records, whereas the two district court decisions cited by Plaintiffs were based on a full record following a trial on the merits. *Brandt v. Rutledge*, 677 F. Supp. 3d 877, 922 (E.D. Ark. 2023); *Doe v. Ladapo,* No. 4:23-cv-114-RH-MAF, 2024 WL 2947123, at *39-40 (N.D. Fla. June 11, 2024); *see also Dekker v. Weida,* 679 F. Supp. 3d 1271 (N.D. Fla. 2023) (concluding a rule and statute banning coverage of gender-affirming care under Florida's Medicaid program violated the equal protection rights of transgender Medicaid beneficiaries after a two-week trial.)

4

courts avoid reaching constitutional questions in advance of the necessity of deciding them."), *quoted with approval* in *Williamson v. Brevard Cnty.,* 928 F.3d 1296, 1316-17 (11th Cir. 2019).

Neither the Supreme Court's consideration of *L.W.*, nor the Eleventh Circuit's potential *en banc* review of *Eknes-Tucker,* will change the analysis of the Title VII claims presented in this case. In fact – right or wrong – Defendants have gone to great lengths in their briefing to distinguish Title VII from the equal protection clause, in an effort to convince this Court that *Bostock* has no bearing on Plaintiffs' equal protection claims and applies *only* in the employment context. The Supreme Court and the Eleventh Circuit have made clear, however, that the type of facial discrimination contained in the Exclusions violates the plain language of Title VII. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1743 (2020); *Lange,* 101 F.4th at 798-99; *Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766, 775 (11th Cir. 2024); *Glenn*, 663 F.3d 1312. (*See also* ECF 170, at 3-6; ECF 173, 8-11.) Plaintiffs have detailed in prior briefing why binding case law requires the rejection of Defendants' arguments that the Exclusions are not facially discriminatory nor discrimination because of sex under Title VII. (ECF 172, § II- III, at 2-8; ECF 136, at 5-27.)

## III. Defendants' Arguments Hinge on Assumptions That Elide Common Sense

Defendants hypothesize that Plaintiffs' position, which is supported by *Lange* and *Bostock,* is "[p]resumably based on their understanding that classification based on certain medical treatments constitutes facial sex discrimination." (ECF 172, at 2-3.) Defendants are wrong, however, as Plaintiffs' position is based on the plain language of the Exclusions,[4] which, on their face, explicitly make clear that the treatments are excluded if, and *only if,* the purpose of the treatment is "*gender* reassignment or modification" or "*sexual* reassignment or modification" – something that cannot be determined without comparing the member's sex assigned at birth before the treatment to how the member's sex or gender would be impacted by the treatment (i.e. whether their "sex" or "gender" has been "reassigned" or "modified").

Defendants' argument that exclusions for gender-affirming medical care do not classify based on sex hinges on the assumption that not all transgender people experience gender dysphoria. In fact, Defendants boldly claim that they "have demonstrated that transgender persons regardless of

---

[4] It is important to note that Defendants have *chosen* to keep the Exclusions in the State Plans despite warnings specifically about their conflict or potential conflict with federal nondiscrimination provisions prohibiting sex-based discrimination. (ECF 123, at 27-29; ECF 173, at 14-17.)

6

their natal sex do not all experience gender dysphoria, just as not all women experience pregnancy or pregnancy-related disabilities." (ECF 172, at 12.) The only record evidence cited by Defendants for this assertion (ECF 125, at 6-7), offers no support for Defendants' statements. Defendants cite four lines from a single deposition transcript for their position that "[s]ome, but not all, transgender individuals experience gender dysphoria." (*id., quoting* Doc.121-16, Gorton 40:21-24.)[5] However, this exchange does not provide any context as to *why* a transgender individual may not suffer from dysphoria – i.e. because they received gender-affirming care and no longer feel dysphoria related to their gender. *See Kadel,* 100 F.4th at 144, n.17 (noting that "transgender people without gender dysphoria may not suffer from gender dysphoria *because* they were treated for it") (emphasis in original).

---

[5] The additional language that Defendants rely on (ECF 125, at 6-7) to assert that they "have demonstrated that transgender persons regardless of their natal sex do not all experience gender dysphoria, just as not all women experience pregnancy or pregnancy-related disabilities" (ECF 172, at 12) is equally unavailing. There, Defendants argued that "[s]ome, but not all, individuals diagnosed with gender dysphoria seek to physically change their bodies in a manner which aligns with their gender identity as a means of easing their dysphoria." (ECF 125, at 6.) But this lacks citation to the record. The only assertion with any footing in the evidentiary record is that only a small number of patients seen by one of Plaintiffs' experts have sought "reassignment surgery" for their gender dysphoria. (*Id.*) Defendants then state, devoid of any record cites, that "some individuals with gender dysphoria may change their name or gender designation. Others may seek hormone therapy." (*Id.* at 6-7) (no record citations).

7

This lack of dysphoria may stem from being able to live in accordance with their gender identity, rather than never having experienced gender dysphoria.

Looking to the record in this case, however, shows that gender dysphoria is a severe but treatable condition, and without access to gender-affirming care, transgender individuals experience serious psychological distress, depression, anxiety, self-harm, and suicidality. (*See, e.g.,* ECF 123, at 4-6); *see also Doe,* 2024 WL 2947123, at *7 ("denial of this treatment will cause needless suffering for a substantial number of patients and will increase anxiety, depression, and the risk of suicide"). Unlike pregnancy, which is not the defining characteristic of womanhood, the Exclusions are based on a characteristic that *defines* membership in the excluded group. *See e.g., Glenn,* 663 F.3d at 1316. Living in accord with one's gender identity rather than sex assigned at birth, which the excluded care enables, is the defining characteristic of a transgender person.

Defendants have not even endeavored to provide any justifications nor record cites that would support banning access to non-surgical treatments for gender dysphoria, such as cross-sex hormones, which Defendants readily admit are excluded under the State Plans. (ECF 122-4, at 9 (ROG 53: "Admit that the State Plans do not permit coverage of hormone

replacement therapy as treatment for gender dysphoria." RESPONSE: "Admitted."); *id.* at 5 (Defendants explicitly admit "some gender-affirming care may be medically necessary to treat specific patients' gender dysphoria, depending on each specific patient's circumstances").) Yet the Exclusions prohibit coverage for *all* employees who need the excluded care for the treatment of their gender dysphoria *regardless* of the patient's specific circumstances. ECF 123, at 7-8, 11-12, 16-19; *see generally, Doe,* 2024 WL 2947123, at *34 ("Worse, the statute and rules make the same decision for everybody, without considering any patient's individual circumstances. The statute and rules do this in contravention of widely accepted standards of care.").

Next, Defendants seek to avoid heightened scrutiny and disclaim discriminatory intent by continuing to make the tautological argument that "transgender individuals are entitled to the same coverage as all State Health Plan members" (ECF 172, at 4-5), which is akin to saying "the law applies equally to all to whom is applies" – an argument that the Fourth Circuit rightly found "elides common sense." *Kadel,* 100 F.4th at 147-58; *see also McLaughlin v. Florida,* 379 U.S. `84, (1964) (the Supreme Court explicitly rejected the line of reasoning relied upon by Defendants, making clear that the notion –that a law does not discriminate if it *applies* equally to all –made

9

no sense). Defendants rely on this flawed argument throughout their briefing. (*See, e.g.,* ECF 172, at 13 (the State Plan allows a transgender male to receive hormone therapy for "an endocrine disorder or any other *covered condition*"); *id.* at 14 ("transgender women along with and all other plan members are entitled to coverage for facial plastic surgery to treat a *covered condition*"); ECF 125, at 8 ("[h]owever, if the member requires treatment for a *covered medical diagnosis*" then "the service would be covered"); *id.* ("[n]o *covered services* are denied because a member identifies as transgender"); *id.* at 24-25 ("this argument ignores the fact that both transgender and cisgender individuals – regardless of natal sex – might require and receive mastectomy for a *covered condition*, such as cancer").) As plaintiffs have explained at length (ECF 136, at 10-16), this argument fails. The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant, *see City of Los Angeles v. Patel,* 576 U.S. 409, 418 (2015), and Title VII does not merely ensure equal treatment between groups of men and women, but rather it focuses on the individual. *See Bostock*, 140 S. Ct. at 1748 ("Title VII's plain terms and [the Court's] precedents don't care if an employer treats men and women comparably as groups…"). Myriad Supreme Court cases illustrate the absurdity of Defendants' "the law applies equally to all to whom is

10

applies" argument, upon which Defendants' positions largely hinge. *See Kadel,* 100 F.4th at 147-48 (collecting Supreme Court cases with examples, i.e. "[a] tax on wearing a kippot would *apply* to non-Jews and Jews alike, but would *affect* only Jews[;]" and "[a] ban on same-sex marriage would *apply* to straight, gay, lesbian, and bisexual people equally, but would *affect* only gay, lesbian, and bisexual people;[]" and "a literacy test only required of people whose ancestors were not allowed to vote before 1866 would *apply* to everyone, but would *affect* only Black people.").

Finally, despite the fact that the Exclusions facially discriminate on the basis of sex, Plaintiffs have nevertheless demonstrated discriminatory intent, as thoroughly detailed in prior briefing. (ECF 173, at 14-17.) Additionally, the state of Florida recently codified the Exclusions challenged in the instant case into statute through Senate Bill 254 (SB 254), creating Fla. Stat. § 286.311, a law which prohibits the use of state funds, including by a state group health insurance program, for "sex-reassignment prescriptions or procedures." Fla. Stat. § 286.311(2); *see* ECF 170, at 19-21. Defendant DMS is the agency responsible for administering the state group health insurance program. (ECF 123, at 19-20.) The statutory provision codifying the Exclusions challenged in this case was determined by this Court to have been "motivated in substantial part by the plainly illegitimate purposes of

11

disapproving transgender status and discouraging individuals from pursuing their honest gender identities." *Dekker*, 679 F. Supp. 3d at 1293; *Id.* at 1292 ("the State's disapproval of transgender status—of a person's gender identity when it does not match the person's natal sex—was a substantial motivating factor in enactment of the challenged rule and statute[;]" and "this case involves invidious discrimination against transgender[ people].").

## IV. Conclusion

The undisputed facts in the record support summary judgment in favor of Plaintiffs on their Title VII claim against DMS and on their equal protection claim against Allende. Defendants' motion for summary judgment should be denied as their claims are not supported legally or factually.

Respectfully submitted on this 28th day of June, 2024.

                                  */s/ Simone Chriss*

                                **SIMONE CHRISS**
                                Fla. Bar No. 124062
                                simone.chriss@southernlegal.org
                                **JODI SIEGEL**
                                Fla. Bar No. 511617
                                jodi.siegel@southernlegal.org
                                Southern Legal Counsel, Inc.
                                1229 NW 12th Avenue
                                Gainesville, FL 32601
                                (352) 271-8890

**DANIEL TILLEY**
Fla. Bar No. 102882
dtilley@aclufl.org
**CAROLINE MCNAMARA**
Fla. Bar No. 1038312
cmcnamara@aclufl.org
ACLU Foundation of Florida
4343 West Flagler St., Suite 400,
Miami, FL 33134
(786) 363-2714

*ATTORNEYS FOR ALL PLAINTIFFS*

**JEFFREY HEARNE**
Fla. Bar No. 512060
jhearne@legalservicesmiami.org
**JOCELYN ARMAND**
Fla. Bar No.44264
jarmand@legalservicesmiami.org
Legal Services of Greater Miami, Inc.
4343 W Flagler Street, Suite 100
Miami, FL 33134
(305) 438-2403

*ATTORNEYS FOR PLAINTIFF MURPHY*

## CERTIFICATE OF WORD COUNT

Pursuant to N.D. Loc. R. 7.1(F), I certify this Reply to Defendants' Response in Opposition to Plaintiffs' Supplemental Brief (ECF 172) contains 2,616 words, which includes headings, footnotes, and quotations, but does not include case style, signature block or Certificates of Word Count and Service.

*/s/ Simone Chriss*
**Counsel for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that, on June 26, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

*/s/ Simone Chriss*
**Counsel for Plaintiffs**

14