## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**JAMI CLAIRE, KATHRYN LANE,**
**and AHMIR MURPHY**

**Plaintiffs,**

**v.**                                            **CASE NO. 4:20-cv-0020-MW-CAS**

**FLORIDA DEPARTMENT OF**
**MANAGEMENT SERVICES and**
**PEDRO ALLENDE, in his official**
**Capacity as Secretary of the Florida**
**Department of Management Services.**

**Defendants.**
_____ /

### DEFENDANTS' SUPPLEMENTAL BRIEF ON DAMAGES

Defendants, FLORIDA DEPARTMENT OF MANAGEMENT SERVICES,

and PEDRO ALLENDE in his official capacity as Secretary of the Florida

Department of Management Services (collectively, "Defendants"), by and through

undersigned counsel, hereby respond to the Court's Order for supplemental briefing

(Doc. 179, 181) regarding available relief and the effect of the Eleventh Circuit's

decision to vacate the *Lange* decision pending *en banc* review.

**I.     This Court should reconsider its ruling on summary judgment and stay**
**further action pending rehearing in *Lange*.**

On August 1, 2024, this Court granted Plaintiffs' motion for partial summary

judgment in part, finding liability against DMS under Title VII. (Doc. 177 p. 16.) The

Court's rationale, and basis for denying DMS' motion for summary judgment (Doc. 126), hinged upon the Eleventh Circuit's holding in *Lange v. Houston Cnty.,* 101 F.4th 793 (11th Cir. 2024). The Court expressly referenced *Lange* 17 times in its Order and found that the exclusion was facially discriminatory as a matter of law "in light of *Lange*" (Doc. 177 p. 16), which the Court was bound to follow at the time it filed the August 8, 2024, Order. (Doc. 177 p. 14.)

On August 15, 2024, the Eleventh Circuit granted a petition to rehear *Lange en banc*, and simultaneously vacated the panel opinion relied on by this Court in granting Plaintiffs' motion for summary judgment. *Lange v. Houston Cnty., Georgia*, 110 F.4th 1254 (11th Cir. 2024). A vacated opinion has "no legal effect whatsoever" and "cannot be considered to express the views of [the court]." *United States v. Sigma Intern., Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002). Plaintiffs agree. (Doc. 182 p. 27.)

This Court did more than "give the vacated opinion persuasive value." (Doc. 182 p. 27.) Due to the controlling nature of *Lange* at the time, the Court's ruling was completely based on *Lange*. But *Lange* is no longer controlling. As such, this Court should reconsider its ruling on summary judgment without reliance on *Lange*.

While the Court could adopt the underlying rationale of *Lange*, which primarily relied on the panel's interpretation of *Bostock v. Clayton Cnty., Ga.,* 590 U.S. 644 (2020), this rationale has seemingly been rejected by a majority of the judges in active service on the Eleventh Circuit, which is the likely reason the *Lange*

opinion was vacated. We also know that the Eleventh Circuit denied the petition for rehearing *en banc* in *Eknes-Tucker*, the related equal protection case which found that medical conditions uniquely impacting transgender persons are not facially discriminatory based on sex. *See Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241 (11th Cir. 2024) denying petition for rehearing of *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023). In light of the continued validity of the Eleventh Circuit's rationale in *Eknes-Tucker* and its potential relevance to the outcome in *Lange*, it seems inevitable that the Eleventh Circuit will ultimately reach a different conclusion in *Lange* than was previously reached in the now-vacated panel opinion, and if that an *en banc Lange* opinion aligns with the Eleventh Circuit's holding in *Eknes-Tucker*, it will be controlling and thus binding on the outcome of this case.

*Lange* is directly applicable to this action, as both cases involve Title VII challenges to employer health plan exclusions for gender reassignment services. (Doc. 177 p. 13.) The eventual *en banc* holding in *Lange* will be controlling. Until the Eleventh Circuit reaches its final conclusion, it would be a waste of judicial resources, time and money to proceed with a jury trial on damages, as it is clear the applicable standards may change, warning judgment in favor of Defendants and against Plaintiffs, or at least a new trial on liability (to consider the issue of intent to discriminate because of biological sex). Therefore, Defendants respectfully request

this Court to stay the case until the Eleventh Court reaches an *en banc* opinion in *Lange,* and then reconsider its ruling on summary judgment in light of the new *Lange* opinion.

## II.   Permanent injunctive relief is improper because there would be no personal benefit to Plaintiffs.

When a court finds intentional discrimination that violates Title VII, it "*may* enjoin the respondent from engaging in such unlawful employment practice….*" 42 U.S.C. § 2000e-5(g)(1) (emphasis added). Thus, the court has the discretion to enjoin the unlawful conduct and order appropriate affirmative relief when such an injunction is necessary to make the victims of discrimination whole. *Albemarle Paper Co. v. Moody,* 422 U.S. 405 (1975); *U.S. EEOC v. Massey Yardley Chrysler Plymouth, Inc.,* 117 F. 3d 1244, 1251 (11th Cir. 1999).

The scope of a permanent injunction under Title VII may not be overly broad and more importantly, should not be granted where there will be no personal benefit to the plaintiff. *E.g., Carmichael v. Birmingham Saw Works*, 738 F. 2d 1126, 1136 (11th Cir. 1984) (affirming the district court's denial of injunctive relief to a successful Title VII plaintiff); *Meyer v. Brown & Root Const. Co.*, 661 F.2d 369, 374 (5th Cir. 1981) (portion of judgment granting injunctive relief reversed because injunctive relief not needed for just disposition of the case); *see also*, *Gregory v. Litton Systems, Inc.,* 472 F. 2d 631, 634 (9th Cir. 1972); *Muller v. United States Steel Corp.*, 509 F. 2d 923, 93 (10th Cir.), *cert. denied*, 423 U.S. 825 (1975).

Although injunctive relief granted in a non-class, individual action may incidentally benefit persons not before court, the line of cases cited by Plaintiffs for this proposition does not deal with the situation here when the injunctive relief being sought does not personally benefit the individual plaintiffs. *Carmichael*, 738 F. 2d at 1136. Rather, a court's authority to grant injunctive relief benefitting non-parties other than the plaintiff is limited by the requirement that "the class benefitted by the injunction must include the plaintiff. Otherwise, the injunctive relief is unnecessary to the 'just disposition of the action.'" *Id.* (*quoting Meyer*, 661 F. 2d at 374); *see also, Rau v. Apple-Rio Management Co., Inc.,* 85 F. Supp. 2d 1344, 1352 (N.D. Ga. 1999) (*citing Carmichael* and finding that the injunctive relief requested by plaintiff "must be denied.").

In this regard, the Eleventh Circuit has repeatedly held that in a Title VII case, a permanent injunction is inappropriate when the plaintiff cannot benefit personally from the injunctive relief. In *Carmichael,* a black, former employee successfully proved that the employer engaged in discriminatory wage disparity in violation of Title VII by starting the employee in the repair shop at a lower wage than was paid to white employees. *Id.* at 1129. However, the trial court denied the plaintiff's request for injunctive relief since the plaintiff was no longer employed by defendant and had not sought reinstatement. *Id.* The Eleventh Circuit affirmed the trial court's denial of injunctive relief and held that it "would be inappropriate in this case. The plaintiff

does not seek reinstatement *and has shown no other way in which he would benefit personally* from the [injunctive] relief requested." *Id.* at 1136. (Emphasis added).

More recently, in the unpublished opinion of *Furcron v. Mail Centers Plus, LLC*, 774 Fed. Appx. 592 (11th Cir. 2019), the Court stated that the *Carmichael* holding was binding and then vacated the district court's equitable relief order under Title VII as an abuse of discretion. The *Furcron* Court pointed out that the plaintiff was relying on "non-controlling cases to argue that, in some circumstances, a court may fashion relief that will not personally benefit the plaintiff" and held that "because she [the plaintiff] is no longer [the defendant's] employee, she would not personally benefit from any additional managerial training; therefore, such relief was inappropriate." *Id.* at 596.

In addition, in *Dybczak v. Tuskegee Institute*, 737 F. 2d 1524, 1527 (11th Cir. 1984), *cert. denied,* 469 U.S. 1211 (1985), the Eleventh Circuit cited and expressly quoted the opinions in *Gregory v. Litton Systems, Inc., supra,* and *Meyer v. Brown & Root Const. Co.*, *supra*, to affirm the district court's denial of injunctive relief, holding that:

> From these precedents, we conclude that in a suit brought in the plaintiff's individual capacity, injunctive relief benefiting nonparties is not required if it in no way relates to the vindication of the plaintiff's rights. Accordingly, we hold that the district court did not err in refusing to enjoin the Institute's alleged adherence to a policy favoring blacks in faculty hiring.

*See also, Wallace v. Dunn Const. Co., Inc.,* 62 F.3d. 374, 380 (11th Cir. 1995)

(holding that if plaintiff prevailed on her Title VII claims, injunctive relief would not be appropriate because she was no longer employed with the defendant company).

As this Court found in its Order on Cross-Motions for Summary Judgment, it is undisputed that Plaintiffs Claire and Murphy are no longer employed by the State of Florida. (Doc. 177 at p. 2.) Accordingly, they are no longer participants in the State Health Plan ("Plan"). Therefore, similar to their respective claim for prospective relief under equal protection, any injunctive relief under Title VII would be inappropriate since they would not benefit personally from the permanent injunctive relief being requested.

Moreover, in its Order on Cross-Motions for Summary Judgment, the Court found, without dispute, that the basis of the denials of coverage for Plaintiff Lane's requested facial feminization surgery included the Plan's cosmetic procedure exclusion, an exclusion not being challenged by Lane's amended complaint in this action. (Doc. 177 p. 2-3.) Thus, as the Court stated, based on the cosmetic procedure exclusion, it "could not order injunctive relief that would redress Ms. Lane's injury [pursuant to her Equal Protection claim] as her desired medical procedure would continue to be excluded from coverage under the unchallenged cosmetic procedures exclusion." (Doc. 177 p. 2-3.) Similarly, a permanent injunction on Lane's Title VII claim would be inappropriate since the unchallenged cosmetic procedures exclusion regarding the benefits sought would still be applicable to her requested relief, and

thus, Lane would not benefit personally from the permanent injunctive relief being requested by Plaintiffs. Furthermore, the purported ongoing nature of the alleged violations does not make injunctive relief mandatory, when none of the Plaintiffs will benefit from the requested injunctive relief.

## II.    Eleventh Amendment immunity precludes Plaintiffs from recovering money damages in this case.

Congress may abrogate the states' Eleventh Amendment immunity when it both unequivocally intends to do so and "act[s] pursuant to a valid grant of constitutional authority." *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000). It has long been held that Title VII derives its authority to apply to the states from Section 1 and Section 5 of the Fourteenth Amendment. *See Fitpatrick v., Bitzer,* 427 U.S. 445 (1976). The Supreme Court is responsible for establishing the substance of constitutional guarantees, not Congress. *City of Bourne v. Flores,* 521 U.S 507, 519–524 (1997). Accordingly, the Supreme Court found when Congress passed legislation authorized by Section 5, the legislation must exhibit "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end" to not reach beyond the scope of Section 1's actual guarantees. *Id.* at 520. "The appropriateness of remedial measures must be considered in light of the evil presented. Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one." *Id.*, at 530 (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 308, (1966)).

8

The Supreme Court acknowledged that "Congress is the final authority as to desirable public policy, but in order to authorize private individuals to recover money damages against the States, there must be a pattern of discrimination by the States which violates the Fourteenth Amendment, and the remedy imposed by Congress must be congruent and proportional to the targeted violation." *Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 371-376 (2001) (recognizing that Congress identified that "American society has tended to isolate and segregate individuals with disabilities" but nonetheless found money damages under Title I of the ADA to be an incongruent remedy because the great majority of evidence used to support Congress' findings were not activities of states.)

Fundamentally, legislation enacted under Section 5 of the Fourteenth Amendment must be targeted at "conduct transgressing the Fourteenth Amendment's substantive provisions." *Florida Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 639 (1999) "Whether a congressional Act passed under Section 5 can impose monetary liability upon States requires an assessment of both the evil or wrong that Congress intended to remedy, and the means Congress adopted to address that evil." *Coleman v. Court of Appeals of Maryland*, 566 U.S. 30, 36 (2012). (quoting *City of Boerne v. Flores*, 521 U.S. 507 (1997)). (Internal quotations omitted.)

In an employment discrimination context, the congruence and proportionality analysis requires a court to 1) determine the metes and bounds of the constitutional right at issue; and 2) examine whether Congress identified a history and pattern of unconstitutional employment discrimination against the particular group in question. *See Garrett,* 531 U.S. at 368; *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 89 (2000) (finding that Congress never identified any pattern of age discrimination by the states that rose to the level of constitutional violation to sufficiently abrogate sovereign immunity under Section 5 of the ADA); *Panzardi-Santiago v. Univ of Puerto Rico,* 200 F. Supp 2d 1, 9-10 (D.P.R. 2002) (summarizing cases on the issue of abrogation of Eleventh Amendment immunity through Section 5 of the Fourteenth Amendment). *See also*, *Dupree v. Owens*, 92 F.4th 999 (11th Cir. 2024).[1] *Garrett* demonstrates that an acknowledgment of such history by Congress in enacting prophylactic legislation without substantive evidence of discriminatory state activity is insufficient to impose monetary liability on the states.

---

[1] The Eleventh Circuit conducts a similar three step inquiry in the ADA context: (1) identify which right Congress "sought to enforce when it enacted the ADA"; (2) examine whether a demonstrated record of unconstitutional discrimination existed to support Congress' decision that preventative legislation was warranted; and (3) determine whether the ADA provision at issue is an appropriate response to the history of mistreatment. *Nat'l Ass'n of the Deaf v. Florida*, 980 F.3d 763, 771 (11th Cir. 2020) (quoting *Ass'n for Disabled Ams., Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 957 (11th Cir. 2005)). In *Dupree,* the underlying analysis of the legislative record for documented patterns of state discrimination was largely the same as *Garrett*. *Dupree*, 92 F.4th at 1007.

While Title VII aims to protect the right to be free from sex-based discrimination in the workplace, the United States Supreme Court previously refuted the notion that exclusionary classifications on the basis of medical condition constitutes sex-based discrimination, absent a showing of pretext for invidious discrimination on the basis of sex in both an equal protection and Title VII context. *See Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)*; See also, Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 135 (1976). The Court has been consistent in this position for nearly 40 years; "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other." *Dobbs v. Jackson Women's Health Organization,* 597 U.S. 236-237 (2022). *(alteration in original)* (quoting *Geduldig,* 417 U.S. at 496 n. 20*; see also, Id.* at 236-237 (recognizing that "the 'goal of preventing abortion' does not constitute 'invidiously discriminatory animus' against women*"* (quoting *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 273–74, (1993)).

During the legislative process to enact Title VII, the 88th Congress engaged in minimal discussion regarding sex discrimination to any degree that could constitute identification of a history and pattern of unconstitutional or irrational employment

discrimination based on sex as it is understood today.[2] That changed in 1978 when Congress passed the Pregnancy Discrimination Act wherein substantive debate occurred with regard to what truly constitutes sex based discrimination toward women, and (men).[3] The 95th Congress expressly expanded the definition of discrimination "because of sex" to include "pregnancy, childbirth, and other related medical conditions" in consideration of evidence demonstrating stereotypical discrimination toward pregnant women's propensity to return to the workforce after giving birth in light of state insurance policies.[4]

By contrast, Plaintiff points to no pattern of discrimination by states towards transgender individuals or those afflicted with gender dysphoria as an evil to be

---

[2] Sex was added to the Civil Rights Act by House Amendment. Congressional discussions in relation to the amendment between both the House and Senate were brief in comparison to the whole legislative record on Title VII. House members raised concerns regarding the preferential treatment of black women in employment at the expense of white women on account of Title VII's ban of discrimination on the basis of race. There was a concern that without 'sex' Title VII would result in detrimental effects on white women's competitiveness for the same employment positions. 110 Cong. Rec. 2577-2583 (1964).

[3] 124 Cong. Rec.  21435-21442; 36817-36819 (1978).

[4] 124 Cong. Rec. 21441-21442 (1978). (Compare remarks of Rep. Goldwater and Rep. Tsongas). The principal case discussed by the 95th Congress was *General Electric Co v. Gilbert*, which dealt with a private employer disability insurance plan.

addressed by Title VII, its subsequent amendments, or its remedial scheme. Put plainly, it does not exist.[5]

Likewise, nothing in the text of the Pregnancy Discrimination Act or the congressional record related to that Act, reflects that Congress contemplated gender dysphoria or conditions and medical treatments related to gender dysphoria when including such a clause or contemplating sex-stereotyping. Further, Plaintiffs have failed to demonstrate that the Plan exclusion was mere pretext for invidious discrimination on the basis of biological sex.

The Supreme Court's principal analysis on money damages in *Garrett*, was reaffirmed once more in *Coleman v. Court of Appeals of Maryland,* 566 U.S. 30 (2012). In *Coleman*, the Supreme Court recognized that Congress relied on well-documented evidence to identify a history and unconstitutional pattern of discrimination on the basis of sex in the administration of family leave policies by states when enacting the FMLA. *Id.* at 36. However, the United States Supreme Court's review of the legislative record demonstrated the family-care provision of the FMLA remedied the evils of "pervasive sex-role stereotypes that care for family

---

[5] The last two amendments to Title VII were the Civil Rights Act of 1991 and the Lilly Ledbetter Fair Pay Act of 2009. The congressional records of the respective Congresses that enacted these amendments do not reflect any identification of a pattern or history of discrimination towards individuals experiencing gender dysphoria or of transgender status by the states by way of sex-stereotyping or otherwise.

members is women's work" in light of well documented patterns of sex-based discrimination in state run family leave policies. *Id.* at 36-37. By contrast, the Court found that the FMLA's self-care provision did not address the aforementioned evil due to a lack of evidence of facially discriminatory self-care policies by the states in violation of Section 1 of the Fourteenth Amendment. *Id.* at 38.

Substantive Congressional findings of discrimination by the states is a lynchpin for abrogation of Eleventh Amendment immunity for money damages.[6] While Title VII may otherwise provide a party access to money damages under 42 U.S.C. § 1981(b)(1), the Supreme Court has long been clear that if Congress endeavors to provide individuals access to money damages against state governments through Section 1 and 5 of the Fourteenth Amendment, it requires the existence of a specific pre-requisite: Congress' identification of a history and pattern of unconstitutional employment discrimination against a particular group in enacting the relevant legislation at issue. *See Coleman,* 566 US at 36-38; *See Garrett,* 531 U.S. at 368; *See Kimel* 528 U.S. at 82-84; *see Florida Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank,* 527 U.S. 627, 642-648 (1999).

---

[6] "Without widespread evidence of sex discrimination or sex stereotyping in the administration of sick leave, it is apparent that the congressional purpose in enacting the self-care provision is unrelated to these supposed wrongs. The legislative history of the self-care provision revealed a concern for the economic burdens on the employee and the employee's family resulting from illness-related job loss and a concern for discrimination on the basis of illness, not sex." *Coleman,* 566 U.S. at 38. (citing *See,* S. Rep. No. 103–3, pp. 11–12 (1993)).

Title VII is not immune to this congruence and proportionality requirement in light of the Eleventh Amendment. *See In re Employment Discrimination Litig. Against State of Ala.,* 198 F.3d 1305, 1320-1324 (11th Cir. 1999) (conducting review of legislative history for a documented history or pattern of racial discrimination by the states during the enactment of the 1972 Title VII amendments to determine abrogation of Eleventh Amendment Immunity). As such, Plaintiffs are not entitled to money damages under Title VII for their claims of sex discrimination by way of Defendant's Plan exclusions on the basis of medical conditions, as medical condition exclusions do not violate the equal protection clause, and Congress has not found sex-based discrimination by way of medical conditions and treatments related to gender dysphoria sufficient to meet the congruence and proportionality requirement.

**III.   Lane's claim for facial feminization was lawfully denied under the non-discriminatory cosmetic exclusion, precluding an award of damages.**

> ***a.*   The same decision defense cuts off compensatory and injunctive relief.**

Section 2000e–5(g)(2)(B) of Title VII provides that if an employer can demonstrate it "would have taken the same action in the absence of the impermissible motivating factor, the court ... shall not award damages" or certain equitable relief. 42 U.S.C. § 2000e–5(g)(2)(B). This defense is also available under § 1983; however, under § 1983 the defense serves as a complete bar to liability. *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1242 (11th Cir. 2016). This Court has already applied

the same-decision defense to dismiss Plaintiff Lane's equal protection claim. (Doc. 177 p. 2-3.)

Because most Title VII cases involve employment termination, the case law speaks to the same decision defense barring back-pay and the injunction relief of reinstatement or front-pay. *See DeBose v. Univ. of S. Florida Bd. of Trustees*, 8:15-CV-2787-EAK-AEP, 2019 WL 3469085, at *1 (M.D. Fla. Mar. 5, 2019). In this case, the comparative relief would be the processing of Lane's claim for medical treatments. Much as a plaintiff who would have been fired for a legitimate reason but for the discriminatory motive cannot be reinstated and is not entitled to back-pay, Lane is not entitled to the medical treatments at issue – and any relief flowing therefrom – because such treatments are excluded by the Plan's cosmetic exclusion, regardless of the exclusion for gender reassignment services. (Doc. 118-19 43:10-18; Doc. 118-19 Ex. 4.)

### b.  Defendants sufficiently raised the same decision defense.

Contrary to Plaintiffs' assertions, Defendants adequately raised the same decision defense. As a threshold matter, this is a somewhat unusual Title VII case, in that it does not involve discrete decisions to take typical adverse employment actions. The same decision defense applies to an intent analysis in the mixed-motive context, and here, Plaintiffs asserted the exclusion was facially discriminatory and that evidence of intent was not required. Nevertheless, Defendants have always

maintained that both the decision to implement the exclusion and the separate decision to deny coverage of Lane's claim for facial feminization were made for "legitimate, non-discriminatory reasons," and that "each and every decision made by Defendants was based on legitimate business reasons and were not in any way based on, or the result of, discriminatory intent." (Doc. 57 p. 23.) This was expressly stated in Defendants' affirmative defenses.

Admittedly, the undersigned did not use the term of art "same decision." However, the legitimate, non-discriminatory reason defense encompasses the concept that Lane's coverage was denied for a non-discriminatory reason – the cosmetic exclusion. As this Court pointed out (Doc. 177 p. 3 n.1), Defendants raised the fact that Lane's facial feminization surgery is barred as cosmetic three years ago in their motions for summary judgment. (Doc. 125 p. 26-27; Doc. 126 p. 15-16.) Plaintiffs expressly addressed this argument in their responses. (Doc. 136 p. 27-30; Doc. 127 p. 2, 34-37.)

While Defendants maintain that the concept of same decision was raised in the Answer, this Court certainly has the discretion to consider affirmative defenses raised for the first time at summary judgment, in the absence of prejudice or bad faith. *See Ahmad v. Furlong*, 435 F. 3d 1196 (10th Cir. 2006) (qualified immunity defense not clearly raised as affirmative defense was permitted since there was no surprise or unfair prejudice and there was sufficient notice to Plaintiff because issue was raised

in motion for summary judgment and was addressed by Plaintiff.). *See also*, *McNulty v. Sandoval Cnty.*, 222 Fed. Appx. 770, 774 (10th Cir. 2007); *McGinest v. GTE Serv. Corp.*, 247 Fed. Appx. 72, 75 (9th Cir. 2007).

Federal courts have afforded substantial leeway to parties who do not expressly raise all defenses or affirmative defenses in responsive pleadings. *Sweet v. Sec'y, Dep't of Corrections*, 467 F.3d 1311, 1321 n. 4 (11th Cir.2006) ("[O]ur cases interpreting [Rule 8(c) ] ... support a liberal approach to waiver where the failure to raise an affirmative defense has not prejudiced the plaintiff.") "Neglect to affirmatively plead [an affirmative defense] is simply noncompliance with a technicality and does not constitute a waiver where there is no claim of surprise." *Jones v. Miles*, 656 F.2d 103, 107 n. 7 (5th Cir. Unit B Aug. 1981). In the Eleventh Circuit, if the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for the trial court to hear evidence on the issue." *Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir.1988). *See also, Proctor v. Fluor Enters., Inc*., 494 F.3d 1337, 1350 (11th Cir.2007); *Sweet v. Sec'y, Dep't of Corrections*, 467 F.3d 1311, 1321 n. 4 (11th Cir.2006).

The facts of this case have always included the cosmetic exclusion. Lane was on notice that her pursuit of facial feminization surgery was denied under both the gender-affirming surgical care exclusion and the cosmetic exclusion. *See* (Doc 118-19, Lane Dep. 43 13-18; 110:20-25.) Lane's counsel also deposed DMS employees

and third-party administrators on the issue of the cosmetic exclusion, its relationship with the gender dysphoria, and the procedures in assessing coverage determinations based on diagnosis and medical necessity. (Doc.118-13, Fillyaw Dep. 102:13-103:123, 108:19-110:25; Doc. 118-9, Stokes Dep. 28:18-29:15; Doc 118-10, Thomas-Brown Dep. 61:19-64:19, 95:11-96:21; Doc 118-14, Jackson Dep. 12:4-23, 62:9; Doc. 118-3, Frost Dep. 22:15-26:24, 39:15-43:9, 64:10-65:24.) During the aforementioned depositions, the parties were repeatedly notified by these witnesses that the cosmetic exclusion was equally applicable to Plaintiff Lane's facial feminization procedure. And as previously mentioned, Defendants raised the same-decision defense, albeit inartfully, in its original motions for summary judgment,[7] and Lane directly responded to DMS's arguments regarding the cosmetic surgery exclusions precluding Lane's facial feminization surgery.[8]

---

[7] In its motions for summary judgment, counsel for DMS referred to the cosmetic surgery exclusion as a separate, facially neutral and additional reason Plaintiff' Lane's challenge of the Plan exclusion fails on grounds of sex discrimination. (Doc. 125, p. 26.) Further, DMS identified its entitlement to relief under Title VII to include the exclusion of facial feminization surgery as cosmetic and a separate facially neutral exclusion. (Doc. 126, p. 2, 15-16.)

[8] Plaintiffs directly responded to DMS's arguments in their response to its summary judgment motion regarding the facial neutrality and applicability of the cosmetic exclusion. Plaintiff argued the cosmetic exclusion was not separate, neutral, or distinct from the gender affirming care exclusion, but rather another component of the Plan exclusions scheme to discriminate on the basis of sex by denying coverage for conditions unique to transgender employees because of a purported lack of consideration for the 'medical necessity' of potential gender affirming surgical

If the Court orders the Plan to re-consider Lane's claim for facial feminization without considering the gender reassignment exclusion, Lane's claim would still be denied. This fact has been repeatedly asserted throughout discovery and at summary judgment. Therefore, this Court should allow Defendants to utilize the same decision defense at trial.[9]

## V.   If non-economic damages are recoverable, Plaintiffs are only entitled to garden-variety pain and suffering damage and should be precluded from calling health care providers to testify about such damages as trial.

Plaintiffs have expressly disclaimed any emotional damages other than garden-variety pain and suffering. In response to discovery requests regarding the identities of health care providers, Plaintiffs stated: "I am only seeking garden-variety emotional distress, non-pecuniary compensatory damages and am therefore not

_____

treatments. (Doc. 136, p. 27-28; Doc. 137 p. 34-37.) In other words, Plaintiffs argued the cosmetic exclusion was not distinct enough to constitute an alternative basis for which the "same decision" would have been rendered, but rather an additional component of Defendant's purported facially discriminatory Plan exclusion in an effort to thwart such a defense. DMS expressly countered this argument by pointing to Plaintiff Lane's misstatements of the record regarding how medical necessity is considered in light of the coverage exclusions and sex neutral diagnostic criteria to qualify for coverage exceptions under the cosmetic exclusion. (Doc. 140 p. 13-15.)

[9] Arguably, this Court has already found that there is no factual dispute as to the applicability of the same decision defense. (Doc. 177 p. 2 finding that "without dispute, after Ms. Lane appealed the denial of her prior-authorization request for facial feminization surgery, the appeal panel denied coverage under both the challenged coverage exclusion and the plan's cosmetic procedure exclusion. . . . . Thus, this Court could not order injunctive relief that would redress Ms. Lane's injury, as her desired medical procedure would continue to be excluded from coverage under the unchallenged cosmetic procedures exclusion.")

contending that I have experienced 'any adverse physical, mental, emotional, psychological, and/or psychiatric conditions which [I] contend resulted from Defendant's actions.'" (Doc. 118-19 75:23-76:11.) Plaintiff Claire also objected to discovery regarding the identify of health care providers who diagnosed them with gender dysphoria and all Plaintiffs objected to the disclosure of psychotherapy notes.

A garden variety claim "should generally be limited to such emotions as personal humiliation and embarrassment rather than clinical diagnoses." *Sessa v. Reinauer Transp. Companies*, LLC.,WL 8160229 *2 (M.D. Fla. June 15, 2005) citing *Jackson v. Chubb Corp.*, 193 F.R.D. 216, 227 (D. N.J. 2000). Courts have described garden variety mental distress claims as those "that are supported only by the plaintiff's testimony, described in vague terms, supported by little or no medical testimony, and involved such emotions as humiliation, shame, shock, and moodiness." (emphasis added) *Id.* at *3. Mental and emotional symptoms are designated as "garden-variety" stress because they are not "clinically-diagnosed medical conditions, but rather, when taken into context, reflect the type of emotional effect that normally accompanies" plaintiff's alleged cause of action. *In re 3M Combat Arms Earplug Products Liab. Litig.*, 2021 WL 1088433 *1 (N.D. Fla. Mar. 22, 2021). *See also*, *Winstead v. Lafayette Cty. Bd. of Cty. Commissioners*, 315 F.R.D. 612, 615 (N.D. Fla. 2016).

Words like "anxiety" and "depression" can be used by Plaintiffs when describing their distress, as they have both clinical and non-clinical meanings. *Id.* But it is clear that allegations of a specific mental or psychiatric disorder with a claim of severe distress is outside the bounds of garden-variety pain and suffering. *Id.; Robinson v. HD Supply, Inc.,* No. 2:12–cv–604, 2013 WL 3815987, at *5 (E.D.Cal. July 19, 2013) (emotional distress *not* "garden-variety" where plaintiff alleged that he suffered from "anxiety, sleeplessness, nightmares, nervousness, depression, worry, loss of appetite, loss of libido, rapid weight gain, hair loss, headaches, nervous twitching, stress, anger, feelings of hopelessness, feelings of isolation, embarrassment, mental anguish, indignation, apprehension, and feelings of betrayal").

While Plaintiffs may testify about their garden-variety pain and suffering damages, they should not be permitted to call medical treaters to do the same. Generally, "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite the impairment(s), and [the claimant's] physical or mental restrictions." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).

Plaintiffs have not produced medical records regarding their mental health treatment. They should not be permitted to call physicians to talk about their garden-variety pain and suffering or to suggest that the denial of coverage at issue worsened their gender dysphoria. Plaintiffs may not use their past or current medical condition as both a "sword and a shield." *Silva v. Potter*, 8:04CV2542T17EAJ, 2005 WL 3636944, at *2 (M.D. Fla. Nov. 23, 2005). Having shut down discovery of Plaintiffs mental / psychiatric conditions, allowing Plaintiffs to call medical professionals to testify regarding garden-variety pain and suffering would imply more than garden variety damages, and would be substantially more prejudicial than probative. For these reasons, Plaintiffs should be prohibited from putting forth medical testimony regarding their pain and suffering damages in light of their 'garden variety' nature.

## CONCLUSION

In conclusion, Defendants ask this Court to stay the present action pending rehearing *en banc* in *Lange*; find that Plaintiffs are not entitled to recover economic or non-economic damages for the reasons set forth above; and hold that Plaintiffs are not entitled to injunctive relief.

Respectfully submitted this 11th day of October 2024.

HENRY BUCHANAN, P.A.

*/s/ Miriam R. Coles*
MIRIAM R. COLES
Florida Bar No. 58402
mcoles@henryblaw.com
J. STEVEN CARTER
Florida Bar No. 896152
Post Office Drawer 14079
Tallahassee, Florida 32317-4079
(850) 222-2920: Telephone
(850) 224-0034: Facsimile
*Counsel for Defendants*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rules 5.1 and 7.1, undersigned counsel certifies that this motion consists of 5544 words and is typed in Times New Roman, font size 14.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed via the CM/ECF system which will send electronic notification to all counsel of record on this 11th day of October 2024.

*/s/ Miriam R. Coles*
ATTORNEY