**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

JAMI CLAIRE et al.,

     Plaintiffs,

vs.                        Case No. 4:20-cv-00020-MW/MAF

FLORIDA DEPARTMENT OF
MANAGEMENT SERVICES et al.,

     Defendants.

_____/

**PLAINTIFFS' RESPONSE TO DEFENDANTS'**
**MOTION FOR RECONSIDERATION OF ORDER ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT**

On August 1, 2024, this Court issued an Order on Cross-Motions for Summary Judgment, finding that Plaintiffs established as a matter of law that Florida's "State Plan Exclusions" are facially discriminatory in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* ("Title VII"). (ECF 177, at 15) (holding that "the exclusion of state plan health insurance coverage for gender reassignment or modification services and supplies violates Title VII as a facially discriminatory policy").

Subsequently, this Court ordered the parties to submit supplemental briefing on the available relief under Title VII and the effect on Plaintiffs' claims of the Eleventh Circuit's decision to vacate the *Lange* panel decision

pending rehearing en banc. (ECF 179.) The parties submitted Responses to the Court's Order for Supplemental Briefing (ECF 182, 183), concluding with Plaintiffs' Reply filed on October 22, 2024 (ECF 186). One day later, on October 23, 2024, this Court stayed the action pending resolution of the en banc rehearing in *Lange*. (ECF 187.) The Court stayed the case based on judicial economy, and did not address any of the substantive arguments raised in the parties' Supplemental Briefing. On September 9, 2025, the Eleventh Circuit issued its new decision. *Lange v. Houston Cnty., Ga.*, 152 F.4th 1245 (11th Cir. 2025) (en banc). In response to that ruling, Defendants moved for reconsideration of the Court's Order on Cross-Motions for Summary Judgment. (ECF 191.)

Defendants' Motion for Reconsideration misconstrues the record regarding alternative theories of liability beyond the facial discrimination claim rejected in *Lange* and ignores the factual distinctions between the health insurance plan language in *Lange* and the State Plan Exclusions at issue here. Further, it relies upon the same arguments that have already been rejected by this Court, and on reasoning that has been rejected by Congress and the Supreme Court.[1] For the reasons articulated in Plaintiffs'

---

[1] *Lange* relies almost entirely on *U.S. v. Skrmetti,* 145 S. Ct. 1816 (2025), where the Supreme Court found a state law prohibiting and criminalizing the

prior memoranda (ECF 123, 136-137, 139, 154, 156, 161, 170, 173, 175, 182, 186), and those explained below (*see Infra* §§ I-II), Plaintiffs are entitled to summary judgment on both their Title VII and Equal Protection claims, or at least entitled to a trial to resolve disputed facts.

Despite Defendants' efforts to convince this Court that *Lange* is dispositive of all issues in this case, the en banc opinion addresses an exceptionally narrow question: "whether the insurance policy at issue, which covers medically necessary treatments for certain diagnoses but bars coverage for Lange's sex change surgery, *facially* violates Title VII.*" Lange*, 152 F.4th at 1250 (emphasis added). While this Court described the *Lange* panel opinion as "nearly on all fours with the facts of this case," the en banc opinion is not for three reasons. *First*, unlike the policy in *Lange* which also precluded coverage for employees who sought to *align* their bodies with their sex stereotypical views of the appearance and anatomy of men and women, the State Plan Exclusions contain no such prohibition, and thus under *Lange*

---

provision of gender-affirming medical care for transgender minors classified based on age and medical use, not sex, for purposes of the Equal Protection Clause. The *Skrmetti* Court's holding was based on the reasoning of *Geduldig v. Aiello,* 417 U.S. 484 (1974), whose reasoning still has purchase in the Equal Protection context, but whose application and reasoning both Congress and the Supreme Court have rejected in the Title VII context. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 676-79 (1983).

they facially discriminate on the basis of sex stereotypes. *Compare* 152 F.4th at 1254 *with* ECF 123, at 34-38; ECF 136, at 13-14; ECF 137, at 14-18; ECF 139, at 6-9; ECF 161, at 7-10; ECF 177, at 12 n.3. *Second*, the State Plan Exclusions do not address any medical diagnosis whatsoever, but instead regulate a class of *persons,* thus discriminating based on transgender status. *Compare* 152 F.4th at 1253, 1267 *with* ECF 136, at 17-18; ECF 139, at 9-10; ECF 173, at 14-17; ECF 175, at 11-12. *Third*, *Lange* does not engage in *any* analysis about whether Houston County's policy was adopted and maintained with discriminatory intent, it does not evaluate the direct or circumstantial evidence, nor does it analyze the legitimacy of the County's justifications. *Lange*, 152 F.4th at 1254-55 ("although Lange implies that the County's policy lacks a legitimate justification, that question is well outside the scope of this appeal[,]" because "[t]he district court expressly held that the County's reason for the policy" and whether it was "done with discriminatory intent" were matters "of genuine dispute" which Plaintiff Lange did not challenge on appeal and thus "the panel, of course, did not reach[.]"). In fact, the en banc opinion states, in explaining the limited nature of the holding, that the lines drawn by the County's plan between covered and excluded treatments "may or may not be appropriate as a matter of health care policy." *Id.* at 1255.

4

Similarly, this Court did not reach those questions in its Order, given the conclusion that the State Plan Exclusions violated Title VII as a facially discriminatory policy. Thus, even if this Court agrees with Defendant that *Lange* is dispositive on the issue of facial sex discrimination, there are still numerous issues before the Court that are not guided by *Lange*.

If the Court concludes that Plaintiffs are still not entitled to summary judgment on their Title VII claims, Plaintiffs have presented circumstantial evidence which would allow a reasonable jury to rule in their favor and are entitled to proceed to trial. (ECF 136, at 18-27.)

Additionally, the en banc opinion in *Lange* does not speak to Plaintiff Lane's Equal Protection claim, which was never reached by this Court due to finding that Plaintiff Lane lacked standing for prospective injunctive relief based on "not challenging the state plan's cosmetic procedure exclusion." (ECF 177, at 2.) As explained in Plaintiffs' prior briefing (ECF 182, at 19-27) and further clarified below (*see Infra* § II), Plaintiffs challenged the cosmetic exclusion, as laid out for the first time in Plaintiffs' February 8, 2021, Motion for Partial Summary Judgment (ECF 123, at 2).[2]

---

[2] Defining the "State Plan Exclusions" being challenged in this case as the "exclusions that work together to categorically exclude coverage for medically necessary gender-affirming care, including exclusions for "gender reassignment and modification services and supplies," *"cosmetic*

**I.    The Eleventh Circuit's *en banc* opinion in *Lange* does not preclude Plaintiffs' claims.**

### A. The State Plan Exclusions discriminate on the basis of sex stereotypes.

As extensively analyzed in Plaintiffs' prior briefing (ECF 123, at 34-38; ECF 136, at 13-14; ECF 139, at 6-9; ECF 161, at 7-10), and as this Court confirmed in the Order, discrimination on the basis of sex stereotypes is also "a cognizable form of sex discrimination." (ECF 177, at 12 n.3) (*quoting Winstead v. Lafayette Cnty. Bd, of Cnty. Comm'rs,* 197 F. Supp. 3d 1334, 1345 (N.D. Fla. 2016) (*citing Price Waterhouse v. Hopkins,* 490 U.S. 228, 251 (1989) (plurality opinion)).

*Lange* does not change this principle of law, nor does it guide this Court's analysis on the sex stereotyping theory. Defendants argue that the *Lange* en banc Court "rejected" the argument Plaintiffs raised that the plan's exclusion facially discriminates because of sex stereotypes. (ECF 191, at 6, 8-9.) However, Defendants miss the mark, as the very fact that resulted in the Eleventh Circuit concluding the policy in *Lange* was *not* based on sex stereotypes proves that the State Plan Exclusions at issue here *are* based on sex stereotypes. In *Lange,* the Court explicitly reasoned that "*[i]f* the plan

---

*surgery/services,"* "sexual reassignment, or modification services or supplies," and prescriptions for "psychosexual disorders" (Exclusions)." (emphasis added).

discriminated against participants because of gender stereotypes, it would presumably cover procedures to *align* a participant's physical characteristics with those of his or her biological sex. But it does not do that. On the contrary, the plan excludes coverage for a suite of medical procedures that change the appearance of a person's sex organs – regardless whether the goal is to differ from, *or align with*, natal sex." *Lange*, 152 F.4th at 1254 (emphasis added).

While Defendants claim, devoid of citation to *any* record evidence supporting this new factual allegation,[3] that the State Health Plan exclusion would prohibit services and surgeries for "detransitioning" (ECF 191, at 8-9), this is disproven by the plain language of the State Plan Exclusions and the record in this case.

First, the language of the State Plan Exclusions speak for themselves (ECF 122-23, at 60, 61; ECF 122-24, at 36). Unlike the policy at issue in *Lange,* which on its face excluded "[s]ervices and supplies for a sex change

---

[3] Defendants' Motion for Reconsideration provides no citation to the record nor to any of Defendants' prior briefing to support this position. Prior to the Motion, Defendants' only reference to this argument is in their supplement brief (ECF 160, at 6). And the only evidence cited in support of this position is expert witness testimony regarding the existence of what is referred to as "detransitioning," (*citing* "Doc. 118-20 p. 14-16, 138-139; Doc. 118-12 p. 69-70, 111-113; Doc. 87 p. 25-26"), but Defendants cite absolutely *no evidence* supporting their position that any such procedures would be excluded under the State Plan Exclusions.

*and / or the reversal of* a sex change," *Lange*, 152 F.4th at 1248 (emphasis added), no such language appears in the policy at issue here. *See e.g. Int'l Union, United Auto Aerospace & Agric. Works of Am., UAW v. Johnson Controls, Inc.,* 499 U.S. 187, 199 (1991) (in a case about facial discrimination, the "explicit terms" of the challenged policy or action control).

Further, while Plaintiffs maintain that the State Plan Exclusions classify based on sex, not diagnosis, Defendants' argument that the plans would prohibit coverage for "detransition" services or surgeries directly undercuts their position in this case that the State Plan Exclusions classify based on "diagnosis." This is because no diagnosis codes exist for detransition or sex change reversal, nor any similar condition or treatment. (*See* ECF 121-18, Am. Psychiatric Ass'ns Diagnostic & Statistical Manual ("DSM-V"); *see also* ECF 122-2, World Health Org.'s Int'l Classification of Diseases ("ICD-10").[4]) The State Plan Exclusions prohibit coverage for "gender reassignment." The DSM-V defines "gender assignment" as "the initial assignment as male or female" which "occurs usually at birth and, thereby, yields the 'natal gender.'" (ECF 121-18, at 1.) In fact, the DSM-V describes the very language

---

[4] Plaintiffs note that the ICD-10 was the operative edition of the ICD at the time of filing of the Motions for Summary Judgment, but since that time, the ICD-11 has been published, which Plaintiffs will refer to: https://icd.who.int/browse/2025-01/mms/en#90875286.

employed by the State Plan Exclusions ("sex[ual] reassignment surgery") as the transition care for "transsexual[s]" (*Id.*). Similarly, the ICD-11 defines the very diagnoses that Defendants claim trigger the State Plan Exclusions as "marked and persistent incongruence between an individual's experienced gender and the assigned sex" which necessitates treatment to "make the individual's body align…with the experienced gender" in order to "live and be accepted as a person of the *experienced* gender." (ICD-11, diagnosis code HA60, HA61.) Contrary to Defendants' argument, coverage for services and surgeries for "detransitioning" is simply not contemplated under, no less prohibited by, the State Plan Exclusions.

As Plaintiffs have made clear, Defendants' attempt to distinguish the State Plan Exclusions from those in *Lange* by arguing that they prohibit *detransition* procedures is subject to two fatal flaws: (1) the position has no support in the record nor in Defendants' prior briefing; and (2) even if the post-hoc argument had any validity, it would undermine Defendants' core argument in this case that the State Plan Exclusions are diagnosis based, as there is no diagnosis for detransition or reversal of sex change.

### B. The State Plan Exclusions discriminate on the basis of transgender status.

Defendants argue that *Lange* found transgender status is not a protected characteristic under Title VII. (ECF 191, at 7.) This position is

based on two statements from the *Lange* Court: (1) "Neither the Supreme Court nor this Court has held that transgender status is separately protected under Title VII apart from sex[,]" and (2) "*Bostock* did not add transgender status, as a category, to the list of classes protected by Title VII." (*Id.* at 7; *citing Lange,* at 1252). To the first point, the converse is true as well: neither the Supreme Court nor this Court has held that transgender status *is not* separately protected under Title VII apart from sex. To the second point, *Bostock* did not add transgender status to the list of classes protected by Title VII because *the core premise* of the landmark decision is that discrimination based on transgender status "necessarily entails discrimination based on sex; the first cannot happen without the second." *Bostock*, 590 U.S. 644, 669 (2020); (*see also* ECF 177, at 12.) In short, the Court did not add transgender status because transgender status is *already* encompassed in the clear protections on the face of the statute. *Bostock*, 590 U.S. at 669 ("[b]y discriminating against transgender persons, the employer *unavoidably* discriminates against persons with one sex identified at birth and another today."). Whether transgender status discrimination is classified as a subset of sex discrimination or a separate category of discrimination, Title VII still prohibits such discrimination.

    Defendants seek to characterize this holding from *Bostock* as "narrow,"

limiting Title VII's applicability to only "when an employer fires an employee simply for being transgender." (ECF 191, at 7.) To the contrary, *Skrmetti* reaffirmed *Bostock's* core principle that discrimination based on transgender status necessarily entails discrimination based on sex. *Skrmetti*, 145 S. Ct. at 1834, citing *Bostock*, 590 U.S. at 662-69. In fact, in *Skrmetti,* the Supreme Court said in no uncertain terms: "[w]e *have not yet considered* whether Bostock's reasoning reaches beyond the Title VII context, and *we need not do so here*." *Id* at 669.  (emphasis added). The Supreme Court followed its seminal holding in *Bostock* with an explanation directly repudiating the narrowing Defendant asks this Court to adopt. *See Bostock*, 590 U.S. at 669-70 ("Nor is there any such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tactic exception. Instead, when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule. And that is exactly how this Court has always approached Title VII." Analogizing Title VII's protections against sexual harassment and motherhood discrimination, despite neither being explicitly listed in the statute, the Court asked "[w]ould the employers have us reverse those cases on the theory that Congress could have spoken to those problems more specifically? Of course not.").

11

Defendants rely on *Lange's* conclusion that the theory of discrimination based on transgender status under Title VII is foreclosed by *Skrmetti*, despite the distinct and unavoidable differences in how Courts analyze *protected categories* under Title VII and *quasi-suspect classifications* under the Equal Protection Clause. Nevertheless, *Lange* concluded, based on *Skrmetti*, that the reason the law did not classify based on transgender status was because the basis for obtaining the treatments at issue turned on whether the person had a "permissible diagnos[is]." *Lange*, 152 F.4th at 1253. *Lange* concluded that the County's policy at issue, like the Tennessee law in *Skrmetti,* was diagnosis-based. *Id.* Plaintiffs do not question the factual findings of the Eleventh Circuit in *Lange*, they merely point to the fact that the State Plan Exclusions at issue here do not mention or rely on any diagnosis. And without those specific factual distinctions that *Lange* used to determine that the exclusions in that case did not discriminate on the basis of transgender status, Defendants cannot rely on *Lange* to avoid the binding logic of *Bostock*.

Unlike the law at issue in *Skrmetti*, which the Court found classified based on age, 145 S. Ct. at 1829 ("SB1 classifies on the basis if age…providers may administer certain medical treatments to individuals ages 18 and older but not to minors"), the State Plan Exclusions categorically

12

deny coverage for *all* plan members and dependents, regardless of age. Further, unlike the law in *Skrmetti*, which the Court found classified based on medical use, 145 S. Ct. at 1829-31 (no minor may be administered the prohibited medications "to treat gender dysphoria, gender identity disorder, or gender incongruence"), the State Plan Exclusions make no reference whatsoever to any diagnoses, instead they regulate a class of *persons* identified on the basis of a specific characteristic. *Id.* at 1834 n.3. Coverage turns not on any particular medical condition or diagnosis, but rather on whether the care leads to "sexual reassignment" or "gender reassignment." This plainly singles out transgender *persons* in violation of Title VII, which protects transgender persons "because of their transgender or *transitioning status,* because transgender or *transitioning status* constitutes an inherently gender non-conforming trait." *Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 577 (6th Cir. 2018), *aff'd sub nom. Bostock,* 590 U.S. 644 (emphasis added); *see also Glenn v. Brumby,* 663 F.3d 1312, 1316 (11th Cir. 2011) ("A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes.").

Additionally, the statutory codification of the State Plan Exclusions on May 17, 2023, makes no reference to any diagnosis, prohibiting the use of

state funds for "sex-reassignment prescriptions or procedures." *See* Fla. Stat. § 286.311(2);[5] (ECF 170, at 19-21).

In fact, *Skrmetti's* application of *Bostock's* test demonstrates why the State Plan Exclusions here are distinguishable from those in the Tennessee law at issue in *Skrmetti*. In explaining why "changing a minor's sex or transgender status does not alter the application of SB1[,]" the Court reasoned that for a transgender boy in need of testosterone, SB1 prevents him from receiving it, and if you change his biological sex, SB1 would still prevent him from receiving it; but "[t]he transgender boy could receive testosterone only if he had one of those *permissible diagnoses*." *Skrmetti*, 145 S. Ct. at 1834. Neither the State Plan Exclusions, nor the statute codifying the exclusions into law, provide qualifying or excluded diagnoses for the treatments. (*See Infra* § II)*.

Further, the way *Lange* applied their understanding of *Skrmetti's* interpretation of *Bostock* is distinguishable here. Take, for example, the analogy provided by the majority to demonstrate why sex is not a but-for-cause: "if a natal woman needed a neovagina as part of a sex change

---

[5] As explained in prior briefing (ECF 170, at 15-16), this Court recently weighed in on that same statutory provision, concluding that it constituted discrimination on the basis of sex and gender nonconformity. *Dekker v. Weida*, 679 F. Supp. 3d 1271, 1289-91 (N.D. Fla. 2023) (appeal pending).

surgery—perhaps as a reversal of a previous female-to-male sex change—the plan would deny coverage for that procedure just as it denied coverage for Lange as a natal man." *Lange*, 152 F.4th at 1252. This analogy would demonstrate the opposite point here as the State Plan Exclusions do not exclude coverage for surgeries for purposes of detransition. (*See Supra* § I(A).)

Notably, the *Lange* en banc opinion makes no reference to *Copeland v. Ga. Dep't of Corr.,* 97 F.4th 766, 775 (11th Cir. 2024) (under Title VII "discrimination against transgender individuals ... is discrimination 'because of sex'") (*quoting Bostock,* 590 U.S. at 662), nor *Glenn v. Brumby*.[6] Because *Lange* did not overrule nor undermine *Copeland* nor *Glenn*, and *Skrmetti* did not overrule nor undermine *Bostock, Price Waterhouse,* and the litany of Supreme Court cases forming the bedrock of sex discrimination jurisprudence, these opinions remain binding precedent. *See Del Castillo v. Sec'y, Fla. Dept. of Health*, 26 F.4th 1214, 1223 (11th Cir. 2022) (a prior panel holding is binding unless an en banc or Supreme Court opinion overrules it or fully undermines it by demolishing and eviscerating its

---

[6] While *Glenn* was an employment discrimination case that was ultimately resolved on Equal Protection grounds, the Eleventh Circuit relied entirely on an exclusively Equal Protection case (*Skrmetti)* in reaching its holding on Title VII in *Lange.*

foundation); *Bolton v. Inland Fresh Seafood Corp. of Am., Inc.*, 155 F.4th 1272, 1280 (11th Cir. 2025).

For the reasons detailed above, and based on Plaintiffs' prior briefing (ECF 123, at 33-35; ECF 136, at 17-18; ECF 139, at 9-10; ECF 173, at 14-17; ECF 175, at 11-12), the State Plan Exclusions discriminate based on transgender status in violation of Title VII.

### C. Plaintiffs have shown direct evidence of discriminatory intent demonstrated by undisputed facts.

As evidenced in Plaintiffs' prior briefings (ECF 136, at 17-18; ECF 139, at 9-10; ECF 170, at 15-21; ECF 173, at 14-17; ECF 175, at 11-12), even if this Court finds the policy is not facially discriminatory based on sex stereotyping or transgender status, Plaintiffs have provided ample direct evidence of discriminatory intent in Defendants' dogged refusal to change the State Plan Exclusions at any point over the last 50 years.

Defendants have treated employees who need to bring their bodies into alignment with their gender identity differently than employees who do not. As Defendants aptly note, "a discriminatory motive may be established by the employer's informal decision-making or a formal, facially discriminatory policy, but liability depends on whether the protected trait . . . actually motivated the employer's decision." (ECF 191, at 12) (internal quotes omitted.) Even assuming *arguendo* that the State Plan Exclusions

16

were crafted in 1970's without an intent to prevent transgender people from obtaining medical care exclusively needed by transgender people, the record shows that discriminatory intent is why the State Plan Exclusions have persisted for 50 years despite changes in understanding or acceptance of medical gender transition, both within the medical establishment and the public in general.

Defendants attempt to justify the State Plan Exclusions' continued existence in the State Plans by arguing that in the late 70s, such exclusions were "common." (ECF 135, at 5.) However, just because it may have been commonplace, or even acceptable, more than 50 years ago to exclude treatments that only transgender individuals needed, that does not make it legally or morally acceptable, nor does it mean it is not discriminatory. The Supreme Court has reminded us that "[t]he nature of injustice is that we may not always see it in our own times" *Obergefell v. Hodges,* 576 U.S. 644, 664 (2015), and "[i]f rights were defined by who exercised them in the past, then received practices could serve as their own continued justification and new groups could not invoke rights once denied." *Id.* at 671.

Despite having the ability to propose changes to benefits (ECF 177, at 7), disclaiming any known present-day justification for the State Plan Exclusions (*id.* at 7-8), and being made aware of the State Plan Exclusions'

harmful impact on transgender employees, including the potential violation of nondiscrimination laws, Defendants have *chosen* not to make changes (ECF 182, at 5-6, n.1) (detailing the undisputed facts, including from from this Court's Order, supporting this conclusion); (ECF 173, at 14-17) (detailing record evidence demonstrating that Defendants have willfully chosen to keep the Exclusions in the State Plans, despite being made aware that they may constitute impermissible sex discrimination by their third-party administrators and through this litigation); (*see also* ECF 123, at 27-29; ECF 136, at 24-25).

Defendants continue to allege that their hands are tied, but the idea that these exclusions cannot be changed is simply unsupported by the record and the undisputed factual findings in this Court's Order. Changes have been made throughout the years to language that was once commonplace and appropriate, but over time has been recognized to be harmful, or discriminatory, or contrary to public health policy or law, etc. (*Compare* ECF 121-7 at 1-5 (1978 State Plan excludes "routine physical(s)," "TB tests," "immunizations," "contraceptives," and maternity and "routine newborn care"), *with* ECF 121-6, at 24-30 (2019 State Plan provides coverage for (or no longer excludes) those same previously excluded services).)

Further, the record undermines Defendants' claim that the care needed by transgender state employees was excluded from coverage in the State

Plans because it was "experimental." (ECF 123, at 14-15, 45-46; ECF 137, at 2-5; ECF 139, at 14-15.) In addition to the reasons articulated in Plaintiffs' prior briefing undermining the "experimental" justification, the 1978 State Health Plan had a specific list of "Experimental Procedure Exclusions" (ECF 212-7, at 3), and none of the procedures constituting "gender reassignment" appear on that list.

Thus, Defendants have intentionally and willfully maintained the State Plan Exclusions and continued to discriminate against transgender employees. ECF 182, at 5-6, n.1; ECF 173, at 14-17; *see also Bostock,* 590 U.S. at 660-61 (being transgender is not "related to sex in some vague sense or because discrimination on th[is] bas[is] has some disparate impact on one sex or another, but because to discriminate on th[is] ground[] requires an employer to intentionally treat individual employees differently because of their sex" … "[t]hus, an employer treating a transgender employee differently "inescapably intends to rely on sex in its decisionmaking").

Indeed, the State has further entrenched this discrimination through the 2023 enactment of Fla. Stat. § 286.311, a law that prohibits the use of state funds, including by a state group health insurance program, for "sex-reassignment prescriptions or procedures." *See* Fla. Stat. § 286.311(2); (*see also* ECF 170, at 19-21.) Defendants are intentionally engaging in enforcing

19

the discriminatory State Plan Exclusions, which is an unlawful employment practice. *See* 42 U.S.C. § 2000e-5(g)(1). Plaintiffs are entitled to summary judgment on their Title VII claims based on these undisputed facts.[7]

### D. Defendants are not entitled to summary judgment on Title VII because a reasonable jury may find Defendants intentionally discriminated.

To the extent this Court finds the State Plan Exclusions are not facially discriminatory as a matter of law or Plaintiffs are not entitled summary judgment on their Title VII claims based upon the direct evidence of discriminatory intent, Defendants also are not entitled to summary judgment on the Title VII claims. Instead, this Court should set aside its prior order and allow Plaintiffs' Title VII claims to proceed to trial because there is circumstantial evidence in the record to allow a reasonable jury to find that Defendant intentionally discriminated against Plaintiffs.

It has been nearly five years since the parties filed their motions for summary judgment. Since then, there has been a "substantive shift in how employment cases in this Circuit should be analyzed: a shift away from *McDonnell Douglas*." *Byrd v. Gwinnett Cnty. Sch. Dist.*, 728 F. Supp. 3d

---

[7] Contrary to the assertions in Defendants' Supplemental Brief of Damages (ECF 183), the Eleventh Amendment does not bar Plaintiffs from obtaining monetary relief because Congress clearly abrogated sovereign immunity of state employers under Title VII (ECF 186, at 1-11).

1257, 1271 (N.D. Ga. 2024). In *Tynes v. Fla. Dep't of Juvenile Justice*, 88 F.4th 939, 941 (11th Cir. 2003), the Eleventh Circuit explained that the evidentiary framework in *McDonnell Douglas* "is not a set of elements that the employee must prove—either to survive summary judgment or prevail at trial." Instead, *McDonnell Douglas* is "an evidentiary tool that functions as a 'procedural device, designed only to establish an order of proof and production.'" *Id.* at 944, quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993). *McDonnell Douglas* is not a "substitute standard necessary to survive summary judgment." *Id.* at 945. Rather, *Tynes* acknowledges that a plaintiff who cannot meet the *McDonnell Douglas* framework can still prove discrimination occurred by presenting a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination" *Id.* at 946, quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). The "convincing mosaic" framework focuses the case, especially in the summary judgment context, on whether there is a sufficient evidentiary basis to find the defendant intentionally discriminated against the plaintiff. *Id.* at 946-47. Judge Newsom would go further. In his concurrence, he describes why *McDonnell Douglas* causes courts to improperly reject cases on summary judgment when those cases should go to trial, and he encourages the use of the "convincing mosaic" standard during summary judgment. *Id.*

at 955-58. In a subsequent case, the Court recognized that this approach is essentially a restatement of the summary judgment standard. *McCreight v. AuburnBank*, 117 F.4th 1322, 1335 (11th Cir. 2024) ("the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent[,]" citing *Smith*, 644 F.3d at 1328).

This is significant because Defendants argue they are entitled to summary judgment because Plaintiffs have not met the *McDonnell Douglas* framework. (ECF 191, at 13-15.) Defendants argue Plaintiffs have not identified any similarly situated comparators. (*Id.* at 15-20.) However, plaintiffs may rely on the "convincing mosaic" standard when they have not identified a similarly-situated comparator. *Tynes*, 88 F.4th at 946, n.2, citing *Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1273, n.1 (11th Cir. 2021).[8] What's more, *McDonnell Douglas* is inapplicable to policies such as the State Plan Exclusions that discriminate against an entire group (such as

---

[8] Further, Defendants misunderstand Title VII's mandate, arguing that "[t]he proper analysis under Title VII is whether members of one biological sex are treated differently than members of another." (ECF 191, at 16.) However, "intentional discrimination can be established by a facially discriminatory policy: one that explicitly applies less favorably to *some*, or all, members of a protected group." *Rodriguez v. Procter & Gamble Co.,* 465 F. Supp. 3d 1301, 1320 (S.D. Fla. 2020) (emphasis added), *citing See Johnson Controls,* 499 U.S. at 198.

transgender people) uniformly. The *McDonnell Douglas* framework's reliance on proof of less favorable treatment of similarly situated individuals outside the protected class makes it unsuitable for cases such as this one, where the focus is on the policy's discriminatory effect and intent rather than individual comparators.

Nevertheless, here, there is a convincing mosaic of circumstantial evidence which would allow a reasonable jury to determine that Defendants intentionally discriminated against Plaintiffs. If this Court finds that the evidence identified in the prior section does not rise to the level of direct evidence of discriminatory intent (*supra* § I(C)), it is still at minimum circumstantial evidence that a jury could consider in assessing whether Defendants violated Title VII. Specifically, the jury could consider that the State Plan Exclusions have been in the State Plan documents with varying language since at least 1978, which then excluded "Sexual Deviation" and "Intersex surgery, charges for surgical procedures for gender reassignment." (ECF 122-5, at 1.) Over the years, the language of the exclusions was expanded, and separated exclusions in two. (*Id. Passim.*) The current PPO language has been consistent since 2007 and the HMO language has remained the same since 2013. (*Id.* at 3, 5.)

Defendants argue they have a legitimate reason for the exclusion: "it was put in place nearly 50 years ago when gender reassignment surgeries were experimental in nature and not widely covered in the insurance industry." (ECF 191, at 21.)  Yet, as explained in prior briefing as well, that overstates their own witnesses' testimony. Defendants did not know the original or current rationale for the State Plan Exclusions; there was no known financial or medical justification. (ECF 118-9, DMS-Stokes, 19:14-20, 20:10-13; ECF 118-10, DMS-Thomas-Brown, 26:2-5; ECF 118-13, Fillyaw, 98:4-6.) The only known justification was that the Exclusions had existed for a long time. (ECF 118-9, DMS-Stokes, 19:21-21:12; ECF 118-13, Fillyaw, 58:15-25, 97:22-98:3.) Even if a jury were to accept Defendants' argument that these procedures were experimental fifty years ago, a jury could find that justification is no longer legitimate and is a pretext for discrimination. This is because Defendants' employees testified during discovery that gender reassignment or modification services and supplies were not currently considered experimental or investigational. (ECF 118-13, Fillyaw, 152:25-153:10; ECF 118-20, Levine, 129:25-130:19; ECF 122-16, at 4. )[9]

---

[9]  To the extent Defendants rely on its expert's testimony to undercut its own witnesses' testimony (ECF 174, at 7-8), it creates a triable issue of fact.

This Court has already found that Defendants had the authority to propose changes and make clarifications to its benefit documents. (ECF 177, at 7.) Despite this authority, Defendants decided not to recommend changes to the State Plan Exclusions even though it received warnings from its own contractors and third-party administrators that maintaining the exclusions was discriminatory against transgender individuals and may be considered a violation of law. (ECF 123, at 27-29.) Then, in 2023, the Florida Legislature enacted § 286.311, Florida Statutes, which prohibits using state funds, including by a state health group insurance program, for "sex-reassignment" prescriptions and procedures. § 286.311(2). Based on these facts and others established in the record, there is sufficient circumstantial evidence that creates a triable issue concerning Defendant's discriminatory intent, which would allow a reasonable jury to find that Defendants have intentionally discriminated against Plaintiffs. Defendants are not entitled to summary judgment and Plaintiffs are entitled to present their evidence at trial.

To the extent that Plaintiffs may be able to prove liability through a disparate impact theory, Plaintiffs should be given the opportunity and are prepared to present their evidence in support thereof at trial.

## II.   Plaintiffs challenged the cosmetic exclusion, and Defendants did not raise the "same decision" defense, requiring evaluation of Plaintiff's Equal Protection claim.

As detailed in Plaintiffs' Response to the Court's Order for Supplemental Briefing following the Order on the Cross Motions for Summary Judgment, Defendants failed to raise the "same decision" defense at any time during the three years the summary judgment motions were being briefed and pending. (ECF 182, at 19-27.) This issue was primarily raised in the Order and the Response with regard to the impact the "same decision" defense would have on Plaintiff Lane's ability to obtain damages under Title VII. (ECF 177, at 3 n.1; ECF 182, at 19-27.) Defendants have waived the "same decision" defense and cannot rely on it now. However, Plaintiffs request that the Court consider the argument made in Plaintiffs' Response to Order for Supplemental Briefing regarding the facts and law supporting a finding that the dismissal of Plaintiff Lane's Equal Protection claim based on lack of standing was incorrect. (ECF 182, at 20, n.7; *id.* at 19-27.)

This Court found that Plaintiff Lane's equal protection claim was due to be dismissed for lack of standing, based upon the Court's analysis that "her desired medical procedure would continue to be excluded from coverage under the unchallenged cosmetic procedures exclusion." (ECF 177, at 2-3.)

Plaintiffs seek to correct the record as the Court's factual finding that Plaintiffs did not challenge the State Plan's cosmetic procedure exclusion (*id*. at 2), which formed the basis for the Court's conclusion that it could not order injunctive relief that would redress Plaintiff Lane's injury. The record makes clear that Plaintiffs challenged the "State Plan Exclusions," which Plaintiffs explicitly defined as "exclusions that work together to categorically exclude coverage for medically necessary gender-affirming care, including exclusions for 'gender reassignment and modification services or supplies,' 'cosmetic surgery/services,' 'sexual reassignment or modification services or supplies,' and prescriptions for 'psychosexual disorders' (Exclusions)." (ECF 123, at 2; *see also* ECF 136, at 3, n.2; ECF 137, at 1, n.1; ECF 170, at 2, n.2.) Plaintiffs' Response to the Court's Order for Supplemental Briefing explained how the State Plans' categorical exclusion of medically necessary gender-affirming care includes cosmetic surgery to improve a transgender plan member's appearance or self-perception, and how the various exclusions making up the challenged State Plan Exclusions work in tandem. (ECF 182, at 22-26.)

Because this Court dismissed Plaintiff Lane's Equal Protection claim based on this factual misunderstanding, this Court never reached the merits of her Equal Protection claim. Plaintiffs ask this Court to evaluate Plaintiff

Lane's Equal Protection Claim in light of the clarification of this point through Plaintiffs' briefing and the factual record in this case. For the sake of efficiency, Plaintiffs cross-reference the prior briefing demonstrating why the State Plan Exclusions constitute discrimination on the basis of sex, sex stereotypes, gender nonconformity, and transgender status in violation of the Equal Protection Clause. (ECF 123, at 43-46; ECF 137; ECF 139, at 10-17; ECF 161, at 6-14; ECF 170, at 6-19; ECF 173, at 1-7, 11-25; ECF 182, at 19-27.)

Anticipating that this Court might reevaluate Plaintiff Lane's Equal Protection claim, Defendants argue that Defendant Allende would be entitled to summary judgment based on the Supreme Court's decision in *Skrmetti* and the Eleventh Circuit decision in *Eknes-Tucker v. Gov. of Ala.*, 80 F.4th 1205 (11th Cir. 2023)*.* (ECF 191 at 4, n.3.) Plaintiffs previously explained why *Eknes-Tucker* does not require a finding on behalf of Defendant Allende (ECF 170, at 6-10; ECF 173, at 11-13, 17-25), but will now briefly explain why *Skrmetti* similarly does not dictate the fate of the State Plan Exclusions.

To start, the terms of the State Plan Exclusions themselves refer to "sex reassignment" and "gender reassignment," and make *no reference* to gender dysphoria or any other diagnosis. *See Johnson Controls*, 499 U.S. at 199. Unlike the statute in *Skrmetti*, the State Plan Exclusions here do not list

specific treatments. (*Compare* Tenn. Code Ann. §§ 68-33-102 (3), (5), (8) (defining "hormone," "medical procedure," and "puberty blocker") *with* ECF 122-23 (AvMed HMO State Plan) (no definition of what prescription or procedures are contemplated under exclusion of "sexual" or "gender" "reassignment or modification services and supplies").) Nor does it list "qualifying diagnoses" for which those specific treatments are permitted. (*Compare* Tenn. Code Ann. § 68-33-103(b) (listing various conditions) *with* ECF 122-23 (no conditions listed).) Nor does it restrict its operation to minors. (*Compare* Tenn. Code Ann. § 68-33-104 (prohibiting providing hormones and puberty blockers to a "minor") *with* ECF 122-23 (prohibiting coverage for "sexual reassignment" and "gender reassignment" services and supplies).)

The codification of the State Plan Exclusions by statute in May of 2023 is equally distinguishable from the language of the *Skrmetti* ban. Unlike the statute in *Skrmetti*, which lists the "qualifying diagnoses" and "excluded diagnoses" for the specific treatments, the Florida Statute simply prohibits the treatments if they are for the purpose of "affirm[ing] a person's perception of his or her sex if that perception is inconsistent with the person's sex as defined in subsection (8)." Fla. Stat. § 456.001(9)(a). In *Skrmetti,* the Supreme Court explicitly distinguished a law like Florida's, which regulates "a class of *persons,"* from SB1, which "regulates certain medical treatments."

29

*Skrmetti*, 145 S. Ct. at 1833-34 n.3 ("[t]he dissent's hypothetical law [like Florida's law], in contrast, does not regulate a class of treatments or conditions. Rather, it regulates a class of *persons* identified on the basis of a specified characteristic [having a "perception" of sex that is "inconsistent with" the state's definition of their sex]. *Neither our analysis nor* Geduldig *speaks to a law that classifies on such a basis*.") (emphasis added).

Similarly, unlike the statute in *Skrmetti*, neither the State Plan Exclusions nor Fla. Stat. § 456.001(9)(a) provide any justifications for the exclusion of medical care that only transgender state employees seek. (*Compare* Tenn. Code Ann. §§ 68-33-101 (setting forth the "[f]indings" that support Tennessee's conclusion that the "state has a legitimate, substantial, and compelling interest" in "protecting minors from physical and emotional harm" and "protecting the ability of minors to develop into adults who can create children of their own") *with* ECF 122-23, at 60, 61; ECF 122-24, at 36 (no justifications); ECF 122-23 (AvMed HMO State Plan) (no justifications); SB 254 (creating Fla. Stat. § 286.31) (no "findings," no justifications).)

The Court's opinion in *Skrmetti* also leaves open the door to an invidious discrimination claim. The Court concluded "we do not subject the law to heightened review unless it was motivated by an invidious discriminatory purpose", however "[n]o such argument has been raised

30

here." *Skrmetti*, 145 S. Ct. at 1832. ("a State does not trigger heightened constitutional scrutiny by regulating a medical procedure that only one sex can undergo *unless [it] is a mere pretext for invidious sex discrimination,"* yet the *Skrmetti* Plaintiffs failed to argue "that SB1's prohibitions are mere pretexts designed to effect an invidious discrimination against transgender individuals"). Here, the record demonstrates that the State Plan Exclusions that deny transgender employees' coverage for healthcare that only transgender employees need, were motivated by, and are maintained due to, invidious discrimination. (*See supra,* § I(c); ECF 170, at 19-21; ECF 173, at 14-25; ECF 175, at 11-12.)

Plaintiffs have detailed in prior briefing why the State Plan Exclusions should be subject to heightened scrutiny, and why the Exclusions cannot satisfy *any* level of review. (ECF 123, at 43-46; ECF 137; ECF 139, at 10-17; ECF 154; ECF 161, at 15-18; ECF 170, at 12-19; ECF 173, at 14-25.) And despite Defendants' assertions to the contrary, Plaintiff Lane would "personally benefit" from prospective injunctive relief (ECF 186 at 11-14).

### III.   Conclusion

Plaintiffs respectfully request that this Court deny Defendants' summary judgment and grant Plaintiffs' summary judgment.

Respectfully submitted on this 26th day of November, 2025.

*/s/ Simone Chriss*
**SIMONE CHRISS**
Fla. Bar No. 124062
simone.chriss@southernlegal.org
**JODI SIEGEL**
Fla. Bar No. 511617
jodi.siegel@southernlegal.org
Southern Legal Counsel, Inc.
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890

**DANIEL TILLEY**
Fla. Bar No. 102882
dtilley@aclufl.org
**CAROLINE MCNAMARA**
Fla. Bar No. 1038312
cmcnamara@aclufl.org
ACLU Foundation of Florida
4343 West Flagler St., Suite 400,
Miami, FL 33134
(786) 363-2714

*ATTORNEYS FOR ALL PLAINTIFFS*

**JEFFREY HEARNE**
Fla. Bar No. 512060
jhearne@legalservicesmiami.org
**JOCELYN ARMAND**
Fla. Bar No.44264
jarmand@legalservicesmiami.org
Legal Services of Greater Miami, Inc.
4343 W Flagler Street, Suite 100
Miami, FL 33134
(305) 438-2403

*ATTORNEYS FOR PLAINTIFF
MURPHY*

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to N.D. Loc. R. 7.1(F), I certify this Response to Defendant's Motion for Reconsideration of Order on Cross Motions for Summary Judgment contains 6,854 words, which includes headings, footnotes, and quotations, but does not include case style, signature block or Certificates of Word Count and Service.

*/s/ Simone Chriss*
**Counsel for Plaintiffs**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed via the CM/ECF system which will send electronic notification to all counsel of record on this 26th day of November 2025.

*/s/ Simone Chriss*
**Counsel for Plaintiffs**